```
1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                         MIAMI DIVISION
                    CASE NO. 21-CR-20005-DPG
3

4    UNITED STATES OF AMERICA,          Miami, Florida

5              Plaintiff,               August 17, 2023

6    vs.                                10:14 a.m. to 5:45 p.m.

7    ALBERICO AHIAS CRESPO,

8              Defendant.               Pages 1 to 175
     _____
9

10                     EXCERPT OF JURY TRIAL
               BEFORE THE HONORABLE DARRIN P. GAYLES
11                 UNITED STATES DISTRICT JUDGE

12
     APPEARANCES:
13

14   FOR THE GOVERNMENT:      CHRISTOPHER CLARK, ESQ.
                              SEAN McLAUGHLIN, ESQ.
15                            ASSISTANT UNITED STATES ATTORNEY
                              UNITED STATES ATTORNEY'S OFFICE
16                            99 Northeast Fourth Street
                              Miami, Florida 33132
17

18   FOR THE DEFENDANT:       JOSE QUINON, ESQ.
                              JOSE M. QUINON, P.A.
19                            75 Valencia Avenue
                              Suite 800
20                            Coral Gables, Florida 33134

21
     STENOGRAPHICALLY REPORTED BY:
22
                              PATRICIA DIAZ, FCRR, RPR, FPR
23                            Official Court Reporter
                              United States District Court
24                            400 North Miami Avenue
                              11th Floor
25                            Miami, Florida 33128
                              (305) 523-5178
```

1

I N D E X

2

3                                          Direct   Cross   Red.

4   WITNESSES FOR THE GOVERNMENT:

5

6   ANAIS LORENZO
    (By Mr. McLaughlin)                       5               108
    (By Mr. Quinon)                                   81
7

8   JORGE DIAZ GUTIERREZ
    (By Mr. McLaughlin)                      112
9

10

11

12

13  EXHIBITS MARKED FOR IDENTIFICATION              PAGE

14
    Government's Exhibit 25C                         20
15  Government's Exhibit 25E                         23
    Government's Exhibit 21A                         48
16  Government's Exhibit 22A                         48
    Government's Exhibit 19C                         140
17

18  EXHIBITS RECEIVED IN EVIDENCE                    PAGE

19

20

21

22

23

24

25

1                    (Excerpt of Proceedings.)

2              MR. MCLAUGHLIN:  At this time, the government calls

3    Anais Lorenzo, Your Honor.

4              The marshals will have to bring her in.

5              THE COURT:  All right.  Ladies and gentlemen, we need

6    to take just a short recess for the next witness.

7              We will just take about five minutes, and then we will

8    call you back in.

9              COURT SECURITY OFFICER:  All rise.

10             (The jury exited the courtroom at 10:15 a.m.)

11             THE COURT:  All right.  Please be seated.

12             Let's bring her out, please.

13             MR. QUINON:  Judge, while we are waiting for the

14   witness, can I address an issue?

15             THE COURT:  Sure.

16             MR. QUINON:  I just want to put on the record, I want

17   to protect the record concerning what my objection was about

18   not having been given the opportunity to recross on this

19   witness is that the prosecutor brought in Exhibit 50E and 50D

20   matters that I did not bring up during my cross, so I think

21   that, you know, under the case law I should be entitled to

22   explore those issues that go beyond my cross-examination

23   because the purpose of redirect in this case by the prosecutor

24   was to address my cross-examination, but he did not.

25             He went much beyond that and I should be entitled to

 1   address those issues that he went into.

 2          THE COURT:  What are the specific issues that you

 3   believe they went into?

 4          MR. QUINON:  Yes, sir.

 5          The anonymous letter that I did not bring up and he put

 6   it up there and he questioned.  I did not bring it during my

 7   cross, and the other thing that he brought up was that

 8   Mr. Crespo had tipped off Mr. Diaz.

 9          I didn't bring that up.  I didn't bring those issues

10   up.

11          THE COURT:  All right.  Your objection is noted.

12          MR. MCLAUGHLIN:  Your Honor, if I may have a moment.

13          THE COURT:  For the marshals, when she testifies, is

14   there a need to keep her handcuffed?

15          THE US MARSHAL:  No, not if you want them taken off.

16          THE COURT:  All right.  If you can, remove the

17   handcuffs.

18          She has ankle restraints.  Correct?

19          THE US MARSHAL:  Correct.

20          THE COURT:  Mr. Clark, will you or Mr. McLaughlin be

21   examining this witness?

22          MR. CLARK:  Mr. McLaughlin, Judge.

23          THE COURT:  Okay.

24          You speak English, ma'am?

25          THE WITNESS:  Yes.

1          THE COURT:  All right.  Are we ready?

2          MR. MCLAUGHLIN:  I am, Your Honor, thank you.

3          THE COURT:  All right.  Let's bring them in.

4          COURT SECURITY OFFICER:  All rise.

5          (The jury entered the courtroom at 10:20 a.m.)

6          THE COURT:  All right.  Please be seated.

7          Ma'am, I need you to please raise your right hand and

8    be sworn.

9          (The witness, Anais Lorenzo, was duly sworn.)

10         COURTROOM DEPUTY:  Thank you.

11         THE COURT:  All right.  Please proceed.

12                    DIRECT EXAMINATION

13   BY MR. MCLAUGHLIN:

14   Q.  Good morning.  Could you please state your name and spell

15   your last name for the record?

16   A.  Anais Lorenzo, L-O-R-E-N-Z-O.

17   Q.  Good morning, Ms. Lorenzo.  How old are you?

18   A.  Thirty-five.

19   Q.  Where were you born and raised?

20   A.  Miami, Florida.

21   Q.  How long have you lived in South Florida?

22   A.  My whole life.

23   Q.  You are clearly communicating in English right now.  Are

24   you also fluent in Spanish?

25   A.  Yes, I am.

1   Q.   How long have you been fluent in Spanish?

2   A.   My whole life.

3   Q.   Are you married?

4   A.   No.

5   Q.   Do you have any children?

6   A.   Yes.

7   Q.   How many children do you have?

8   A.   I have three.

9   Q.   What are their ages?

10   A.   19, 14 and one year and a half.

11   Q.   Are you taking any medications today?

12   A.   Yes, I am.

13   Q.   What medications are those?

14   A.   Oxcarbazepine.

15   Q.   What do you take that for?

16   A.   Bipolar disorder.

17   Q.   How long have you been taking it?

18   A.   For a year and a half.

19   Q.   Is that medication affecting your ability to recall or

20   testify here today?

21   A.   No, it's not.

22   Q.   Do you know an individual by the name of Alberico Crespo?

23   A.   Yes, I do.

24   Q.   Do you recognize him sitting in court here today?

25   A.   Yes, I do.

1    Q.   Can you please point him out and describe what he is

2    wearing for the jury?

3    A.   He is sitting right there in the second chair.  He has a

4    black suit on with a white shirt and a striped red and white

5    tie.

6    Q.   Let the record reflect the witness has identified the

7    defendant.

8         When did you first meet Defendant Crespo?

9    A.   In year 2015.

10   Q.   All right.  How did you end up meeting him?

11   A.   I met him through my ex, Jorge.  He went to my house

12   because of Jorge.

13   Q.   I am going to show you Exhibit 19A.

14        Do you recognize the individual in front of you depicted

15   here in Government's Exhibit 19A?

16   A.   Yes.

17   Q.   Who is that?

18   A.   That's Jorge Diaz.

19   Q.   How long have you known Mr. Diaz?

20   A.   Since 2011.

21   Q.   Were you ever in a relationship with him?

22   A.   Yes.

23   Q.   When did that relationship start?

24   A.   In 2011.

25   Q.   Did it conclude at some point?

```
 1   A.   Yes, it did.

 2   Q.   When did it conclude?

 3   A.   Around 2019.

 4   Q.   Did you engage in Oxycodone trafficking with Jorge Diaz?

 5   A.   Yes, I did.

 6   Q.   And when did that start?

 7   A.   That started around 2015 and 2016.

 8   Q.   Let me show you on the left-hand side, Government's

 9   Exhibit 51A.

10        Do you recognize the individual depicted here, Ms. Lorenzo,

11   in Government's Exhibit 51A?

12   A.   Yes, I do.

13   Q.   Who is that?

14   A.   That's Dr. Gonzalez.

15   Q.   Did you engage in Oxycodone trafficking with Jorge Diaz at

16   Dr. Gonzalez's clinic?

17   A.   Yes, I did.

18   Q.   Let me show you on the left-hand side, Government's

19   Exhibit 56A.  Do you recognize this individual?

20   A.   Yes, I do.

21   Q.   Who is that?

22   A.   That's Dr. Espinosa.

23   Q.   Did you engage in Oxycodone trafficking with Jorge Diaz

24   with Dr. Espinosa?

25   A.   Yes, I did.
```

1    Q.   I am now going to show you on the left-hand side

2    Government's Exhibit 58A.  Do you recognize the individual

3    depicted here in Government's Exhibit 58A?

4    A.   Yes, I do.

5    Q.   Who is that?

6    A.   That's Dr. Carpman.

7    Q.   Did you engage in Oxycodone trafficking with Jorge Diaz and

8    with Dr. Carpman?

9    A.   Yes, I did.

10   Q.   Now, during your relationship with Jorge Diaz, did you live

11   with him?

12   A.   Yes, I did.

13   Q.   Where was the first residence that you lived at with Jorge

14   Diaz?

15   A.   It was an apartment in Hialeah, Florida, 416 East 27

16   Street.

17   Q.   And when did you live at that residence?

18   A.   In 2011.

19   Q.   And did you eventually move from that residence to another

20   location?

21   A.   Yes, I did.

22   Q.   Where was that location?

23   A.   We went to a house in Hialeah as well, 353 East 63rd

24   Street.

25   Q.   Let me show you on the right-hand side, Government's

1    Exhibits 23, and I am going to take you here to the bottom,

2    Ms. Lorenzo.

3        Is the second residence that you lived with Jorge Diaz

4    reflected here on the first page of Government's Exhibit 23?

5    A.   Yes, it is.

6    Q.   What type of residence was this address on 63rd?  Was that

7    an apartment or a house?

8    A.   A house.

9    Q.   And how long did you live with Jorge Diaz at that location?

10   A.   We lived here together until around 2017.

11   Q.   And after that, did you live together at a third location?

12   A.   We did.

13   Q.   Where was that?

14   A.   We went to another apartment in Hialeah.  That one was on

15   24th and 63rd.

16   Q.   I'm going to show you what's been already admitted on the

17   right-hand side as Government's Exhibit 25G, and I am going to

18   take you to page 60 of Government's Exhibit 25G.

19       Do you recognize the address depicted here, Ms. Lorenzo?

20   A.   Yes.

21   Q.   What is that?

22   A.   That is the address where we lived at.

23   Q.   How long did you live together at that residence?

24   A.   Until around '19.

25   Q.   What happened during 2019 regarding your relationship with

1   Jorge Diaz?

2   A.   We split up for good.

3   Q.   Why did you split up for good?

4   A.   I didn't want to be with him anymore.  He was a

5   manipulator, and he wasn't good.

6   Q.   After you split up, did you still keep in touch with Jorge

7   Diaz?

8   A.   Sometimes.

9   Q.   Do you know where he went to live after he stopped living

10   with you?

11   A.   I believe he went for a little bit to his daughter's house

12   and then to Alberico's house.

13   Q.   Let me show you Government's Exhibit 9A.  I am now showing

14   you Government's Exhibit 9A, subscriber records.

15       Do you recognize the address depicted here?

16   A.   Yes, I do.

17   Q.   What address is that?

18   A.   That was Ashley's house, Jorge's daughter.

19   Q.   16922 Northwest 53rd Court, Miami Gardens?

20   A.   Correct.

21   Q.   Had you visited that address?

22   A.   Yes, I did.

23   Q.   While you were together with Jorge Diaz?

24   A.   Correct.

25   Q.   I am now going to show you Government's Exhibits 22B3 --

1    excuse me, now showing you Government's Exhibit 21B5.

2        All right.  I clicked on the photo in entry number eight

3    here of Government's Exhibit 21B5.

4        Do you recognize the individuals depicted in this

5    photograph?

6    A.   Yes, I do.

7    Q.   Who are those individuals?

8    A.   That's Jorge and Ashley.

9    Q.   And Ashley again is who?

10   A.   That's Jorge's daughter.

11   Q.   After Jorge Diaz lived with Ashley, to your knowledge,

12   where did he end up living?

13   A.   In Alberico's house.

14   Q.   Let me show you Government's Exhibit 12A.

15       Do you recognize the residence depicted here in

16   Government's Exhibit 12A?

17   A.   Yes, I do.

18   Q.   What do you recognize here?

19   A.   That's Alberico's house.

20   Q.   How do you recognize that residence?

21   A.   I visited that house before.

22   Q.   When you visited that residence, who were you with when you

23   visited?

24   A.   Jorge.

25   Q.   Now, while you were still living with Jorge Diaz -- I am

1   showing you 12A and also going to show you 19A -- approximately

2   how many times did you visit Alberico Crespo's residence?

3   A.   Three times.

4   Q.   What was the purpose of your visit?

5   A.   I was accompanying Jorge.

6   Q.   During the time you lived with Mr. Diaz, did you develop

7   drug dependency issues?

8   A.   I did.

9   Q.   Explain to the jury what drugs you became dependent on.

10  A.   I started consuming the Oxycodone that the doctor was

11  prescribing to us.  I started getting hooked on that.  That

12  later led on to consuming crystal meth.

13  Q.   Are you still using those substances today?

14  A.   No.

15  Q.   When did you stop?

16  A.   Eighteen months ago.

17  Q.   Have you been clean and sober those 18 months?

18  A.   Yes, I have.

19  Q.   Have you been in custody those entire 18 months?

20  A.   Yes, I have.

21  Q.   Was Mr. Diaz aware of your addiction issues during the time

22  that you lived together?

23  A.   Yes.

24  Q.   And after?

25  A.   Yes.

 1   Q.   I am going to show you over here on the left-hand side

 2   Government's Exhibits 25A, excuse me, 24A, my apologies.

 3        Do you recognize the individual depicted here in

 4   Government's Exhibits 24A?

 5   A.   Yes, I do.

 6   Q.   Who is that?

 7   A.   That's Yandre Trujillo.

 8   Q.   How do you know him?

 9   A.   He used to buy the Oxycodone pills from Jorge.

10   Q.   When did you first meet him?

11   A.   I met him when I started in the Carpman era.

12   Q.   Did he have a nickname, by chance, that you knew of?

13   A.   No.

14   Q.   Did you engage in Oxycodone trafficking with Mr. Trujillo?

15   A.   Yes.

16   Q.   What doctors?

17   A.   I met him in the Carpman era.

18   Q.   Now -- you started your relationship with Mr. Diaz in what

19   year?

20   A.   In 2011.

21   Q.   All right.  Did he have a job at that time?

22   A.   No.

23   Q.   Did he have a job the entire time you were in a

24   relationship with him?

25   A.   No.

1    Q.   What did he do for money?

2    A.   Trafficking.

3    Q.   Did you have a job while you were in the relationship with

4    Mr. Diaz?

5    A.   Yes.  Yes.

6    Q.   What was your employment history?

7    A.   I used to work at Jackson Memorial Hospital, and then I was

8    an insurance agent.

9    Q.   When did you work at Jackson?

10   A.   Pathology Associate II.

11   Q.   When?

12   A.   In around 2011.

13   Q.   And then from there you went?

14   A.   Then I went to an insurance agency in Miami Gardens, and I

15   was an insurance agent.

16   Q.   What was the name of that insurance agency?

17   A.   Admiral Insurance.

18   Q.   What did you do there?

19   A.   I was the office manager.

20   Q.   How long did you work there?

21   A.   Until around 2016, 2017.

22   Q.   Why did you stop working there?

23   A.   I got into an argument with my brother there and never went

24   back.

25   Q.   Once you stopped working, is that when you started

1    Oxycodone trafficking with Mr. Diaz at that time?

2    A.   That's correct.

3    Q.   When did your addiction issue begin?

4    A.   When I started going to the doctors with Jorge.

5    Q.   I am going to show you Government's Exhibit 26A.  Do you

6    recognize the individual depicted here?

7    A.   Yes, that is Pozo's name.

8    Q.   Do you know his full name?

9    A.   Carlos Alberto Pozo's name.

10   Q.   When did you first meet Mr. Pozo's name?

11   A.   I met him around 2018.

12   Q.   And did you engage in Oxycodone trafficking with Mr. Pozo's

13   name?

14   A.   Yes, I did.

15   Q.   At what doctors?

16   A.   Espinosa and Carpman -- I'm sorry, no, not Carpman,

17   Espinosa.

18   Q.   When you lived with Mr. Diaz, did you ever see Mr. Pozo's

19   name together with Jorge Diaz?

20   A.   Yes, I did.

21   Q.   Describe -- what was the nature of their relationship?

22   A.   Pozo used to help him with the patients, driving them and

23   doing the trafficking of the Oxy.

24   Q.   When you say, "help with the patients," what do you mean by

25   that?

1   A.   He would drive them to the clinic, pick them up at their

2   house, drive them to the clinic, and then the pharmacy and back

3   home.

4   Q.   How often did you see Mr. Pozo with Mr. Diaz?

5   A.   Almost every day.

6   Q.   They visited your residence?

7   A.   Yes.

8   Q.   How would you describe the nature of the relationship,

9   aside from the trafficking side, the nature of the relationship

10  between Pozo and Diaz?

11  A.   They used to get along very well.  They used to go gamble

12  and everything together.

13  Q.   Does Defendant Crespo know Mr. Pozo?

14  A.   Yes.

15  Q.   How does he know him?

16  A.   I have seen them together at Ashley's house when Jorge

17  lived there.

18  Q.   When you say, "Ashley," again, whose daughter is that?

19  A.   Jorge.

20  Q.   When you say, "Jorge" --

21  A.   Jorge Diaz, my ex.

22  Q.   Now, did there come a time when you were arrested in this

23  case during January of 2021?

24  A.   Yes.

25  Q.   If you could, describe for the jury, how did you come to be

1   arrested in January 2019?

2   A.   I got a phone call from the FBI, and I self-surrendered in

3   Miramar.

4   Q.   When you self-surrendered, did you agree to be interviewed

5   by the FBI?

6   A.   Yes, I did.

7   Q.   Did you sign a Miranda waiver agreeing to be interviewed?

8   A.   Yes.

9   Q.   Did you agree your video would be recorded and audio and

10  videotaped?

11  A.   Yes.

12  Q.   Did you then have a chance to look at this tape?

13  A.   Yes.

14  Q.   During your initial interview with the FBI, did you tell

15  the truth?

16  A.   No, I didn't.

17  Q.   Why not?

18  A.   I was very scared and very high, both.

19  Q.   When you say, "very high," what did you mean with that?

20  A.   I smoked crystal meth the whole way when I was going to

21  surrender.

22  Q.   Did you tell the FBI that you were very high?

23  A.   No, I didn't.

24  Q.   Why not?

25  A.   I was very scared.

1   Q.   Now, when you were arrested in 2019, did you initially

2   receive a bond?

3   A.   Yes, I did.

4   Q.   Describe for the jury what were the conditions of your bond

5   at that time.

6   A.   I had to complete a drug program in Pompano Beach.  That

7   was the condition of the bond.

8   Q.   Did you go to this drug rehab clinic in Pompano Beach?

9   A.   I did.

10  Q.   Did you comply with your bond conditions to stay there?

11  A.   No, I left the program.

12  Q.   What happened?

13  A.   I went to go get high, and I was out for a whole year.

14  Q.   Were you eventually arrested again?

15  A.   Yes, I was.

16  Q.   Since that time, you have been in federal custody?

17  A.   Yes, I have.

18  Q.   Did you, in this case, later accept responsibility and

19  plead guilty?

20  A.   Yes, I did.

21  Q.   When did you plead guilty?

22  A.   In 2022.

23  Q.   Who was the judge you plead guilty in front of?

24  A.   Gayles.

25  Q.   And to what charges did you plead guilty?

1   A.   Conspiracy of possession and intent to distribute Oxy.

2   Q.   Did you have an attorney during the entire process?

3   A.   Yes, I did.

4   Q.   Who was your attorney?

5   A.   Roger Cabrera.

6   Q.   Why did you plead guilty?

7   A.   Because I had to plead guilty.  That was part of my

8   process.

9   Q.   Did anyone force you to plead guilty?

10   A.   No.

11   Q.   So why did you plead guilty?

12   A.   Because I had to.  It was part of my process to --

13   Q.   Did you sign a plea agreement prior to pleading guilty?

14   A.   Yes, I did.

15        MR. MCLAUGHLIN:  Your Honor, if we could dim the juror

16   screens.

17   BY MR. MCLAUGHLIN:

18   Q.   I am now showing you what's been marked as Government's

19   Exhibit 25C for identification, Ms. Lorenzo.  Do you recognize

20   this document?

21        (Government's Exhibit 25C was marked for identification.)

22   A.   Yes.

23   BY MR. MCLAUGHLIN:

24   Q.   What is this document?

25   A.   This is the plea agreement.

```
 1   Q.   Have you had a chance to review this document?

 2   A.   Yes, I did.

 3   Q.   Is there anything in this document that tells you that you

 4   had to plead guilty?

 5   A.   That I had to?  I'm confused.

 6   Q.   Were you forced to plead guilty?

 7   A.   No, I wasn't.

 8   Q.   So, again, I will ask you why did you plead guilty?

 9   A.   This is the document that my lawyer brought me and he

10   explained it to me.

11   Q.   Did you plead guilty because you are, in fact, guilty?

12   A.   Yes.

13            MR. QUINON:  Objection.  Leading.

14            THE WITNESS:  Well, that's why.

15            THE COURT:  Sustained.

16   BY MR. MCLAUGHLIN:

17   Q.   Now, this is a nine-page document, Government's Exhibit 25C

18   for identification.  Is your signature on this document?

19   A.   Yes, it is.

20   Q.   What is the date of your signature?

21   A.   June 24th, 2022.

22   Q.   Is your attorney's signature on this document?

23   A.   Yes, it is.

24            MR. QUINON:  I'm sorry, did you say 25C?

25            MR. MCLAUGHLIN:  Yes, it's 25C for identification.
```

1            MR. QUINON:  Thank you.

2    BY MR. MCLAUGHLIN:

3    Q.  To what count of the indictment did you plead guilty?

4    A.  I believe it's 20 years.

5    Q.  What count?

6    A.  Oh, I believe it was count -- was it one -- yeah, one.  Oh,

7    right here, one, I'm sorry.

8    Q.  What were you charged with in Count 1?

9    A.  Conspiracy with possession and intent to distribute

10   Oxycodone.

11   Q.  What was the statutory maximum penalty you faced for

12   pleading guilty to Count 1?

13   A.  Twenty years.

14   Q.  Were you ultimately sentenced in this case?

15   A.  Yes, I was.

16   Q.  Who sentenced you?

17   A.  Judge Gayles.

18   Q.  What were you sentenced to?

19   A.  Thirty-six months.

20   Q.  Was your attorney present with you during your sentencing

21   hearing?

22   A.  Yes, he was.

23   Q.  Now, did you also plead guilty to conspiracy to commit bank

24   fraud?

25   A.  Yes, I did.

1    Q.   When was that?

2    A.   About a month ago.

3    Q.   What judge was that?

4    A.   Judge Williams.

5    Q.   And did you sign a plea agreement pursuant to that plea?

6    A.   Yes, I did.

7    Q.   I will show you Government's Exhibit 25E for

8    identification.   Do you recognize this plea agreement?

9         (Government's Exhibit 25E was marked for identification.)

10   A.   Yes, I do.

11   BY MR. MCLAUGHLIN:

12   Q.   Who was your attorney during the process of pleading guilty

13   pursuant to the case in front of Judge Williams?

14   A.   Roger Cabrera.

15   Q.   Was that the same attorney you had in this case --

16   A.   Yes, I did.

17   Q.   -- before Judge Gayles?

18        Have you been sentenced yet in the case before Judge

19   Williams?

20   A.   No, not yet.

21   Q.   When are you going to be sentenced?

22   A.   October 12th.

23   Q.   Now, as part of both of your plea agreements, did you agree

24   to cooperate with the U.S. Attorney's Office here in the

25   Southern District of Florida?

1    A.    Yes, I did.

2    Q.    What did you agree to do?

3    A.    Testify.

4    Q.    Did you agree to testify truthfully?

5    A.    Yes, I did.

6    Q.    Are you aware that if you lie in this proceeding you could

7    be charged with perjury?

8    A.    Yes, I am.

9    Q.    Now, by allowing you to cooperate, did the U.S. Attorney's

10   Office for the Southern District of Florida guarantee you

11   anything?

12   A.    No.

13   Q.    About your sentence?

14   A.    No, not at all.

15   Q.    Are you guaranteed a reduction in your sentence?

16   A.    No, I am not.

17   Q.    But nonetheless, you are testifying here today?

18   A.    Yes, I am.

19   Q.    What are you hoping will happen in terms of your sentence

20   by testifying?

21   A.    Time off.

22   Q.    Who is the only person that can reduce your sentence?

23   A.    The judge.

24   Q.    Can I reduce your sentence?

25   A.    No, you cant.

1    Q.   Can Agent Slattery reduce your sentence?

2    A.   No.

3    Q.   Are you aware that the only -- are you aware that I might

4    recommend to the judge that he lower your sentence but the

5    judge might ignore it --

6    A.   Of course.

7    Q.   -- give you no reduction at all?

8    A.   Of course, yeah.

9    Q.   Are you aware there is nothing you could do about that?

10   A.   Yes.

11   Q.   Knowing all that, are you still willing to testify here

12   today?

13   A.   Yes, I am.

14   Q.   Now, Ms. Lorenzo, I am showing you again Government's

15   Exhibit 19A.  How did you first learn how to engage in

16   Oxycodone trafficking?

17   A.   Jorge taught me.

18   Q.   What did he teach you?

19   A.   He told me let's go to the doctor and the doctor will

20   prescribe medication and we can sell it.

21   Q.   I am showing you Government's Exhibit 51D.

22        We see here in this exhibit, Diaz's first prescription is

23   what month and year?

24   A.   November of 2016.

25   Q.   We see here yours don't begin until when?

1    A.   November of 2017.

2    Q.   Why did it take you almost a year to go to Dr. Gonzalez's

3    clinic?

4    A.   Well, I used to work, so I didn't go.

5    Q.   Even when you were working, were you aware that Mr. Diaz

6    was engaging in Oxycodone trafficking at Dr. Gonzalez's clinic?

7    A.   Yes, I was.

8    Q.   How did you know that?

9    A.   He told me.

10   Q.   Did that concern you?

11        You have a regular job and he is engaging in illegal

12   activity?

13   A.   Yes, it did.

14   Q.   When you first started your relationship with him in 2011,

15   what was he doing for money?

16   A.   Nothing.

17   Q.   Was he engaged in the illegal acquisition and selling of

18   prescription pills before Dr. Gonzalez?

19   A.   Yes, he was.

20   Q.   What was he doing?

21   A.   He used to sell Opana.

22   Q.   What is Opana?

23   A.   It's another opiate that the doctors used to give, but it's

24   discontinued.

25   Q.   Now, at Dr. Gonzalez's clinic, did he have bene's or

1    recruited patients that he used to get for Oxycodone?

2    A.   Yes.

3    Q.   Did he have to recruit patients before Gonzalez when he was

4    doing Opana?

5    A.   I don't think so.

6    Q.   Was the Dr. Gonzalez time period the first time you were

7    aware of him recruiting patients?

8    A.   Yes.

9    Q.   Now, you testified earlier you didn't start going to

10   Gonzalez until '17?

11   A.   That is correct.

12   Q.   Is that when you quit your job at the insurance company?

13   A.   That is correct.

14   Q.   Now, you testified earlier that you were aware that Diaz

15   was engaged in patient recruiting and Oxycodone trafficking

16   almost a year before you went there?

17   A.   That is correct.

18   Q.   Why not just leave him, break up with him and go on your

19   way?

20       Why stay with him?

21   A.   I don't know.  I was still being manipulated with him

22   there.

23   Q.   How were you being manipulated?

24   A.   He was -- he used to tell me -- he would manipulate my mind

25   in various ways psychologically.

1   Q.   But nonetheless, you could have left if you wanted to.

2   Right?

3   A.   I could have.

4   Q.   And you didn't?

5   A.   And I didn't.

6   Q.   Now, during this time period at Gonzalez, where were you

7   guys living?

8   A.   In the Gonzalez era we were in the house already.

9   Q.   All right.  And if we see here, the view of the second

10  page, again, you start going in what month and year?

11  A.   November of 2017.

12  Q.   So after you start going, are you working?

13  A.   No.

14  Q.   How are you paying for rent and bills at this time?

15  A.   Trafficking Oxycodone.

16  Q.   And how would you pay rent every month once you stopped

17  working?

18  A.   I would make money orders.

19  Q.   Let me show you Government's Exhibit 25G.

20       Here we are.  I am showing you page 31 of Government's

21  Exhibit 25G.  What is the date here, Ms. Lorenzo?

22  A.   December 1st of 2017.

23  Q.   What are we looking at here?

24  A.   A money order to the office where we used to live.

25  Q.   What was Hilton Estates?

```
 1   A.   That is the address of 6385 West 24th Avenue.

 2   Q.   How would you go about getting these money orders?

 3   A.   I would go to Amscot and give them the cash, and they would

 4   give me the money order.

 5   Q.   Who would provide you the cash for doing that?

 6   A.   That was with the trafficking of the Oxy.

 7   Q.   Who provided you the cash to do that?

 8   A.   Jorge.

 9   Q.   Would you do this every month?

10   A.   Yes, I would.

11   Q.   Why did you have to obtain money orders to obtain rent when

12   you were living at this location during 2017?

13   A.   That is how they required us to pay the rent.

14   Q.   If we scroll here, we see -- again, this is another one.

15        Now we're in 2018.  I am showing you page 37.  Do you see

16   the section I just circled on the lower right-hand corner of

17   the money order?

18   A.   Yes.

19   Q.   What is that referring to?

20   A.   That is the apartment I used to live in.

21   Q.   From this time all the way until you broke up with

22   Mr. Diaz, is this how you guys would pay rent?

23   A.   Yes.

24   Q.   Now, taking you back to Government's Exhibit 51D.  You see

25   here -- do you recognize this individual here?
```

1   A.   Yes, I do.

2   Q.   Jose Garcia?

3   A.   Yes.

4   Q.   How do you recognize him?

5   A.   He used to be a patient.

6   Q.   How do you know he was one of Mr. Diaz's patients?

7   A.   Because I used to see him.  We used to do the trafficking

8   activities with him.

9   Q.   Do you recognize these two individuals?

10  A.   Yes, I do.

11  Q.   Who are they?

12  A.   That's Anibal and Pedro.  They're partners and we used to

13  do trafficking activities with them as well.

14  Q.   When you say, "We used to do trafficking activities," what

15  do you mean by that?

16  A.   We would pick them up, take them to the clinic and take

17  them then to the pharmacy and get their medication.

18  Q.   Why would you need to take them to the clinic?  Why would

19  you need to take then to the pharmacy?

20  A.   Well, sometimes because Anibal has a car, so sometimes he

21  would go by himself.

22  Q.   When you say, "we," who are you referring to?

23  A.   Jorge and I.

24  Q.   Were you physically present for the exchange of cash for

25  pills?

1   A.   Sometimes, yes.

2   Q.   And you testified earlier this is Mr. Pozo.  Would Diaz

3   purchase pills from Mr. Pozo?

4   A.   Yes.

5   Q.   How do you know that?

6   A.   Because I was there.

7   Q.   When you say you were there, how did you know that?

8   A.   I seen them.

9   Q.   What did you see?

10  A.   Pozo giving him the medication, and then Jorge would buy

11  them.

12  Q.   Do you recognize this individual?

13  A.   Yes, I do.

14  Q.   Who is that?

15  A.   That is Lucia.  She was another patient.

16  Q.   How do you know she was a patient of Jorge Diaz?

17  A.   Because I've seen her.

18  Q.   What does that mean?

19  A.   She also sold the medication to Jorge, and Jorge has bought

20  them.

21  Q.   And you recognize these two individuals here?

22  A.   Yes, I do.

23  Q.   Who are they?

24  A.   They were also patients.

25  Q.   Martha Cardero and Braulio Sotolongo?

1  A.  Correct.

2  Q.  When you say they were patients, what do you mean by that?

3  A.  They used to be married.

4      He passed away.  They would also sell their medication to

5  Jorge.

6  Q.  I am now showing you this individual.  Do you recognize

7  this individual?

8  A.  No, I don't.

9  Q.  Do you recognize this individual?

10 A.  Yes, I do.

11 Q.  Who is that?

12 A.  That is another patient that Jorge used to do the

13 trafficking activities with.

14 Q.  And her name is Milka Lao?

15 A.  Correct.

16 Q.  Where did you first meet her?

17 A.  I met her in Espinosa era.

18 Q.  Now I am going to show you this individual.  We are on the

19 second page of Government's Exhibit 51D.  Do you recognize this

20 individual?

21 A.  Yes, I do.

22 Q.  Who is this?

23 A.  This is Luis Paniagua.  He was also a patient that did the

24 trafficking activities with Jorge.

25 Q.  How do you know that?

1    A.   I've seen him.

2    Q.   What have you seen?

3    A.   I've seen him give the medication, sell the medication to

4    Jorge.

5    Q.   Now, during the time you were living with Mr. Diaz, when a

6    patient would get their prescription filled, how quickly would

7    Mr. Diaz go obtain that medication from the patient?

8    A.   Right away.

9    Q.   Then how quickly would he sell it thereafter?

10   A.   Right away.

11   Q.   Do you know who Mr. Diaz sold his pills -- Diaz all the

12   pills he would acquire, do you know who he sold them to?

13   A.   Yes.

14   Q.   Who did he sell them to?

15   A.   Yandre Trujillo.

16   Q.   Anyone else?

17   A.   There was another guy named El Curita, but that's all I

18   know.

19   Q.   Do you recognize this individual?

20   A.   Yes, I do.

21   Q.   How do you -- what's his name?

22   A.   His name is Alexis.  That's Milka's husband.  He is also

23   another patient.

24   Q.   How do you recognize him as a patient?

25   A.   I've seen him sell the medication to Jorge.

1  Q.  Now, showing you this photograph, do you recognize this

2  person?

3  A.  Yes, that's Mercedes.  She is another patient and she also

4  did the trafficking with Jorge.

5  Q.  How do you know that?

6  A.  I've seen them.

7  Q.  And do you recognize this individual?

8  A.  Yes.  That's Braulia, and she is another patient, and she

9  also did the trafficking with Jorge.

10  Q.  Now, we are still on page three.

11     I am going to show you these three individuals, both with

12  last name Ponce.  Who are these two individuals?

13  A.  These are husband and wife and they are also patients of

14  Jorge.  They also did trafficking with Jorge.

15  Q.  How do you know that?

16  A.  I've seen them.

17  Q.  Ms. Lorenzo, how would Mr. Diaz, Jorge Diaz, end up having

18  these patients?  How would he recruit them?

19  A.  In the same clinic he would ask about and they would -- or

20  they were referred from another one of the patients.

21  Q.  Now, you start going -- what's the month here?

22  A.  November of 2017.

23  Q.  When you would get your -- let me ask you this; how many

24  times did you go to West Medical?

25  A.  To Gonzalez, like one time inside and maybe twice outside

1   in the car.

2   Q.   How were you able to get six prescriptions by going once or

3   twice?

4   A.   I didn't.  That was Jorge that got them under my name.

5   Q.   What do you mean by that?

6   A.   Well, the doctor would leave the prescription signed, and

7   he wouldn't go back in a while.  And Jorge would get the

8   prescriptions under my name.

9   Q.   Would you go to the pharmacy then?

10   A.   No.

11   Q.   How would Mr. Diaz -- how would Jorge Diaz get the pills?

12   A.   He would get them in the pharmacy.  He knew the guy there,

13   as well.

14   Q.   Even though you weren't present?

15   A.   Correct.

16   Q.   Now, as we see here, taking you back to the second page of

17   Government's Exhibit 51D, there is an end month here for a

18   number of patients.

19        Now going to the third page we see here, Paniagua, Lorenzo,

20   Mercedes, Gustavo Ponce, Amanda Ponce and Braulia Rego.

21        What month did everyone, according to this exhibit, stop

22   going to Dr. Gonzalez?

23   A.   In Aprilish.

24   Q.   What is the last month you went?

25   A.   In July.

1  Q.  Is that the same month here for Mr. Paniagua?

2  A.  Yes.

3  Q.  Ms. Perez?

4  A.  No.  I'm sorry, yes.

5  Q.  I will zoom in here, I apologize.

6      Showing here both Ponce and Rego, what was the last month

7  they went?

8  A.  In July.

9  Q.  I am going to zoom in on Mr. Garcia, Mr. Amaro, Mr. Ruiz,

10  Mr. Pozo, and Ms. Alvarez.  What is the last month they all

11  went?

12  A.  In July.

13  Q.  Then, again, focusing on Martha Cardero and Mr. Sotolongo,

14  what was the last month they all went?

15  A.  In July.

16  Q.  Once you all left Dr. Gonzalez, where did you go next?

17  A.  We went to Dr. Espinosa.

18  Q.  Let me show you Government's Exhibit 56D, Dr. Espinosa, and

19  you see here, this is your prescription history.

20      You were there for, approximately, how many months?

21  A.  For one month.

22  Q.  How many prescriptions did you get?

23  A.  Two.

24  Q.  I will take you to the first page of Government's

25  Exhibit 56D.  How did you all end up at Dr. Espinosa?

1   A.   This is when Milka, the patient, she referred us to go over

2   there.

3   Q.   When you say, "Milka," are you referring to Milka Lao?

4   A.   Yes, I am.

5   Q.   All right.  How did that come about?

6   A.   We were there for that couple of months.

7   Q.   Now taking you back to 51D.

8        Prior to leaving Dr. Gonzalez's clinic on July 2018, did

9   you learn that Dr. Gonzalez's clinic was under investigation?

10  A.   Yes.

11  Q.   How did you learn of that?

12  A.   I was told by Jorge.

13  Q.   What did he tell you?

14  A.   He told me that Suzy, a girl that worked there, told him

15  that the clinic was under investigation.

16  Q.   That's what he told you?

17  A.   Yes.

18  Q.   During the entire time you were going to Gonzalez's, what

19  was the nature of the relationship between Diaz and Defendant

20  Crespo?

21  A.   They started coming about -- Crespo used to go to the house

22  for religious activities, and they started coming like father

23  and son.

24  Q.   What do you mean, "like father and son"?

25  A.   They would talk on the phone every day, almost all day.

1    They would see each other a lot.

2    Q.   Would Defendant Crespo come visit you at the house you

3    lived with Mr. Diaz?

4    A.   Yes.

5    Q.   Now, at this time Mr. Diaz is engaging in criminal

6    activity?

7    A.   Yes.

8    Q.   Did that bother you?

9    A.   Yes.

10   Q.   Did it worry you?

11   A.   Yes.

12   Q.   Why did it worry you?

13   A.   Because we were trafficking Oxy, and he is a federal agent.

14   Q.   Did you express these concerns to Mr. Diaz?

15   A.   Yes, I did.

16   Q.   What did he tell you?

17   A.   He said it was okay that he would cover for him.

18   Q.   Did you believe Mr. Diaz?

19   A.   No.

20   Q.   You did not believe that Crespo would cover for him?

21   A.   No.

22   Q.   But nonetheless, you still engaged in Oxycodone trafficking

23   with Diaz?

24   A.   Yes.

25   Q.   Why?

 1   A.   We were -- that's what he told me to do.

 2   Q.   Now, I take you back to 56D.  Do you see here Mr. Pozo is

 3   here.  Right?

 4   A.   Yes.

 5   Q.   After Espinosa you end up going where?

 6   A.   To Carpman.

 7   Q.   Why did you end up going to Carpman?

 8   A.   Because Espinosa was very far away.

 9   Q.   And how did you find Dr. Carpman?

10   A.   We found Dr. Carpman through Yandre.

11   Q.   When you say, "Yandre," you are referring to the individual

12   depicted here in Government's Exhibit 24A?

13   A.   Yes, I am.

14   Q.   Now, I am showing you Government's Exhibit 58D.  What is

15   the month everyone arrives at Carpman?

16   A.   In October.

17   Q.   You see here.  When is your first prescription at Carpman?

18   A.   October.

19   Q.   Now I, am showing you both the third page.

20        Do you see Mr. Pozo's face and name on this exhibit?

21   A.   No.

22   Q.   Now, prior to arriving at Dr. Carpman's, did Jorge Diaz and

23   Pozo get into an altercation?

24   A.   Yes, they did.

25   Q.   What happened?

1    A.   They got into a big fight over money, and he never went

2    again to the house or anything.

3    Q.   What was the last time you saw Pozo?

4    A.   In that era.

5    Q.   So if we go to 56D, did that fight occur on the second

6    page, highlighting Pozo, during this August, September 2018

7    time frame?

8    A.   Yes, it did.

9    Q.   How did you learn about their fight and disagreement?

10   A.   Jorge told me.

11   Q.   What did he tell you?

12   A.   He told me that they got into an argument.

13   Q.   Prior to the argument, what was Pozo's role with Mr. Diaz?

14   A.   He used to help him with the patient, pick them up, take

15   them to the clinic and the pharmacy.

16   Q.   Now, after they had their argument, did your role change in

17   the trafficking scheme that you engaged in?

18   A.   Yes.

19   Q.   How did your role change?

20   A.   I started doing everything Pozo was doing, helping Jorge.

21   Q.   So, if we go to 58D, does that happen when everyone is

22   going to Dr. Carpman?

23   A.   Yes.

24   Q.   Showing Government's Exhibit 57, do you recognize the photo

25   depicted here?

```
 1    A.   Yes, I do.

 2    Q.   How do you recognize it?

 3    A.   That's Carpman's office.

 4    Q.   How many times have you been there?

 5    A.   A lot.

 6    Q.   Now taking you back here to the second page of 58D, again,

 7    focussing on that start date, when you say you did everything

 8    that Pozo used to do, what specifically did you do?

 9    A.   I would pick up the patients from their home, take them to

10    the doctor's office, and then to the pharmacy and then back

11    home.

12    Q.   Did you personally pay patients for pills?

13    A.   Sometimes.

14    Q.   And who provided you the money to do that?

15    A.   Jorge.

16    Q.   You said sometimes.  Why not every time?

17    A.   Because Jorge would normally do all of that.

18    Q.   When you would pick up patients and take them to the clinic

19    and take them to the pharmacy, was anyone else with you?

20    A.   Jorge.

21    Q.   So the two of you would go together?

22    A.   Yes.

23    Q.   When you were doing that, were there times when Defendant

24    Crespo would show up unannounced to your house?

25    A.   Sometimes.
```

1    Q.   Did you express your concerns?  Did you have concerns about

2    that?

3    A.   Yes.

4    Q.   When you met Defendant Crespo, did you know what he did for

5    a living?

6    A.   Yes.

7    Q.   What did you know?

8    A.   Jorge told me he was a federal agent.

9    Q.   Do you know what agency he worked for?

10   A.   At that time I was told DEA.  I didn't know.

11   Q.   Now, when Defendant Crespo would show up unannounced at

12   your house -- with patients at your house, right?

13   A.   Correct.

14   Q.   Did that worry you?

15   A.   Yes.

16   Q.   And you expressed those concerns to Jorge Diaz?

17   A.   I did.

18   Q.   What was his response?

19   A.   He said to not worry that he would cover for him.

20   Q.   Now, during the time that you lived with Mr. Diaz, did you

21   meet other law enforcement officers?

22   A.   I didn't but Jorge did.

23   Q.   How do you know that?

24   A.   He told me.

25   Q.   What agency did those law enforcement officers work with?

 1   A.   He told me he met Humberto from Hialeah Police.

 2   Q.   Showing the witness what has already been admitted as

 3   Government's Exhibit 21B2 --

 4        MR. QUINON:  I'm sorry, what exhibit is this?

 5        MR. MCLAUGHLIN:  21B2.

 6        Before doing that, I am showing the witness what has

 7   been previously marked as Government's Exhibit 10A and 10B.

 8   BY MR. MCLAUGHLIN:

 9   Q.   Now, Ms. Lorenzo, I am showing you what's been admitted as

10   Government's Exhibit 10A and B.

11        Do you recognize the numbers reflected under Mr. Diaz in

12   this exhibit?

13   A.   Yes, I do.

14   Q.   How do you recognize them?

15   A.   Those were his numbers.

16   Q.   During the entire time that you lived with Jorge Diaz, did

17   he carry two phones?

18   A.   Yes, he did.

19   Q.   What was the purpose of that?

20   A.   One was his normal phone and the other was the drug phone.

21   Q.   Now, we see here a number of contacts between Diaz and a

22   number for Defendant Crespo.  Does that -- is that consistent

23   with your memory when you lived with Diaz?

24   A.   Yes.  Yes, it is.

25   Q.   Again, you are aware that Defendant Crespo is a federal law

1   enforcement officer?

2   A.   Yes, I was.

3   Q.   Were you concerned that your boyfriend at the time was

4   constantly on the phone with him?

5   A.   Yes.

6   Q.   Did you raise those concerns with Diaz?

7   A.   Yes, I did.

8   Q.   What did he say?

9   A.   He said to not worry, that he would cover for him.

10   Q.   Did you also speak to Defendant Crespo on the phone?

11   A.   Yes, I did.

12   Q.   Let me show you Government's Exhibits 10B.

13        Do you recognize this number?

14   A.   Yes, I do.

15   Q.   How do you recognize it?

16   A.   That was my phone number.

17   Q.   I will show you the second page of the summary again.

18        We are on 10B.  Do you recognize this number?

19   A.   Yes, I do.

20   Q.   How would you recognize it?

21   A.   That was my phone number.

22   Q.   During this period, were you living with Mr. Diaz?

23   A.   Yes, I was.

24   Q.   All right.  Why would Crespo be calling you?

25   A.   Sometimes he would call just to say hi, or if Jorge didn't

1    answer to ask me about Jorge and stuff like that.

2    Q.   Now, taking you back to 21B2, these are the contacts set

3    forth in one of Jorge Diaz's phones.

4         I am showing you entry 189.  Do you see the entry here?

5    A.   Yes, I do.

6    Q.   Listed as Brian Restaurant?

7    A.   Yes.

8    Q.   Are you familiar with that location?

9    A.   Yes.

10   Q.   How are you familiar with that?

11   A.   That's where Jorge would go eat with Humberto, the cop, or

12   Alberico.  That's like a cop's restaurant when they would go

13   eat there.

14   Q.   During the time this was happening, were you engaged in

15   Oxycodone trafficking with Mr. Diaz?

16   A.   Yes, I was.

17   Q.   Didn't that concern you?

18   A.   Yes, it did.

19   Q.   Did you raise these concerns with Mr. Diaz?

20   A.   Yes, I did.

21   Q.   What was his response?

22   A.   To not worry that he would cover for him.

23   Q.   During this time that you were living together, were you

24   ever arrested?

25   A.   No.

1    Q.   Did Crespo ever arrest you?

2    A.   No.

3    Q.   Did any federal agent ever arrest you?

4    A.   No, I wasn't.

5    Q.   Now, taking you back to 51D, there are a number of patients

6    here.

7         Did Mr. Diaz have other patients than the individuals

8    depicted here on Government's Exhibit 51D?

9    A.   Yes, he did.

10   Q.   How would -- based on your experience living with him, how

11   would Mr. Diaz go about acquiring, but more importantly, losing

12   patients.  What would be the reason for that?

13   A.   Sometimes when the patient figured out that there was more

14   money made, and they actually got in contact with somebody that

15   would buy their medication, then they would just leave.

16   Q.   And did that happen on a regular basis?

17   A.   Sometimes.

18   Q.   What was the most highest number of patients that Jorge

19   Diaz had at one time?

20   A.   This was a normal group of patients that he had.

21   Q.   His regulars?

22   A.   Yes, his regulars.

23        THE COURT:  Counsel, is this a good time to take a

24   break?

25        MR. MCLAUGHLIN:  Certainly.

1            THE COURT:  Ladies and gentlemen, let's take

2   15 minutes.

3            Please don't discuss anything about the case.

4            COURT SECURITY OFFICER:  All rise.

5            (The jury exited the courtroom at 11:14 a.m.)

6            THE COURT:  All right.  Please be seated.

7            If the witness needs to use the restroom or anything,

8   you can take her now.

9            U.S. MARSHAL:  She is okay.

10            THE COURT:  Anything from the government?

11            MR. MCLAUGHLIN:  Not from the government, Your Honor.

12            THE COURT:  From the defense?

13            MR. QUINON:  No, Your Honor.

14            THE COURT:  All right.  We will take 15 minutes.

15            (Recess.)

16            THE COURT:  There are still a couple of jurors in the

17   restroom.

18            Note the presence of the attorneys and the defendant.

19            While we are waiting, 25C and E you did not move that

20   into evidence.

21            MR. MCLAUGHLIN:  Not yet.

22            THE COURT:  All right.  Are you ready?

23            COURT SECURITY OFFICER:  We are.

24            THE COURT:  All right.  You can bring them in.

25            All right.  Please be seated.

1          (The jury entered the courtroom at 11:36 a.m.)

2          THE COURT:  Rehan told me somebody asked -- we will

3    again break for lunch today at 12:30, and we should conclude at

4    5:00 or 5:30 depending on where we are with the witness.

5          MR. MCLAUGHLIN:  Thank you, Your Honor.

6    BY MR. MCLAUGHLIN:

7    Q.  Ms. Lorenzo, you testified earlier that during the entire

8    time -- I am going to show defense counsel what was, what's

9    marked as Government's Exhibit 21A and 22A for identification.

10          You testified earlier that Jorge Diaz carried two phones

11   always.

12          (Government's Exhibits 21A and 22A were marked for

13   identification.)

14   A.  Yes.

15   BY MS. MCLAUGHLIN:

16   Q.  What was the purpose for that?

17   A.  One was his regular phone, and one was his drug phone.

18   Q.  Showing you Government's Exhibit 21A and 22A, Ms. Lorenzo,

19   do you recognize either of these phones?

20   A.  Yes.

21   Q.  How do you recognize that?

22   A.  They were Jorge's phones.

23   Q.  Which one was the drug phone?

24   A.  The flip phone.

25   Q.  How do you know that's the drug phone?

1   A.   Because I have seen it.  I have talked from it.

2   Q.   Even though that was the designated drug phone, would Diaz

3   still hawk his narcotics business on the other phone?

4   A.   Yes.

5   Q.   I'd like to take you to Government's Exhibit 21B2 --

6   actually, scratch that -- hold up Government's Exhibit 21A,

7   Ms. Lorenzo, for the jury.

8        These are the contacts for that phone.  I'd like to take

9   you here.  Do you recognize the name and the phone number

10  listed here?

11  A.   Yes, I do.

12  Q.   How do you recognize it?

13  A.   That's Alberico's phone number.

14  Q.   In your phone number, did you have the defendant's name and

15  phone number saved?

16  A.   Yes.

17  Q.   Why?

18  A.   Sometimes he would call me.

19  Q.   You testified earlier that Jorge Diaz sometimes had

20  patients that he would recruit, but then he would lose.

21  Correct?

22  A.   Correct.

23  Q.   Let me see here just before we get to that question.

24       Do you recognize the contact here, entry 21?

25  A.   Yes, I do.

1    Q.   Who is that?

2    A.   That's me.

3    Q.   And 22, of course?

4    A.   That's Anibal, the patient from before.

5    Q.   Do you know the individual depicted here in entry 24?

6    A.   That's Api, one of Jorge's friends.

7    Q.   Let me go down to entry 50.

8         Do you recognize the individual here in entry 50?

9    A.   That's Cheo.

10   Q.   Who is that?

11   A.   He is one of the patients that Jorge lost.

12   Q.   Drawing your attention to entry 69, do you know why Jorge

13   Diaz would have a number for the Hialeah Police Department on

14   his phone?

15   A.   That I am not sure.

16   Q.   I will go to entry 160.  Do you recognize the entry here in

17   160?

18   A.   Yes, that's Narrita.  He was a godson of Jorge's for

19   religious activities.

20   Q.   To your knowledge, was he engaged in Oxycodone trafficking?

21   A.   Not that I know of.

22   Q.   Teresita Perez here in entry 173, do you recognize that

23   name?

24   A.   That is my mother.

25   Q.   All right.  The entry on 186, do you recognize that

1   individual?

2   A.   That is Raul.  He is another patient recruiter.

3   Q.   When you say, "patient recruiter," what do you mean by

4   that?

5   A.   He would have his own patients as well and do trafficking

6   activities.

7   Q.   Do you recognize this entry here in 201?

8   A.   Yes, I do.

9   Q.   Who is that?

10  A.   That is Samantha, Alberico's girlfriend.

11  Q.   How do you know her?

12  A.   I've met her before.

13  Q.   If we can take you to Government's Exhibit 12A.

14       Ms. Lorenzo, do you recognize the house here on

15  Government's Exhibit 12A?

16  A.   Yes, I do.

17  Q.   When you first went there, who did you go with?

18  A.   Jorge.

19  Q.   Who did you first meet at the residence?

20  A.   At first, I met his ex-wife Irene, and then I met Samantha.

21  Q.   Have you met anyone else in that residence aside from those

22  individuals?

23  A.   His daughter.

24  Q.   Aside from his daughter?

25  A.   That's it.

1    Q.   At some point, did you become aware that Jorge Diaz was

2    living in this residence?

3    A.   Yes.

4    Q.   How did you become aware of that?

5    A.   I went once when Jorge was living there.

6    Q.   I am going to show you what's been admitted as Government's

7    Exhibit 22B1 and if you can hold up 21A for the jury,

8    Ms. Lorenzo.

9         You can hold up 22A, I apologize.

10        I am now showing the contact log of 22A, which has been

11   admitted as Government's Exhibit 22B1.

12        We are seeing here 22A, that is the drug phone?

13   A.   Correct.

14   Q.   Do you know why this number would be in Jorge Diaz's drug

15   phone?

16   A.   He would talk to Alberico as well off that phone.

17   Q.   We see here, Alexis, you identified earlier?

18   A.   Yes.

19   Q.   The entry on 13, who is that?

20   A.   Anibal, the other patient.

21   Q.   Let me see your entry 15, who is that?

22   A.   Jorge's daughter, Ashley.

23   Q.   Was she aware of his Oxycodone trafficking activities?

24   A.   Yes.

25   Q.   How does she know that?

1    A.   Because when we lived together in the house, we talked

2    about it.   I've seen her.

3    Q.   Does she know Defendant Crespo?

4    A.   Yes.

5    Q.   How do you know that?

6    A.   Because I've seen them together.

7    Q.   Entry 17, who is this person?

8    A.   The other patient, Braulia.

9    Q.   Entry 18?

10   A.   Dr. Carpman.

11   Q.   19?

12   A.   Cheo, the other patient that he lost.

13   Q.   Do you know entry 20 and 21?

14   A.   I don't know who they are.

15   Q.   Entry 29?

16   A.   Gustavo, that's Ponce, the husband.

17   Q.   Entry 30?

18   A.   Ileana.  He has a sister-in-law named Ileana.  I don't know

19   if that's her.

20   Q.   Entry 33?

21   A.   Lourdes, that's a friend of his from Facebook, I believe.

22   Q.   Entry 34?

23   A.   The patient Lucia.

24   Q.   Do you recognize any of the entries here 35 through 39?

25   A.   Yes, Magalys was another patient.

1   Q.  Is that entry 36?

2   A.  36, correct.

3   Q.  Do you recognize anybody else here?

4   A.  I've heard of their names, but I don't know who they are.

5   Q.  Entries 40 through 44, do you recognize any of these

6   individuals?

7   A.  Yes.  Maria is a lady from the machines that he went to

8   gamble.  Maria Raquel was another patient that he had on and

9   off.

10      I don't know who Marisol is.  And 44, Martha Cardero is the

11   patient.

12   Q.  Let me stop here.

13      Number 46 through 50, do you recognize any of these names?

14   A.  Mercedes, I don't know who that is.  And 47, Miguelito, is

15   another guy from the gambling machines.  I don't know who 48

16   is.  Number 49 is Milka, the patient, and 50 is Narrita, the

17   godson.

18   Q.  What about 55 through 55?

19   A.  I don't know who 51, 52, 53 -- Omar, that's another friend

20   of his, a patient or something like that from him.

21   Q.  Let me stop you there.  When you say that's a patient or

22   something like that, what do you mean?

23   A.  I know they have talked about pills and stuff like that

24   because I remember him.

25   Q.  Did you ever meet Omar?

1  A.   Yes, I did.

2  Q.   When you say, "they talked about pills," what do you mean?

3  A.   They talked about business of the Oxycodone.  54, Osmar, I

4  don't know who that is, and 55, I don't know who that is.

5  Q.   Now, 56 and 57?

6  A.   Entry 56, Paniagua, that's the patient, and 57, I don't

7  know who that is.

8  Q.   Entries 58 through 62, do you recognize any of these names?

9  A.   Yes, 58 is Pipo.  He is an old guy that he loves like his

10  dad.

11     Raquel, that's the one Raquel that's a patient, but I don't

12  know if it's this one or the other one.

13     Raul, I don't know who that is.  I only know Raul Yemaya.

14     Ruben, that used to be his godfather, and 62 is a car

15  place.

16  Q.   When you say, "godfather," regarding Ruben, do you

17  recognize the individual depicted here in Government's

18  Exhibit 27A?

19  A.   Yes, I do.  That is Ruben.

20  Q.   Do you know his last name?

21  A.   Cabrera Sotolongo.

22  Q.   How do you know him?

23  A.   I've met him before.  He used to be like my godfather at

24  one point.

25  Q.   When you say he used to be your godfather, what do you mean

1   by that?

2   A.   Of religious activities.

3   Q.   What kind of religious activities?

4   A.   Like Santeria.

5   Q.   Does Defendant Crespo know that individual?

6   A.   Yes, he does.

7   Q.   How did he know?

8   A.   Because that house was in front of Ashley's, and they have

9   seen each other in the house.

10   Q.   Do you recognize any individuals here in 63 through 66?

11   A.   Yes, Samantha, I believe that's Alberico's girlfriend.

12        Tere cel, I think that's the lady that used to work for

13   Carpman.

14        65, that's his other daughter Taina, and 66 is a friend.

15   Q.   And 68 and 69?

16   A.   Valodia is a barber that's a mutual friend of his and

17   Alberico, and Yandre is the guy that would buy the Oxycodone.

18   Q.   When you say, "the guy that would buy the Oxycodone," who

19   are you referring to?

20   A.   The one you showed earlier, Yandre Trujillo.

21   Q.   The one you that is depicted here in Government's

22   Exhibit 24A?

23   A.   That is Yandre.

24   Q.   Now, Ms. Lorenzo, taking you back to Government's

25   Exhibit 51D, during this time I'd like to draw your attention

1   to -- again, where were you guys living during that time?

2   A.   In the house, in 353 East 63rd Street.

3   Q.   How often would Crespo visit that house?

4   A.   A lot.

5   Q.   When you say, "a lot," what do you mean by that?

6   A.   He would go a couple of times a week.

7   Q.   What times of the week would that occur?

8   A.   Sometimes during the day or in the afternoon, in the

9   morning or afternoon.

10   Q.   Was it always on the weekends or during the week?

11   A.   During weekdays too.

12   Q.   Would that strike you as strange that he would show up

13   during the middle of the day on a weekday?

14   A.   Yes.

15   Q.   All right.  What was strange about that for you?

16   A.   People should work during the weekday, and he was there.

17   Q.   Did you raise those concerns with Mr. Diaz?

18   A.   I did.

19   Q.   What was his response?

20   A.   He said to not worry, that he would cover for him.

21   Q.   And, again, during this entire time, from November of 2013

22   to July of '18, were you and Jorge Diaz ever arrested by

23   Defendant Crespo?

24   A.   No.

25   Q.   By any law enforcement officer?

1    A.    No.

2    Q.    Showing you Government's Exhibit 50E, do you recall

3    Defendant Crespo ever having a side business entitled AC

4    Therapeutic Services?

5    A.    Yes, I do.

6    Q.    How do you remember that?

7    A.    I went there once with Jorge.

8    Q.    What was the purpose of that?

9    A.    We were stopping by the clinic, and we just stopped by

10   there.

11   Q.    All right.  When you say, "stopping by the clinic," what do

12   you mean by that?

13   A.    To Gonzalez's office.

14   Q.    Doesn't it strike you as strange you were going to the very

15   location where you engaged in Oxycodone trafficking and

16   stopping at a federal law enforcement officer's business?

17   A.    Yes, it did.

18   Q.    Did you raise those concerns with anyone?

19   A.    I told Jorge.

20   Q.    When you say you told Jorge, what do you mean by that?

21   A.    I would tell him every time I would notice something like

22   this, it's very close, and he said to not worry.

23   Q.    Specifically, what sort of concerns would you raise with

24   Mr. Diaz?

25   A.    We are trafficking Oxycodone and he's a federal agent, so I

1   was scared, afraid.

2   Q.   What was his response?

3   A.   He said to not worry that he would cover for him.

4   Q.   When you say, "he would cover for him," who are you

5   referring to?

6   A.   I'm referring to that he said Alberico would cover for him;

7   if something would happen we wouldn't get in trouble.

8   Q.   Now showing you Government's Exhibit 56D, again, this is

9   the -- this is your time here and everyone else's time with

10   what doctor?

11   A.   This is Espinosa.

12   Q.   Any time you were at Dr. Espinosa, were you ever arrested

13   by Defendant Crespo?

14   A.   No, I wasn't.

15   Q.   Ever arrested by any other law enforcement officer?

16   A.   No, I wasn't.

17   Q.   And you testified earlier that during this time Diaz had an

18   argument with who?

19   A.   With Crespo -- I mean, I'm sorry, with Pozo.

20   Q.   Would Jorge Diaz pay Pozo for helping him?  How would that

21   work?

22   A.   He would give him profit of whatever money was made.  He

23   would pay him a profit.

24   Q.   During the heydays of West Medical and Dr. Espinosa,

25   approximately how much money, to your memory, was Jorge Diaz

 1  making at the time?

 2  A.  Sometimes like 20,000 a day.

 3  Q.  A day?

 4  A.  Sometimes.

 5  Q.  Every day?

 6  A.  No, like once a week or sometimes a little less, twice a

 7  week, something like that.

 8  Q.  Where would all this money go?

 9  A.  A lot of it gambling.

10  Q.  When you say, "gambling," what do you mean by that?

11  A.  Jorge used to play a lot of machines, like casinos, little

12  stores that have machines.  He would waste all the money there.

13  Q.  Did you have arguments about that?

14  A.  Yes.

15  Q.  Taking you to 58D, everyone arrives at Dr. Carpman what

16  month?

17  A.  In October.

18  Q.  Now, during all of 2019, were you ever arrested by

19  Defendant Crespo?

20  A.  No.

21  Q.  Were any of these patients arrested by any law enforcement

22  officer during 2018 or 2019?

23  A.  No.

24  Q.  Did you become aware at some point, though, that Jorge Diaz

25  and Defendant Crespo had been arrested in this case?

1  A.   In 2021, I believe we all got arrested.

2  Q.   Before you were arrested, did you learn that Jorge Diaz and

3  Defendant Crespo had been arrested before?

4  A.   Yes.

5  Q.   How did you go about learning that?

6  A.   Jorge told me.

7  Q.   Prior to that, had any of these patients or you been

8  arrested by anybody?

9  A.   No.

10  Q.   Now, during the time you were at Carpman here, is this when

11  you broke up for good with Mr. Diaz?

12  A.   Yes, it was.

13  Q.   Approximately, when was that?

14  A.   Around fall of '19.

15  Q.   All right.  When you say, "break up for good," what do you

16  mean by that?

17  A.   We used to be on and off, but then I was really addicted to

18  crystal meth, so we just stopped seeing each other.

19  Q.   When did you stop living together?

20  A.   Around 2019.

21  Q.   All right.  When you stopped living together, would you

22  still help Mr. Diaz with his patients?

23  A.   Very little.  Sometimes, very little.

24  Q.   Do you know who helped him after that?

25  A.   No.

1   Q.   Were you still obtaining pills even though you weren't

2   living with Jorge Diaz?

3   A.   Very little.

4   Q.   Who would you sell them to at that time?

5   A.   Sometimes Yandre or Curita.

6   Q.   Leading up to your arrest in January of 2021, before that,

7   had you ever acted as a confidential informant for law

8   enforcement?

9   A.   No.

10   Q.   At any time had Defendant Crespo or any other agent or law

11   enforcement officer asked you to be a confidential informant?

12   A.   No.

13   Q.   Now, during what we call the Carpman era, and after you

14   stopped living with Jorge Diaz, did you, at any time, threaten

15   Jorge Diaz that you would go to the police and inform on him

16   regarding his Oxycodone trafficking activities?

17   A.   Yes, I did.

18   Q.   Why did you do that?

19   A.   Because I wanted money to get high.

20         MR. MCLAUGHLIN:   Can I have a moment, Your Honor?

21         THE COURT:   Sure.

22         MR. MCLAUGHLIN:   I am handing the witness the

23   transcript book, which is numbered 7-1 through 7-70.

24         Permission to approach.

25         THE COURT:   Okay.

1    BY MR. MCLAUGHLIN:

2    Q.  Now showing the witness what's been admitted as

3    Government's Exhibit 10G.

4         Ms. Lorenzo, if you could, go to tab one in the transcript

5    book.

6    A.  Can you repeat the tab number?

7    Q.  Tab number one.

8    A.  Okay.  Thank you.

9    Q.  Now, focusing your attention on the screen in front of you,

10   which is Government's Exhibit 10G, focusing you here on this

11   section, what is the date and time listed here?

12   A.  September 24th of 2019, 5:47 p.m.

13   Q.  What doctor were you going to at that time?

14   A.  Carpman.

15   Q.  What was the status of your relationship with Jorge Diaz

16   during September, late September of 2019?

17   A.  We were on and off.

18   Q.  I am now going to play the call reflected here in

19   transcript 7-1.  This is call 5-A, Government's 5-A.

20            MR. QUINON:  What tab is that on?

21            MR. MCLAUGHLIN:  Tab number one.

22            MR. QUINON:  All right.

23            (Government's Exhibit 5-A played in open court.)

24   BY MR. MCLAUGHLIN:

25   Q.  I am going to stop the call here, Ms. Lorenzo.  We are on

1   page one.

2       Were you present for this phone call?

3   A.   Yes.

4   Q.   Where did this phone call take place?

5   A.   I believe we were playing machines or in the car, one of

6   those two.

7   Q.   How were you able to hear the call?

8   A.   He was on speaker.

9   Q.   Very well.

10      (Government's Exhibit 5-A played in open court.)

11  BY MR. MCLAUGHLIN:

12  Q.   I am going to stop the call here.  We are on page four,

13  Ms. Lorenzo.

14      Were you present for the entirety of this call?

15  A.   Yes.

16  Q.   Just focusing here on page four, Diaz is having a

17  conversation with an individual by the name of Pedro Alvarez.

18      Do you know Pedro Alvarez?

19  A.   Yes.

20  Q.   How do you know him?

21  A.   I met him through Jorge.

22  Q.   When you say you met him through Jorge, what do you mean?

23  A.   That's the one that we call Raul Yemaya, El Negro.

24  Q.   You met him how with Jorge Diaz?

25  A.   He went once to the apartment, where we were living at the

1   apartment.

2   Q.  Do you know what Pedro Alvarez did for a living?

3   A.  A patient recruiter as well.

4   Q.  Do you remember when you met him?

5   A.  Around 2018ish.

6   Q.  So if we are looking at the time and date of the call here,

7   approximately how long before this call did you meet Pedro

8   Alvarez?

9   A.  Maybe a couple of months, almost a year.

10  Q.  What doctor were you going to at the time that you met him?

11  A.  Carpman.

12  Q.  You were already at Carpman when you met him?

13  A.  Yes.

14  Q.  Now if you look here on page four, they're talking about,

15  you see here, Diaz references Gonzalez?

16  A.  Correct.

17  Q.  And Diaz states, "I'm no a supplier nor have I ever been a

18  supplier or shit like that in my life."  Do you see that?

19  A.  Yes, I do.

20  Q.  Was that true?

21  A.  No.

22  Q.  Well, why was he saying that on the phone then?

23  A.  Because at that point is when I believe Gonzalez was

24  already arrested and supposedly he was talking when he got

25  arrested.

1  Q.  You said supposedly he was talking.  Why did you believe he

2  was supposedly talking?

3  A.  That's what Jorge told me.

4  Q.  Did you ask Mr. Diaz how he knew that?

5  A.  That's what Suzy had said at the beginning.

6  Q.  That's what Diaz told you?

7  A.  Correct.

8            MR. MCLAUGHLIN:  We will continue playing.

9            We are on four, bottom of four.

10           (Government's Exhibit 5-A played in open court.)

11  BY MR. MCLAUGHLIN:

12  Q.  All right.  We are on page five here, Ms. Lorenzo.

13      Do you see where Diaz says here, "I will fix this quickly

14  because my godson, my godson who loves me."

15      Who is Diaz referring to here?

16  A.  Alberico.

17  Q.  And he says, "I'm going to go call him.  I'm waiting for

18  him to arrive from Greece.  I am going to call him in order to

19  go and talk to him because he's also a federal agent."

20      And he said here, "about some controlled substance from

21  when you had your psychology sessions over here."

22      What's Diaz referring to here?

23  A.  He is talking about Gonzalez's office.

24  Q.  Why would -- did you talk to Jorge Diaz either after this

25  call or in the days while this was going on?  But why would he

1    need to talk to Crespo?

2    A.  Because now he is worried that he is getting caught.

3          MR. MCLAUGHLIN:  I am going to continue with the bottom

4    of five.

5          (Government's Exhibit 5-A played in open court.)

6    BY MR. MCLAUGHLIN:

7    Q.  Stop right there.

8        We are on page six, Ms. Lorenzo.

9        You interject yourself in the conversation right here.

10       Why do you start speaking during this conversation?

11   A.  Because now I am scared, too.

12         MR. MCLAUGHLIN:  We are still on six.

13         (Government's Exhibit 5-A played in open court.)

14   BY MR. MCLAUGHLIN:

15   Q.  Now we are on page nine, Ms. Lorenzo, here, see at the top

16   where you ask, "What prescription was it, Pedrito?"

17   A.  Right.

18   Q.  Why did you ask that question?

19   A.  Because now I'm really scared, and I feel like we've gotten

20   caught.

21   Q.  When you ask, "what prescription," what are you asking him?

22   A.  I'm asking what prescriptions did the federals show him.

23   Q.  Why do you want to know that information?

24   A.  Because I'm really scared now at this point.

25         (Government's Exhibit 5-A was played in open court.)

1   BY MR. MCLAUGHLIN:

2   Q.   Now, Ms. Lorenzo, taking you back to Government's

3   Exhibit 10G, we see here, the call that just occurred.

4        Next we see on this call, Diaz to who?

5   A.   To Alberico.

6   Q.   Were you present for that call?

7   A.   I'm sure I was because I was right next to him.

8   Q.   All right.  And you see here, what's the time of this call?

9   A.   At 6:40 p.m.

10  Q.   Were you present when this call occurred at 6:40?

11  A.   I don't remember.

12  Q.   And then there is a second call here at the bottom of 10G

13  between Diaz and Pedro Alvarez.

14       Were you present for that call?

15  A.   I don't remember.

16  Q.   Now, as we went into late '19, early 2020, where were you

17  living at this point?

18  A.   After I left the last apartment I was in hotels.

19  Q.   What were you doing for money?

20  A.   Nothing.

21  Q.   Were you engaged in drug trafficking?

22  A.   Yes.

23  Q.   What other criminal activity were you engaged in?

24  A.   That's it.  I was consuming drugs.

25  Q.   How were you paying for food?

1    A.   My family would help me out and stuff like that.

2    Q.   Now, during this time, were you still in touch with Jorge

3    Diaz?

4    A.   Sometimes.

5    Q.   Why would you be in touch with him during this time?   We

6    are now early 2020.

7    A.   Sometimes I would call him.   Sometimes he would come and

8    give me money.

9    Q.   Why would you ask him for money?

10   A.   To get high.

11   Q.   Now, taking you to page, Tab 17 in your book, Ms. Lorenzo,

12   Tab 17, everyone -- is everyone on Tab 17?

13        Ms. Lorenzo, are you on Tab 17?

14   A.   Yes, I am.

15   Q.   All right.   Do you see here in the transcript under the

16   section, "participants"?

17   A.   Yes.

18   Q.   Do you see where it says RC, "Recorded Message RC"?

19   A.   I see -- yes, I do.

20   Q.   Do you see a phone number ending in 7129?

21   A.   Yes.

22   Q.   Do you recognize that number?

23   A.   Yes.

24   Q.   How do you recognize it?

25   A.   That used to be either my number or my boyfriend at the

1    time number, one of the two.

2    Q.  Did you ever utilize that number?

3    A.  Yes, I did.

4    Q.  I'm going to play the call here again, this is May 8th.

5    This is call 4-17, and we are on the transcript, for the

6    record, 7-17.

7         (Government's Exhibit 4-17 was played in open court.)

8              MR. QUINON:  May I approach just briefly?

9              May I approach for a second?

10             THE COURT:  Okay.

11             (Sidebar conference.)

12             MR. QUINON:  I think counsel is about to play a tape

13   that was already played in this trial, which is -- again, it

14   doesn't go to the charges in this case.  It's basically the

15   tape where Mr. Crespo, my client, is very angry at this woman

16   and is somewhat threatening.

17             Again, it's not directly involved with the charges or

18   the elements of the crime in this case.  It's very prejudicial,

19   and I'm going to move that it not be played a second time under

20   403 at this point.  It was already played.

21             It's repetitive, prejudicial and 403, and, quite

22   frankly, enough is enough of this.

23             MR. MCLAUGHLIN:  Can I respond, Your Honor?

24             THE COURT:  Yes, sir.

25             MR. MCLAUGHLIN:  It directly relates at the charges.

1   This is a directed threat at the witness.  Your client wanted

2   to kill and assault this witness repeatedly on the night of

3   July 17th, which goes directly to the obstruction conspiracy,

4   and I am playing the call because she was the recipient of the

5   call, Your Honor.

6              THE COURT:  Okay.

7              MR. QUINON:  But it was played before.  Again, it is a

8   threatening phone call.

9              THE COURT:  Well, I understand you are saying it's

10  cumulative, among other things, but I am going to overrule the

11  objection.

12             MR. MCLAUGHLIN:  Thank you, Your Honor.

13             (Sidebar concluded.)

14             MR. MCLAUGHLIN:  Permission to approach, Your Honor?

15             THE COURT:  Yes, sir.

16             MR. MCLAUGHLIN:  Thank you, Your Honor.

17             Again, we are on Tab 17, transcript 7-17.

18             (Government's Exhibit 4-17 played in open court.)

19  BY MR. MCLAUGHLIN:

20  Q.  Now, Ms. Lorenzo, do you recall receiving this message on

21  May 8, 2020?

22  A.  Yes.

23  Q.  Now, if we go into the transcript, do you see here where

24  Defendant Crespo states, "Don't threaten an old man anymore?"

25  A.  Yes.

1   Q.   During this time -- we are in May of 2020 -- were you

2   attempting to extort Jorge Diaz at this time?

3   A.   Yes.

4   Q.   What were you attempting to extort him?

5   A.   To get money.

6   Q.   How?

7   A.   I told him if he didn't give me money I would tell the cops

8   everything.

9   Q.   Did you ever make good on that threat?

10  A.   No.

11  Q.   Why not?

12  A.   Nothing ever happened.

13  Q.   I'd like to now take you to Tab 20 in the transcript

14  book -- Tab 18, my apologies.

15       And I'd like to take you to page nine.  It's for transcript

16  7-18, going to play call 4-18.

17       Ms. Lorenzo, if we look at the cover sheet of 7-18, what is

18  the date of this call?

19  A.   May 10th, 2020.

20  Q.   Taking your attention on page nine, to the bottom where

21  Crespo is going to be saying in English, "I don't -- a person,

22  you know, one makes mistakes, this or that."

23       We're going to start there.

24  A.   Okay.

25            MR. QUINON:  I'm sorry, the bottom of page nine where?

1          MR. MCLAUGHLIN:  The bottom of page nine where Crespo

2    states, "I don't -- a person, you know, one makes mistakes,

3    this or that," which in the recording is at nine minutes and

4    22 seconds, approximately.

5          (Government's Exhibit 4-18 was played in open court.)

6    BY MR. MCLAUGHLIN:

7    Q.   We are going to stop here on page 11.

8         Ms. Lorenzo, do you see here on the bottom where Jorge Diaz

9    states, "because I do not have friends, if I introduce you as

10   a --" do you see that in the bottom of page ten?

11   A.   Yes, I do.

12   Q.   And it says, "And she saw some people I fucked over in

13   business."  Do you see that?

14   A.   Yes, I do.

15   Q.   What business was Jorge Diaz in?

16   A.   In trafficking Oxycodone.

17   Q.   Was he involved in any other business?

18   A.   No.

19          MR. MCLAUGHLIN:  On page 11.

20          (Government's Exhibit 4-18 played in open court.)

21   BY MR. MCLAUGHLIN:

22   Q.   Now we are here at the bottom of 11.

23        Do you see here where Diaz states, "And the rest, look as

24   to the rest"?  We are in the bottom of 11, Ms. Lorenzo.

25   A.   Yes.

1   Q.   "Nothing scares me because the burden she has in the family

2   is big, and it will hurt her because I am going to hit her

3   where it hurts most."  Do you see that?

4   A.   Yes, I do.

5   Q.   What burden did you have in -- first of all, what burden

6   did you have in the family?

7   A.   No burden.

8   Q.   It says here, "It will hurt her because I am going to hit

9   her where it hurts most."

10       What's Diaz referring to here?

11   A.   I am sure he is referring to doing vodoo on me.

12   Q.   When you testified earlier that you were attempting to

13   extort Diaz for money in exchange for not going to the place

14   regarding his Oxycodone activities, how did you communicate

15   that to him?

16   A.   Over the phone.

17       THE COURT:  Counsel, it's 12:30.  Is this a good time

18   to break?

19       MR. MCLAUGHLIN:  Yes, Your Honor.

20       THE COURT:  We will break for lunch for an hour.

21       We will resume at 1:30.

22       Don't discuss anything about the case.

23       (The jury exited the courtroom at 12:31 p.m.)

24       THE COURT:  Please be seated.  Anything we need to take

25   up from the government?

1          MR. MCLAUGHLIN:  Nothing from the government.

2          THE COURT:  From the defense?

3          MR. QUINON:  Nothing, Your Honor.

4          THE COURT:  All right.  We will be in recess until

5     1:30.

6          (Lunch recess.)

7          THE COURT:  All right.  We are back on the record.

8     Note the presence of the attorneys and the defendant.

9          Are we ready?

10          MR. MCLAUGHLIN:  Yes, Your Honor.

11          MR. QUINON:  Yes, Your Honor.

12          THE COURT:  Bring them in.

13          All right.

14          COURT SECURITY OFFICER:  All rise.

15          (The jury entered at 1:33 p.m.)

16          THE COURT:  Just a reminder, ladies and gentlemen,

17     because the lawyers just complained about how cold it is.

18          We don't control it.  It's all over the courthouse, but

19     we will make a call and see if they can fix it.

20          MR. MCLAUGHLIN:  Ready to proceed?

21          THE COURT:  Yes, sir.

22          MR. MCLAUGHLIN:  Thank you.

23     BY MR. MCLAUGHLIN:

24     Q.  Ms. Lorenzo, I will show you Government's Exhibit 56D

25     again.

1      You testified before lunch that during the time you were

2  with Dr. Carpman, that you stopped living with Mr. Diaz.

3  Correct?

4  A.   Correct.

5  Q.   Even after you stopped living with him, were you aware that

6  Mr. Diaz was continuing to engage in Oxycodone trafficking?

7  A.   Yes, I was.

8  Q.   How were you aware of that?

9  A.   I used to talk to him sometimes.

10  Q.   We were previously playing a call.  I'd like to take you to

11  another call.

12      This is Tab 21 in your binder.

13      Is everybody on Tab 21?  Very well.

14      If you go to page six -- before we start, Ms. Lorenzo, on

15  the first page here, it says transcript 7-21.  What is the date

16  and time of this call?

17  A.   May 12th, 2020, 12:54 p.m.

18  Q.   If we can go to page six, we will start at the top of page

19  six.

20      Is everybody ready?

21      (Government's Exhibit 4-21 was played in open court.)

22  BY MR. MCLAUGHLIN:

23  Q.   Now, Ms. Lorenzo, we are on page ten here.  You see at the

24  top where Crespo says, "Yes, yes, yes, that's the problem,

25  pops.  He here -- her whole problem is -- so what she wants is

1    to simply say, quote, no, because I know what you are up to you

2    have to give me a thousand dollars."  Do you see that?

3    A.   Yes, I see that.

4    Q.   What was the price you were asking Jorge Diaz in exchange

5    for you not going to the police?

6    A.   A thousand dollars.

7    Q.   And when he says, "I know what you are up to because I know

8    what you are up to," what business, again, was Jorge Diaz in?

9    A.   Trafficking Oxycodone.

10   Q.   Now, I'm going to take you to Tab 41 in the binder.

11        MR. QUINON:  Did you say 41?

12        MR. MCLAUGHLIN:  Yes, Tab 41.

13        This is transcript 7-41 and, for the record, call

14   0-41 (sic).

15   BY MR. MCLAUGHLIN:

16   Q.   Ms. Lorenzo, here on transcript 7-41, what is the date of

17   this call?

18   A.   July 8th, 2020.

19        (Government's Exhibit 4-41 was played in open court.)

20   BY MR. MCLAUGHLIN:

21   Q.   I am going to stop you here.  We are on page one still,

22   Ms. Lorenzo.  What are you talking about with Jorge Diaz here?

23   A.   I am going to a rehab.

24   Q.   We listened to these calls in May where Crespo and Diaz

25   were discussing your extortion threats to Jorge Diaz.

1    A.   Correct.

2    Q.   And here we are in June, and you are talking directly again

3    to Diaz.

4         How were you able to go from extorting him to talking to

5    him?

6    A.   That's how it was with us.

7              MR. MCLAUGHLIN:   We are still on page one.

8              (Government's Exhibit 4-41 was played in open court.)

9    BY MR. MCLAUGHLIN:

10   Q.   All right.   We are now on the top of two.

11        Do you see here on the top of two, Ms. Lorenzo, where Diaz

12   states, "I will get in touch with you later because I was on,

13   on Braulia Rego's house, you know, waiting for my friend."

14        And he goes on to say, "They fucking explore, you know,

15   outside.   I was watching Braulia's house."

16   A.   Yes, I see.

17   Q.   What did you take that to mean?

18   A.   The police was watching the house.

19   Q.   Why would Diaz tell you that?

20   A.   Because we were trafficking Oxycodone.

21   Q.   At this time, were you living together?

22   A.   No.

23   Q.   Why is he telling you that now?

24   A.   Because now he is scared.

25             (Government's Exhibit 4-41 was played in open court.)

1    BY MR. MCLAUGHLIN:

2    Q.   Do you see at the bottom of two when Diaz tells you, "But

3    otherwise, they can't do shit, forget that"?

4    A.   Yes, I do.

5    Q.   What did you take that to mean?

6    A.   That the cops can't do anything.

7    Q.   Now, taking you to Tab 43.  Are you now at Tab 43?

8    A.   Yes.

9    Q.   What is the date and time of this call?

10   A.   July 9th, 2020, and 4:15 p.m.

11   Q.   And for the record, this is transcript 7-43, now playing

12   call 04-43.

13        Here we are on the first page, Ms. Lorenzo.  You state,

14   "Call Pistolita because he has a hundred blue ones."

15   A.   Yes.

16   Q.   What are you referring to here?

17   A.   A hundred blue Oxycodone pills.

18   Q.   Who was Pistolita?

19   A.   He used to be a friend.

20   Q.   Why are you telling Diaz about Pistolita?

21   A.   So he can go buy the pills.

22   Q.   Even though Jorge Diaz utilized Dr. Carpman and his

23   patients there, why would you bring up Pistolita to him?

24   A.   Because he had the money.

25   Q.   Were you hoping to make money out of the transaction?

1   A.   No.

2   Q.   You were not?

3   A.   No, not with them.

4        (Government's Exhibit 4-43 was played in open court.)

5   BY MR. MCLAUGHLIN:

6   Q.   Did you later learn that Jorge Diaz ended up paying

7   Pistolita for pills he thought were Oxycodone?

8   A.   Yes, I did.

9   Q.   Did you later learn those pills were determined to be fake?

10  A.   Yes, I did.

11  Q.   How did you learn that?

12  A.   Jorge told me.

13  Q.   Now taking you to July 17, prior to your testimony today

14  you heard a series of calls from July 17th?

15  A.   Okay.

16  Q.   Have you?

17  A.   Yes.

18  Q.   Where your life was being threatened?

19  A.   Yes.

20       MR. MCLAUGHLIN:   Your Honor, if we can go to the ELMO.

21  BY MR. MCLAUGHLIN:

22  Q.   I will show you Tab 65, which is transcript 7-65.

23       It will be on your screen, so you don't have to go to it.

24       I am showing you page 11 of 7-65, just for the record.

25       Now, Ms. Lorenzo, drawing your attention to this section

```
 1   here --

 2   A.   Okay.

 3   Q.   -- do you know Carlos Pozo's sexual orientation?

 4   A.   Yes.

 5   Q.   What is that?

 6   A.   He is gay.

 7             MR. MCLAUGHLIN:  Can I have a moment, Your Honor?

 8             THE COURT:  Yes.

 9             MR. MCLAUGHLIN:  No further questions.

10             Can I have a moment to retrieve my computer, Your

11   Honor.

12             THE COURT:  Okay.

13                        CROSS-EXAMINATION

14   BY MR. QUINON:

15   Q.   Good afternoon, Ms. Lorenzo.

16   A.   Good afternoon.

17   Q.   You and I have never met before, have we?

18   A.   No.

19   Q.   Okay.  You and I have never talked about your case.

20   Correct?

21   A.   Correct.

22   Q.   And I have never communicated to you what the questions

23   would be that I will ask you today.  Is that correct?

24   A.   That is correct.

25   Q.   Now, prior to today, did you meet with the agents and the
```

1   prosecutors to go over your testimony?

2   A.   Yes, I did.

3   Q.   How many times did you meet with them?

4   A.   A couple of times, like maybe four times.

5   Q.   Four times.

6        Okay.  I would think that -- did they go to the jail or did

7   they transport you over to their offices?

8   A.   They transported me over here to the marshals.

9   Q.   Okay.  When was the first time they met with you about your

10  testimony?

11  A.   Maybe like two months ago or something.

12  Q.   But you had met with him before that.  At the time that you

13  got arrested you had started your cooperation.  Correct?

14  A.   A little bit after.

15  Q.   A little bit after?

16  A.   That's correct.

17  Q.   So what happened is you got arrested and you made a

18  statement at the time of arrest.  And you mentioned before --

19  you testified to before that when you gave that statement you

20  were scared, you didn't tell the truth.  Correct?

21  A.   That is correct.

22  Q.   And it was basically a statement exculpating yourself,

23  correct, trying to get yourself out of the jam.

24       Correct?

25  A.   Correct.

1   Q.   Later you got out of jail and you had a bond that was just

2   signing a piece of paper saying that you were responsible for

3   making sure that you appeared for trial and any other court

4   purposes.  Correct?

5   A.   Correct.

6   Q.   And that if you did not appear you would be responsible to

7   pay a certain amount of money to the government because you

8   failed to appear.  Correct?  You knew that?

9   A.   Correct.

10   Q.   Now, later you absconded, you fled.

11       Correct?

12   A.   That is correct.

13   Q.   But before you did, did you meet with the prosecutors and

14   the agents and you began your cooperation?

15   A.   No, I didn't.

16   Q.   Okay.  Now, part of the bond papers that you signed, and

17   typically the magistrate who gives you the bond tells you, that

18   if you fail to appear, you are going to be facing additional

19   charges of bail jumping.

20       You knew that, that would have been a crime if you fled.

21   Correct?

22   A.   I guess so.  I don't remember a lot of it but --

23   Q.   Well, did you think that, you know, the time that you

24   signed a paper saying that you are required to appear for trial

25   and for hearings, did you think that nothing would happen if

1    you just said I'm not going to show up?

2    A.   To be honest, I was only worried about going and getting

3    high.  I wasn't even paying attention.  That's the truth.

4    Q.   In other words, you had a raving drug habit at that time.

5    Correct?

6    A.   I did.

7    Q.   And you were very much hooked or addicted to

8    methamphetamine.  Correct?

9    A.   That is correct.

10   Q.   That's the one that you call crystal?

11   A.   Crystal meth, correct.

12   Q.   And by the way, that's a very addictive drug, isn't it?

13   A.   Yes, it is.

14   Q.   And it doesn't have -- once it gets you, so to speak, it's

15   hard to really kick that habit.  Correct?

16   A.   That is correct.

17   Q.   And, essentially, your whole life revolved around drugs,

18   correct, at that time, unfortunately?

19   A.   After a certain time, yes.

20   Q.   All right.  Fair enough.  Again, not faulting you or

21   passing judgment on you, that's not my deal here.  Okay?

22   A.   Okay.

23   Q.   But it was a reality.  The only reason why I ask you is

24   because it was a reality that the drugs had ahold of you.

25   Correct?

1   A.   That is correct.

2   Q.   All right.  Now, eventually, though, you fled and when you

3   fled did you get into additional trouble at the time that you

4   fled?

5   A.   At the time that I fled, I got arrested later on for having

6   crystal meth on me, and I went to TGK.

7   Q.   So, let me just get the sequence correctly.

8        You get arrested in this case.  They give you a bond that

9   you don't need a bondsman or anything like that or post

10  property.  You flee; you leave.  You get arrested again because

11  you are out there, and you get arrested with a certain

12  quantity?

13       MR. MCLAUGHLIN:  Objection.  Narrative.

14       THE COURT:  Let me hear the question.

15  BY MR. QUINON:

16  Q.   You get arrested because you had a quantity of meth.

17  Correct?

18  A.   Correct.

19  Q.   And even though you had fled from this case and you get

20  arrested again, did you get transported to the federal

21  authorities to face the charges in this case?

22  A.   Yes.

23  Q.   At that time also you had pending probation in the state

24  system from another meth case that you had before?

25  A.   It was one day.

1    Q.   Pardon me?

2    A.   It was a one-day probation.

3    Q.   Okay.  But at the time that you got arrested for this

4    second case of meth, were you on probation at that time?

5    A.   For one day only.

6    Q.   Okay.  Now, you then come back to this case and you met

7    with the prosecutors at that time when you come back.  You met

8    with them to go over the case.  Correct?

9    A.   A little bit later than that, yes.

10   Q.   All right.  In other words, there were arrangements made

11   through your lawyer where it was that you were ready and

12   willing to come in and cooperate.  Correct?

13   A.   That is correct.

14   Q.   So that led, ultimately, to a meeting where you sat down

15   with a prosecutor and the agents and they asked you questions.

16   Correct?

17   A.   That is correct.

18   Q.   And that went -- that went at least two times.

19        Correct?

20   A.   That is correct.

21   Q.   Now, now move the clock up to the time that we're here and

22   you are about to testify.

23        They come and visit you now or they bring you over to visit

24   and they meet with you four additional times.  Correct?

25   A.   Something like that.

1    Q.   All right.  And you discuss with them what your potential

2    testimony would be.  Correct?

3    A.   Well, they ask me questions and I answered.

4    Q.   Okay.  Fair enough.

5         Insofar as the answers, the questions were somewhat, some

6    of them, similar to what you have testified to here, what was

7    your relationship, for example, with Jorge Diaz.  Correct?

8    A.   Correct.

9    Q.   And you testified here that your relationship with him

10   started, I believe, if I recall correctly, 2011?

11   A.   That is correct.

12   Q.   And at the beginning when you started that relationship

13   with him, were you -- you weren't hooked at all on meth at that

14   time, were you?

15   A.   No, I wasn't.

16   Q.   All right.  And you were employed.  Correct?

17   A.   Correct.

18   Q.   And you mentioned that he was not.  He was leading already

19   a life that was very different from yours.  Correct?

20   A.   That's correct.

21   Q.   And you ultimately came to the conclusion that much later,

22   that he is a manipulator, correct, that he was manipulating

23   you?

24   A.   That is correct.

25   Q.   All right.  So, what happens is -- when did you start using

1    the drugs, the meth?

2    A.   The methamphetamine about two years before I got arrested.

3    Q.   Okay.  And prior to that you mentioned that you had also

4    acquired an addiction or at least a consumption of Oxycodone as

5    well.  Correct?

6    A.   That is correct.

7    Q.   And Mr. Diaz knew that all along.

8         Correct?

9    A.   No, he didn't.

10   Q.   No?

11   A.   No.

12   Q.   So, tell me about that.  In other words, when you were

13   addicted to the methamphetamine, he didn't know that you were

14   addicted to it?

15   A.   Not until after.

16   Q.   Until after when?

17   A.   Until maybe like a year after.

18   Q.   Okay.  And you kept it from him?

19   A.   Yes, I did.

20   Q.   Okay.  Now, once you got addicted to meth and you were

21   living with him, that was the period of time that he was doing

22   his selling and buying Oxycodone.  Correct?

23   A.   That is correct.

24   Q.   And he brought you into that world, so to speak, by

25   bringing you over to Dr. Gonzalez's.  Correct?

1    A.   That is correct.

2    Q.   And I believe you testified that you only went there three

3    times to Dr. Gonzalez's medical clinic.   Correct?

4    A.   That is correct.

5    Q.   And you only entered once, if I recall correctly?

6    A.   One time.

7    Q.   And the two other times you stayed out in the car.

8    Correct?

9    A.   That is correct.

10   Q.   Now, in what ways did he manipulate you?

11   A.   Well, for one, he made me believe in Santeria and all vodoo

12   stuff and at times if I didn't do something correctly or

13   however he wanted, then he would do vodoo on me like how the

14   phone call says.

15   Q.   So, I take it then that when you meet Mr. Diaz, you are not

16   a believer in Santeria.   Is that right?

17   A.   No, not really.

18   Q.   Meaning that I am correct?

19   A.   You are correct.

20   Q.   Okay.   Thank you.

21        So he then gets you to become a believer in Santeria?

22   A.   Something like that, yes.

23   Q.   All right.   Now, he holds a position in the Santeria

24   religion.   What is he, a Babalawo?

25   A.   He is just a santero or Palero, both.

1    Q.   And that is a higher position than a lot of the believers.

2    Correct?

3    A.   Correct.

4    Q.   And if we make a comparison with a Catholic church, we can

5    call him a priest sort of position.   In other words, he holds a

6    position that we think is closer to God, so to speak.

7    A.   Something like that, yes.

8    Q.   Except in this case, being Santeria will be closer to some

9    degree to the spirits.   Correct?

10   A.   Something like that, yes.

11   Q.   Because one of the things is that Santeria -- different

12   than the rest of most people, Santeria, the belief is you can

13   talk to the spirits.   Correct?

14   A.   Correct.

15   Q.   And that the spirits are going to know -- they will answer

16   your questions.   Correct?

17   A.   Correct.

18   Q.   And you do some type of rituals -- to be able to talk to

19   the spirits so the spirits will answer, you need to do some

20   type of rituals.   Correct?

21   A.   Correct.

22   Q.   What kind of rituals would those be?

23   A.   Well, Jorge really didn't do any rituals.   He just passed

24   spirits according to him.

25   Q.   He would pass the spirits?

 1   A.  According to him, yes.

 2   Q.  Let's talk about that.  How would he pass a spirit?  How

 3   would that be done?

 4   A.  I don't know, something -- just his body would change,

 5   something like that.

 6       I never did any of that, so...

 7   Q.  What would happen when his body would change?

 8   A.  He would change, his personality, the way he talked, the

 9   way he was acting.

10   Q.  And he would say that he would, at that time, be in contact

11   with the spirits?

12   A.  Yeah, that it would be a spirit that went through his body.

13   Q.  And he had a special spirit; Francisco was his spirit?

14   A.  Correct.

15   Q.  So, he would do this Santeria, and he would communicate

16   with Francisco and Francisco would give -- Francisco would give

17   answers to his questions.  Correct?

18   A.  That's correct.

19   Q.  So, in other words, if he went through a jam or had an

20   important decision to make in his life is something that he

21   would consult with Francisco to see if he should do it this way

22   or that way?

23   A.  That's correct.

24   Q.  And for whatever reason, again, I am not passing judgment.

25   People in the Santeria religion believe that?

1   A.   That is correct.

2   Q.   So he attracted certain people that were devoted to the

3   Santeria religion.   Is that correct?

4   A.   That's correct.

5   Q.   Because he was a Palero -- for the record, P-A-L-E-R-O.

6        Because he was a Palero, people would go to him so that he

7   could help them in guidance and lead them in their religion.

8        Correct?

9   A.   Yes.

10  Q.   So in this case, Crespo comes into, so far as you remember,

11  into the life of Diaz, of Jorge Diaz, sometime around 2015 or

12  so you said.   Is that correct?

13  A.   That is correct.

14  Q.   And he comes in, Crespo does.   Obviously, he is a believer

15  in the Santeria religion.   Correct?

16  A.   That is correct.

17  Q.   So Jorge Diaz became the guidance, the guider, the fellow

18  who was the leader in the religion.   Correct?

19  A.   That is correct.

20  Q.   So Diaz became the son.   It's kind of a father and son

21  relationship.   Correct?

22  A.   That is correct.

23  Q.   So Diaz would refer to Crespo as "mijo," son.   Correct?

24  A.   Yes.

25  Q.   And Crespo would refer to him as "padrino," godfather.

1   Correct?

2   A.   Yes.

3   Q.   And it's kind of a situation of reverence.   In other words,

4   you respect that person and you respect the status of that

5   person within the religion.

6        Correct?

7   A.   Yes.

8   Q.   And I believe you mentioned because of the religious

9   affiliation or relationship that existed, Crespo would visit

10  very frequently the house that you were cohabitant with

11  Mr. Diaz.   Correct?

12  A.   That is correct.

13  Q.   And they talked on the phone all the time.   Correct?

14  A.   That is correct.

15  Q.   Not only would they talk on the phone, they would talk on

16  the phone for quite some time, in other words, lengthy calls.

17  Correct?

18  A.   That is correct.

19  Q.   So Crespo would come over and talk about their religion and

20  would do whatever religious things were done at that time.

21  Correct?

22  A.   That is correct.

23  Q.   And that went on throughout the time that you knew them,

24  that you knew Crespo to be around Jorge Diaz.   Correct?

25  A.   That is correct.

1    Q.   Now, part of the manipulation of Mr. Diaz, aside from the

2    fact that he got you into this religion that was somewhat

3    different than what you were used to, Mr. Diaz can be

4    manipulating in the sense that if he wants to lead you to do

5    something, he will find -- he will try to study the way to get

6    you to do it.

7         In other words, he is capable of not telling you the truth,

8    lying to you, whatever is necessary to get you to do whatever

9    his purpose is.   Correct?

10   A.   Correct.

11   Q.   So he has this ability not only to do religious rituals but

12   also to manipulate people that come to him or are around him to

13   serve his purposes.   Correct?

14   A.   Correct.

15   Q.   And if necessary, he will lie to them as well and lie to

16   whoever is necessary in order to accomplish whatever is good

17   for Mr. Diaz.   Correct?

18   A.   Correct.

19   Q.   So when he kept telling you, "Don't worry about it; he will

20   cover for me," meaning Mr. Crespo will cover for him, you

21   tended not to believe that.   Correct?

22        You said you didn't believe that.   Correct?

23   A.   That is correct.

24   Q.   And you knew Diaz to be a manipulator.   Is that correct?

25   A.   That is correct.

1  Q.   Now, this religion, Santeria, tends to be -- the people who

2  are devotees, the people who practice that, because it's kind

3  of a different religion, people tend to keep it with themselves

4  and not share it with other normal -- with other people in the

5  community?

6  A.   Jorge used to share it.

7  Q.   Pardon me?

8  A.   Jorge used to share it.

9  Q.   You share it with the people who, obviously, believe and

10  are devotees to Santeria, but how about with individuals who

11  are not?

12       Would you go and present yourself as a santero?  I mean,

13  was that the kind of thing that he did or he tried to keep that

14  in the low key?

15  A.   Correct.

16  Q.   In other words, it was okay for people in the Santeria

17  religion talk to one another and let each other know, that I, I

18  am into Santeria, but when it comes to people outside of the

19  religion itself, they tend to be close vested, keep it in-house

20  because we are going to be ridiculed or look like you are a

21  weirdo type of deal.  Correct?

22  A.   Correct.

23  Q.   Now, Diaz was dealing in another type of drug you said

24  before.  What was the name of that drug?  I hadn't heard of it

25  before.

```
 1   A.   Opana.

 2   Q.   Opana?

 3   A.   October.

 4   Q.   What kind of drug is that?  What does it do to you?

 5   A.   It's an opiate.

 6   Q.   Is it a pharmaceutical or something that is grown or what?

 7   A.   Pharmaceutical.

 8   Q.   And he was doing that when you met him in 2011?

 9   A.   Correct.

10   Q.   When did he start, as far as you know, getting into the

11   other pharmaceutical such as Oxycodone?  When did he do that?

12   A.   Around 2015, 2016.

13   Q.   Okay.  And you mentioned at that time you didn't get into

14   that because you had a job.  You were working, I believe, at

15   Jackson Memorial Hospital for a time?

16   A.   That is correct.

17   Q.   And you were a -- what was your position there?  What did

18   you do?

19   A.   Pathology Associate II.

20   Q.   All right.  And later you went to an insurance company.

21   Correct?

22   A.   That is correct.

23   Q.   And it's only after that when you leave the insurance

24   company that you became unemployed and that you get into the

25   issue or into the business, shall we say, of the Oxycodone.
```

1   Correct?

2   A.   That is correct.

3   Q.   So, slowly but surely he was able to manipulate you more

4   and more into that world?

5   A.   Yes.

6   Q.   To the point that at one point in the end he had you so

7   much in his grasp that he basically put you to do the job or to

8   take the place of Carlos Pozo.   Correct?

9   A.   That is correct.

10   Q.   Did he at times give you money knowing that you were going

11   to be using that money to feed your methamphetamine, your

12   habit?

13   A.   No.

14   Q.   No, okay.

15        That's something that you pursued because at that point you

16   couldn't help it.   The drug basically had ahold of you.

17   Correct?

18   A.   Correct.

19   Q.   Now, you tried to, to your credit, to kind of kick the

20   habit, and you have gone to rehab and at times you have been

21   back to the drug.   Correct?

22   A.   Yes, one time I went to rehab.

23   Q.   You went to rehab and you gave it a shot, I mean, you gave

24   it a real effort or not?

25   A.   No.

1    Q.   You went in there and you had in mind, I need to get back

2    to the drugs?

3    A.   Yes, I did.

4    Q.   So this is the first time since around 2017?

5    A.   No, I have been clean for 18 months.

6    Q.   No, but, I mean, this is the first time you have been

7    really clean since you went into the habit?

8    A.   That is correct.

9    Q.   And the reason for that is because at this point you are

10   incarcerated.  Correct?

11   A.   That is correct.

12   Q.   All right.  Now, over all, correct me if I am wrong, it

13   sounded to me during your testimony that your contacts or your

14   relationship with Crespo was not that close, certainly not as

15   close or anywhere near as close as the Diaz Crespo

16   relationship.  Correct?

17   A.   That's correct.

18   Q.   And you mentioned that if Mr. Crespo called you at times it

19   was simply to find out, "Hey, have you seen Jorge?  I can't get

20   ahold of him?  Can you get ahold of him," and things like that?

21   A.   That is correct.

22   Q.   And when the drug got ahold of you, you had problems all

23   around you because of the drug?

24        Again, I'm not faulting you.  I want to make sure you

25   understand that.  I understand what drugs are.

     1   A.   That's correct.

     2   Q.   But the drugs had ahold of you and had your life really

     3   upside down.   Correct?

     4   A.   That is correct.

     5   Q.   Brought you problems with, for example, your mother?

     6   A.   That is correct.

     7   Q.   Your kids?

     8   A.   That is correct.

     9   Q.   In fact, that went really bad with the kids.   Correct?

    10   A.   That is correct.

    11   Q.   You lost custody of the kids?

    12   A.   That is correct.

    13   Q.   Your life really got wrecked because of the drugs.

    14   Correct?

    15   A.   That is correct.

    16   Q.   Even though you didn't visit physically the medical clinic

    17   of this Dr. Gonzalez, you learned some things because Jorge

    18   Diaz would tell you about those things.   Correct?

    19   A.   That is correct.

    20   Q.   And when Dr. Gonzalez was under investigation, you learned

    21   through Jorge Diaz that -- from Suzy he had learned that

    22   Dr. Gonzalez was under investigation.   Correct?

    23   A.   That is correct.

    24   Q.   So apparently, Jorge Diaz had a connection to find out what

    25   was going on inside of that clinic.   Is that correct?

1    A.   That is correct.

2    Q.   Enough to know that they were under investigation.

3    Correct?

4    A.   Correct.

5    Q.   And Suzy appears to be at least one of his contacts.

6    Correct?

7    A.   Correct.

8    Q.   When Mr. Crespo was going over and had a conversation with

9    Mr. Diaz about the religion and things of that sort, they would

10   do it on their own without you being present?

11   A.   Sometimes.

12   Q.   Sometimes, and sometimes you were present.  Correct?

13   A.   Sometimes.

14   Q.   And the times that you were present, you knew that their

15   conversations and their dealings were related to that religion.

16   Correct?

17   A.   That is correct.

18   Q.   Did I hear you correctly, and I may have misunderstood,

19   that you, yourself, was selling some of the Oxycodone?

20   A.   Sometimes Jorge would tell me to.

21   Q.   So, it's not that you were doing it on your own.  It's that

22   he was kind of directing you to sell the Oxycodone.  Correct?

23   A.   Sometimes, yes.

24   Q.   In other words, go ahead and sell this or deliver this to

25   Yandre as an example, that kind of thing?

1    A.   That is correct.

2    Q.   It's not like you did it on your own; it's just that he

3    asked you to do those things.   Is that correct?

4    A.   When Jorge and I were on and off, I sold mine like twice

5    maybe.   That's it.

6    Q.   One of the things we learned and we heard part of it at

7    least in one of the conversations that he would -- by "he" I

8    mean Jorge Diaz -- would threaten you with using vodoo against

9    you.   Correct?

10   A.   That is correct.

11   Q.   Is this something that you took that concerned you, the

12   fact that he would threaten you with using vodoo?

13   A.   That, of course, yes.

14   Q.   Why did that concern you?   Why were you afraid of that that

15   he would say I'm going to use vodoo against you?

16   A.   Because I was with him for years, and that's what I seen so

17   I was afraid.

18   Q.   All right.   Okay.   So, if he told somebody, like me, I'm

19   going to use vodoo, knock yourself out, do it.

20        Why is it -- what did you see him do when he says I am

21   going to do vodoo on somebody?   What would he do that would

22   make you afraid?

23   A.   He would teach me to do these bad jobs, like wicked stuff,

24   and he would say that that's going to work on this one and that

25   one and stuff like that, so I was afraid.   Without knowing if

1    it was going to work or not, he manipulated me to the point

2    where I was afraid.

3    Q.  When he did the wicked stuff, what was the wicked stuff you

4    are talking about?

5    A.  In the back porch he had like this big, how can I say it, a

6    big pan, and it had like sticks in it.  And he had a skull and

7    all that stuff in there.

8    Q.  All right.  And when he did whatever he did with the skull

9    and the sticks and all of that, what was supposed to happen to

10   the person that he was directing this to?

11   A.  Whatever job he was saying that would happen, like they

12   would lose their jobs or lose their kids, or the relationship

13   would end, stuff like that.

14   Q.  All right.  And you became afraid of why, did you see that,

15   in fact, it worked if he did that?

16   A.  I don't know if it worked, but it was scary.

17   Q.  Okay.  So you became afraid of him?

18   A.  Yes.

19   Q.  So, when he said to you that he would use vodoo against

20   you, that was a concern?

21   A.  Yes.

22   Q.  Now, you had your own ability to do vodoo against him.

23   Correct?

24   A.  Yes.

25   Q.  Did you ever do that?

1   A.   No.

2   Q.   Now, during the period of time of time that you went

3   through a very difficult time that you had broken up with

4   Mr. Diaz and you found yourself living in hotels and basically

5   homeless at the time.  Correct?

6   A.   Correct.

7   Q.   It was the toughest time for you.  Correct?

8   A.   That is correct.

9   Q.   You had no place to hang your life, nobody to really hang

10  with of any worthwhile, and tough time.  Correct?

11  A.   That is correct.

12  Q.   Now, at that time he did -- whether to manipulate you or

13  whatever purpose -- at times, throw money your way.  Correct?

14  A.   That is correct.

15  Q.   For that reason, it became sort of an on and off -- some

16  people would say toxic relationship, but on and off.  Correct?

17  A.   That is correct.

18  Q.   What caused you to finalize the breakup, in other words, go

19  your own way?

20  A.   I didn't want to be with him anymore.  He was too old for

21  me.

22  Q.   And you realized the kind of person he was?

23  A.   Correct.

24  Q.   You finally saw him for who he was?

25  A.   Yes.

1  Q.   In this case, you have been sentenced by Judge Gayles to

2  three years.  Correct?

3  A.   That is correct.

4  Q.   I understand that the sentence was three years, but you

5  understood that you were facing potentially more.  Correct?

6  A.   That is correct.

7  Q.   What were your guidelines as you went to the sentencing

8  hearing?

9  A.   My guidelines were number 23.

10  Q.   And do you remember how many months you were potentially

11  facing, roughly?

12  A.   I believe it was 46 months, starting off like that.

13  Q.   The bottom would have been 46 months?

14  A.   That is correct.

15  Q.   In other words, so that the jury understands, in the

16  federal system there is a thing called the Sentencing

17  Guidelines.  Correct?

18  A.   That is correct.

19  Q.   And how you get sentenced, for example, the drug involved

20  has something to do with it.  There is a book that tells you

21  for this drug could be penalties.

22       Correct?

23  A.   That is correct.

24  Q.   The more drugs or the more pills involved the higher the

25  penalty.  Correct?

1   A.   That is correct.

2   Q.   And, of course, as you are going into this process of the

3   sentencing, you want to be aware of everything.  You want to

4   know what you are facing.  My God, this is my life.  Correct?

5   A.   That is correct.

6   Q.   And you are going in there and you are told from the

7   beginning that the judge has the power to sentence you in this

8   case that you plead guilty to, Count 1, the distribution,

9   possession to distribute drugs, up to 20 years.

10       Correct?

11  A.   That is correct.

12  Q.   And you are told straight out when you plead guilty, I

13  don't care -- well, the judge doesn't say it that way.

14       The judge would tell you, no matter what your attorney

15  explained to you, no matter what anybody explained to you, I am

16  going to impose the sentence and I can sentence you to up to

17  20 years.  Correct?

18  A.   That is correct.

19  Q.   And those are very frightening words, aren't they?

20  A.   Yes, they are.

21  Q.   But because you know you could get 20 years.  Correct?

22  A.   Correct.

23  Q.   Now, you went in there and instead of getting a higher

24  sentence, which could have been beyond the four years, which is

25  the minimum, instead of getting four and above, you got three

1   years.  Correct?

2   A.  Correct.

3   Q.  All right.  And the way that it works is that because you

4   are cooperating, because you are here today, you have an

5   opportunity to get a reduction.  Correct?

6   A.  Correct.

7   Q.  And you understand, though, that the only way that you can

8   get a reduction is if the prosecutor in this case fails a

9   motion with the Court requesting that your sentence be reduced.

10  Correct?

11  A.  Correct.

12  Q.  Even the judge cannot reduce your sentence unless the

13  prosecutor files that motion.

14      You understand that?

15  A.  Yes, I do.

16  Q.  Now, you could have gotten a reduction before but you are

17  not getting it yet.

18      In other words, you are here testifying and you will find

19  out later if you are going to get a reduction.  Correct?

20  A.  Correct.

21  Q.  So, the bottom line is, it behooves you or it helps you to

22  get a lower sentence if the prosecutor was satisfied or happy

23  with your cooperation.  Correct?

24  A.  Correct.

25  Q.  I, on the other hand, not only have I not met with you, but

1    I can't give you anything, I can't say to you, Ms. Lorenzo, if

2    you help in this case, I can get your sentence reduced.  I

3    can't do that.  You know that.  Right?

4    A.   That is correct.

5    Q.   You know, if I did that, I'd probably be going there,

6    meaning I'd probably get arrested because I cannot do that.

7         Correct?

8    A.   Correct.

9    Q.   So here today, insofar as one would want to make one happy

10   or satisfied in order to be get a reduction between the two

11   sides, the prosecutor is the more important one from your

12   perspective.  Correct?

13   A.   I am here to say the truth.

14   Q.   Okay.  But at the end of the day, when it gets down to the

15   reduction, one of the things that is very important -- I am not

16   faulting you.  This is the reality of how the system works.

17        What's important at the end of the day is, how big of a

18   reduction is important.  Correct?

19   A.   That is correct.

20   Q.   And the person who will get up and agree or disagree with a

21   certain amount of reduction to some extent is going to be the

22   prosecutor.  Correct?

23   A.   The judge is the only one that can decide that.

24   Q.   I understand, but the judge is going to listen because the

25   prosecutor is going to say, Judge, we recommend; is that

1    correct?

2    A.   That's correct.

3    Q.   And that recommendation goes a long way, and we all know

4    that.   Correct?

5    A.   I guess so.   I've never been here before.

6    Q.   Okay.   What do you think is going to be the reduction after

7    you get your sentence reduced?

8    A.   I don't know.

9         MR. QUINON:   Okay.   Fair enough.   That's a fair answer.

10        Thank you very much.

11        Judge, can I just have a second?

12        I just want to make sure.

13        No further questions, Your Honor.

14        THE COURT:   All right.   Any redirect?

15        MR. MCLAUGHLIN:   Yes, Your Honor.

16                       REDIRECT EXAMINATION

17   BY MR. MCLAUGHLIN:

18   Q.   Ms. Lorenzo, you testified on direct, and there were many

19   questions of Mr. Quinon about Mr. Diaz, so I'd like to ask you

20   questions about that.

21   A.   Okay.

22   Q.   You see here, your date of birth is what here?

23   A.   July 31st, 1988.

24   Q.   You began your relationship with Mr. Diaz in what year?

25   A.   In 2011.

1   Q.   How old were you when you started your relationship with

2   Mr. Diaz?

3   A.   I was 23 going on 24.

4   Q.   23 and 24.

5        Now, I am going to show you Government's Exhibit 19B.  Do

6   you see here?

7        What's his date of birth?

8   A.   11/18/1954.

9   Q.   So, he is what 34 --

10  A.   He's 34 years older than me.

11  Q.   So he would have been?

12  A.   57, 58.

13  Q.   Okay.  Regarding your relationship, you lived together for

14  a number of years?

15  A.   That's correct.

16  Q.   And, again, he is how much older than you?

17  A.   He's 34 years older than me.

18  Q.   Very well.

19       Just so I'm clear, during the time you were with him, you

20  were not a federal law enforcement agent?

21  A.   No.

22  Q.   Were you authorized to carry a weapon at that time?

23  A.   No.

24  Q.   Mr. Quinon asked you how many times you have met with

25  myself and the agents.  You testified four times.  Correct?

1    A.   Yes.

2    Q.   Is this the first time this trial has been scheduled since

3    you were arrested?

4    A.   No.

5    Q.   How many times has it been rescheduled?

6    A.   Five.

7    Q.   I'd like to show you Government's Exhibit 10A.  Now,

8    Mr. Quinon asked you about the nature of the relationship

9    between Diaz and Crespo.

10        For a good portion of this time, July 2017 through

11   July 2020, were you living with Jorge Diaz?

12   A.   Yes.

13   Q.   Did you listen to every single phone call he engaged in?

14   A.   Not all of them.

15   Q.   Did you hear what the other person said on the other end of

16   the line for every single phone call he engaged in?

17   A.   No.

18   Q.   Did you read every single text message that Jorge Diaz got?

19   A.   No.

20   Q.   When Jorge Diaz would meet with someone outside of your

21   house, were you always there?

22   A.   No.

23   Q.   Do you know everything Jorge Diaz says and does with

24   people?

25   A.   No.

1          MR. MCLAUGHLIN:  I have no further questions, Your

2    Honor.

3          THE COURT:  All right.  Ladies and gentlemen, we need

4    to take a short break.  Why don't we go ahead and take ten

5    minutes?

6          Please don't discuss anything about the case.

7          COURT SECURITY OFFICER:  All rise.

8          (The jury exited the courtroom at 2:35 p.m.)

9          THE COURT:  All right.  Please be seated.

10         You can remove this witness.

11         Thank you, ma'am.

12         Your next witness is going to be?

13         MR. MCLAUGHLIN:  Jorge Diaz, Your Honor.  He is here.

14   He is ready to go as soon as we begin.

15         THE COURT:  All right.  We will take ten minutes.

16         (Recess.)

17         THE COURT:  I note the presence of the attorneys and

18   the defendant.  Are we all set?

19         MR. MCLAUGHLIN:  I wanted to let the Court know that we

20   have interpreters here for Mr. Diaz.

21         THE COURT:  All right.  Let's bring in the jury,

22   please.

23         (The jury entered the courtroom at 2:50 p.m.)

24         THE COURT:  Please be seated.

25         MR. MCLAUGHLIN:  Permission for the witness to

1   approach, Your Honor.

2            THE COURT:  Very well.

3            All right.  Please come forward.

4            Sir, I need you to please raise your right hand and be

5   sworn.

6            (The witness, Jorge Diaz, was duly affirmed.)

7            THE DEFENDANT:  I affirm.

8            THE COURT:  All right.  Please be seated.

9            Whenever you're ready.

10           MR. MCLAUGHLIN:  Thank you, Your Honor.

11                       DIRECT EXAMINATION

12   BY MR. MCLAUGHLIN:

13   Q.  Would you please state your full name, and spell your last

14   name for the record?

15   A.  Jorge Diaz Gutierrez, J-O-R-G-E, D-I-A-Z,

16   G-U-T-I-E-R-R-E-Z.

17   Q.  Thank you.

18           Good afternoon, Mr. Diaz.  How old are you?

19   A.  Sixty-seven.

20   Q.  Where were you born?

21   A.  Cuba.

22   Q.  Where did you grow up?

23   A.  In Cuba.

24   Q.  At some point, did you come to the United States?

25   A.  Yes.

1    Q.   When was that?

2    A.   May 3rd, 1980.

3    Q.   Have you been in the United States since that day?

4    A.   Yes.

5    Q.   Are you currently a U.S. Citizen?

6    A.   No.

7    Q.   What is your immigration status?

8    A.   Permanent resident.

9    Q.   And how long have you -- since when have you been a U.S.

10   permanent resident?

11   A.   Since 1981.

12   Q.   How far have you gone in school?

13   A.   Sixth grade.

14   Q.   Where was that?

15   A.   At the school Camila Jinerez, J-I-N-E-R-E-Z, maybe.

16   Q.   In Cuba?

17   A.   In Cuba.

18   Q.   Where do you currently live now?

19   A.   Cape Coral.

20   Q.   How long have you lived in Cape Coral?

21   A.   Two years.

22   Q.   And before you lived in Cape Coral, where did you live?

23   A.   I lived in Hialeah with my son.  He was the one who got me

24   out of Cuba.

25   Q.   How long did you live in South Florida, prior to moving to

1   Cape Coral?

2   A.   Since 1986 up to now.

3   Q.   You became a U.S. resident in 1981.  Where did you live

4   between 1981 and 1986?

5   A.   New York.

6   Q.   Now, Mr. Diaz, you are clearly fluent in Spanish.

7        Do you speak some English?

8   A.   Yes.

9   Q.   What is the language you are most comfortable in?

10  A.   Spanish.

11  Q.   Are you taking any medications today?

12  A.   Yes.

13  Q.   For what conditions are you taking medications?

14  A.   I'm taking medication for my diabetes, for my blood

15  pressure, for COPD, and for an aneurysm that I have in the

16  aorta.

17  Q.   Any of the medications you are taking now, do they affect

18  your ability to remember or testify clearly today in trial?

19  A.   No.

20  Q.   Do you know an individual by the name of Alberico Crespo?

21  A.   Yes.

22  Q.   Do you recognize him in court today?

23  A.   Yes.

24  Q.   Can you please point him out and describe what he is

25  wearing?

1    A.   The one who is behind there.

2    Q.   What is he wearing?

3    A.   A suit.

4    Q.   What color is his tie?

5    A.   I can't see very clearly from here.

6    Q.   Can you step down from the witness stand?

7    A.   Yes.

8         MR. QUINON:  We will stipulate that he knows

9    Mr. Crespo.

10        MR. MCLAUGHLIN:  Let the record reflect the witness has

11   identified the defendant, Alberico Crespo.

12   BY MR. MCLAUGHLIN:

13   Q.   When did you first meet Defendant Crespo?

14   A.   Around 2016.

15   Q.   All right.  How did you meet Defendant Crespo?

16   A.   He went to my home.

17   Q.   Did someone introduce you?

18   A.   Yes.

19   Q.   Who was that person?

20   A.   Valodia Aguilera.

21        MR. MCLAUGHLIN:  Permission to use the computer screen,

22   Your Honor.

23        Actually, the ELMO might be easier, I'm sorry.

24        Thank you, Your Honor.

25   BY MR. MCLAUGHLIN:

1   Q.   Mr. Diaz, I am going to focus you on the screen in front of

2   you and show you what has already been admitted as transcript

3   7-18.  I'm just going to show everyone on the ELMO with ease.

4        This is transcript 7-18.  We see here -- do you see here

5   the name I am pointing at here, Mr. Diaz, V-A-L-O-D-I-A?

6   A.   Yes.

7   Q.   I was showing you page three.  I am now taking you to page

8   five.

9        Do you see the name I am pointing out there?

10  A.   Yes.

11  Q.   What name is that?

12  A.   Valodia.

13  Q.   Is that the same Valodia that introduced you to Defendant

14  Crespo?

15  A.   Yes.

16  Q.   At the time you met Defendant Crespo, did you know what he

17  did for a living, what his job was?

18  A.   No.

19  Q.   Did you later learn what he did for a living?

20  A.   Yes.

21  Q.   What was his job?

22  A.   He was an FBI agent.

23  Q.   Did you know him to work for any other federal agency?

24  A.   No.

25  Q.   Why did you think he worked for the FBI?

1   A.   Because he said that he worked for the FBI, that he was

2   part of the FBI.

3   Q.   Did you know that he was a federal law enforcement agent?

4   A.   He was a federal, yes.

5   Q.   And how did you learn that?

6   A.   Because he told me so.

7   Q.   Now, Mr. Diaz, at any point leading up to today, have you

8   ever been a licensed physician?

9   A.   No.

10  Q.   Have you ever been authorized to prescribe, dispense,

11  distribute narcotics?

12  A.   No.

13  Q.   At any time, have you been a licensed pharmacist?

14  A.   No.

15  Q.   If we can go to the computer, Your Honor.

16       Showing the witness what's been -- I apologize.

17       Mr. Diaz, after meeting Crespo, did you eventually become

18  friends?

19  A.   Yes.

20  Q.   How soon after meeting did you become friends?

21  A.   At around two months later.

22  Q.   All right.  Describe for the jury, if you could, how did

23  your friendship develop?

24  A.   This friendship developed as part of the religion.

25  Q.   How did it develop as part of your religion?

1    A.   Because I practice Santeria and Palo Mayombe.

2    Q.   And within the Santeria religion, what was your position?

3    A.   I was a santero.

4    Q.   Have you heard the term Palero?

5    A.   Yes.

6    Q.   Were you a Palero?

7    A.   Yes.

8    Q.   Soon after you said your relationship developed because of

9    Santeria?

10   A.   Santeria.

11   Q.   Did you also have a friendship outside of the religion?

12   A.   Yes.

13   Q.   At the time you became friends with Defendant Crespo, where

14   were you living?

15   A.   I was living at West Third Street and 63rd.  It was a long

16   time ago.

17   Q.   Were you living with anyone at the time?

18   A.   Yes.

19   Q.   Who were you living with?

20   A.   With my wife.

21   Q.   I will show you Government's Exhibit 25A.

22        Do you recognize this individual?

23   A.   Yes.

24   Q.   Who is that?

25   A.   My wife, Anais Lorenzo.

1    Q.   Now, you just testified that she was your wife.

2         Were you ever married?

3    A.   No, but -- no.

4    Q.   When did you begin your relationship with Ms. Lorenzo?

5    A.   In 2011.

6    Q.   I am going to show you Government's Exhibit 23.

7         Mr. Diaz, drawing your attention to the exhibit on the

8    screen in front of you, if at any time you need me to Zoom or

9    turn something off, please le me know.

10        THE INTERPRETER:  Excuse me, sir.

11        MR. MCLAUGHLIN:  I said if at any time he needs me to

12   zoom or turn something up, just let me know.

13        THE INTERPRETER:  I think you should zoom it a little

14   bit.

15        MR. MCLAUGHLIN:  I am just going to.  I was just

16   letting him know.  The same, Mr. Interpreter, if you need me to

17   zoom, just let me know.

18   BY MR. MCLAUGHLIN:

19   Q.   Mr. Diaz, I'm going to zoom here on the bottom right-hand

20   corner and also towards the bottom.

21        Do you recognize the address depicted here?

22   A.   Yes.

23   Q.   How do you recognize that address?

24   A.   That's where we used to live.

25   Q.   What type of residence was at this address?

1   A.   A house.

2   Q.   At the time you were living at that house, did you have a

3   regular job?

4   A.   No.

5   Q.   Did you then move somewhere else after living at this

6   residence?

7   A.   Yes.

8   Q.   Where did you move after this residence?

9   A.   The thing is we lived in so many places.

10   Q.   I will rephrase the question.

11        Did you move out of this residence at some point?

12   A.   Yes.

13   Q.   And this was a house?

14   A.   Yes.

15   Q.   What was the next place you lived after the house?

16   A.   I think we moved to 58.

17   Q.   I am showing you now on the screen in front of you

18   Government's Exhibit 25, 25G.  Now I am going to take you to

19   page 60.

20        Going to page 60 of Government's Exhibit 25G, Mr. Diaz, I

21   am going to zoom in here.  We are on page 60 of Government's

22   Exhibit 25G.  What is the date reflected here?

23   A.   February 5th, 2019.

24   Q.   Do you recognize the address depicted here?

25   A.   Yes.

1   Q.   How do you recognize that address?

2   A.   Because this was apartment 58 where we used to live.  That

3   was the 58 that I referred to previously.

4   Q.   Now, at some point did your relationship with Ms. Lorenzo

5   come apart and end?

6   A.   Yes.

7   Q.   Did you stop living together?

8   A.   Yes.

9   Q.   When you stopped living together, where did you go live?

10  A.   I went to live with my daughter.

11  Q.   Now showing the witness what has already been admitted as

12  part of Government's Exhibit 9A.

13      Mr. Diaz, do you recognize the address depicted here?

14  A.   Yes.

15  Q.   What address are you looking at here?

16  A.   My daughter and I lived there.

17  Q.   What is your daughter's name?

18  A.   Ashley Diaz.

19  Q.   And how long did you live with Ashley Diaz, your daughter?

20  A.   I think it was about a year.  That was a long time ago.

21  Q.   About a year?

22  A.   I think so, maybe a little bit more.

23  Q.   How many months did you live with Ashley Diaz?

24  A.   I don't recall.  I do recall that I lived with her.

25  Q.   I am going to take you down back to the screen in front of

1    you.  I am now showing you Government's Exhibit 12A, Mr. Diaz.

2         Do you recognize the residence depicted here in

3    Government's Exhibit 12A?

4    A.  Yes.

5    Q.  How do you recognize it?

6    A.  I lived there.

7    Q.  Who owns this residence?

8    A.  Alberico Crespo.

9    Q.  What was the first time you went to this residence?

10        THE INTERPRETER:  Excuse me?

11   BY MR. MCLAUGHLIN:

12   Q.  When was the first time you went to this residence?

13   A.  Before I lived with Ashley, but that was a long time ago.

14   But I would always go there.

15   Q.  Had you visited this residence multiple times prior to

16   moving in?

17        THE INTERPRETER:  Excuse me?

18   BY MR. MCLAUGHLIN:

19   Q.  Had you visited this residence multiple times prior to

20   moving in?

21   A.  Yes.

22   Q.  Why did you go to this residence?

23   A.  Reason related to religion.

24   Q.  Who would you visit at this residence?

25   A.  Alberico.

1   Q.   When you first went there, who lived at the residence?

2   A.   He lived there with his wife.

3   Q.   What was her name?

4   A.   If I'm not mistaken, Irene or something like that.

5   Q.   How many times did you meet Irene?

6   A.   Many times.

7   Q.   Was anyone -- did anyone else live in the residence?

8   A.   And their daughter, Thalia.

9   Q.   At some point did -- who was Irene?

10  A.   Alberico's wife.

11  Q.   At some point, did Irene leave the residence and move

12  somewhere else?

13  A.   Yes.

14  Q.   Did anyone else move in after that?

15  A.   Yes.

16  Q.   Who was that?

17  A.   Samantha.

18  Q.   And when you moved into the residence here, Mr. Diaz, who

19  was living there?

20  A.   He and Samantha.

21  Q.   When you were living with Ms. Lorenzo, would both of you go

22  to the residence?

23  A.   Yes.

24  Q.   Would Defendant Crespo visit you at your residence with

25  Ms. Lorenzo?

1  A.   Yes.

2  Q.   Prior to moving in with Defendant Crespo here, how often

3  would you see him every week?

4  A.   We would see each other almost constantly.

5  Q.   I am going to show you Government's Exhibit 10A, Mr. Diaz.

6  The date range here is July of 2017 through July of 2020.

7        Do you see that?

8  A.   Yes.

9  Q.   And the very next day, July 21st, 2020, were you arrested?

10  A.   Yes.

11  Q.   When you were arrested, where were you residing?

12  A.   In Alberico's home.

13  Q.   I am going to take you to the second page of Government's

14  Exhibit 12A, Mr. Diaz.

15        You indicated that you were residing in the home.  Where

16  did you live in the residence?

17  A.   I was living in the garage.

18  Q.   If you could, mark on the screen with your finger the

19  portion of the house were you lived.

20  A.   (Indicating.)

21  Q.   Let the record reflect the witness has done as directed.

22        Mr. Diaz, how were you able to enter where you lived in the

23  house?

24  A.   Because I had my own key.

25  Q.   Where was the door that worked for your key?

1    A.   I would go in through a hallway.

2    Q.   Can you mark on the screen where that hallway was?

3    A.   It was over here.

4    Q.   Mr. Diaz, I am going to point to you, this is the house.

5         Do you see that?

6    A.   It's this one.  Right.

7    Q.   I am going to zoom in for you here.

8         Do you see the house in front of you?

9    A.   Yes.

10   Q.   Where would you enter the residence?

11   A.   There was a gate and I would go in through that gate

12   entrance there.

13   Q.   And if you can mark on your screen where that was?

14   A.   Right here.

15   Q.   This is the driveway here.  Did you have a vehicle during

16   the time that you lived at Defendant Crespo's residence?

17   A.   Yes.

18   Q.   Where would you park your vehicle?

19   A.   Here.

20   Q.   Would you please mark on your screen where that was?

21   A.   (Indicating.)

22   Q.   In front of the house?

23   A.   In front of the garage door.

24   Q.   Mr. Diaz, was there also a way to walk to the side of the

25   house here?

1    A.   There was also a gate, but I would not go into the house

2    through the right side.  I would come in through the left side

3    of the house.

4    Q.   Approximately, if we are going to -- if this is the front

5    door here --

6    A.   Yes.

7    Q.   -- would this be the left side of the house?

8    A.   Yes.

9    Q.   So if you could show the jury how you would enter the

10   residence.

11   A.   I would park my car here, and I would park my car and go

12   into the house through the alleyway here.

13   Q.   And when you say, "the alleyway here," is that the alleyway

14   reflected right here?

15   A.   Yes.

16          MR. QUINON:  Objection, Your Honor.  Leading.

17          THE COURT:  I'm sorry, I didn't hear your objection.

18          MR. QUINON:  I said leading because counsel asked the

19   question --

20          THE COURT:  Sustained.

21          I didn't hear the objection.

22   BY MR. MCLAUGHLIN:

23   Q.   Can you mark on the screen, Mr. Diaz, where you entered the

24   residence?

25   A.   Through the entrance door that was here.

```
 1   Q.   On the right side of the house?

 2   A.   Yes.

 3   Q.   Very well.  Do you remember -- you were arrested on

 4   July 21st, 2020.  Correct?

 5   A.   Yes.

 6   Q.   How long had you been living at the house when you were

 7   arrested?

 8   A.   I had been living there, I think, around eight months.

 9   Q.   I am going to show you --

10   A.   Between seven and eight.

11   Q.   I am going to show you Government's Exhibit 23.

12        When you lived at Defendant Crespo's residence, did you

13   sign a lease?

14   A.   No.

15   Q.   Did you pay rent?

16   A.   Yes.

17   Q.   And when did you pay rent?

18   A.   Every month.

19   Q.   At what point in the month did you pay rent?

20   A.   Well, sometimes I will pay it on the 20th, in advance.

21   Other times I would pay by the third.  There was not a set

22   date.

23   Q.   How would you pay?

24   A.   Cash.

25   Q.   Any other way?
```

1   A.   No.

2   Q.   Now, Mr. Diaz, I'm going to -- now showing you -- can I

3   have a moment, Your Honor?

4        Mr. Diaz, are there two phones in front of you?

5        THE INTERPRETER:  I'm sorry, Counsel.

6   BY MR. MCLAUGHLIN:

7   Q.   Are there two phones in front of you?  Not on the screen

8   but on the table in front of you?

9   A.   Yes.

10  Q.   All right.  Can you please grab those two?

11       Do you recognize both of those phones?

12  A.   Yes.

13  Q.   Drawing your attention to the exhibit that's labeled

14  Government's Exhibit 21A, do you recognize that phone?

15  A.   Yes.

16  Q.   What color is it?

17  A.   Red.

18  Q.   How do you recognize that phone?

19  A.   Because it's mine.

20  Q.   Do you recognize the phone that's labeled Government's

21  Exhibit 22A?

22  A.   Yes.

23  Q.   What kind of phone is that?

24  A.   A flip flap, one of those that opens and closes.

25  Q.   Did you have those phones with you when you were arrested?

1   A.   Yes.

2   Q.   Why did you own two phones at the time you were arrested?

3   A.   Because 22, 22A, I had it in order to place calls because I

4   was told that it couldn't be traced, so I used to use it to

5   make calls for the business.

6   Q.   All right.  When you say, "the business," what do you mean?

7   A.   In the pill business.

8   Q.   When you say, "pill business," specifically, what do you

9   mean?

10   A.   To Oxycodone.

11   Q.   If you could, hold up for the jury Government's

12   Exhibit 22A.

13   A.   (Indicating.)

14   Q.   Your other phone, was that Government's Exhibit 21A?

15   A.   (Indicating.)

16   Q.   What did you use that phone for?

17   A.   This was my personal phone, which I always had.

18   Q.   Did you also discuss Oxycodone trafficking in your personal

19   phone?

20   A.   Yes.

21   Q.   I am going to show you, Mr. Diaz, I am taking you to the

22   screen here, which is a download of the red phone, Government's

23   Exhibit 21A.

24       You testified that you were living at Defendant Crespo's

25   residence for approximately eight months prior to your arrest?

1    A.   Yes.

2    Q.   All right.  I am going to take you here.  We see entry

3    number three.  Do you see that here?

4    A.   Yes.

5    Q.   And what is the date listed here?

6    A.   January 31st, 2020.

7    Q.   Do you recognize the photograph here on the right-hand

8    side?

9    A.   Yes.

10   Q.   Where was that photograph taken?

11   A.   That picture, that's where I lived -- those saints are

12   where I used to live, in the efficiency.

13   Q.   Whose house was that?

14   A.   Alberico's.

15   Q.   I am going to control down here.

16        Do you see the entry here, Mr. Diaz, at number ten?

17   A.   Yes.

18   Q.   I am going to zoom here.  What is the date listed here?

19   A.   February 24th, 2020.

20   Q.   Do you recognize the photograph here on the right-hand

21   side -- I will zoom in, this photograph here?

22   A.   The picture?  If you zoom it more, I may be able to see.  I

23   have a lot of vision problems.

24        I don't recognize it very well.  I don't remember this

25   picture.

1   Q.  We will move along.

2       There is another photograph, entry 13.  What is the date

3   here?

4   A.  February 1st, 2020.

5   Q.  I am going to click on the file link.  Perhaps this will --

6       Do you recognize where this photograph was taken?

7   A.  That picture was during a barbecue.

8   Q.  Do you know where it was taken?

9   A.  At Alberico's house.

10  Q.  How do you recognize that's where it was taken?

11      THE INTERPRETER:  I'm sorry, Counsel.  May I have the

12  question again?

13  BY MR. MCLAUGHLIN:

14  Q.  How do you recognize that is where the photograph was

15  taken?

16  A.  Because that's his barbecue, and that day I also had

17  chicken.

18  Q.  I am going to go back to entry 10.  I am going to go back

19  to picture 10 and show you the photograph.

20      Mr. Diaz, do you recognize where this photograph was taken?

21  A.  Now it's bigger.

22      Yes, that picture was at Alberico's house.

23  Q.  When you say, "at his house," was that in your efficiency?

24  A.  No, at his house in the living room.

25  Q.  Now, I see the photographs depicted in 17 and 18, Mr. Diaz.

1          Do you see?

2     A.   Where are the pictures; here?

3     Q.   Right here.

4     A.   Yes, that's my efficiency.

5     Q.   How are you able to determine that this is the efficiency?

6     A.   My religious things are there with a candle.

7     Q.   I am showing you entry 14.  What is the date listed here?

8     A.   February 12th, 2020.

9          MR. QUINON:  Did you say entry 14?

10         MR. MCLAUGHLIN:  Correct.

11         MR. QUINON:  Thank you.

12    BY MR. MCLAUGHLIN:

13    Q.   Do you recognize where this photograph was taken?

14         THE INTERPRETER:  This is the interpreter, Counsel.

15         Did you say where or when?

16    BY MR. MCLAUGHLIN:

17    Q.   Where?

18    A.   On the counter of the efficiency where I lived.

19    Q.   Now, Mr. Diaz, when you moved in -- I am going back to show

20    you Government's Exhibit 12A.

21         When you moved in here, did you pay Defendant Crespo money

22    to move in?

23    A.   Yes.

24    Q.   How did you pay him?

25    A.   Cash.

1   Q.   I am taking you to Government's Exhibit 23, taking you down

2   to page two -- we are on page -- for the record, we are on

3   Government's Exhibit 23, page 227.  I am going to zoom in here,

4   Mr. Diaz.

5        Do you see the deposit here occurring on December 3rd,

6   2019?

7   A.   Yes.

8   Q.   What type of deposit is that?

9   A.   I honestly don't remember that very well.

10  Q.   Did you receive social security during December of 2019?

11  A.   Yes.

12  Q.   How much was your social security that you received?

13  A.   It was 900 something.  I don't remember now because after

14  that it's increased.

15  Q.   When did you get your social security?

16  A.   I would receive it at the beginning on the first, and then

17  it was switched to the third.

18  Q.   How often would you get social security?

19  A.   Every month.

20  Q.   Can you see here there are two walls on the same day,

21  December 3rd?

22  A.   Yes.

23  Q.   What kind of walls are those?

24  A.   It's just that I am trying to remember.

25  Q.   Do you know what an ATM withdrawal is?

1   A.   Yes.

2   Q.   What do you get out of an ATM?

3   A.   I had a limit of up to $900 -- $600 I could take out.

4   Q.   What kind of money comes out of an ATM, Mr. Diaz?

5   A.   Well, what came out of there, the money that I could have

6   was from social security.

7   Q.   Have you ever used an ATM before?

8   A.   Yes.

9   Q.   And what happens when you use an ATM?

10   A.   It gives you money.

11   Q.   And what type of money?

12   A.   Cash.

13   Q.   And do you see the word here, do you see where it says ATM

14   withdrawal?

15   A.   Yes.  Yes.

16   Q.   What's the amount here?

17   A.   Three hundred.

18   Q.   Do you see the word "cash" right here?

19   A.   Yes.

20   Q.   What's the amount next to that?

21   A.   Six hundred.

22   Q.   How did you pay rent to Defendant Crespo?

23   A.   I would pay cash.

24   Q.   Now I take you back to Government's Exhibit 21B.

25        Mr. Diaz, when you moved into Defendant Crespo's residence,

1   how many times had you been there before that time you moved

2   in?

3   A.   Many, many times I have been there.

4   Q.   Aside from Irene and Defendant Crespo's daughter and

5   Samantha, had you ever met any other members of his family?

6   A.   The mother, the mom.  I also met the one who is almost like

7   his father, and I met friends of his also.

8   Q.   In terms of family members, you met his mother?

9   A.   Yes.

10   Q.   How many times did you meet his mother?

11   A.   I saw her like -- I saw her like twice.  One time at his

12   house, and then at her house I saw her several times, like two

13   or three times.

14   Q.   When you met with Defendant Crespo's mother, who was with

15   you?

16   A.   I was alone.

17   Q.   No one else was with you?

18   A.   No, no one else.

19   Q.   Defendant Crespo was not with you when you met his mother?

20   A.   Yes, we played dominoes together.

21   Q.   So Defendant Crespo was with you when you met Defendant

22   Crespo's mother?

23   A.   Yes.

24   Q.   Did you ever have the phone number for Defendant Crespo's

25   name on your phones?

1  A.  No.

2  Q.  You mentioned that you met Defendant Crespo's stepfather or

3  father.

4  A.  No, the stepfather.

5  Q.  Who was with you when you met Defendant Crespo's

6  stepfather?

7  A.  Crespo.

8  Q.  Did you ever spend time with either his mother or his

9  stepfather outside of the presence of Defendant Crespo?

10  A.  No.

11  Q.  Did you ever have Defendant Crespo's stepfather's phone

12  number saved on your phones?

13  A.  No.

14  Q.  Now, when you moved to the residence, you had your own key?

15  A.  Yes.

16  Q.  What did that key allow you to do?

17  A.  To open the door that gave access to the efficiency where I

18  lived.

19  Q.  Were you allowed to go in any other parts of the house?

20  A.  Yes.

21  Q.  Did you have to ask permission?

22  A.  No, I was allowed.

23  Q.  I am going to show you here now, this is entry 21.

24      What is the date here, Mr. Diaz?

25  A.  March 6th, 2020.

```
 1    Q.   What are we looking at in this photograph?

 2    A.   Samantha and me.

 3    Q.   Where are you depicted here in this photograph?

 4    A.   In the dining room.

 5    Q.   Can you mark on your screen where you are?

 6    A.   Here.

 7    Q.   And this photo takes place were inside the house?

 8    A.   Here is the kitchen.  In front of the kitchen, and on this

 9    side there is a living room.

10    Q.   Is that part of your efficiency?

11    A.   No, that's his house.

12    Q.   So you were allowed to walk around the house with your

13    shirt off?

14    A.   Yes.

15    Q.   Now, showing you entries 22 and 23, what are the dates

16    here, Mr. Diaz?

17    A.   March 6, 2020, March 6th, 2020.

18    Q.   Did your efficiency have a lock on it?

19    A.   To go into his house he would lock it from inside.

20    Q.   But you were still allowed to go into his house when you

21    wanted to?

22    A.   Yes, yes.  We trusted each other that way, yeah.

23    Q.   Did Defendant Crespo have access to your efficiency?

24    A.   Yes.

25    Q.   Mr. Diaz, I am going to take you back to Government's
```

1   Exhibit 12A, and I am going to take you back to Government's

2   Exhibit 10A.  And I want to talk about the nature of your

3   relationship with Defendant Crespo after you met him.

4        Do you see here -- and I will zoom in.

5        We are on the first page of Government's Exhibit 10A.

6        Do you see the four phone numbers here?

7   A.   Yes.

8   Q.   Do you recognize those phone numbers?

9   A.   Yes.

10  Q.   And during this period, July 2017 through July 2020, did

11  you use multiple different phones?

12  A.   These two phones.

13  Q.   Did you use multiple different phones?

14  A.   I used 542-3906 and 450-0487.

15  Q.   Why would you use so many different phone numbers?

16  A.   Because of the business I was involved in, the Oxycodone.

17  Q.   Why do you need to use so many phone numbers?

18  A.   Because I thought that this would protect me from somebody

19  capturing my fixed phone numbers, and I wouldn't be caught.

20  Q.   And we see here you used all four numbers to communicate

21  with Defendant Crespo.  Correct?

22  A.   Yes, I always contacted him.

23  Q.   And we see here, based on this summary, this number of

24  calls and texts went this way and this number went that way.

25       Do you see that?

1   A.   Yes.

2   Q.   Why was Crespo always calling you?

3   A.   First the conversations were about religion, and afterwards

4   our conversations dealt with the problems that I had, that

5   somebody had asked about me for the FBI.

6   Q.   Did you find it annoying that he was calling you all the

7   time?

8   A.   Yes.

9   Q.   If it was annoying, why would you answer his phone calls?

10  A.   Because I wanted to know about my problem that they were

11  following me.

12  Q.   Mr. Diaz, you were arrested at Crespo's residence on

13  Government's 12A in July of 2020.   Correct?

14  A.   Yes.

15  Q.   Did you later accept responsibility to plead guilty in this

16  case?

17  A.   Yes.

18  Q.   When did you plead guilty?

19  A.   September -- it was either September 5th or September 15th,

20  but it was September.

21  Q.   Do you remember exactly when you plead guilty?

22  A.   No, I don't recall very well.

23  Q.   Now, prior to pleading guilty, did you sign a plea

24  agreement?

25  A.   Yes.

1    Q.   Would looking at that plea agreement help you remember when

2    you plead guilty?

3    A.   Yes.

4         MR. MCLAUGHLIN:   Your Honor, if we could dim the juror

5    screens.

6    BY MR. MCLAUGHLIN:

7    Q.   Now showing the witness Government's Exhibit 19D -- excuse

8    me, 19C for identification.

9         I am now showing the witness the first page of Government's

10   Exhibit 19C for identification.

11        Now, Mr. Diaz, do you recognize the first page of this

12   document?

13        (Government's Exhibit 19C was marked for identification.)

14   A.   Yes.

15   BY MR. MCLAUGHLIN:

16   Q.   And what is that?

17   A.   It's an agreement to declare myself guilty.

18   Q.   Did you have an attorney during the process before you

19   signed this plea agreement?

20   A.   Yes.

21   Q.   Who was your attorney?

22   A.   At that time, Joaquin Padilla.

23   Q.   Is he still your lawyer today?

24   A.   No.

25   Q.   Who is your lawyer right now?

```
 1   A.   Christian -- I don't recall his last name.

 2   Q.   I am going to take you here to the last page of your plea

 3   agreement.

 4        Do you recognize your name here, Mr. Diaz?

 5   A.   Yes.

 6   Q.   Did you sign this document?

 7   A.   Yes.

 8   Q.   Did your attorney sign this document?

 9   A.   Yes.

10   Q.   What attorney was that?

11   A.   Christian Duncan.

12   Q.   We will call him Attorney Christian.  Was he your attorney

13   for this agreement?

14   A.   Yes.

15   Q.   All right.  Is there a date next to your name and your

16   attorney's name and signature?

17   A.   Yes.

18   Q.   What is that date?

19   A.   Mine is July 6th, 2022.

20   Q.   Now do you remember when you plead guilty?

21   A.   Yes, now I do.

22   Q.   When did you plead guilty?

23   A.   July 6th, 2022.

24   Q.   All right.  You were arrested in July of 2020?

25   A.   Yes.
```

1   Q.   Right?

2   A.   Yes.

3   Q.   At your residence here?

4   A.   Yes.

5   Q.   Why did it take you almost two years to plead guilty?

6   A.   Because, the truth is, I really didn't know what to do

7   because I knew his character and he might have thought that I

8   was a person who was snitching on him.

9   Q.   And when you say, "him," who are you referring to?

10  A.   Alberico could have thought that.

11  Q.   Why were you worried about him thinking you were a snitch?

12  A.   Because I was worried.   There was too much, too much

13  friendship between us.

14  Q.   Mr. Diaz, what charges did you declare yourself guilty of

15  in this case?

16  A.   Number one, charges 1 and 10.

17  Q.   What were you charged with in number one, the count?

18  A.   I know that one of them was possession of narcotics.   The

19  other one was distribution of Oxycodone, and the other one I

20  think was conspiracy.

21  Q.   Would looking at your plea agreement help you refresh your

22  memory in terms of what you plead guilty to?

23  A.   Yes, please.

24  Q.   Now showing, again, the witness Government's Exhibit 19C

25  for identification.

1      Mr. Diaz, I am focusing here on paragraph one.  Do you see

2  where it says, "Confidential Informant 1" here?

3  A.   Yes.

4  Q.   What did you plead guilty to for purposes of Count 1?

5  A.   Yes.

6  Q.   What did you plead guilty to?

7  A.   Conspiracy and intent to distribute Oxycodone.

8  Q.   Did you also -- in Count 10 you plead guilty too.  Right?

9  A.   Yes.

10  Q.   What did you plead guilty to in Count 10?

11  A.   Conspiracy and obstruction of a proceeding.

12  Q.   Does that help refresh your recollection?

13  A.   Yes.

14  Q.   Who did you conspire with in both of those counts?

15  A.   I conspired with Alberico.

16  Q.   In terms of just now focusing on the narcotics count, can

17  we go back to the screen, Your Honor -- the computer, Your

18  Honor, I'm sorry.

19      For purposes of Count 1 -- Mr. Diaz, do you recognize the

20  individual depicted here in Government's Exhibit 24A?

21  A.   Yes.

22  Q.   Did you conspire with him to traffic Oxycodone?

23  A.   Yes.

24  Q.   I am now showing you Government's Exhibit 25A.

25  A.   Yes.

1  Q.  Do you recognize this person?

2  A.  Yes.

3  Q.  Did you conspire with Ms. Lorenzo to engage in Oxycodone

4  trafficking?

5  A.  Yes.

6  Q.  Now, Mr. Diaz, we talked about your plea agreement.  During

7  that plea agreement process, who is your attorney again?

8  A.  Christian Duncan.

9  Q.  Did you go over the plea agreement with your attorney?

10  A.  Yes.

11  Q.  Did your attorney have it translated for you into Spanish

12  so you could understand it?

13  A.  Yes.

14  Q.  Was your attorney there to answer any questions that you

15  had?

16  A.  Yes.

17  Q.  Did you and/or your attorney sign your plea agreement?

18  A.  Yes.

19  Q.  What was the maximum penalty or, I'll rephrase, the maximum

20  time in prison you faced for pleading guilty to Count 1 and

21  Count 10?

22  A.  If I recall correctly, 87 months.

23  Q.  What was the maximum time in prison you got -- you could

24  have gotten for both counts?

25  A.  No, I did not understand you the first time, I apologize.

1       No, it was 20 years.

2   Q.   In exchange for you pleading guilty to Count 1 and

3   Count 10, did the government agree to dismiss the remaining

4   counts in your indictment?

5   A.   Yes.

6   Q.   Who negotiated that for you?

7   A.   My attorney.

8   Q.   After you plead guilty, did you later agree to cooperate

9   with the U.S. Attorney's Office here in the Southern District

10   of Florida?

11   A.   Yes.

12   Q.   Did you later sign a cooperation agreement with the U.S.

13   Attorney's Office here in the Southern District of Florida?

14   A.   Yes.

15   Q.   Did you have your attorney with you prior to and during

16   your decision to sign the cooperation agreement with the U.S.

17   Attorney's Office?

18   A.   Yes.

19   Q.   Did your attorney have that agreement translated and

20   provided to you so you could understand it?

21   A.   Yes.

22   Q.   Was your attorney with you through the entire cooperation

23   agreement process so that you could ask him all the questions

24   you had?

25   A.   Yes.

1    Q.   When did you sign your cooperation agreement?

2    A.   I don't recall the date, man.

3         If you show it to me --

4    Q.   Would that help refresh your recollection?

5    A.   Yes.

6         MR. MCLAUGHLIN:   If we could dim the juror screens,

7    Your Honor.

8    BY MR. MCLAUGHLIN:

9    Q.   Now showing the witness, again, Government's Exhibit 19C

10   for identification.

11        Mr. Diaz, I am taking you here, this is page 10 of

12   Government's 19C.

13        Do you recognize this document?  I will zoom in here.

14   A.   Yes.

15   Q.   What is this document?

16   A.   This document referred to the fact that by pleading guilty

17   the prosecutor could recommend too, but the judge was the one

18   to decide and that upon pleading guilty I also accepted that I

19   could be deported.

20   Q.   I am going to show you the second page here.

21        Does this document reference your agreement to cooperate?

22   A.   Yes.

23   Q.   All right.  I am going to take you to the second page here.

24   I am going to zoom in on the bottom of the second page.

25        Do you recognize your name here?

1    A.   Yes.

2    Q.   And do you recognize your signature here on this document?

3    A.   Yes, likewise.

4    Q.   And what is the date you signed this document?

5    A.   August 16th, 2022.

6    Q.   I am going to zoom in here at the top.

7         Just above your name, do you recognize your attorney's

8    name?

9    A.   Yes.

10   Q.   And do you recognize your attorney's signature?

11   A.   Yes.

12   Q.   What is the date that your attorney signed your agreement

13   for cooperation?

14   A.   August 16th, 2022.

15   Q.   Now, why did it take you six weeks to agree to cooperate in

16   this case, Mr. Diaz?

17   A.   Because first I have repented because when I declared

18   myself guilty, I felt that I needed to repent.  Second, because

19   I have much more a sentencing in my mind, a condemnation in my

20   mind and I want to free myself of that.

21   Q.   When you say you want to free yourself, what do you mean by

22   that?

23   A.   I wanted everything to come out into the light.

24        I didn't want to hide anything anymore.

25   Q.   How come you didn't start cooperating right after you were

1   arrested?

2   A.   Because I had that concept that we had so many things in

3   common, first of all, and our religion, and I thought he was

4   going to assume I was a snitch.

5   Q.   When you say, "he," who are you referring to?

6   A.   Alberico, logically.

7   Q.   It took you over two years to agree to cooperate.  Right?

8   A.   Yes.

9   Q.   During those two years, were you concerned for your safety

10  if you cooperated?

11          MR. QUINON:  Objection, Your Honor.

12          THE COURT:  Basis?

13          MR. QUINON:  I would have to go sidebar to give you the

14  basis.

15          THE COURT:  All right.  You may approach.

16          Actually, why don't we take a final break.

17          Why don't we just take five minutes?

18          Please don't discuss anything about the case.

19          COURT SECURITY OFFICER:  All rise.

20          (The jury exited the courtroom at 4:17 p.m.)

21          THE INTERPRETER:  Your Honor, the witness would like to

22  go to the bathroom.

23          THE COURT:  All right.

24          THE INTERPRETER:  The witness would like to go to the

25  bathroom.

1          THE COURT:  Yes, he could step down.

2          All right.  Please be seated.

3          Yes, sir.

4          MR. QUINON:  I am going to wait until he goes out,

5     Judge.

6          (The witness exited the courtroom.)

7          MR. QUINON:  The reason I objected, I didn't want

8     him -- what I thought he could blurt before the jury because I

9     heard before that he had expressed at one point that he was

10    concerned that if he cooperated against Mr. Crespo, that

11    Mr. Crespo, with his connections would kill him in the prison.

12    That's what I thought that could come out.

13         It was an open-ended question.  Were you concerned for

14    your safety?  I mean, that leaves the door open to a lot of

15    possibility.  I thought that could come out.

16         I don't think that should come out.  It would be

17    extremely prejudicial.  It should be excluded under 403, and,

18    you know, I just felt it would be prudent to make the

19    objection.

20         Not only prudent but appropriate, I should say.

21         THE COURT:  All right.  What's the government's

22    response?

23         MR. MCLAUGHLIN:  The jury is entitled to know his

24    decision-making process, Your Honor, in terms of why it took

25    him so long to cooperate and what his state of mind is in his

1    decision to cooperate.

2            He's not simply just coming in here and saying, hi, I

3    want to cooperate right out of arrest, I'm here to get my

4    sentence reduced.  It was a long process for Mr. Diaz.  There

5    were a lot of factors involved and also part of that was

6    concern for his safety.

7            I think the jury is entitled to hear that.

8            He can explore that on cross-examination but --

9            THE COURT:  I guess I'm not understanding what the

10   legal basis is.  I mean, if this is his thought, whether or not

11   it's reasonable or not or whether or not there is any real

12   basis to believe that, I don't understand why it's excludable.

13           MR. QUINON:  Because he has no factual basis to do

14   that, and what he is doing is basically putting thoughts in the

15   minds of the jurors that Mr. Crespo has the ability to kill

16   him, when, in fact, that's not the case.

17           Unless he has a factual basis for that, he should not

18   be allowed to testify to that.

19           THE COURT:  Well, he is talking about his own --

20   whatever it is, I don't know but whatever it is, it's his

21   motivation to do or not do something.  And I think you can

22   explore that on cross-examination, so I'll overrule your

23   objection.

24           So, I am going to overrule your objection.  Okay.

25           Would you like a break?

```
 1              MR. MCLAUGHLIN:  That would be great, Your Honor.

 2              (Brief recess.)

 3              COURTROOM DEPUTY:  All rise.

 4              THE COURT:  Note the presence of the attorneys and the

 5    defendant.

 6              Are we all ready?

 7              MR. MCLAUGHLIN:  Yes.

 8              THE COURT:  All right.  Let's bring them in.

 9              (The jury entered the courtroom at 4:28 p.m.)

10              THE COURT:  All right.  Please be seated.

11              Please continue.

12              MR. MCLAUGHLIN:  Thank you, Your Honor.

13    BY MR. MCLAUGHLIN:

14    Q.  Mr. Diaz, when we last broke before the break, we were

15    discussing why it took you so long to cooperate.

16              Do you remember that?

17    A.  For the same reason that I just mentioned that there was

18    too much, too much friendship between the two of us.

19              We had too many things in common.  I knew his character and

20    I knew he could think that I was snitching on him.  I was

21    afraid.  He had a lot of power.

22    Q.  When you said you were afraid, why were you afraid?

23    A.  Because, nothing, I mean, he had power.  There was no

24    problem.  When he would talk to me, it was -- I really would

25    get scared.
```

1   Q.   What power did he have?

2   A.   Well, imagine that, he was a federal agent.  He would go

3   get people.  One time he told me he went to Spain to get

4   someone.

5   Q.   Now, as part of your cooperation agreement, did you agree

6   to testify here at trial?

7   A.   Yes.

8   Q.   Did you agree to testify truthfully?

9   A.   Yes.

10  Q.   Are you aware that if you lie here during this trial you

11  could be prosecuted for perjury?

12  A.   Yes.

13  Q.   Have you been sentenced in this case?

14  A.   Yes.

15  Q.   Who sentenced you?

16  A.   Judge Gayles, Gayles.  It's just that I don't know how to

17  say the name.  Judge Gayles, something like what.

18  Q.   Is it the same judge that's in the courtroom now?

19  A.   I honestly have not looked at the Judge.

20  Q.   All right.  Do you remember what courtroom you were in when

21  you were sentenced?

22  A.   Yes.  Well, I remember when I was sentenced, but I don't

23  remember the courtroom.

24  Q.   What were you sentenced to?

25  A.   It was of 66 -- I'm sorry, 76 months.  Well, it's six

1   years, four months.

2   Q.   When were you sentenced?

3   A.   In -- I believe it was September.

4   Q.   And was your attorney with you during your sentence?

5   A.   Yes.

6   Q.   You said your sentence was 76 months?

7   A.   Yes, I think it was -- yes, 76 months.

8   Q.   Was that for both Count 1 and Count 10?

9   A.   Yes.

10  Q.   Have you started serving your sentence yet?

11  A.   Not yet.

12  Q.   When do you start serving your sentence?

13  A.   I have to be on the 31st of this month at 12 noon in

14  Kentucky.

15  Q.   By allowing you to cooperate, has the U.S. Attorney's

16  Office here for the Southern District of Florida guaranteed you

17  anything in terms of your sentence?

18  A.   No.

19  Q.   Are you aware that you might not get a sentence reduction

20  for testifying in this case?

21  A.   Yes.

22  Q.   Who is the only person that can reduce your sentence?

23  A.   The judge.

24  Q.   Are you aware that even though I might recommend that the

25  judge lower your sentence, the judge might ignore it and give

1   you nothing?

2   A.  Yes.

3   Q.  Are you aware that I might recommend that the judge reduce

4   your sentence and the judge might give less than what I ask

5   for?

6   A.  Yes.

7   Q.  There is nothing you can do about that?

8   A.  No.

9   Q.  Considering -- knowing all of that, are you still willing

10  to testify here, Mr. Diaz?

11  A.  Yes.

12  Q.  Now, Mr. Diaz, I'd like you to explain for the jury how did

13  you first learn how to engage in Oxycodone trafficking

14  Oxycodone trafficking?

15  A.  I used to play slots on the street.  I met a man who

16  passed, he passed away, whose name was Jose Garcia.  So we

17  started talking and he got me into the business.  He told me

18  what I was supposed to do.

19  Q.  I am going to stop you right there.

20      Mr. Diaz, do you recognize the individual depicted here in

21  Government's Exhibit 37A?

22  A.  Yes.

23  Q.  Who are we looking at here?

24  A.  Jose Garcia.

25  Q.  How did he teach you about the Oxycodone trafficking

1   business?

2   A.   First they talked to me.   Then he told me what I needed to

3   do.   He brought me to a clinic to do, to get a prescription for

4   an MRI and since I had a lot of disc problems -- so after that

5   he introduced me in the business of Oxycodone.

6   Q.   Now, are you familiar with the prescription drug Opana?

7   A.   Yes.

8   Q.   Before you got into Oxycodone trafficking, would you sell

9   Opana pills?

10   A.   The ones that I would get at Mount Sinai, Opana.

11   Q.   Who would you sell them to?

12   A.   I would sell them on the streets.

13   Q.   How much would you sell your pills for?

14   A.   It was about $13, around 13, yes.

15   Q.   Thirteen dollars per what?

16   A.   I think it was -- it was either 10 or 13.   I actually think

17   it was $10.   It's been many years.

18   Q.   Ten dollars for what?

19   A.   At the time they would give me 60.

20   Q.   So it was $10 per pill?

21   A.   Yes.

22   Q.   And how many pills of Opana would you get every month?

23   A.   I would get 60.

24   Q.   Would you sell all of them?

25   A.   I would sell them all individually.

1  Q.  One at a time?

2  A.  No, some people wanted five, others wanted six.  Other

3  people wanted two.

4  Q.  Now, when you met Jose Garcia, were you still selling Opana

5  pills?

6  A.  No, it's just that I did that thing with Opana once.

7  Q.  Where did you meet Jose Garcia?

8  A.  Playing in the small little casino machines on the street.

9  Q.  How did Oxycodone come up in conversation with Jose Garcia?

10  A.  You start losing money there.  You become friends.  You

11  lose more money, then you go outside; you smoke a cigarette and

12  that's when you start talking.

13  Q.  He was the first one that took you to get an MRI?

14  A.  Yes.

15  Q.  Did he actually take you to an actual clinic where you were

16  prescribed the Oxycodone?

17  A.  Yes, right there.

18  Q.  You testified that Mr. Garcia was the one who introduced

19  you to the Oxycodone trafficking business.  Did he later become

20  a recruited patient of yours?

21  A.  Yes.

22  Q.  How did he go from someone who introduced you to the

23  business to your patient?

24  A.  He got sick and was very ill and started swelling a lot

25  because of some medication they gave him, so he was in Hialeah

 1   Hospital and he died.  He was already feeling badly or poorly

 2   so he could no longer take patients.

 3   Q.  And we see here, I am showing you Government's Exhibit 37C.

 4   Do you remember when Mr. Garcia passed away, Mr. Diaz?

 5   A.  I honestly don't remember when he died.  I know he died but

 6   I don't remember when.

 7   Q.  Let me go back to Government's Exhibit 37A.

 8       When you first met Mr. Garcia, was he what's called a

 9   patient recruiter?

10   A.  Yes, he had like three patients only.  He didn't have much.

11   Q.  So he tried to recruit you?

12   A.  Yes, the first time.

13   Q.  What was the first clinic that Mr. Garcia took you to?

14   A.  The first one was Nicole on 27th Avenue, Northwest.

15   Q.  All right.  When you say, "Nicole," who are you referring

16   to?

17   A.  The doctor, the lady doctor, that was her name.

18   Q.  She was a female doctor?

19   A.  Yes.

20   Q.  Where was that clinic located?

21   A.  On 27th Avenue, Northwest and approximately 12th or 13th

22   Street.

23   Q.  What happened the first time you went to the clinic?

24   A.  The first time.  Well, that clinic didn't last much.  I

25   just went one time for pills because then the police came and

1    people would gather early at the crack of dawn, and they picked

2    them all up.

3    Q.  When you went to the clinic, were you prescribed Oxycodone?

4    A.  Yes.

5    Q.  What did you do with the Oxycodone?  Did you go to the

6    pharmacy and get that prescription filled?

7    A.  I turned in the prescription in the pharmacy I would get my

8    medication.

9    Q.  Once you got the Oxycodone, what did you do with it?

10   A.  I sold them to Jose.

11   Q.  How much would Jose pay you at that time for your Oxycodone

12   prescription?

13   A.  At that time $10 were paid for Oxycodone.

14   Q.  He would pay you that; Jose Garcia would pay you $10?

15   A.  Yes.

16   Q.  Ten dollars per what?

17   A.  Per pill.

18   Q.  How many times did you go to the doctor in the Nicole

19   Clinic?

20   A.  At the most I went there twice because after that -- well,

21   I told you about that -- the police closed it.

22   Q.  All right.  And how did you learn that the police closed

23   it?

24   A.  I found out through him and also through a lady who used to

25   go there whose name is Isabelita.

1   Q.   When you say, "him," who are you referring to?

2   A.   To Garcia, Jose.

3   Q.   After you stopped going -- we will call it Nicole Clinic.

4   What was the next clinic you went to?

5   A.   After that, we went to Plaza -- after that we went to Plaza

6   Roma, if I am not mistaken.

7   Q.   When you say, "Plaza Roma," what are you referring to?

8   A.   It was a shopping mall that was in Kendall and about 83rd.

9   There was a clinic there.

10          MR. MCLAUGHLIN:   Your Honor, I just noticed the juror

11   screens have not been on.   I forgot to tell the Court to do so,

12   so we've had exhibits up for quite a while.

13          Thank you, Your Honor.

14   BY MR. MCLAUGHLIN:

15   Q.   Mr. Diaz, the jurors have been not been able to see this

16   exhibit for the entire time that we have been talking.   I am

17   going to ask you again, who is the gentleman we see here in

18   Government's Exhibits 37A?

19   A.   Jose Garcia.

20   Q.   All right.   This is the individual that first recruited you

21   into the Oxycodone business?

22   A.   Yes.

23   Q.   And this is the individual that direct you to the

24   Dr. Nicole Clinic?

25   A.   Yes.

1   Q.   Now, we are talking about the -- we will all call it the

2   Plaza Roma clinic.  How did you find out about the Plaza Roma

3   clinic?

4   A.   Through Jose.

5   Q.   How many times did you go there?

6   A.   Also like about three times we went because that clinic was

7   also closed.

8   Q.   And you say you went three times.

9        What does that mean?

10  A.   Three visits.

11  Q.   And when you say, "visits," would you have to pay each time

12  you went to the clinic at Plaza Roma and Dr. Nicole?

13  A.   All doctors, they always collect cash.

14  Q.   How much did you pay each time you went to those clinics?

15  A.   300 always the first time.  They all charge the same and

16  then the next one, 250.

17  Q.   Would you always pay your own appointment or consultation

18  fee or would Jorge pay yours for you -- Jose, sorry?

19  A.   No, I would pay my consultation.

20  Q.   You testified that you went three times to the Plaza Roma

21  Clinic.  Did you get Oxycodone prescriptions there each time?

22  A.   Yes.

23  Q.   Did you get those prescriptions filled at a pharmacy?

24  A.   The pharmacy where I would get my prescriptions, Moreno.

25  Q.   Where is Moreno Pharmacy located?

 1  A.   65 -- 56 West 65 Street.   65 West and 65th Street --

 2          THE INTERPRETER:  I'm sorry.

 3          THE WITNESS:  No, 56 West and 65th Street.

 4  BY MR. MCLAUGHLIN:

 5  Q.   At the Plaza Roma Kendall Clinic, did you sell the pills

 6  that you got, the Oxycodone pills?

 7  A.   Yes.

 8  Q.   Who did you sell them to?

 9  A.   Jose.  I would sell them to Jose.

10  Q.   The individual depicted here at Government's Exhibit 37A?

11  A.   Yes.

12  Q.   Was there a time that you stopped going to, we'll call it

13  the Plaza Roma Clinic in Kendall?

14  A.   Yes.

15  Q.   Why did you stop going?

16  A.   Because the doctor at that clinic was Hawaiian, and she

17  left for vacation to Hawaii and she left another doctor.  So we

18  went, as we usually did, but when he gave us a prescription and

19  we took the prescription to the pharmacy, the pharmacy said

20  that they could not dispense his prescription because that

21  doctor was under review.  That's what we were told.

22  Q.   Very well.  When you say, "that's what we were told," who

23  are you referring to?

24  A.   No, I mean, we were told because any person or any other

25  person even if I didn't know the person who would have gone to

1   another pharmacy, they just were not dispensing medication from

2   that doctor.

3       As a matter of fact, we went back to the clinic to get our

4   money back, and the clinic had already been shut down.

5   Q.  Again, when you say the words, "We went to the clinic, we

6   went to the pharmacy," who are you referring to?

7   A.  Well, it was Jose and I.  We went to get the money from the

8   prescription.

9   Q.  Understood.

10      Mr. Diaz, after you left, we'll call it the Kendall Plaza

11  Roma Clinic, did you go to a third clinic with Mr. Garcia?

12  A.  From there we went to -- I believe, if I remember

13  correctly, it was 1448 on 49th Street.  There was a building,

14  and it was on the third floor, office 301.

15  Q.  Do you remember the name of the doctor at that third

16  clinic?

17  A.  No, I don't remember.  I know how he looked like, but I

18  don't remember the name.

19  Q.  What did he look like?

20  A.  He was skinny.  He was short.  He was not mid size.  He was

21  kind of short.

22  Q.  Do you remember the name of the doctor at the Plaza Roma

23  Clinic?

24  A.  That was the Hawaiian doctor.

25      I don't remember the name, female.  It was a Hawaiian name.

1    Q.   All right.  Mr. Diaz, at this point you went to Dr. Nicole

2    two times?

3    A.   Yes.

4    Q.   And the Plaza Roma how many times?

5    A.   In Plaza Roma I went three times.  Twice we got the

6    prescriptions that we were able to fill and the third time was

7    with this other doctor that we couldn't fill the prescription

8    and they didn't return our money.

9    Q.   How often would you go to these clinics?

10   A.   Every month there was a visit.

11   Q.   At the time you were going to these first two clinics, we

12   will get to the third, who were you living with?

13   A.   I don't recall.  Give me a moment to see if I can refresh.

14        I was already then living with Anais.

15   Q.   Were you taking Anais to these clinics at this time?

16   A.   No.

17   Q.   Why not?

18   A.   Because she had no medical condition to get a prescription.

19        You have to have arthritis, something.

20   Q.   Now, let's talk about the third clinic you went to.

21        Who introduced you to this third clinic?

22   A.   We spoke about the first one, Dr. Nicole.  Then the second

23   one with the Hawaiian doctor and then the one at Plaza.

24        Jose was the one who took me there.  The one on 49th

25   Street, Jose took me there.  That's where we met the doctor --

1    I don't recall the name.  Well, I'll remember in a while now.

2    Q.  Now, focusing on the third clinic, you indicated there was

3    a skinny doctor there.  Do you remember that?

4    A.  Yes.

5    Q.  Was there another doctor that works at this third clinic in

6    addition to the skinny doctor?

7    A.  Yes, on Thursdays there was a Dr. Gonzalez.

8    Q.  I am going to show you Exhibit 51A.  Do you recognize the

9    individual depicted here in Government's Exhibit 51A?

10   A.  Yes.

11   Q.  How did you meet him?

12   A.  I met him at the 49 Street clinic, the clinic that was

13   owned by the skinny doctor.

14   Q.  How did you know he only worked on Thursdays?

15   A.  That doctor wasn't doing so well and the skinny doctor

16   would give him a chance on Thursdays so he could make some

17   money.

18   Q.  Now, when you are going -- we will call it the skinny

19   doctor clinic.  When you are going to the skinny doctor clinic,

20   are you still going with Mr. Garcia?

21   A.  Yes.

22   Q.  In addition to you, did Mr. Garcia -- I'm showing you

23   Government's Exhibit 51A, also in the right here inside

24   Government's Exhibit 37A.

25        In addition to you, did Mr. Garcia, in addition to you,

1   have any other patients?

2   A.   At that time Garcia had as patients only myself and two

3   other persons.

4   Q.   Who were the two other persons?

5   A.   Friends of his.

6   Q.   Do you know their names?

7   A.   I really didn't find out their names.

8   Q.   Would you go with them -- would they go with you in

9   addition to Mr. Garcia to the clinic?

10       Would you all go together?

11  A.   No, we would always meet at the clinic and also outside.

12  We were online waiting to get into the clinic.

13  Q.   The other patients that Mr. Garcia had, would they be with

14  you as well?

15  A.   Yes, they were with us.

16  Q.   Approximately, how many times -- we will call it the skinny

17  doctor clinic.  How many times would you go to the skinny

18  doctor clinic?

19  A.   We went quite a few times.  Yes, quite a few times.

20  Q.   And each time you went to the skinny doctor clinic were you

21  described Oxycodone?

22  A.   Yes.

23  Q.   What would you do with the Oxycodone prescriptions once you

24  had them filled?

25  A.   I kept on selling them to Jose.

1   Q.   Did Mr. Garcia teach you anything in terms of what was the

2   most valuable type of Oxycodone pill?

3   A.   Yes.

4   Q.   What did you learn?

5   A.   That the numbering that he gave me was the good one.

6   Q.   When you say, "numbering," what do you mean?

7   A.   The Oxycodone, which was sold the most that nobody objected

8   to it, that they bought it all the time, was Oxycodone 30, that

9   is M30.

10   Q.   When you say, "30," what are you referring to?

11   A.   Thirty milligrams.

12   Q.   Now, did there come a time -- we're still in the skinny

13   doctor clinic.  Did there come a time where you left the skinny

14   doctor clinic?

15   A.   Both I, him, and several other persons left.

16   Q.   Why did you leave the skinny doctor clinic?

17   A.   Because Dr. Gonzalez set up another clinic with a young

18   lady called Tania.

19   Q.   What was the name of that clinic?

20   A.   I don't recall exactly, but it was on West 53rd Avenue and

21   37 Street.

22        MR. MCLAUGHLIN:  Your Honor, if I could have the

23   overhead turned on, the ELMO.

24   BY MR. MCLAUGHLIN:

25   Q.   Mr. Diaz, I am going to show you an exhibit here marked

 1    50B1.

 2         Do you see that?

 3    A.   Fine.

 4    Q.   Do you recognize your name here on this patient file?

 5    A.   Yes.

 6    Q.   Open up the file.

 7         Do you recognize the driver's license copy here?

 8    A.   Yes.

 9    Q.   Whose driver's license copy is that?

10    A.   Mine.

11    Q.   I am going to go here.

12         Do you recognize your name right there?

13    A.   Yes.

14    Q.   Is that your social security number?

15    A.   Yes.

16    Q.   All right.  Was this a phone number you utilized?

17    A.   Yes.

18    Q.   Are you familiar with a clinic by the name of West Medical?

19    A.   Yes, that was the clinic, Palm Avenue and 53rd.

20    Q.   Is this the clinic you went to after the skinny doctor

21    clinic?

22    A.   Yes.

23    Q.   Who was the doctor at West Medical?

24    A.   Dr. Gonzalez, I don't recall his name.

25    Q.   Mr. Diaz, do you see the address here on Palm Avenue?

1    A.   Yes.

2    Q.   Was there a time where West Medical moved locations from

3    the Palm Avenue location?

4    A.   Yes.

5    Q.   Let me show you now a second, another address that is on

6    the file.

7         Do you see the address that's here?

8    A.   Yes.

9    Q.   What location is listed here under --

10   A.   3408 West 84 Street, Suite 309.

11   Q.   Was this a location that Dr. Gonzalez went to after Palm

12   Avenue?

13        MR. MCLAUGHLIN:  Your Honor, if we could go back to the

14   computer.  Thank you very much.

15   BY MR. MCLAUGHLIN:

16   Q.   Mr. Diaz, I am going to show you a document that's listed

17   as 51D.  We are going to take you to the second page.

18        This exhibit you see here, you start going to West Medical,

19   at least we have prescriptions from you, beginning, at least,

20   as early as November of 2016.

21        Do you see that here?

22   A.   Yes.

23   Q.   Now, you testified earlier, but I don't think the jurors

24   could see, Mr. Garcia is the one that recruited you in the

25   Oxycodone trafficking business.  Correct?

1  A.  Yes.

2  Q.  But at some point did he become your patient?

3  A.  Yes.

4  Q.  Again, how did he become your patient?

5  A.  When he got sick.

6  Q.  Do you recognize this individual here, Anibal Amaro?

7  A.  Yes.

8  Q.  Was he one of your patients?

9  A.  Yes.

10  Q.  How did you end up recruiting Anibal Amaro?

11  A.  He is an old friend of mine, and I lived right across the

12  street from him.  And then I moved out and they raised his

13  rent.  He could barely pay, and I spoke to him, "Look, I can

14  get you into this business."

15  Q.  Did he agree?

16  A.  Yes.

17  Q.  Now, next to Mr. Amaro is Mr. Ruiz, Pedro Ruiz.

18      Do you recognize this individual?

19  A.  Yes.

20  Q.  Was he one of your recruited patients?

21  A.  Yes.

22  Q.  How did he become one of your recruited patients?

23  A.  He was Anibal's partner.  They were committed.

24  Q.  Now, we see here Mr. Garcia, Mr. Amaro, and Mr. Ruiz.  What

25  is the date of their first prescription?

1   A.   Yes, the date is here, 11/3/16.

2   Q.   What month is that?

3   A.   November.

4   Q.   Now, this is November of what year?

5   A.   2016.

6   Q.   Now, at this point in November, 2016, do you know Defendant

7   Crespo?

8   A.   Yes, I already knew him.

9   Q.   Are you friends at this point; this is November 2016?

10  A.   Yes, at that time we were starting a good friendship.

11  Q.   You testified earlier you met him in 2016.  What time in

12  2016?

13  A.   I don't recall the exact date.  This was a long time ago.

14  It seems to me -- it seems to me that it was around April.

15  Q.   So, by the time you meet Defendant Crespo, you are engaged

16  in Oxycodone trafficking with Dr. Gonzalez.  Right?

17  A.   Yes.

18  Q.   At this point where it's November of 2016, who were you

19  living with?

20  A.   I am sure that I was living with Anais.

21  Q.   I am going to take you to the second page of this document

22  here.  Did you introduce Anais Lorenzo to Dr. Gonzalez's

23  clinic?

24  A.   Yes.

25  Q.   All right.  So, if we go back to the first page, you,

1   Mr. Garcia, Mr. Amaro, and Mr. Ruiz all start in what month,

2   what year?

3   A.   They started with me around 2017, 2018.

4   Q.   Mr. Diaz, you start getting scripts from -- you, Mr. Garcia

5   and Mr. Ruiz start getting prescriptions from Dr. Gonzalez in

6   what month?

7   A.   When he was at West Medical on 53rd and Palm Avenue.

8   Q.   What month is 11?

9   A.   November.

10   Q.   All right.  What year is '16?

11   A.   2016.

12   Q.   Do you see Mr. Garcia here?  What month and what year is

13   listed right here?

14   A.   November 3, 2016, to July 3rd, 2018.

15   Q.   What month and year is listed right here in the green

16   square I have just put on your screen?

17   A.   November 3rd, 2016.

18   Q.   Now showing you Mr. Amaro, what month and what year is in

19   the green screen I have just put in front of your screen?

20   A.   November 3, 2016.

21   Q.   Now showing you Mr. Ruiz -- I'm highlighting here in the

22   green box -- what month and year is that?

23   A.   November 3rd, 2016.

24   Q.   Why do these prescriptions for you, Mr. Garcia, Mr. Amaro

25   and Mr. Ruiz all start on the same time, same month, same year?

1    A.   Because the doctors, when they give you a prescription for

2    Oxycodone, for example, they give you one on January 3rd.   You

3    have to come back for the refill on February the 3rd and so on.

4    Q.   Were these your first three patients you recruited?

5    A.   Yes.

6    Q.   Now, taking you to the second page here, why did it take

7    until November of 2017 for Anais Lorenzo to start going to see

8    Dr. Gonzalez?

9    A.   Because she didn't have the necessary medical conditions

10   and then she went to the doctor, they did an MRI or a scan, I'm

11   not sure, and it revealed that she had generalized arthritis.

12   Q.   Did she also start going to Dr. Gonzalez because she no

13   longer had a job at the insurance company she worked for?

14           MR. QUINON:   Objection.   Leading, Your Honor.

15           THE COURT:   Sustained.

16   BY MR. MCLAUGHLIN:

17   Q.   Where did Ms. Lorenzo work during the time you had a

18   relationship with her?

19   A.   She worked at an insurance company.   It no longer exists.

20   It was called Admiral.

21   Q.   Did there come a time when she stopped working for Admiral?

22   A.   Admiral closed down.

23   Q.   Did there come a time where she stopped working for

24   Admiral?

25   A.   Yes.

1  Q.  Again, focusing on Ms. Lorenzo, would you sell the pills

2  she obtained from Dr. Gonzalez?

3  A.  Yes.

4  Q.  And would you sell the pills that Mr. Garcia obtained from

5  Dr. Gonzalez?

6  A.  And when Mr. Garcia could no longer do the business, he

7  gave me this guy and another friend of his called Luis.

8  Q.  And when you say, "Luis," are you referring to Luis

9  Paniagua here?

10  A.  Yes.

11  Q.  Would you sell his pills?

12        THE COURT:  Counsel, are you going to a different area?

13        MR. MCLAUGHLIN:  No, we have a lot more on this, but we

14  can recess now.

15        THE COURT:  Ladies and gentlemen, we are going to

16  recess now for the evening.  We are going to start tomorrow

17  later at 10:00.

18        A JUROR:  I rescheduled so there is not an issue.

19        THE COURT:  I know, but when you told us that you

20  needed that time, we rescheduled some things.  Everyone stayed

21  a little later today, so we will start a little later at 10:00

22  tomorrow.

23        (The jury exited the courtroom at 5:25 p.m.)

24        THE COURT:  What time do you want him here tomorrow

25  morning?

1          MR. MCLAUGHLIN:  We are starting tomorrow at 10:00.

2          THE COURT:  Okay.

3          MR. MCLAUGHLIN:  I will let the agents talk to him

4     about getting here before that.

5          THE COURT:  All right.  Anything we need to take up

6     from the government?

7          MR. MCLAUGHLIN:  Nothing from the government, Your

8     Honor.

9          THE COURT:  From the defense?

10         MR. QUINON:  Nothing, Your Honor.

11         THE COURT:  All right.  We will be in recess until

12    10:00 tomorrow.

13         MR. MCLAUGHLIN:  Thank you, Your Honor.

14         (Proceedings were concluded at 5:45 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3            I hereby certify that the foregoing is an

4    accurate transcription of the proceedings in the

5    above-entitled matter.

6

7

8

9    November 6, 2023          /s/Patricia Diaz
     DATE                      PATRICIA DIAZ, FCRR, RPR, FPR
10                             Official Court Reporter
                               United States District Court
11                             400 North Miami Avenue, 11th Floor
                               Miami, Florida 33128
12                             (305) 523-5178

13

14

15

16

17

18

19

20

21

22

23

24

25