```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                     CASE NO. 21-CR-20005-DPG
 3

 4     UNITED STATES OF AMERICA,          Miami, Florida

 5               Plaintiff,               August 23, 2023

 6     vs.                                1:01 p.m. to 4:03 p.m.

 7     ALBERICO AHIAS CRESPO,

 8               Defendant.               Pages 1 to 68

 9     _____

10                     EXCERPT OF JURY TRIAL
                 BEFORE THE HONORABLE DARRIN P. GAYLES
11                  UNITED STATES DISTRICT JUDGE

12     APPEARANCES:

13     FOR THE GOVERNMENT:      CHRISTOPHER CLARK, ESQ.
                                SEAN McLAUGHLIN, ESQ.
14                              ASSISTANT UNITED STATES ATTORNEY
                                UNITED STATES ATTORNEY'S OFFICE
15                              99 Northeast Fourth Street
                                Miami, Florida 33132
16

17     FOR THE DEFENDANT:       JOSE QUINON, ESQ.
                                JOSE M. QUINON, P.A.
18                              75 Valencia Avenue
                                Suite 800
19                              Coral Gables, Florida 33134

20

       STENOGRAPHICALLY REPORTED BY:
21
                                PATRICIA DIAZ, FCRR, RPR, FPR
22                              Official Court Reporter
                                United States District Court
23                              400 North Miami Avenue
                                11th Floor
24                              Miami, Florida 33128
                                (305) 523-5178
25
```

```
 1                        I N D E X

 2
                                        Direct   Cross   Red.
 3       WITNESSES FOR THE GOVERNMENT:

 4

 5       JORGE DIAZ GUTIERREZ
         (By Mr. McLaughlin)
 6       (By Mr. Quinon)                           4

 7

 8

 9
         WITNESSES FOR THE DEFENDANT:
10

11

12

13       EXHIBITS MARKED FOR IDENTIFICATION         PAGE

14

15

16       EXHIBITS RECEIVED IN EVIDENCE              PAGE
17

18

19

20

21

22

23

24

25
```

```
1                (Call to the Order of the Court.)

2                COURTROOM DEPUTY:  Calling case 22-CR-20005.  United

3    States of America versus Alberico Ahias Crespo.

4                Counsel, state your appearances, starting with the

5    government.

6                MR. MCLAUGHLIN:  Good afternoon, Sean McLaughlin on

7    behalf of the United States.  Also with us at counsel table is

8    it AUSA Chris Clark, and the case agent, FBI Special Agent Sean

9    Slattery.

10               THE COURT:  Good afternoon.

11               MR. QUINON:  Good afternoon, Jose Quinon on behalf of

12   Alberico Crespo, who is present in court, and also present,

13   Jose Gonzalez, my paralegal/investigator, who is present here

14   today.

15               THE COURT:  All right.  Are we ready to resume?

16               MR. QUINON:  Yes, sir.

17               THE COURT:  All right.  We are ready to proceed.

18               Let's bring in the jury, please.

19               (The jury entered the courtroom at 1:02 p.m.)

20               THE COURT:  All right.  Please be seated.

21               Welcome back, ladies and gentlemen.  We are ready to

22   resume.  You will come back to the stand, sir.

23               All right.  Cross.

24               MR. QUINON:  Thank you, Your Honor.

25                              CROSS-EXAMINATION
```

1    BY MR. QUINON:

2    Q.   Good afternoon, Mr. Diaz.

3    A.   Good afternoon.

4    Q.   You and I have never met, have we, sir?

5    A.   No.

6    Q.   And I have never sat down with you to discuss what your

7    testimony would be in this case, have I?

8    A.   No.

9    Q.   Okay.  Now, you have had opportunities to sit down with the

10   government in this case concerning what your testimony would

11   be, have you not?

12   A.   Yes.

13   Q.   Okay.  In addition to that, when you began cooperating you

14   sat down with the prosecutors and the agents to discuss what

15   you knew about this matter.

16        Correct?

17   A.   Yes.

18   Q.   How many times did you meet with the prosecutors and the

19   agents when had you started to cooperate?

20   A.   Several times.

21   Q.   Okay.  When you say several times, more than five?

22   A.   Maybe five, more or less.

23   Q.   And that was out in Cape Coral where you are living now?

24   A.   Yes.

25   Q.   So they went up there to meet with you.  Correct?

1    A.   Yes.

2    Q.   How many hours would the five meetings that you had with

3    them -- how many hours are we talking about, just so we have an

4    idea?

5    A.   Around six, five hours.

6    Q.   So they went all the way to Cape Coral, which is what, it

7    takes you traveling in car about two and a half, hours, three

8    hours to get there from Miami?

9    A.   Yes.

10   Q.   So they travel two and a half hours there, two and a half

11   hours back, five hours just to meet with you for an hour at a

12   time.   Is that what you are saying?

13   A.   I never said one hour.

14   Q.   Okay.  I am trying to determine how many hours you have met

15   in total with them at that time?

16   A.   I met with them on occasions five hours, other occasions

17   six hours.

18   Q.   And those were five different occasions.  Correct?

19   A.   Correct.

20   Q.   Okay.  In addition, prior to this round, you met with them

21   again just to go over what the questions were going to be that

22   they were going to ask you.  Correct?

23   A.   Yes.

24   Q.   And also to discuss or anticipate the questions that I

25   would ask you.  Correct?

1   A.   No.

2   Q.   All right.   Now, I believe you testified you came over from

3   Cuba in 1980.   Is that correct?

4   A.   Yes.

5   Q.   Was that during the -- you came through the Mariel boat

6   lift?

7   A.   Yes.

8   Q.   Now, you came here, and did you settle in Miami in 1980 or

9   not?

10  A.   Yes, I lived in Miami.

11  Q.   And eventually you moved to New York.   Correct?

12  A.   Yes.

13  Q.   What year did you go to New York?

14  A.   In 1981, 1981, maybe 1982.

15  Q.   Okay.   And you came back to Miami in 1986.   Correct?

16  A.   Yes.

17  Q.   And you had been in New York living with an aunt of yours.

18       Is that right?

19  A.   Yes.

20  Q.   And I guess the husband was not too happy with you being

21  there.   That's the reason why you returned to Miami in 1986.

22  Correct?

23  A.   Yes.

24  Q.   You came to Miami and you opened -- well, you worked at a

25  number of jobs when you came to Miami.

1        Correct?

2   A.   Yes.

3   Q.   And, eventually, you opened a paint company.  Correct?

4   A.   Yes.

5   Q.   All right.  What kind of painting did you do at that time?

6   A.   Commercial and residential painting.

7   Q.   All right.  So you would paint commercial buildings?

8   A.   Yes.

9   Q.   And how many people did you have working for you at that

10  time?

11  A.   The company grew until we had 21 employees.

12  Q.   And you were the sole owner of that company?

13  A.   Yes.

14  Q.   How many years did you have that company?

15  A.   From 1991 until 2008, which I had an accident.

16  Q.   Did you have the accident in 2008 or was it in 2013 or

17  2014?

18  A.   My accident was in 2008.

19  Q.   All right.  What happened in that accident?

20  A.   I fell from a third floor.

21  Q.   And what happened to you physically?

22  A.   I have five herniated discs, two fractured vertebrae.

23  Q.   And were you hospitalized during that fall?

24  A.   Yes.

25  Q.   Were you given medication, pain medication to help you with

1    the pain that you were suffering from your back injuries?

2    A.  Yes.

3    Q.  And that pain in your back has followed you ever since

4    that.  Is that correct?

5    A.  Yes.

6    Q.  And you have been prescribed by a doctor -- before this

7    Dr. Gonzalez, other doctors have prescribed to you medication

8    for pain.

9        Correct?

10   A.  Yes.

11   Q.  So you had been prescribed before this Dr. Gonzalez

12   episode, and we will get to this in a minute, you have been

13   prescribed medication such as Oxycodone and Percocet.  Correct?

14   A.  I was always prescribed at Mount Sinai.

15       I don't recall the doctor's name.  I was always prescribed

16   Percocet.

17   Q.  And you understand that Percocet, part of the Percocet is

18   Oxycodone.  Correct?

19   A.  Yes.

20   Q.  So you have been taking that kind of medication ever since

21   you had that unfortunate accident in 2008.  Correct?

22   A.  Yes.

23   Q.  And at times, in order to take care of your pain, you have

24   used less than a pill, sometimes you may take half a pill.

25       Correct?

1   A.   At that time I always took the entire pill.   The pain was

2   too strong.

3   Q.   True, but as time has gone by, you have been able at times

4   to do less than an entire pill.

5       Correct?

6   A.   No, I always took the entire pill.

7   Q.   So you never take half a pill?

8   A.   At that time, Percocet, no.

9   Q.   I am talking at the time of that incident that you

10  testified in this courtroom, you were taking at times less than

11  a full pill.   Correct?

12  A.   I was taking less than a pill but, really, I don't

13  understand what year are you referring to.

14  Q.   I am talking about in the period of 2020, to be more clear,

15  sometime between April and July of 2020, at times when you had

16  pain in your back you would take half a pill.   Right?

17  A.   No, I sold them.

18  Q.   I understand that you testified before during, direct

19  examination with the prosecutor, that you sold the pills, but

20  that's not what I'm asking.

21  A.   Okay.

22  Q.   My question to you is, during this time period that I

23  mentioned to you -- and I will give you a date, June 7th of

24  2020, you would take less than a full pill.   You would take

25  half of an Oxycodone when you had pain in your back.

1        Is that true or not, yes or no?

2   A.   I don't recall having taken half a pill.

3   Q.   Do you recall having conversations with your daughter

4   Ashley, telling Ashley, your daughter that you had pain in your

5   back and that you were taking half of an Oxycodone in order to

6   mollify, in order to reduce that pain?

7        Do you recall that?

8   A.   I was taking 10/325, half of it.

9   Q.   That's an Oxycodone.  Correct?

10  A.   Yes.

11  Q.   And you were taking half a pill.  Correct?

12  A.   Yes, that one, yes.

13  Q.   And to take half a pill you have to cut the pill in half.

14  Correct?

15  A.   Yes.

16  Q.   And that's what you were doing.  Correct?

17  A.   Yes.

18  Q.   And the reason for that is because if you take one full

19  pill it's kind of strong and you don't want to be driving or

20  doing something that requires your full attention.

21       Correct?

22  A.   That wasn't the reason.

23  Q.   Why would you take then half a pill?

24  A.   I was staying at home.

25  Q.   But even though you were staying at home you would take

1    only half a pill.  Correct?

2    A.  Sometimes.

3    Q.  Now, you then worked in the paint business until what year?

4    A.  As of 2008, I stopped working, but I don't recall exactly

5    when I stopped working.

6    Q.  Did you stop working in the paint business around 2013 or

7    2014, Mr. Diaz?  Do you recall that?

8    A.  Yes, it could be.

9    Q.  Do you recall that?

10   A.  Yes, I know.

11   Q.  All right.  Now, since that time you haven't had a steady

12   job.  Correct?  You became disabled at that time.  Correct?

13   A.  Yes.

14   Q.  Okay.  But you did make your living because you had social

15   security.  Correct?

16   A.  Yes.

17   Q.  And on the side you would sell, at that time, a drug by the

18   name of Opana.  Correct?

19   A.  At that time I was living with my father, and I don't

20   recall having sold Opana at that time.  I do know that I did

21   sell Opana.

22   Q.  When, to the best of your recollection, did you begin

23   selling that drug Opana?

24   A.  When I was dealing with Gonzalez.

25   Q.  So, when did you start going to Dr. Gonzalez then?

1    A.   Around 2017, I think.

2    Q.   So you are telling us under oath that at the time that you

3    were visiting Dr. Gonzalez you were selling two types of drugs,

4    Oxycodone and Opana?

5    A.   Yes, true.

6    Q.   Before Dr. Gonzalez, before visiting Dr. Gonzalez you were

7    not selling Opana?

8    A.   Only on one occasion when the doctor changed my Percocet

9    for Opana.

10   Q.   All right.  Now, the paint business was over, you were --

11   and you mentioned or you testified to the fact that you are a

12   Palero.  Correct?

13   A.   Yes.

14   Q.   And tell us what is a Palero?

15   A.   It's an Yoruba religion.

16   Q.   What does that mean, an Yoruba religion?  Be more specific.

17   A.   It was born in Egypt, and it proliferated all over Africa.

18   Q.   How do you get into that religion?

19   A.   I was born into that religion.

20   Q.   What do you mean by you were born into that religion?

21   A.   My mother has a sainthood Oshun.  My father is Chango and

22   my brother is Oshosi, and I have Yemaya Mayelewo.

23   Q.   All right.  Since I don't know any of those terms, let's

24   start with yours.  What does that mean, Yemaya Mayelewo?

25   A.   That's my guardian angel.

1   Q.   So, when you become a believer in that religion you are --

2   you get a guardian angel.  Is that what you are saying?

3   A.   The thing is every one of us has a guardian angel since we

4   are born.

5   Q.   All right.  But not all of us get to talk to one, so I am

6   going to get there.  So, let's start from there.

7        You have the guardian angel because you believe in that

8   religion.  So who is your guardian angel?

9   A.   Yemaya.

10  Q.   And forgive my ignorance, but I just learned in my case --

11  I heard the name Francisco.  Who is Francisco?

12  A.   Through Palo Mayombe he is my major guider.  He guides me.

13  Q.   So you have an angel?

14  A.   He is my guide and protector.

15  Q.   So you have an angel and you have a guide and protector in

16  addition to the angel.  Right?

17  A.   Yes.

18  Q.   Okay.  And, by the way, as a Palero you assist people who

19  believe in that religion.  Correct?

20  A.   Yes.

21  Q.   Do you charge money for those consultations?

22  A.   No.

23  Q.   You don't charge?

24  A.   No, when people consult with me and they say how much it

25  is, I say nothing.  If you want to give me something, but if

1    it's a much more difficult task, I do charge.

2    Q.   Okay.  Let me get this straight.

3         So you don't charge but you do charge depending on what you

4    need to do.  Is that right?

5    A.   A consultation I don't charge, of course.

6         What has to be done with that person regarding the

7    religion, I do charge for that.  That has a fee.

8    Q.   What kind of fees are we talking about?

9    A.   It depends on the type of problem the person is facing.

10   Q.   All right.  Well, explain to us the different type of

11   problems that you attend to and what the charges are.  I am

12   trying to find out.

13   A.   There are many different things that some people are

14   possessed by dark spirits and I charge differently.

15   Q.   Okay.  And people who are possessed by dark spirits come to

16   you to get rid of the dark spirits that are possessing them.

17        Is that what it is?

18   A.   Yes.

19   Q.   How much do you charge -- let's say that I come to you and

20   I say, listen, I think I am possessed by this dark spirit and I

21   want you to get rid of it, how much would you charge me?

22   A.   First I have to do a consultation to determine whether you

23   are possessed by a dark spirit.

24   Q.   Okay.  So I go to your consultation and I come away with

25   the conclusion that I do have a dark spirit, how much are you

1   going to charge me?

2   A.   It's $121.21.

3   Q.   All right.  You got me there.

4        Why the 21 cents?

5   A.   Because that is what my spirit sets as a fee.

6   Q.   Okay.  So, the spirit is the one who sets the fee?

7   A.   Yes.

8   Q.   Okay.  And, of course, the spirit doesn't get paid.  You

9   get paid.  Right?

10  A.   Of course, yes.

11  Q.   Okay.  And you keep the money.  Right?

12  A.   Yes.

13  Q.   All right.  And you have been doing that ever since you

14  finished the painting business.  This is something that you are

15  getting rid of spirits and doing all these things has

16  progressed as you got rid of your painting business.

17       Correct?

18  A.   I have done it my entire life.  I grew up in this.

19  Q.   All right.  Now, you got together with Anais Lorenzo as a

20  couple.  What year was that?

21  A.   In 2011.

22  Q.   Until what year?

23  A.   We started in 2017 up until 2015, 2016, up to 2018, more or

24  less.

25  Q.   All right.  Seven years, about?

```
1    A.   Let me explain.  Yes, she brought Jasmine into my life when
2    she was seven, so we must have been together around seven
3    years.
4    Q.   All right.  Where did you meet Ms. Lorenzo?
5    A.   In the building where I moved to.
6    Q.   All right.  Now, you meet her in 2011 and shortly
7    thereafter you began living together?
8    A.   Yes.
9    Q.   Was she a devotee or a follower or a believer of Santeria
10   when she met you?
11   A.   Yes.
12   Q.   Okay.  So no issue that she was already familiar and
13   practicing Santeria.  Is that what you were saying?
14   A.   Yes.
15   Q.   Okay.  Who was her Palero before?
16   A.   He passed away.
17   Q.   Okay.
18   A.   The deceased Bartolome Mesa Anthony.
19   Q.   So you were then also guiding Anais Lorenzo; you were her
20   guide, her spiritual guide also as well?
21   A.   No, the spiritual guide is named by a Babalawo.
22   Q.   So what's the difference between a Babalawo and a Palero?
23   A.   The Babalawo is the highest level in the Yoruba religion.
24   He is the one who has the direct connection with Olodumare.
25   Q.   Who is Olodumare?
```

1   A.   It's the God for them, and they're different lands.

2   Q.   Okay.  Now, let me ask you, going back to you getting paid

3   this $121.21 for lifting or getting rid of the dark spirits,

4   what's your batting average in getting rid of dark spirits?

5        How many of them do you succeed and how many of them the

6   dark spirit overcame what you were doing?

7   A.   I don't have what you say -- how do you say it in Spanish,

8   an average?

9   Q.   Do you win more than you lose or is it the other way

10  around?

11  A.   First of all, my fee is very low because there are other

12  people who abuse of these things, and from that money I have to

13  buy candles; I have to buy aguardiente; I have to buy things

14  for the saints.

15  Q.   And you mentioned that some of the people abuse this.  You

16  mean some other Paleros and Babalawos abuse the religion by

17  charging too much money?  Is that what you are saying?

18  A.   Yes.

19  Q.   All right.  You, of course, do not.  Right?

20  A.   No.

21  Q.   All right.  Now, you started to sell Oxycodone what year?

22  A.   Let me see if I can remember.

23       I think it was around 2017.  I don't recall exactly when

24  but it was around 2017.

25  Q.   If I heard you correctly, on direct examination you

1    testified that you were already doing that before you met Al

2    Crespo.  Correct?

3    A.   No.  No.

4    Q.   When did you meet Alberico Crespo, what year?

5    A.   Around 2015.

6    Q.   And you are saying that up to that point, 2015, you had not

7    sold any Oxycodone or Opana.  Correct?

8    A.   The Opana I sold it before because my doctor at Mount Sinai

9    changed my prescription.  I sold it once, but it wasn't a

10   business I did every month.

11   Q.   How many people did you attend to for the religion at the

12   time -- you met Mr. Crespo you said what year was it, 2015?

13   A.   A lot of people, including Crespo, who is my godson.

14   Q.   All right.  But I am trying to determine a number here.

15   When you say, "a lot of people," how many people were you

16   attending to?

17   A.   I can't give you an exact number.  Sometimes I would start

18   giving a consultation at 10 o'clock in the morning, and it

19   would end at 9 o'clock at night.  Other times I would start at

20   10:00 and end at 4:00.  I can't give you an exact number of

21   people.

22   Q.   But it sounds like you had a lot of work.  Right?

23   A.   Yes, I did have a lot of work.

24   Q.   Okay.  Now, let me understand this.  You meet Mr. Crespo

25   and he comes to you for purposes of religion.  Correct?

1      That's how you meet him?

2   A.  Yes.

3   Q.  And you had a consultation.  Is that right?

4   A.  Yes, I gave him a consultation.

5   Q.  All right.  After that, apparently, he was satisfied with

6   your consultation, correct, because he came back?

7   A.  Yes.

8   Q.  You were living at that time where with Ms. Lorenzo?

9   A.  It was a big house.  If I recall correctly, the address was

10  343 West 63rd Street was the big house.

11  Q.  All right.  Part of that religion, by the way, they come

12  and consult with you about events that are happening in

13  people's lives.  Correct?

14  A.  They arrive and come and see me without telling me

15  anything.

16  Q.  All right.  When they come to you, they come to you

17  typically because they have some type of issue, some type of

18  situation in their lives that they want to consult with you as

19  somebody higher up in the religion.  Correct?

20  A.  That's true.

21  Q.  Okay.  Just to be clear, this religion, you are able to

22  speak to the spirits.

23      Am I correct about that?

24  A.  I can connect with them.  I am a medium.

25  Q.  Okay.  And when we talk about spirits, we are talking about

1   people who are dead.  Right?

2   A.  Yes.

3   Q.  For example, Francisco, in your case, is a person who died

4   and now you talk to Francisco.  Is that right?

5   A.  Yes.

6   Q.  And how did you come about to connect with this individual,

7   Francisco?

8   A.  We connect with the spirits, all the spiritualists do so

9   because we have a gland, which is called the pineal in our

10  brains, and we connect with the spirits who are in the lower

11  astral levels or in the threshold of the astral levels.

12  Q.  So, Francisco apparently was in the lower astral levels,

13  but the question is why Francisco is what I'm going at?

14  A.  Francisco is not in the lower astral level.  I said that I

15  can connect with spirits in the lower astral level, and I can

16  connect with those spirits that are in the light as well.

17  Q.  All right.  Wherever Francisco is at whatever level, the

18  question is why Francisco is, why not somebody else is what I

19  am trying to get from you.

20  A.  I have several spirits in my spiritual rope, but Francisco

21  is the main one because he is my protective guide?

22  Q.  So if you have a problem, you consult the problem with

23  Francisco.  Is that how it works?

24  A.  Yes.

25  Q.  And Francisco can help you to overcome that problem.

1   Correct?

2   A.   Yes.

3   Q.   All right.   So, this religion is based upon the fact that

4   you can talk to the dead and you can change events.   Correct?

5   A.   Not always.

6   Q.   Sometimes you can.   Right?

7   A.   If they are problems of illness, yes, but if they are

8   problems related to an infringement of the law, then these

9   spirits don't allow this because both the saints and the

10   spirits are pure.

11       They don't like things that are done incorrectly.

12   Q.   I didn't get there yet.   We are going to get there, so let

13   me ask you this:   The spirit will alter events or change events

14   depending on what?

15   A.   They can cure people, and they can take spirits that are

16   not of the light away from people.   They can change the way of

17   behaving, the person's behavior as well.

18   Q.   Let me ask you this:   Part of what you can do and part of

19   what you do is you also can use the spirits to put a curse on

20   somebody.   Right?

21   A.   I'm not a person to put a spell on someone, and I need the

22   spirit to be the one to put the spell or the curse.   But

23   Francisco is a spirit of the light, and he does not do that.

24   Q.   Did you threaten Anais Lorenzo that when you were having,

25   you were on the outs with her, that you were going to put a

1   curse on her?  Did you do that?

2   A.  No, never.

3   Q.  Did she ever tell you that she was afraid of you putting a

4   curse on her?  Did that ever happen?

5   A.  No.  Anais has her Cofa de Orula, and she was gathering to

6   become -- and she was going to become a saint.

7   Q.  That's not what I'm asking you.

8        What I am asking you is, did you tell her when you were

9   fighting with her and she wasn't going back with you that you

10  were going to put a curse on her and she got real afraid of

11  you?  Did that happen?  That's what I am asking you.

12  A.  No, never.

13  Q.  Now, look, bottom line, because you have this religion

14  where you talk to the dead and you can change events, you wield

15  a lot of power and authority over people who come to you and

16  believe in your religion, don't you?

17  A.  To consult those persons, yes.

18  Q.  You do have a lot of power over them.  Right?

19  A.  I only tell them what develops in the consultation.  If

20  they want to do it, they do it.  If they don't, they don't.

21  Q.  Let's talk about Mr. Crespo and the religion coming to you.

22       When he came to you, head over heels over you, he would

23  call you all the time.  He visited your house multiple times a

24  week.  Correct?

25  A.  And in order to contact me the first time, he came to my

1   house three times, and he wasn't able to contact me until the

2   third visit.  And the second time that he came to my home, he

3   brought a bottle of aguardiente, and he gave it to Anais for my

4   spirit.

5   Q.  So he kept coming back because you weren't there.  Is that

6   what happened?  You were busy?

7   A.  He wanted to see me, but it wasn't until the third time

8   that he was able to see me.

9   Q.  All right.  But after that third time, subsequent to that,

10  after that he kept in constant contact with you.

11      Is that correct?

12  A.  Yes.

13  Q.  And that was as a result of the religious guidance and the

14  religious things that you were doing for him.  Correct?

15  A.  Because we had those things in common.  He has his own

16  spirits.

17  Q.  So the believers like Crespo would have their own spirits.

18  Correct?

19  A.  The thing is everyone has their own spirits.  That's what

20  we believe in.

21  Q.  So I got one and I can talk to that one?

22  A.  If you develop the pineal gland, which is the spiritual

23  gland which has a lot of connection with the pituitary gland,

24  and the pituitary gland has a connection with Ori, where the

25  spirit lives.

1    Q.   And you are the man that makes all that possible for a

2    person, let's say, like me, to develop that gland to be able to

3    speak to the spirit.  Right?

4    A.   And I developed it and other people can develop that

5    relationship through spiritual masses of development.

6    Q.   My question to you is, people come to you believing that

7    you are going to help them in the religion for them to be able

8    to connect with these dead people, these spirits so that they

9    can resolve their problems.

10        Right?

11   A.   The people come to me to see if I can help them with their

12   problems, the reason why they are not feeling well, the

13   problems they are having in their marriages, that's why they

14   come to me.

15   Q.   All kinds of problems, different problems.  Correct?

16   A.   Yes.

17   Q.   And sounds like you said before that you were very busy, so

18   you must have been making a pretty good living from all of the

19   counseling and all of the religious services that you were

20   participating in.  Correct?

21   A.   I did not do only that.  I also made people saints.  I was

22   doing well.

23   Q.   What does that mean, "doing well"?  How well?

24   A.   And when I was doing saints, when I was making a saint of a

25   person, I would charge $2,000, $2,500.  Each saint had a

1   different price.

2   Q.   Did the saints, themselves, determine their price or did

3   you?

4   A.   That was the saint.

5   Q.   So the saints determined $121.21 and also $2,500 and this

6   saint is $3,000, this one is $1,500?  Is that how it works, and

7   the saints tell you how much to charge?

8   A.   First, my protected guide, Francisco, did not determine

9   which saint.

10   Q.   Okay.  Whether Francisco determined or not which saint, the

11   saints, themselves, determined what the price was going to be.

12   Right?

13   A.   And the person goes to the Yoruba heavens and goes to the

14   Babalawo and the Babalawo determines the saint for that person.

15   Depending on the saint that is chosen for that person, and it

16   also determines whether he has to crown himself as a saint and

17   that person is made a saint and he is charged for that service.

18   Q.   All right.  Now, Crespo came to you, I believe we

19   established, in 2017 or thereabouts -- 2015, excuse me.

20   A.   2015.

21   Q.   The question was, he kept coming to you after that on a

22   constant basis, correct, for religious purposes?

23   A.   Yes.

24   Q.   And so that there is no doubt, he showed a tremendous

25   amount of respect to you and deference to you because you were

1   the religious guide in his life, correct, or the religious --

2   guide, yeah.

3   A.   Yes.

4   Q.   In fact, when he would address you, he would address you as

5   father.  Correct?

6   A.   Yes.

7   Q.   And always treated you with reference.  Correct?

8   A.   Yes.

9   Q.   And you, on the other hand, would refer to him as a son.

10  Correct?

11  A.   Yes.

12  Q.   So it is a relationship of you, sort of the higher, more

13  revered person versus the son.  Correct?

14  A.   Yes.

15  Q.   And that went on for years.

16       Correct?

17  A.   Yes.

18  Q.   All right.  Now, because he believed in that religion, he

19  came to you rather often and consulted with you very often.

20  Correct?

21  A.   Yes.

22  Q.   And kept in contact with you constantly.  Correct?

23  A.   Yes.

24  Q.   All right.  You now or you learned from -- when did you

25  learn, in the first time that he came to you or subsequently,

1    that he was a federal agent?  When did you learn that?

2    A.  He was referred to me by a common friend of ours, and his

3    name is Valodia Aguilera Santin.  Valodia was his barber and

4    also his friend.  Valodia was the one who referred him to me

5    due to a problem that he had at that time.

6    Q.  All right.  The question was, when did you learn that

7    Mr. Crespo was a federal agent?  When?

8    A.  Because Valodia said to me he is a friend of mine, he is a

9    federal agent, and I need you to see him.

10   Q.  All right.  Fair enough.

11       Now, at that time when you first meet Crespo, were you

12   dealing -- were you buying Oxycodone and reselling it or not,

13   at that time when you first meet him?

14   A.  No.

15   Q.  How long after you met Mr. Crespo did you start your

16   business of buying and selling Oxycodone?

17   A.  Around '17 is I think when I started.

18   Q.  So it would have been about two years after you met Crespo?

19   A.  Yes, approximately.

20   Q.  All right.  Now, when you were involved in the purchasing

21   and selling of Oxycodone, that's something that you kept to

22   yourself.  Right?

23   A.  Yes.

24   Q.  I mean, it is an illegal business so you don't want it

25   spread around.  Right?

1   A.   Yes.

2   Q.   By the way, what does your saint think about you being

3   involved in that illegal business, since we are talking about

4   before that they are -- your saint is one of light.  What did

5   this Francisco think about you involving yourself in Oxycodone,

6   which is illegal to sell?

7   A.   What I have now, today, is God's punishment.

8   Q.   Okay.  But that wasn't my question.

9        My question is, and I will rephrase it.  As part of your

10  religion, if you really believe in that religion, you are not

11  supposed to be involved in that type of business which is

12  illegal to buy and resell Oxycodone.  Is that right?

13       The saints would not approve that?

14  A.   Exactly.

15  Q.   So you were breaking your religion beliefs and rules by

16  doing what you were doing with the Oxycodone.  Is that right?

17  A.   Yes.

18  Q.   And besides not wanting to offend the Gods, you needed to

19  keep your business quiet because it is illegal and you can get

20  arrested, which you did, eventually, and go to prison.

21       Correct?

22  A.   I did not understand that question very well.

23  Q.   All right.  Let me rephrase it.

24       Besides not wanting to offend the saints by reselling

25  Oxycodone, you needed to keep things quiet because you didn't

1   want to get arrested.  Correct?

2   A.  Yes.

3   Q.  So you, for a number of years, led what could be called or

4   what it is, actually, a double life.  Correct?

5   A.  Yes.

6   Q.  On the one side, people -- you face people, you are a

7   law-abiding Palero and religion leader and all of that, but in

8   reality, that's not who you really were.

9       Correct?

10  A.  I have always been religious, and I will continue being

11  until the last days of my life, but disobedience is what

12  brought this along because I never -- because the spirits, the

13  saints never agree with anything wrong.  What I don't do is ask

14  them if what I am doing is good or bad.

15      I don't do that part because I know they are going to tell

16  me no.

17  Q.  That's not my question.  My question is, you are leading a

18  double life, which is, on the one hand, you are making people

19  believe that you are law-abiding religious guy.  On the other

20  hand, you are meeting with other people and you are doing

21  business which is illegal, totally different lives that you are

22  leading, correct, double life?

23  A.  Yes.

24  Q.  Now, because you supposedly had this connection to the

25  saints and your position, whether you are doing it or not, your

1   position allows you to be in a position to manipulate people

2   who are coming to see you.  Correct?

3            MR. MCLAUGHLIN:  Objection.  Argumentative.

4            THE COURT:  Just a moment.

5            Sustained.  You can rephrase the question.

6   BY MR. QUINON:

7   Q.  Because you have a position of authority in your religion,

8   it allows you, if you so desire, to manipulate people.

9       Correct?

10           MR. MCLAUGHLIN:  Same objection, Your Honor.

11           THE COURT:  Sustained.

12  BY MR. QUINON:

13  Q.  Because you have a position of authority in your religion,

14  you can get people, if you so desire, to do things that are to

15  your benefit and maybe not to the benefit of those people.

16      Correct?

17  A.  No, I ask people.  I tell them what they have to do and

18  they then decide if they do it or not, but I never impose on

19  people what they are supposed to do.

20  Q.  You stated that you met Mr. Crespo sometime around 2015.

21  You moved into the efficiency you testified in December

22  of 2019, or thereabouts?

23  A.  Yes.

24  Q.  And you testified that it is after you move in, about a

25  month after you move in, that you told Mr. Crespo that you were

1   involved in the buying and selling of Oxycodone.  Correct?

2   A.  Yes.

3   Q.  All right.  So that puts us -- if you moved in at the end

4   of December, 2019, and you told him that about a month later,

5   sometime at the end of January of 2020, correct, you told him

6   that?

7   A.  Yes.

8   Q.  All right.  Let's talk about for a minute where you moved

9   into this efficiency.

10       When you move in, you talk to Mr. Crespo about the rent,

11  correct, how much rent was going to be paid?

12  A.  Yes.

13  Q.  And you offered to pay -- I believe you testified on direct

14  examination, you told him, "I could pay a thousand dollars a

15  month."  Correct?

16  A.  Yes.

17  Q.  He told you, no, no, no, no, no, you don't have to pay that

18  much.  You can pay less.  He told you that.  Correct?

19  A.  Yes.

20  Q.  And, in fact, you offered to pay him, look, I'll pay you

21  900, I'll pay you 800.  He said, no, no, no.  Finally you

22  settled on 700.  Correct?

23  A.  Yes.

24  Q.  And you learned that the prior person that lived in that

25  efficiency had been paying $1,200.

1      Correct?

2   A.   Well, they told me he was paying 1,000.

3   Q.   So, in any event, the point is Mr. Crespo, again, treating

4   you with love, with reverence, absolutely refused to take money

5   that you offered and gave you a more favorable price.

6      Correct?

7   A.   Yes.

8   Q.   All right.  When you moved in, Mr. Crespo was living there

9   at the house with his wife, Samantha.  Correct?

10  A.   Yes.

11  Q.   All right.  The house has an efficiency by the garage,

12  which is independent of the house.

13     Correct?

14  A.   Well, there was a door that connected to the house, and I

15  could go to the house through that door and he could come to my

16  efficiency through that door.

17  Q.   You had a door on your side of the efficiency.  Correct?

18  A.   Yes, that was -- it divided his house and the efficiency.

19  Q.   So there was a door dividing the house from the efficiency.

20  Right?

21  A.   Yes.

22  Q.   And he controlled from his side of the house whether you

23  can get in or not.  Correct?

24  A.   Yes.

25  Q.   You had no control from your side whether he could come in

1   or not.  Correct?

2   A.   No.

3   Q.   So, in other words, he controlled how private he would keep

4   his home.  Correct?

5        He could do that?

6   A.   He never locked that door.  He always told me, "Pops, you

7   can come in whenever you want."  As a matter of fact, one time

8   he told me to go in and activate his alarm.

9   Q.   But there was a mechanism by which he could keep whoever

10  was a tenant out of his house.  Correct?

11  A.   Yes.

12  Q.   All right.  And when you moved in, if he treated you,

13  again, in a very cordial way, almost as if you were family.

14       Correct?

15  A.   Yes.

16  Q.   I think even during direct examination you mentioned that

17  at times you would play dominoes with him.

18       Correct?

19  A.   Yes.

20  Q.   And going back to -- whether he came back to you when he

21  went to you with the religious matters, I think you testified

22  he was so much in contact with you that at times he was

23  annoying to you.  Correct?

24  A.   Yes.

25  Q.   All right.  Now, you were involved, again, as you described

1   during your testimony, in the trafficking of Oxycodone and you

2   were making $14,000 to $16,000 a month.

3        You testified to that.  Correct?

4   A.   Thirteen, 13, between 13 and 14, from what I remember.

5   Q.   All right.  Now, Mr. Crespo was not making any money out of

6   your business of trafficking in Oxycodone.  Correct?

7   A.   No.

8   Q.   In other words, he was not in business with you about

9   buying and selling Oxycodone.  Correct?

10  A.   No.

11  Q.   That was your business.  Correct?

12  A.   Yes.

13  Q.   And the profits went to you.  Right?

14  A.   Yes.

15  Q.   And the only reason why anybody gets involved in the drug

16  business is to make money.  Correct?

17  A.   Yes.

18  Q.   Which you were making money.  Correct?

19  A.   Yes.

20  Q.   He was making none of it.  Correct?

21  A.   No.

22  Q.   Now, the prosecutor asked you before why did it take you so

23  long to cooperate.  Do you remember that?

24  A.   Yes.

25  Q.   I believe that you mentioned that you were not treated too

 1   well at the time of your arrest.  Correct?

 2   A.  There were several but that was one of them.

 3   Q.  What was it that you didn't like at the time that you were

 4   arrested?

 5   A.  Well, the way I was treated by one of the agents.

 6   Q.  What do you mean by the way you were treated?

 7   A.  He was very hard from the beginning, I have to say it in

 8   English because I don't know the word.  He was very hard.

 9   Q.  What do you mean, "very hard"?

10        How were you treated?

11   A.  It's just that he showed me a picture and I said I didn't

12   know that person, and then I asked to see the picture again and

13   he said, "No, no."

14        He tucked it away, and he says I'm going to put 75 years on

15   you and I didn't like that.

16   Q.  Okay.  And this is the day you got arrested.  Right?

17   A.  Yes.

18   Q.  And you were arrested at what time during that day?

19   A.  I actually don't remember.  It was during the day, but I

20   don't remember if it was at 12:00.  But I was arrested that

21   day.

22   Q.  Okay.  That would have been July 21, 2020.  Right?

23   A.  Yes.

24   Q.  All right.  So when this agent tells you that you are going

25   to get 75 years, did that scare you?

1  A.  No, because it was -- it stressed me because it was five

2  agents who went, and four of them treated me like a normal

3  person and one of them treated me like -- he intimidated me,

4  you know what I mean.

5  Q.  All right.  But aside from how you were treated, the

6  question is, once you're told that you are going to get years

7  in prison, that became worrisome to you.  Correct?

8  A.  Yes.

9  Q.  So once -- your place where you're living, they come and

10  they put handcuffs on you?

11  A.  No, once I had that interaction with that person, I got up

12  and I said, "Well, if you have evidence," then I put my hands

13  behind me and I said, "you can take me."

14  Q.  All right.  Now, once you are arrested, you realized you

15  had big problems in your hands.  Right?

16  A.  Yes.

17  Q.  What did you think at that time that would happen to you?

18  A.  That I was going to go to prison.  I knew that.

19  Q.  In your mind, at that time when you got arrested, how long

20  did you think you were going to go to prison?

21  A.  At that moment, I honestly didn't think more about it other

22  than that I was going to go to prison.

23  Q.  Later on after you get arrested, you got booked.  Right?

24     They took you to jail, photographed you, fingerprinted you

25  and put you in a cell.  Right?

1    A.   Yes, they did do the booking.

2    Q.   And subsequent to that, after that there came a point in

3    time where you had to appear in court concerning charges

4    against you.  Correct?

5    A.   Yes.

6    Q.   And you learned of the seriousness of the charges.

7    Correct?

8    A.   Yes.

9    Q.   So there was a formal accusation against you, which is

10   called an indictment.  Correct?

11   A.   Yes.

12   Q.   And you had against you a number of counts.  Correct?

13   A.   Yes.

14   Q.   Count 1, which you ended up pleading guilty to, was a count

15   of conspiracy to distribute and to possess with intent to

16   distribute a controlled substance.  Correct?

17   A.   Yes.

18   Q.   And you learned that that charge alone had a maximum

19   penalty of 20 years.  Correct?

20   A.   Yes.

21   Q.   So that if you were convicted of that charge, whether at

22   trial, or whether you plead, the judge can give you up to

23   20 years.  Correct?

24   A.   Yes.

25   Q.   You were also charged on Counts 2, 3, and 4 with

1  distribution and possession with intent to distribute a

2  controlled substance.

3      Do you recall that?

4  A.  No, it's just that those charged were dismissed.

5      They just left charge one and charge ten.

6  Q.  Well, they were dismissed later but this is what you were

7  charged with originally.

8      That's where I am going at this point.

9  A.  Yes.

10  Q.  So initially you were charged with Count 1, which was a

11  20-year minimum mandatory -- I'm sorry, which was a 20 years

12  maximum.  Correct?

13  A.  Yes.

14  Q.  And Counts 2, 3 and 4, distribution, possession with intent

15  to distribute a controlled substance, three counts, and each

16  one of them, 20-year maximum as well.  Correct?

17  A.  Yes.

18  Q.  So there you have three counts, 60 years, plus Count 1,

19  another 20 years.  We are up to eight years.

20      Correct?

21  A.  Uh-huh.

22  Q.  That's a yes?

23  A.  Yes.

24  Q.  In addition to that, you have Count 5, which is conspiracy

25  to commit witness tampering.  Correct?

1      You were charged with that also.  Correct?

2   A.   Yes.

3   Q.   Another 20 years.  Correct?

4   A.   Yes.

5   Q.   And then you were charged with Counts 6 and 8 with witness

6   tampering?

7   A.   Yes.

8   Q.   And each one of those two counts carry another 20 years

9   maximum.  Correct?

10  A.   Yes.

11  Q.   Lastly, you were also charged on Count 10 with conspiracy

12  to obstruct justice, which also carry a maximum sentence of

13  20 years.  Correct?

14  A.   Yes.

15  Q.   So I suppose when you learn that, you're facing a very

16  serious problem here.  Correct?

17  A.   Yes.

18  Q.   Over a hundred years potentially, maximum.  Correct?

19  A.   Yes.

20  Q.   All right.  And were you scared?

21  A.   Yes.

22  Q.   The question became how to get out of your problem.

23       Correct?

24  A.   The question that I was asking myself is, how did I get

25  myself into this problem?

1    Q.   Well, you knew the answer to that.  Right?

2    A.   Of course.

3    Q.   The question is not how did you get into the problem.  The

4    question is, how are you going to get out of the problem.

5         Right?

6    A.   Yes, that's what I thought too, how do I get out of this.

7    Q.   As the prosecutor asked you, you took two years, roughly,

8    to come in and figure out how you were going to do it.

9         Right?

10   A.   Actually, the prosecutor asked me why it took me two years

11   to make this decision.

12   Q.   You were figuring out what was the best way, how you can

13   get out of your jam the best way?

14   A.   Yes.

15   Q.   Okay.  And you found the solution, which is you learned

16   that if you get sentenced in the case -- well, let me strike

17   that.  Let me strike that.

18        Let me start differently.  You decided eventually that you

19   were going to cooperate.  Right?

20   A.   Yes.

21   Q.   And you found out that in the federal system there is no

22   such thing as parole, correct, if you get a sentence?

23   A.   Yes.

24   Q.   In other words, once you get sentenced, you got to do your

25   time?

```
 1   A.   Yes.

 2   Q.   All right.  And you knew that you were facing years in

 3   prison.  Correct?

 4   A.   Yes.

 5   Q.   You are -- how old are you now?

 6   A.   Sixty-seven.

 7   Q.   You didn't want to spend the next 15 or 20 years in prison,

 8   did you?

 9   A.   Yes.

10   Q.   That would be correct, you didn't want to do that.  Right?

11   A.   No.

12   Q.   All right.  So you learned that if you cooperate, you are

13   going to get benefits because you can get your sentence

14   reduced.  Right?

15   A.   Yes.

16   Q.   You also learned, by the way, that in order to get your

17   sentence reduced, it depends on the government.  Correct?

18   A.   Yes, likewise.

19   Q.   In other words, you learned in the system that unless the

20   prosecutor files a motion to lower your sentence, to reduce

21   your sentence, it can't be done?

22   A.   Yes.

23   Q.   In fact, you learned that if the prosecutor doesn't file

24   that motion, even the judge cannot reduce your sentence?

25   A.   Yes.
```

1   Q.   And you learned that in the federal system the sentence

2   that you get is very much tied up, in a case like yours, a drug

3   case, based upon the amount of pills in this case involved.

4   Correct?

5   A.   Yes, because I read it in a piece of paper.

6   Q.   All right.  The more pills involved the higher the

7   sentence.  Correct?

8   A.   Yes.

9   Q.   Also, another factor that is taken into account in how high

10   of a sentence you are going to get is whether you recruited

11   people to commit the crime.  Correct?

12   A.   Yes.

13   Q.   In other words, that person who is a leader, the

14   higher-ups, they are going to get a higher sentence.

15        Correct?

16   A.   Yes.

17   Q.   And you learn that all of that is done through a table,

18   correct, the sentencing table?

19   A.   Yes, I read it in the paper.

20   Q.   All right.  In your case, eventually you ended up pleading

21   guilty and what was the recommended sentence under those

22   tables, under the Sentencing Guidelines?

23   A.   Six years, four months.

24   Q.   That's what you were sentenced to, 76 months.  Correct?

25   A.   The guideline said 20.

1   Q.   Did you testify before, maybe I misheard you so correct me,

2   that the bottom of the guidelines in your case were 87 months?

3   A.   Yes, I saw that also on the piece of paper they gave me.

4   Q.   All right.  But the sentence that you got, 76 months, was

5   less than any recommended sentence, so far as you understood.

6        Correct?

7   A.   Yeah.

8   Q.   And another factor that went into your sentence to your

9   favor is, a person who pleads guilty gets levels reduced, so

10  you got a lower sentence by virtue of the fact that you plead

11  guilty.  Correct?

12  A.   Yes, that's called escape valve.

13  Q.   All right.  And although you were sentenced to 76 months,

14  you knew, at the time you got sentenced, that you had a

15  built-in reduction, that you were going to come back and your

16  sentence was going to be reduced after you testified, correct,

17  in this case?

18  A.   Yes.

19  Q.   So you knew that although 76 months was there, that wasn't

20  your real sentence.  You knew that you were going to get a

21  lower sentence.

22       Correct?

23  A.   Yes, but the judge can also maintain the sentence at the

24  same level.

25  Q.   That is true.  However, it does help you, though, to have

 1   friends at this table; right?

 2       That helps?

 3   A.   I don't have any friendship with him.

 4   Q.   Well, let me ask you this; can I help your sentence?

 5       Can I reduce your sentence?

 6   A.   No.

 7   Q.   I can't do anything for you.  Correct?

 8   A.   Correct.

 9   Q.   In fact, I am not even going to be in your sentencing.

10       Correct?

11          THE INTERPRETER:  Excuse me?

12   BY MR. QUINON:

13   Q.   In fact, I am not even going to be at your sentencing.

14       Correct?

15   A.   Correct.

16   Q.   However, the people at this table are going to be there and

17   if they say nice things about you, that's going to help you,

18   isn't it?

19   A.   Yes.

20   Q.   So you know that when you walk in here, it would help you

21   if you say things that will help people at this table.

22       Correct?

23   A.   If I say the truth as I am saying now, yes.

24   Q.   Who would you like to make happy in this courtroom, me, who

25   cannot do anything for you, or the table that can do something

1    for you?  Between the two of us, who would you like?

2    A.   I just want to please myself.  I want to have my mind at

3    peace, okay.  I have to empty out my mind.  I recognize that I

4    made a mistake, but I cannot cover the mistakes made by others.

5    Q.   I heard you before, when the prosecutor asked you the

6    question exactly that, that you wanted to free your mind.

7         Correct?

8    A.   Yes.

9    Q.   This is about, really, at the bottom line is you, sir, want

10   to get your sentence reduced.  Isn't it true?

11   A.   I would like that to happen, but if it isn't reduced, I

12   deserve what I am getting.

13   Q.   Now, the agreement that you signed with the government you

14   understand that it is in their judgment whether they are going

15   to recommend a reduction or not is totally a hundred percent up

16   to them?

17   A.   Yes.

18   Q.   And if they decide not to, there is nothing you can do.

19        Correct?

20   A.   Yes.

21   Q.   Now, let me go back to Anais Lorenzo.  When she came to you

22   and you started your relationship with her in 2011, she was not

23   hooked on drugs, was she?

24   A.   Yes, she was already an addict.

25   Q.   So that's at the time that she was working at Jackson

1    Memorial Hospital.  Is that right?

2    A.  Yes.

3    Q.  What drug was she hooked on?

4    A.  She would take five 2-milligram Xanax per day, and once in

5    a while she would snort cocaine.

6    Q.  When did she become addicted to methamphetamine?

7    A.  Around 2019 she became an addict of methamphetamine.

8    Q.  But she became an addict first to the Oxycodone before the

9    methamphetamine.  Correct?

10   A.  First Oxycodone because from the bottles that I would

11   collect from my clients, and the person to whom I sold them

12   would tell me each bottle is missing two.  And that's when I

13   realized she was the one taking the pills because she was the

14   only one who knew where I kept them.

15   Q.  And you were the one who got her into the Oxycodone

16   business.  Correct?

17   A.  Yes.

18   Q.  When she became addicted to the methamphetamine,

19   unfortunately, she got taken over by the drug.

20        Correct?

21   A.  Yes.

22   Q.  And, again, she became a person that acted kind of

23   irrationally towards her mother, her children, towards everyone

24   around her.  Correct?

25   A.  Yes.

1    Q.   And it all started with Oxycodone where you brought her

2    into that world.   Correct?

3    A.   You could say so, but there were friends of hers that got

4    her involved completely with crystal meth, up to the point that

5    she abandoned her children and I had to assume control of them.

6              THE COURT:   All right.   While you are reviewing your

7    notes, why don't we take our first break.

8              We will take 15 minutes now.   Please don't discuss the

9    case.

10             (The jury exited the courtroom at 2:49 p.m.)

11             THE COURT:   All right.   Please be seated.

12             Anything we need to take up for the government?

13             MR. MCLAUGHLIN:   Not from the government, Your Honor.

14             THE COURT:   From the defense?

15             MR. QUINON:   No, Your Honor.

16             THE COURT:   All right.   We will take 15 minutes.

17             (Recess.)

18             THE COURT:   I do note the presence of the attorneys and

19   the defendant.

20             Mr. Quinon, are you ready?

21             MR. QUINON:   Ready.

22             THE COURT:   All right.   Let's bring them in.

23             COURT SECURITY OFFICER:   All rise for the jury, please.

24             Judge, there is somebody in the restroom.

25             THE COURT:   All right.   Please be seated.

1          COURT SECURITY OFFICER:  I think they are ready, Judge.

2          All rise.

3          (The jury entered the courtroom at 3:10 p.m.)

4          MR. QUINON:  May I proceed, Judge?

5          THE COURT:  Yes, sir.

6   BY MR. QUINON:

7   Q.  Mr. Diaz, do you recall sometime on June 19 of 2020 that

8   you were attending to a medical procedure that Mr. Crespo

9   called you and he told you, "Come home, I need to talk to you.

10  It's about the Gonzalez case."

11         Do you recall that?

12  A.  Yes.

13  Q.  And, in fact, you went home.  Correct?

14  A.  Yes.

15  Q.  And you testified that Mr. Crespo had shown you his

16  telephone and that there were various names of people.

17         Correct?

18  A.  Yes.

19  Q.  This is something, by the way, that was covered by you

20  during direct examination with the prosecutor.

21         Correct?

22  A.  Yes.

23  Q.  And the name that you recognized, the only name that you

24  recognized during your direct examination was a woman by the

25  name of Milka Lao.  Correct?

1    A.  No, I recognized two.  Right now I don't remember the other

2    one aside from Milka Lao, but it was two I recognized.

3          MR. QUINON:  All right.  Is there any way you can put

4    up Government Exhibit 17C, that particular list.

5    BY MR. QUINON:

6    Q.  Do you see the screen there, Mr. Diaz, in front of you?

7    A.  Yes.

8    Q.  All right.  That's what you saw when Mr. Crespo showed you

9    his telephone?

10   A.  Yes, I saw a lot of names.

11   Q.  And you see the name there pointed out to you there, number

12   7, Milka Lao?  Do you see that?

13   A.  Yes.

14   Q.  Any other names of people that you know there?

15   A.  Consuelo.

16   Q.  That's Consuelo Diaz?

17   A.  Yes.

18   Q.  How do you know her?

19   A.  I know Consuelo from the clinic.

20   Q.  That would have been Dr. Gonzalez's clinic?

21   A.  Yes.

22   Q.  All right.  She is the other one that you were referring

23   to?

24   A.  Most likely because it's the only one -- she is the only

25   one I know aside from Milka.

1   Q.  All right.  Now, you testified that Mr. Crespo showed you

2   or flashed at you the telephone and you saw the names and you

3   said to him that you were not involved in anything illegal with

4   those people but that you knew them.

5       Correct -- sorry, that you knew Milka Lao.  Correct?

6           THE INTERPRETER:  I am sorry, the last part, that you

7   knew?

8   BY MR. QUINON:

9   Q.  That you knew Milka Lao?

10  A.  What I told Mr. Crespo was he was showing me a list and I

11  told him that I recognize two people, two names there, and he

12  is the one that told me, "You see, Pops, you are not involved

13  in any of this.  Your name is not here."

14  Q.  He told you, "See, Pops, your name is not on this list."

15      Correct?

16  A.  He only told me you are not involved in any of this.  He

17  never told me his name.

18  Q.  When you say, "his name," what do you mean?

19  A.  He never told me, Jorge, your name is not here.  He just

20  told me you are not involved in any of this.

21  Q.  This is June 19, 2020.  Correct?

22  A.  Yes.

23  Q.  However, turn the clock back, on October the 2nd of the

24  prior year, 2019, he had told you, Crespo had told you that he

25  had spoken to an agent who was in charge of the Dr. Gonzalez

1    investigation who told him that the investigation had been shut

2    down, that there was no investigation.

3    A.   It was not like that.  He called in front of me he called

4    an FBI agent, asked him if he was in charge of the Gonzalez

5    case.

6         The person said, no, that it may be another person from the

7    FBI.  So, he gave him the number, and he called that person.

8    And when he asked, that the person told him that I did not

9    appear in anything and that that person wanted to close the

10   case, that Gonzalez was -- that he was already sick and tired

11   of snitching too much.  He was tired of it and he wanted to

12   close the case.

13   Q.   So you are saying that in your presence Crespo talks to

14   this agent who tells you that it was his case but he was

15   closing the case now and that you were not part of that

16   investigation, and that he, the agent, was tired of the case.

17        Is that what happened?

18   A.   Yes.

19   Q.   So, so far as you were concerned at the time, and Crespo

20   was concerned, he told you, "There's no case.  The

21   investigation is closed."

22        That's what Crespo told you.  Correct?

23   A.   That's what the agent told Crespo, that he was going to

24   close the case.

25   Q.   And you took that to mean, I got no worries.  I mean,

1    that's it.  I'm not there, my name is not there, and the

2    investigation is going to be closed.

3        Correct?

4    A.  Yes.

5    Q.  All right.  So now we move the clock back to this one here

6    that is in front of you here on the screen, June 19th of 2020

7    and now Crespo shows you this list and, again, says, your name

8    is not there.  Right?

9    A.  Yes.

10   Q.  All right.  By your name not being there and having been

11   told a few months before that there was no investigation with

12   you, you felt pretty good as of June 19 of 2020.

13       Correct?

14   A.  Yes.

15   Q.  However, you did recognize the name of Milka Lao.

16       Did you tell Crespo on this meeting that you had with him

17   on June 19th of 2020, that you knew Milka Lao?  Did you tell

18   him that?

19   A.  I told him that I knew two people there.  I didn't say the

20   names, and he said, "Okay.  Pops, your name is not here."

21   Q.  Did you tell Crespo at that time that you recognized two of

22   those people there but you had nothing to do with them?

23   A.  No.

24   Q.  All right.  Let me show you what has already been entered

25   into evidence here, Government's Exhibit 7-37, which is part of

1    the binder that the jurors have.  Let me put it here on the

2    ELMO.

3        Let me show you first, you see here on top of the page the

4    date, June 19, 2020?  Do you see that?

5    A.  Yes.

6    Q.  The same day that you and I have been discussing now.

7    Correct?

8    A.  Yes.

9    Q.  This is a call at, approximately, 5:24 p.m.

10       Do you see that?

11   A.  Yes.

12   Q.  And it's between you, you see here Jorge Diaz, and your

13   phone number that ends in 3906.  Correct?

14   A.  Yes.

15   Q.  And you are talking in this call to your daughter, Ashley

16   Diaz.  Do you see that?

17   A.  Yes.

18   Q.  And that's her phone number that ends in 7349.  Correct?

19   A.  Yes.

20   Q.  All right.  Let me go to page five.  This is you and Diaz

21   talking.  Do you see it there?

22   A.  Yes.

23   Q.  And, again, this is with Ashley because we see Ashley down

24   here.  Do you see that?

25   A.  Yes.

1    Q.   This is page five of Government's Exhibit 7-37, and this is

2    you talking.

3         All right.  So, let me start reading from here.  Here where

4    it says, "But listen, dear, if I tell you, he is very special

5    with me."

6         Do you see that?  You were telling that to your daughter.

7    Correct?

8    A.   Yes.

9    Q.   And you were referring to the person who was very special

10   with you to be Alberico Crespo, Alberico Crespo.  Correct?

11   A.   Yes.

12   Q.   Then you go on to say, "Look, he told me, are you going to

13   do catheterization?"

14        And I told him, "The stress test?"

15        And I told him, "Yes."

16        He told me, "When you finish come over because I have to

17   speak with you."  Do you see that?

18        And at this point, you are relating your conversation that

19   you had a few hours earlier with Mr. Crespo; you're relating

20   this conversation with your daughter.  Correct?

21   A.   Most likely.  I don't have secrets with my daughter.

22   Q.   I understand.  I'm not saying that you do, sir.

23        All I am saying is that this is simply you telling your

24   daughter the conversation that you had earlier with Crespo.

25        Correct?

1    A.   Yes.

2    Q.   And then you say, "and I told him," the "him" here is

3    Crespo.  Correct?

4    A.   Yes.

5    Q.   "Okay.  I'll go over now.  I told the guy, Listen, I left

6    my son without a key.  I'm going home."

7         Do you see that?

8         That's what you told to the gentleman who was doing the

9    medical procedure at the time, correct, that you were going

10   home?

11   A.   Yes.

12   Q.   And then you go on to say to your daughter, Ashley, "So I

13   went to the house to talk to him."

14        Do you see that?

15   A.   Yes.

16   Q.   And "him" referring to Mr. Crespo.  Correct?

17   A.   Yes.

18   Q.   And then you continue, "Listen, he is such a classy guy

19   with me."

20   A.   Yes.

21   Q.   "I don't like to exaggerate.  You understand me?"

22   A.   Yes.

23   Q.   Nothing.  The guy reached out, showed me his cell phone and

24   said, "Look, I don't want you to have anything to do with these

25   people."  Do you see that?

1    A.   Yes.

2    Q.   Then you continue, "I told him, no, I have nothing to do

3    with those people.  I do know them, but I have nothing to do

4    with them."

5    A.   Yes.

6    Q.   All right.  And you were telling that part, no, I have

7    nothing to do with those people but I have nothing to do with

8    them.  Correct?

9    A.   Yes.

10   Q.   And by that you meant that you had told Crespo that you

11   knew those people whose name had been shown to you but you had

12   done nothing illegal with those people.

13        Correct?

14   A.   It's that from this list I only knew two.  The rest I

15   didn't know.

16   Q.   Precisely.  True, true.

17        But the point is you told Crespo, "No, I have nothing to do

18   with those people.  I do know them, but I have nothing to do

19   with them."  Correct?

20   A.   Yes.

21   Q.   Meaning, you knew them but you did nothing illegal with

22   them.  Correct?

23   A.   Yes.

24   Q.   And then he said to you, "Then, I'm not worried.  Continue

25   on.  Continue working the Uber the way you're doing.  There's

1    no problem."

2         Do you see that?

3    A.   Yes.

4    Q.   And Mr. Crespo knew that you were friends with individuals

5    about your age that you would transport or you would take to

6    the doctor.  Correct?

7    A.   Yes, but Uber, what he is saying is for me to continue with

8    my pills.

9    Q.   It doesn't say that.  It says, "Continue to do Uber."  Uber

10   doesn't sell pills, does it?

11   A.   Yes -- no, no.

12   Q.   Uber transports people.  Correct?

13   A.   Yes.

14   Q.   All right.  And he knew that you did take some of those

15   people to doctors.  Correct?

16   A.   Yes.

17   Q.   Now, when you told him that you knew those people but you

18   had done nothing illegal with them, that he said to you then I

19   am not worried.  Correct?

20   A.   Yes.

21   Q.   All right.  But as if to say to you, "Everything is cool.

22   You have done nothing, done anything with them, so I'm not

23   worried."  Correct?

24   A.   Yes.

25   Q.   And this is what you were relating to your daughter.

1      Correct?

2   A.   Yes.

3   Q.   Okay.  In fact, that was a lie that you told to Alberico

4   Crespo because you had been doing illegal things with Milka

5   Lao.  Correct?

6   A.   No.

7   Q.   Well, you knew Milka Lao that she used to work at

8   Dr. Gonzalez's medical clinic.  Correct?

9   A.   Yes.

10  Q.   And you were the one who recommended to Milka Lao to go to

11  the doctor out in Boca Raton by the name of Dr. Espinosa.

12       Correct?

13  A.   Yes.

14  Q.   And what do you think that Milka Lao is going to do at

15  Dr. Espinosa in Boca if not to traffic in Oxycodone?

16  A.   Yes.

17  Q.   So you knew that Milka Lao was involved in illegal

18  activity?

19  A.   Yes.

20  Q.   In fact, you knew that her husband was also involved in the

21  business.  Correct?

22  A.   Yes.

23  Q.   And her mother too.  Correct?

24  A.   Yes.

25  Q.   Not only did you refer her to the doctor in Boca, you had

1  referred her to Dr. Carpman as well.  Correct?

2  A.  Yes.

3  Q.  So you lied then when a few minutes ago you testified that

4  you told Crespo I know those people but I have done nothing

5  illegal with them.  Correct?

6  A.  No, I did not lie.  I did not lie.  I didn't lie because at

7  the time she was working with Gonzalez, Milka and I had an

8  affair.  That's what we had.  Because of that affair is that we

9  became closer, and that's when I told her what places she could

10  go after Dr. Gonzalez closed.

11  Q.  Mr. Diaz, I didn't ask you whether you had an affair or

12  not.

13     I simply asked you, when you told Crespo, according to what

14  you are telling to your daughter Ashley, that you had done

15  nothing illegal with Milka Lao, that was a lie.  You lied to

16  Crespo about that.

17     You had been doing illegal activities with Milka Lao.

18  Correct?

19  A.  Back then I had done nothing illegal with her.  As a matter

20  of fact, to this date, I have done nothing illegal for her.

21  She didn't need anything because at that time she was working

22  for Gonzalez, and Gonzalez would give her the prescriptions for

23  her, for her husband and her mother.

24  Q.  Sir, this takes place -- this particular event June 19th,

25  of 2019.  At that time, the Gonzalez clinic had been closed

1   already, which it closed in 2018.  Isn't that true?

2   A.  Yes, okay.

3   Q.  So Milka Lao, indeed, was doing things with you because

4   this happened in 2019 when you had recommended her to go to

5   Boca to get her Oxycodone.  Correct?

6   A.  Oh, yes, of course.  Of course it's legal -- of course it

7   is illegal what I did.

8   Q.  That's the point, sir.

9       In fact, who did Milka Lao sell her Oxycodone to?

10  A.  No, I didn't -- I wouldn't know who she was selling to.

11  Q.  Okay.  And you would agree then that on June 19 of 2020,

12  here, when you told Crespo that you knew Milka Lao but that you

13  did nothing illegal with her, you lied to Crespo because you

14  could have and you should have told him that you were

15  recommending Ms. Lao go to a doctor in Boca and later

16  Dr. Carpman to get illegally her Oxycodone.  Correct?

17  A.  Well, here there must have been a confusion, and I am going

18  to explain why or maybe I didn't understand or maybe he did it

19  anyway without understanding.

20      When I told him everything that was going on, when I told

21  him everything about the clinic I was going to, he told me this

22  clinic is hot, meaning it was already under investigation.

23  Q.  That's the Gonzalez clinic, isn't it, that you're talking

24  about?

25  A.  Yes, I am referring to the Gonzalez clinic from a long time

1    ago.

2    Q.   Which closed in 2018.  Correct?

3    A.   Yes, I think so.

4    Q.   In fact, you learned that the Gonzalez clinic was under

5    investigation because he had a secretary by the name of Sucett.

6    That's how you learned that the Gonzalez clinic was under

7    investigation.

8         Sucett told you that the clinic was under investigation.

9         Isn't that true?

10   A.   No.  Sucett never.  We would go there.  We would sit down.

11   She would write the prescription that the doctor had previously

12   signed, and with her that was it.  I mean, the only thing we

13   would talk about is how are you, you look good, that's it.

14   Q.   Let me ask you this; did you tell Anais Lorenzo that, in

15   fact, that's how you learned that Dr. Gonzalez's clinic was

16   under investigation, through Sucett?

17        Did you or did you not tell that to Anais Lorenzo?

18   A.   I did not learn that through Sucett.  In fact, Sucett left

19   for Cuba.

20   Q.   Before she left, did you tell Anais Lorenzo that Sucett

21   told you that the clinic was under investigation, yes or no?

22   A.   No.

23   Q.   Is there any reason that Anais Lorenzo would have to lie

24   about you telling her that?

25   A.   Yes.

1   Q.   So Anais Lorenzo then is lying when she says that you told

2   her that that's how you learned that the Dr. Gonzalez clinic

3   was under investigation, through Sucett?

4   A.   Yes.

5   Q.   And she says -- making up things about you.  Correct?

6   A.   She must have invented it because I never told her anything

7   about Sucett.

8   Q.   In fact, isn't it a fact that Milka Lao is the person who

9   put you in contact with Omar, El Gordo?

10  A.   No.

11  Q.   Did you ever tell that to -- well, never mind.  You are

12  saying that that didn't happen?

13  A.   I developed a contact with El Gordo, but Milka Lao wasn't

14  the one who put me in contact with him.

15  Q.   Who did?  Who put you in contact with El Gordo?

16  A.   Jose Gonzalez.

17  Q.   Now, we heard a number of tapes where you tell the

18  patients, the individuals who were going to the doctor, your

19  customers, that you were buying Oxycodone from, you tell them

20  not to worry, that you have a son who is a federal agent who is

21  telling you, don't worry, the FBI will only come once to

22  interview.  They don't come back.

23       Correct?

24  A.   Yes.

25  Q.   And you were doing that because you want to calm down your

1    customers to make sure that they are not going to say, wait a

2    minute, Diaz is hot, you know, he may have problems.  I'm going

3    to sell to someone else.

4         That's what was going on.  Correct?

5    A.   And I tried to calm him down because based on what Alberico

6    told me that they were no longer the target.

7    Q.   Well, we have heard a number of recordings here.  In no

8    recording at all does Mr. Crespo tell you exactly that, that

9    they only go once, the FBI, they don't go back.

10        We don't hear that in the recordings, do we?

11   A.   That's true but out of the 24 hours of a day, Crespo would

12   talk to me 25 hours a day.

13   Q.   The problem here is that those are matters that are not

14   anywhere close to these tapes and you got yourself a problem,

15   don't you, that you want to get a reduction.  Right?

16   A.   And, as I said before, if they reduce my sentence, I accept

17   it.  If they don't, I deserve my sentence.

18   Q.   Would you lie to get your sentence reduced?

19   A.   No.

20   Q.   You rather do six years and four months than lie.  Correct?

21   A.   I am not lying.

22   Q.   The question is, would you lie?

23   A.   No.

24   Q.   You rather do the time?

25   A.   If there is no reduction, yes.

1    Q.   We've heard a number of audio conversations between you and

2    a number of people but also including Mr. Crespo.  Many of

3    those calls or some of those calls, I should say, took place

4    closer to the arrest, to the time of the arrest.

5         Do you remember that?

6    A.   Yes.

7    Q.   Particularly on July 17th, of 2020, you recall that there

8    were quite a few conversations between you and Mr. Crespo.

9         Correct?

10   A.   Okay.

11   Q.   In fact, do you recall all together, I believe, is eight

12   calls between you and Crespo that day.  Correct?

13   A.   Yes.

14   Q.   And that's when you were going down to the Keys to visit

15   Anais' mother, Teresita.  Correct?

16   A.   Yes.

17   Q.   And Crespo was trying to buy a portable AC unit because the

18   one in your efficiency had broken down.  Correct?

19   A.   Yes.

20   Q.   And you had conversations with Crespo that day and he is

21   talking about that Pozo and Anais, they are snitching on you.

22   Correct?

23        That was one of the things they said.  Right?

24   A.   Yes.

25   Q.   And that he would kill them both and feed them to the

1    alligators in the Everglades.  Correct?

2    A.  As far as I know, that's something that he wouldn't do.

3    Q.  That's totally out of character with Mr. Crespo.  Isn't it

4    true?

5    A.  Sometimes he gets angry.  Other times he doesn't get angry,

6    but he wouldn't be capable of doing that.

7    Q.  In fact, you were debriefed; you were interviewed by the

8    agent in this case and you told the agent, Mr. Crespo, appeared

9    to be drunk during the conversation.  Correct?

10   A.  Yes.

11   Q.  I mean, you can tell that because you knew from talking to

12   Mr. Crespo that he had been drinking.  Correct?

13   A.  As of the point I got on the Palmetto and I reached Florida

14   City, he kept on talking and talking and talking to me all the

15   time.

16   Q.  And you noticed he had been drinking.  Correct?

17   A.  Well, I thought so.

18   Q.  All right.  Let's talk a little bit about some of the

19   individuals from whom you were buying the Oxycodone.  Anibal,

20   Anibal Amaro, you mentioned that you met him at a time that

21   Anibal was hardly able to pay the rent.  Correct?

22   A.  Yes.

23   Q.  And you offer him an opportunity to make a little bit more

24   money by selling his pills to you.  Correct?

25   A.  Yes.

1    Q.   And I believe you testified that you were paying Anibal a

2    thousand dollars a month for his pills.   Correct?

3    A.   Yes.

4    Q.   But that you negotiated with them individually and to some

5    you paid less money.   Correct?

6    A.   Yes.

7    Q.   In fact, Martha Cardero you would pay only $400, correct,

8    for her pills?

9    A.   Four hundred dollars from the pills and the $250 from the

10   consultation I would pay.

11   Q.   So you would pay her substantially less than you paid

12   Anibal.   Correct?

13   A.   Yes.

14   Q.   And Mercedes Perez you would pay $900 a month.   Correct?

15   A.   At 925 because they would pay for her consultation and I

16   would add the money that she paid for the consultation.

17   Q.   And the bottom line, these were people that were receiving

18   social security, which is relatively low and needed additional

19   money to pay their rent and buy their food.

20        Right?

21   A.   Yes.

22        MR. QUINON:   Judge, I'm almost done.   I am just

23   reviewing my notes before I sit down.

24        THE COURT:   Sure.

25   BY MR. QUINON:

```
 1    Q.   By the way, one of the things you would do for income, you
 2    would lend people money and charge an interest rate.
 3         Is that correct?
 4    A.   Yes.
 5    Q.   How much interest were you charging?
 6    A.   Ten percent.
 7    Q.   Crespo, by the way, had back problems.  Correct?
 8    A.   Yes.
 9    Q.   So when he called you, we heard one of those calls, and
10    asked you for a pill, he had issues his back.  Correct?
11    A.   Yes.
12    Q.   And you knew that he had his own prescribed medication to
13    deal with the pain in his back.  Correct?
14    A.   No.
15    Q.   You didn't know that he would take medication for his back?
16    A.   I didn't know that he was going to a doctor.
17         He would go into my efficiency and said, "Old man, I took a
18    325" and sometimes he would take a little piece of Oxycodone.
19    Q.   When his back was bothering him?
20    A.   Yes.
21    Q.   Mr. Diaz, during direct did you say that at times you had
22    looked into Google, the search engine concerning the
23    investigation of Dr. Gonzalez's clinic?
24    A.   Yes, I'm not sure if it was through Google but I saw it on
25    the phone.  It appeared on my phone.
```

1   Q.   Do you recall specifically whether you got into Google and

2   Googled Dr. Gonzalez's investigation?

3   A.   I'm not sure if it was Google but I read it on the phone.

4   Q.   Was that something that you were looking for or something

5   that just popped up on your phone?

6   A.   No, it appeared on my phone.

7           MR. QUINON:  That's all I have, Judge.

8           THE COURT:  All right.  Any redirect?

9           MR. MCLAUGHLIN:  No redirect, Your Honor.

10           THE COURT:  All right.  Sir, you may step down.

11           (Excerpt was concluded at 4:03 p.m.)

12

13

14                     C E R T I F I C A T E

15

16

17           I hereby certify that the foregoing is an

    accurate transcription of the proceedings in the

18

    above-entitled matter.

19

20

21

    November 7, 2023          /s/Patricia Diaz

22   DATE                     PATRICIA DIAZ, FCRR, RPR, FPR
                             Official Court Reporter
23                             United States District Court
                             400 North Miami Avenue, 11th Floor
24                             Miami, Florida 33128
                             (305) 523-5178
25