## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

        *Plaintiff,*

v.                          **CASE NO: 21-20005-CR-GAYLES**

ALBERICO AHIAS CRESPO, et al.

        *Defendant.*

_____/

### DEFENDANT CRESPO'S OBJECTIONS TO PRESENTENCE REPORT

Defendant, ALBERICO AHIAS CRESPO ("Mr. Crespo"), through undersigned counsel, hereby files his objections to the Presentence Report ("PSR"), and in support alleges as follows:

### I.      PSR OBJECTIONS

Mr. Crespo objects to the following factual content and legal conclusions in the PSR:

**A.** *Objections Not Affecting the Guidelines Range*

**¶ 9**: Paragraph 9 states that "Diaz and Lorenzo were in a relationship together and lived in an efficiency unit at the residence of SA Crespo …" This statement is incorrect. Lorenzo at no time lived in the efficiency unit at the residence of SA Crespo. Thus, her name should be deleted.

**¶ 10(a)**: Paragraph 10(a) asserts that SA Crespo "knew" of the planned arrest of [Dr.] Gonzalez. However, the evidence adduced at trial revealed that a doctor, whose name was not disclosed in the documents sent out, was going to be arrested on February 7, 2019. The email that went out to the agents did not include Dr. Gonzalez's name, nor did anyone inform SA Crespo that the doctor to be arrested was Dr. Gonzalez. Accordingly, this paragraph must be corrected.

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134. Tel. (305) 858-5700. Fax (305) 358-7848. jquinon@quinonlaw.com*

¶ **10(b)**: Likewise, Paragraph 10(b) must be corrected for the same reasons as ¶ 10(a). That is, neither the email that went out to the agents, nor the testimony at trial, revealed that Dr. Gonzalez's office was the office to be searched. All that was known to SA Crespo, as well as to many other agents at that time, was that a medical office was going to be searched – but no information was provided identifying the individual doctor or doctors associated with those premises. Therefore, this paragraph must be corrected to delete that SA Crespo "knew" that Dr. Gonzalez's medical office was going to be searched on February 7, 2019.

¶ **13**: This paragraph in the PSR states that "the initial patient interviews revealed that Diaz had been warned of these interviews, which led to Diaz telling the patients to be calm and that SA Crespo confirmed that law enforcement would not return to conduct additional interviews." The evidence adduced at trial refutes this assertion. In fact, Diaz testified at trial that he said these things to the patients to calm them and that way they would not sell their pills to someone else.

**B. *Objections Affecting the Guidelines Range***

¶ **34: P**aragraph ¶ 34 attributes 1,802 kilograms of converted drug weight to Mr. Crespo under the Sentencing Guidelines, which puts him at Base Offense Level 24. That calculation is incorrect. We submit that, for the reasons stated below, the amount of converted drug weight properly attributable to Mr. Crespo is substantially less. Therefore, we object.

**(1) *Probation's Methodology to Compute the Base Offense Level***

Our analysis begins by examining how Probation arrived at attributing 1,802 kilograms of converted drug weight to Mr. Crespo.[1] Probation held Mr. Crespo responsible for Oxycodone pills

---

[1] We first thank the Probation Officer, who, in response to an email from the undersigned (with copy to AUSA Sean McLaughlin), graciously provided a succinct and clear explanation of the methodology she used to arrive at the 1,802 kilograms. A copy of that email is incorporated hereto as Exhibit "1."

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134. Tel. (305) 858-5700. Fax (305) 358-7848. jquinon@quinonlaw.com*

prescribed during the conspiracy to the six patients mentioned in the Indictment (at ¶ 15) – specifically, patients M.P., A.A., P.R., B.R., M.C., and L.A. Probation's methodology to arrive at converted drug weight is explained in Exhibit "1," as follows:

By multiplying the number of pills prescribed to each patient times 30 mg (the weight of Oxycodone in each pill) to arrive at the total amount Oxycodone milligrams. Thereafter, the total number of milligrams was divided by one thousand to obtain the total number of grams. So, the total number of Oxycodone grams as to the six patients in the Indictment was reported as follows:

- **Patient M.P** – Oxycodone 30 mg. from Dr. Gonzalez 13.5 grams, and from Dr. Carpman 73.53 grams.
- **Patient A.A.** – Oxycodone 30 mg. from Dr. Gonzalez 69.9 grams, and from Dr. Carpman 94.5 grams.
- **Patient P.R.** – Oxycodone 30 mg. from Dr. Gonzalez 68.4 grams, and from Dr. Carpman 94.5 grams.
- **Patient B.R.** – Oxycodone 30 mg. from Dr. Gonzalez 0 grams (no prescriptions), and from Dr. Carpman 32.46 grams.
- **Patient M.C.** – Oxycodone 30 mg. from Dr. Gonzalez 58.5 grams, and from Dr. Carpman 69.3 grams.
- **Patient L.A.** – Oxycodone 30 mg. from Dr. Gonzalez 58.8 grams, and from Dr. Carpman 75.6 grams.

The total number of grams for all six patients came out to 269.1 grams. And pursuant to the Sentencing Guidelines Drug Conversion Tables, Schedule I or II Opiates (see § 2D1.1, cmt. n. 8), the 269.1 grams was multiplied by 6700 grams, and then divided by 1,000 to get the total kilograms of converted drug weight. Accordingly, in this case: 269.1 x 6700 = 1,802.97 kilograms of converted drug weight.

Importantly, when Probation performed the Guidelines calculations, it was not familiar with the trial evidence and relied exclusively on information provided by the Government. However, the Government provided incomplete information. In fact, Probation's email to the undersigned, with copy to AUSA McLaughlin, contained two important disclaimers: (1) Probation

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134. Tel. (305) 858-5700. Fax (305) 358-7848. jquinon@quinonlaw.com*

had "no knowledge that any part of the conspiracy was unknown or not reasonably known by the defendant;" and (2) Probation had no knowledge if Crespo "enter[ed] the conspiracy in this case at a later time than his co-defendants." *See* Exhibit 1 at 2. These two factors, which the Government did not bring up with Probation, carry great weight in correctly calculating the Guidelines in this case. But Probation is not to blame, because its calculations relied solely on the factual background provided by the Government. If the information relating to these two factors had been timely and correctly provided to Probation, the Base Offense Level attributable to Mr. Crespo would have been significantly lower, as we will explain below.

**(2)  *The Sentencing Guidelines Provisions that Control***

Section 1B1.3 of the Sentencing Guidelines sets forth the rules that must be followed to calculate the applicable Guideline Range. As relevant here, this particular provision states as follows:

### § 1B1.3. Relevant Conduct (Factors that Determine the Guideline Range)

(a)      CHAPTERS TWO (OFFENSE CONDUCT) AND THREE (ADJUSTMENTS). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1)      (A)  all acts and omissions committed, aided, abetted, counseled, commanded induced, procured, or willfully caused by the defendant; and

(B)  in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were –

*(i)      within the scope of the jointly undertaken criminal activity,*

> ***(ii)  in furtherance of that criminal activity, <u>AND</u>***
>
> ***(iii) reasonably foreseeable in connection with that criminal activity;***
>
> that occurred during the commission of the ***offense of conviction***, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)      solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)      all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)      any other information specified in the applicable guideline.

(Emphasis added.) Mr. Crespo's case involves a Chapter Two cross reference; thus, it falls within the ambit of § 1B1.3(a)(iii). Accordingly, the Court is obligated to follow the criteria set forth in this section to determine his Base Offense Level and Guideline Range.

<u>**The Application Notes provide a roadmap to**</u>
<u>**correctly apply the § 1B1.3 criteria set forth immediately above:**</u>

<u>***First Element – "Within the Scope."***</u> § 1B.3(a)(1)(B)(i) speaks to the scope of a defendant's accountability. In defining the scope of accountability, § 1B.3 cmt. n. 3(B) warns that *"the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy."* (Emphasis added.) "In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must **first** determine the scope of the criminal activity the particular defendant agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement fairly inferred from the conduct of

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134. Tel. (305) 858-5700. Fax (305) 358-7848. jquinon@quinonlaw.com*

the defendant and others." (Emphasis added.) See *United States v. Kuc*, 846 Fed. Appx. 860, 865–66 (11th Cir. 2021). And the defendant's accountability is "limited" by the scope of his or her agreement. *Id*. So that "[a]cts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B)." *Id*. Lastly, the Application Notes state that a defendant cannot be held accountable or responsible for "conduct of members of a conspiracy prior to the defendant joining the conspiracy, *even if the defendant knows of that conduct*." *Id*. (emphasis added). To summarize, the defendant's accountability is strictly "limited by the scope of his or her agreement to jointly undertake the particular criminal activity." *Id*.

 **<u>Second Element – "in furtherance."</u>** This element found in § 1B.3(a)(1)(B)(ii) requires the Court to determine if the conduct of others was in furtherance of the jointly undertaken activity.

 **<u>Third Element – "reasonably foreseeable."</u>** § 1B.3(a)(1)(B)(iii) requires the court to determine if the conduct of others that was within the scope of, and in furtherance of, the jointly undertaken criminal activity was reasonably foreseeable in connection with that criminal activity.

 In conclusion, "The conduct of others that meets *all three criteria* set forth in subdivisions (i) through (iii) (i.e., 'withing the scope,' 'in furtherance,' and 'reasonably foreseeable') is relevant conduct under [§ 1.B.3]." However, when the conduct of others *does not meet any one of the criteria set forth in subdivisions (i) through (iii)*, the conduct is not relevant conduct under this provision." § 1B.3 cmt. n. 3 (emphasis added).

 **(3)  *Application of § 1B.3 Criteria to this Case***

 Mr. Crespo's case involves a cross reference under Chapter Two and jointly undertaken criminal activity, so that § 1B.3 criteria must be obeyed and followed. And as discussed immediately above, only conduct that meets **all three criteria** – that is, the criteria set forth in

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134. Tel. (305) 858-5700. Fax (305) 358-7848. jquinon@quinonlaw.com*

subdivisions (i) "withing the scope," (ii) "in furtherance," and (iii) "reasonably foreseeable" may be deemed relevant conduct. However, if any of the three criterions is not satisfied, then it is not relevant conduct. In the instant case, not all three criteria were satisfied. And for that reason, as further explained below, Mr. Crespo's accountability for the conduct of others under subsection (a)(1)(B) is significantly less than attributed to him in the PSR's ¶ 34.

To begin, the "within the scope" criterion of § 1B.3(a)(1)(B)(i) has not been met. This failure, the failure to meet a single criterion, is sufficient to discount the PSR's ¶ 34 conclusion that put Mr. Crespo at Base Offense Level 24. More to the point, the scope of the criminal activity Mr. Crespo agreed to jointly undertake was not as extensive as determined by the PSR. The PSR mistakenly held Mr. Crespo accountable for Oxycodone pills prescribed to <u>all</u> six patients mentioned in the Indictment. That mistaken conclusion may be explained in that, as acknowledge by Probation, the Government did not share with Probation "knowledge that any part of the conspiracy was unknown or not reasonably known by the defendant." *See* Exhibit "1" (Probation admits not receiving such information). But the evidence at the trial revealed that Mr. Crespo did <u>not</u> have knowledge that Mr. Diaz was pill trafficking with patients A.A., P.R., B.R., M.C., and L.A. In fact, no evidence was adduced at the trial that Mr. Crespo even knew four of the five patients. Mr. Diaz did not testify that Mr. Crespo even knew patients A.A., P.R., B.R, or MC. Mr. Diaz testified Mr. Crespo knew patient L.A. because Crespo, while employed as a Hialeah police officer, had helped L.A. to protect her mentally challenged son from neighborhood gang members. But Diaz did not testify that Mr. Crespo knew of or facilitated in his pill trafficking with L.A., or with any of the other four patients. Indeed, Mr. Diaz's testimony at trial clearly established that Mr. Crespo did not receive even a single penny as part of a division of profits from trafficking in Oxycodone. It is important to bear in mind, while analyzing this issue, that the jury found Mr.

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134. Tel. (305) 858-5700. Fax (305) 358-7848. jquinon@quinonlaw.com*

Crespo not guilty of Count 1, conspiracy to distribute and possess with intent to distribute a controlled substance. So that Mr. Crespo's jointly undertaken criminal activity was limited in scope, and it did not include Mr. Crespo engaging in jointly undertaken criminal activity to obstruct on behalf of Mr. Diaz or these five patients.

There is only one patient, out of the six mentioned in the Indictment, that perhaps could support an argument that Mr. Crespo should be held accountable for some (but not all) of the pills prescribed to her.[2] That patient is M.P. This is the patient discussed between Mr. Diaz and Mr. Crespo in one of the telephone calls introduced as evidence at trial. As discussed earlier, all the Oxycodone pills prescribed to M.P. amount to 87.03 grams. Converting the entire 87.03 grams to converted drug weight under the Sentencing Guidelines Drug Conversion Tables (87.03 x 6700) yields 583 kilograms of converted drug weight. Under § 2D1.1(c), the Drug Quantity Table, this amount of converted drug weight yields a Level 26 (at least 400kg but less than 700 kg). However, per 2X3.1(a)(1) a 6-level subtraction must take place, which brings the Base Offense Level to Level 20. Mr. Crespo would then receive a 2-level increase for abuse of a position of trust or use of a special skill. But he would receive a 2-level reduction because he meets the criteria for the newly enacted § 4C1.1. Accordingly, (using Probation's pill numbers) his Total Offense Level would be 20, with a guidelines range of 33-41 months. However, that is not the end of the analysis.

We know that Application Note § 1B.3 cmt. 3(B), provides that Mr. Crespo cannot be held accountable for "conduct of members of a conspiracy prior to [him] joining the conspiracy, *even if [he] knows of that conduct.*" (Emphasis added). We also know that Mr. Diaz testified at trial that he told Mr. Crespo about his Oxycodone trafficking approximately a month after he moved

---

[2] This argument is not meant to be, nor should be taken or considered as, a waiver of Mr. Crespo's position that the evidence presented at trial was insufficient as a matter of law to find him guilty of those counts that he was found guilty.

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134. Tel. (305) 858-5700. Fax (305) 358-7848. jquinon@quinonlaw.com*

into Crespo's garage/efficiency. That would mean that he told Mr. Crespo that he was trafficking in Oxycodone on or about the beginning of February 2020. Therefore, this is the point that Mr. Crespo arguably joined the conspiracy, and he could be held accountable for the Oxycodone prescribed to M.P. after that date. According to the PDMP introduced into evidence at trial, M.P. received six prescriptions from February 6 to July 16, 2020, for a total of 540 Oxycodone pills. *See* GX 58-C. Under the Guidelines 540 Oxycodone pills translate to converted drug weight as follows: 540 x 30 = 16,200 mg. Then the 16,200 is divided by 1,000 to convert it to grams, which in this case yields 16.2 grams. In conformity with the Drug Conversion Tables the 16.2 is multiplied by 6700, which equals 108,540 grams. That is divided by 1,000 to obtain kilograms, which in this case comes out to 108.5 kilograms of converted drug weight. And under the Drug Quantity Table this amount of converted drug weight yields a Level 24. However, per 2X3.1(a)(1) a six-level subtraction must be applied. That means the Total Base Offense Level here is Level 18 (24-6=18). To this Total Base Offense Level of 18, we must add a 2-level increase for abuse of a position of trust or use of a special skill. But must also apply a 2-level reduction for the newly enacted § 4C1.1. All this yields a Total Offense Level of 18. This is the correct level in this case, which has a range of 27-33 months.

In conclusion, the Total Offense Level in Mr. Crespo's case should be significantly lower than the Level 26 in the PSR. Indeed, we know that the Total Offense Level must go down to at least Level 18.

¶ **78** This section of the PSR covers assets and liabilities. The liabilities category must be amended. It must include an IRS lien with accrued interest and accrued failure to pay penalty in the amount of $121,203.53, that is presently due and owing to the Internal Revenue Service. For

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134. Tel. (305) 858-5700. Fax (305) 358-7848. jquinon@quinonlaw.com*

the convenience of Probation, a copy of the lien and the calculations of interest and penalty are incorporated as Exhibit "2."

¶ **87** We object because the correct Total Offense Level is Level 18, and not Level 26 as it appears in the initial PSR.

Respectfully submitted,

s/*Jose M. Quinon*
Jose M. Quinon

**JOSE M. QUINON, P.A.**
75 Valencia Avenue, Suite 800
Coral Gables, Florida 33134
Tel. (305) 858-5700
Cell (786) 348-3778
Email: jquinon@quinonlaw.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing Defendant Crespo's Objections to the Presentence Report was filed this December 4, 2023, via PACER, which will serve copy on all parties in this case.

s/*Jose M. Quinon*
Jose M. Quinon

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134. Tel. (305) 858-5700. Fax (305) 358-7848. jquinon@quinonlaw.com*

# EXHIBIT 1

**Jose Quiñon**

| | |
|---|---|
| **From:** | Stephanie Galvez <stephanie_galvez@flsp.uscourts.gov> |
| **Sent:** | Monday, November 13, 2023 4:40 PM |
| **To:** | Jose Quiñon |
| **Cc:** | Sean Thomas McLaughlin (sean.mclaughlin@usdoj.gov) |
| **Subject:** | RE: United States v. Alberico Ahias Crespo, Case No. 21-20005-GAYLES |

Hi Mr. Quinon,
The defendant is being held responsible for the conspiracy with his co-defendants, which the government previously identified as the "Gonzelez Era." Below is what the government previously provided as offense materials for this conspiracy:

M.P.
Gonzalez:
Oxycodone 30mg:      13.5 Grams
Carpman:
Oxycodone 30mg:      73.53 Grams

A.A.
Gonzalez:
Oxycodone 30mg      69.9 Grams
Carpman:
Oxycodone 30mg      94.5 Grams

P.R.
Gonzalez:
Oxycodone 30mg:      68.4 Grams
Carpman:
Oxycodone 30mg:       94.5 Grams

B.R.
Gonzalez           0 Grams (No prescriptions from Gonzalez)
Carpman
Oxycodone 30mg:      32.46 Grams

M.C.
Gonzalez:
Oxycodone 30mg:      58.5 Grams
Carpman:
Oxycodone 30mg:      69.3 Grams

L.A.
Gonzalez:
Oxycodone 30mg:      58.8 Grams
Carpman:
Oxycodone 30mg:      75.6 Grams

Adding up everyone and using the drug conversation table under 2D1.1(D) for Oxycodone (actual), you get the following:

Gonzalez era (2016-2018) = 269.1 grams x 6700 grams = 1,802.97 kg of converted drug weight

1,802.97 kg of converted drug weight is usually a base offense level 30. Per 2X3.1(a)(1), 6 levels lower is 24.

The underlying offense in this case is the conspiracy to distribute and possess with intent to distribute a controlled substance, which involved 1,802.97 kg of a converted drug weight as noted above. To my knowledge, Crespo did not enter the conspiracy in this case at a later time than his co-defendants. Also,  See 2X3.1 application note 1 for the definition of underlying offense, specifically its redirection to application note 9 of 1B1.3, which has a more broad description. I have no knowledge that any part of the conspiracy was unknown or not reasonably known by the defendant.

Hope this helps

Stephanie Galvez
U.S. Probation Officer
Wilkie D. Ferguson. Jr. U.S. Courthouse
400 North Miami Avenue, 9th Floor South
Miami, FL 33128
(305) 523-5383

---

**From:** Jose Quiñon <jquinon@quinonlaw.com>
**Sent:** Monday, November 13, 2023 3:23 PM
**To:** Stephanie Galvez <stephanie_galvez@flsp.uscourts.gov>
**Cc:** Sean Thomas McLaughlin (sean.mclaughlin@usdoj.gov) <sean.mclaughlin@usdoj.gov>
**Subject:** United States v. Alberico Ahias Crespo, Case No. 21-20005-GAYLES

CAUTION - EXTERNAL:

Ms. Galvez --

Good afternoon.

I represent Alberico Ahias Crespo. You prepared his initial Presentence Report ("PSR") and his sentencing hearing is scheduled to take place on December 14, 2023, before Judge Darrin P. Gayles. The PSR objections are due December 4, and I am looking into possible objections to the initial draft you prepared.

## Converted Drug Weight

I write to seek clarity regarding an important point. Specifically, I need clarification regarding the **Base Offense Level**, at ¶ 34 (at p. 14), wherein you concluded that Mr. Crespo "is responsible for at least 1,802 kilograms of converted drug weight." You included int the PSR the "converted drug weight" without providing an analysis or breakdown of its integral parts – i.e., the patients and number of Oxycodone pills attributed to each patient – utilized to arrive at the 1,802 kilograms. It is important that you do that so we can understand (and if appropriate, object to) the correctness of the

conclusion. Otherwise, we are left with a conclusion that we cannot understand, test, or accept.

## USSG § 1b1.3(a)(1) (scope of jointly undertaken criminal activity

In addition to clarification of how you arrived at the converted drug weight, I need clarification regarding how you applied USSG § 1B1.3(a)(1) to determine the Base Offense Level. Because this case involves a Chapter Two cross reference and "jointly undertaken criminal activity," USSG § 1B1.3(a)(1) must be used to determine the Base Offense Level. *See* § 1B1.3(a)(iii). Mr. Crespo can be responsible only for

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (i.e., a conspiracy), all acts and omissions of others that were –
>    **(i)    within the scope of the jointly undertaken criminal activity;**
>    **(ii)   in furtherance of that criminal activity**; **and**
>    (iii)  reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

USSG § 1B1.3(a)(1) (emphasis added). And "when the conduct of others does not meet any one of the criteria set forth in subdivisions (i) through (iii), the conduct is not relevant conduct under this provision." *Id.*, cmt. n. 3(A) (emphasis added). In determining the Base Offense Level, "the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." *Id.*, cmt. n. 3(B). Moreover, "Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(;B)." *Id.* (emphasis added).

It's respectfully submitted that the scope of Mr. Crespo's jointly undertaken criminal activity here is less than the scope of the entire conspiracy, and that relevant conduct for purposes of Mr. Crespo's Base Offense Level is of lesser scope than that applicable to co-defendants Jorge Diaz Gutierrez and Anais Lorenzo. But because I cannot tell what acts and omissions of others you are attributing to Mr. Crespo to arrive at his Base Offense Level, I ask you to please explain the components you took into consideration and how you applied them. Your explanation would save us time and

3

resources and avoid having to lodge an objection and possibly engage in an evidentiary hearing at sentencing. I hope you'll help us out in this regard.

**We need to continue the discussion to narrow the issues**

I am copying AUSA Sean McLaughlin because I have discussed some of these issues with him and believe that he also would welcome an open discussion so we can all contribute to narrow or eliminate issues prior to the sentencing hearing.

Lastly, for your benefit, I am attaching three charts (GX 51-D, GX 56-D, and GX 58-D) prepared by the Government and introduced by the Government as evidence at trial to prove the total number of Oxycodone pills dispensed during the conspiracy to Jorge Diaz Gutierrez and his recruited "patients."

If after reading this email, you desire additional information or documents from me, please let me know and I will assist you.

Respectfully,
*Jose M. Quiñon*
Jose M. Quiñon, Esq.

**Jose M. Quiñon, P.A.**
75 Valencia Avenue, Suite 800
Coral Gables, Florida 33134
Office (305) 858-5700
Cell (786) 348-3778
Fax (786) 358-7848
Emai: jquinon@quinonlaw.com

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

# EXHIBIT 2

 **IRS** Department of the Treasury
Internal Revenue Service

**CERTIFIED MAIL**

CCP-LU ACS CORRESPONDENCE
P.O. BOX 145566, STOP 813G CSC      9307110756609752844453
CINCINNATI, OH 45250-5566

**Letter Date:**      04/06/2023
**Taxpayer Identification Number:**
XXX-XX-7069
**Person to Contact:**
M. DELUCA
**Contact Telephone Number:**
(800) 829-3903
**Employee Identification Number:**
23-08PHIL

 ALBERICO A CRESPO
5845 W 3RD LN
HIALEAH,FL 33012

000266

## Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320

Dear ALBERICO A CRESPO

We filed a Notice of Federal Tax Lien on  04/06/2023 .

| Type of Tax | Tax Period | Assessment Date | Amount on Lien |
|---|---|---|---|
| 1040 | 12/31/2020 | 10/11/2021 | 90308.66 |

NOTE:  Please contact the person whose name and telephone number appears on this notice to obtain the current amount you owe.  Additional interest and penalties may be increasing the amount on the lien shown above.

A lien attaches to all property you currently own and to all property you may acquire in the future.  It also may damage your credit rating and hinder your ability to obtain additional credit.

You have the right to a hearing with us to appeal this collection action and to discuss your payment method options.  To explain the different collection appeal procedures available to you, we have enclosed Publication 1660, Collection Appeal Rights.

You must request your hearing by  05/15/2023 . Please complete the enclosed Form 12153, *Request for a Collection Due Process or Equivalent Hearing,* and mail it to:

Internal Revenue Service
IRS-ACS/CDP
P.O. BOX 42346
PHILADELPHIA, PA 19101-2346

Letter 3172 (DO) rev. (3-2009)
Catalog No. 267671

**Denial or revocation of United States passport**

On December 4, 2015, as part of the Fixing America's Surface Transportation (FAST) Act, Congress enacted section 7345 of the Internal Revenue code, which requires the Internal Revenue Service to notify the State Department of taxpayers certified as owing a seriously delinquent tax debt. The FAST Act generally prohibits the State Department from issuing or renewing a passport to a taxpayer with seriously delinquent tax debt.

Seriously delinquent tax debt means an unpaid, legally enforceable federal tax debt of an individual totaling more than $59,000 for which, a Notice of Federal Tax lien has been filed and all administrative remedies under IRC 6320 have lapsed or been exhausted, or a levy has been issued. If you are individually liable for tax debt (including penalties and interest) totaling more than $59,000 and you do not pay the amount you owe or make alternate arrangements to pay, or request a Collection Due Process hearing by 05/15/2023, we may notify the State Department that your tax debt is seriously delinquent. The State Department generally will not issue or renew a passport to you after we make this notification. If you currently have a valid passport, the State Department may revoke your passport or limit your ability to travel outside the United States. Additional information on passport certification is available at www.irs.gov/passports.

We will issue a Form 668(Z), *Certificate of Release of Notice of Federal Tax Lien, within 30 days:*

- After you pay the full amount of your debt;
- We accept a bond guaranteeing payment of the amount owed; or
- A decision is made to adjust your account (i.e., during an Appeals hearing).

We have enclosed Publication 1450, Instructions on How to Request a Certificate of Release of Federal Tax Lien.

If you have any questions, please contact the person whose name and telephone number appear at the top of this letter.

Sincerely,

Director, Specialty Collections

**Enclosures:**
Publication 594, *The Collection Process*
Publication 1450, *Instructions on Requesting a Certificate of Release of Federal Tax Lien*
Publication 1660, *Collection Appeal Rights*
Form 668 (Y)(C), *Notice of Federal Tax Lien*
Form 12153, *Request for a Collection Due Process Hearing*

| Form 668 (Y)(c)<br>(Rev. February 2004) | 1872 | Department of the Treasury - Internal Revenue Service<br>**Notice of Federal Tax Lien** | |
|---|---|---|---|

| Area:<br>SMALL BUSINESS/SELF EMPLOYED AREA #3<br>(800) 913-6050 | Serial Number<br>470352723 | For Optional Use by Recording Office |
|---|---|---|

As provided by section 6321, 6322, and 6323 of the Internal Revenue Code, we are giving a notice that taxes (including interest and penalties) have been assessed against the following-named taxpayer. We have made a demand for payment of this liability, but it remains unpaid. Therefore, there is a lien in favor of the United States on all property and rights to property belonging to this taxpayer for the amount of these taxes, and additional penalties, interest, and costs that may accrue.

- This Notice of Federal Tax Lien has been filed as a matter of public record.
- IRS will continue to charge penalty and interest until you satisfy the amount you owe.
- Contact the Area Office Collection Function for information on the amount you must pay before we can release this lien.
- See the back of this page for an explanation of your Administrative Appeal rights.

Name of Taxpayer
ALBERICO A CRESPO

Residence
5845 W 3RD LN
HIALEAH, FL 33012

**IMPORTANT RELEASE INFORMATION:** For each assessment listed below, unless notice of the lien is refiled by the date given in column (e), this notice shall, on the day following such date, operate as a certificate of release as defined in IRC 6325(a).

| Kind of Tax<br>(a) | Tax Period<br>Ending<br>(b) | Identifying Number<br>(c) | Date of<br>Assessment<br>(d) | Last Day for<br>Refiling<br>(e) | Unpaid Balance<br>of Assessment<br>(f) |
|---|---|---|---|---|---|
| 1040 | 12/31/2020 | XXX-XX-7069 | 10/11/2021 | 11/10/2031 | 90308.66 |

| Place of Filing | | |
|---|---|---|
| County Courthouse<br>Dade County<br>Miami, FL 33130 | Total | 90308.66 |

This notice was prepared and signed at ____BALTIMORE, MD____ , on this,

the __28th__ day of __March__ , __2023__ .

| Signature<br>for DAD DELUCA | Title<br>ACS SBSE<br>(800) 829-3903 | 23-00-0008 |
|---|---|---|

**(NOTE:** Certificate of officer authorized by law to take acknowledgment is not essential to the validity of Notice of Federal Tax Lien
Rev. Rul. 71-466, 1971 - 2 C.B. 409)

**Part 3 - Taxpayer's Copy**

CAT. NO 60025X
Form **668 (Y)(c)** (Rev. 02-04)

000266

**Lien**
This Notice of Federal Tax Lien gives public notice that the government has a lien on all your property (such as your house or car), on all your rights to property (such as money owed to you) and to property you acquire after this lien is filed.

**Your Administrative Appeal Rights**
If you believe the IRS filed this Notice of Federal Tax Lien in error, you may appeal if any of the following conditions apply:

● You had paid all tax, penalty and interest before the lien was filed;

● IRS assessed tax after the date you filed a petition for bankruptcy;

● IRS mailed your notice of deficiency to the wrong address;

   You have already filed a timely petition with the Tax Court;

   The statute of limitations for collection ended before IRS filed the notice of lien.

**Your appeal request must be in writing and contain the following:**

● Your name, current address and SSN/EIN;

● Copy of this notice of lien, if available;

● The specific reason(s) why you think the IRS is in error;

● Proof that you paid the amount due (such as cancelled check);

● Proof that you filed a bankruptcy petition before this lien was filed.

Send your written request to the IRS, Attention: Technical Services Group Manager, in the office where this notice of lien was filed.

**When This Lien Can Be Released**

The IRS will issue a Certificate of Release of Federal Tax Lien within 30 days after:

● You pay the tax due, including penalties, interest, and any other additions under law, or IRS adjusts the amount due, or;

● The end of the time period during which we can collect the tax (usually 10 years).

Publication 1450, Request for Release of Federal Tax Lien, available at IRS offices, describes this process.

**When a Lien against Property can be Removed**
The IRS may remove the lien from a specific piece of property if any of the following conditions apply:

● You have other property subject to this lien that is worth at least two times the total of the tax you owe, including penalties and interest, plus the amount of any other debts you owe on the property (such as a mortgage);

● You give up ownership in the property and IRS receives the value of the government's interest in the property;

● IRS decides the government's interest in the property has no value when you give up ownership;

● The property in question is being sold; there is a dispute about who is entitled to the sale proceeds; and the proceeds are placed in escrow while the dispute is being resolved.

Publication 783, Instructions on How to Apply for a Certificate of Discharge of Property from a Federal Tax Lien, available at IRS offices, describes this process.

**Gravamen**
Este Aviso de Gravamen del Impuesto Federal da aviso público que el gobierno tiene un gravamen en todas sus propiedades (tal como su casa o carro), todos sus derechos a propiedad (tales como el dinero que le adeudan a usted) y la propiedad que adquiera después que se presentó éste gravamen.

**Sus Derechos de Apelación Administrativos**
Si usted cree que el IRS presentó éste Aviso de Gravamen del Impuesto Federal por error, usted puede apelar si cualquiera de las siguientes condiciones le aplican:

● Usted pagó todo el impuesto, multa, interés antes de que el gravamen fuera presentado;

● El IRS tasó el impuesto después del la fecha en que usted presentó una petición de quiebra;

● El IRS le envió por correo el aviso de deficiencia a una dirección incorrecta;

● Usted presentó a tiempo una petición ante la Corte de Impuesto;

● El IRS no presentó el aviso de gravamen dentro del término prescriptivo.

**Su petición de apelación tiene que estar por escrito y debe incluir lo siguiente:**

● Su nombre, dirección actual y SSN/EIN;

● Una copia de este aviso de gravamen, si está disponible;

● La razón (o razones) especifica(s) por qué piensa que el IRS está erróneo;

● Prueba que pagó la cantidad adeudada (tal como un cheque cancelado);

● Prueba que presentó una petición de quiebra antes de que se presentara el gravamen.

Envíe su petición por escrito al IRS, Atención: *"Technical Services Group Manager" (Grupo de Gerente-Servicios Técnicos)* en la oficina dónde este aviso de gravamen fue presentado.

**Cuándo Este Gravamen Se Puede Cancelar**
El IRS emitirá un Certificado de Cancelación de Gravamen del Impuesto Federal dentro de 30 días después que:

● Usted paga el impuesto adeudado, incluyendo multas, intereses, y otras sumas adicionales según la ley, o el IRS ajusta la cantidad adeudada, o;

● Aceptemos una fianza garantizando el pago de su deuda;

● La expiración del término en que podemos cobrar el impuesto (usualmente 10 años).

La Publicación 1450, en inglés, *"Petición Para Cancelar el Gravamen del Impuesto Federal"*, describe este proceso y está disponible en las oficinas del IRS.

**Cuándo un Gravamen en Contra de la Propiedad Puede Eliminarse**
El IRS puede eliminar el gravamen de una propiedad especifica si cualquiera de las siguientes condiciones aplica:

● Usted tiene otra propiedad sujeta a este gravamen cuyo valor es por lo menos dos veces el total del impuesto que usted adeuda, incluyendo intereses y multas, más la cantidad de cualquiera de las otras deudas que adeuda sobre la propiedad (tal como una hipoteca);

● Usted cede su interés en la propiedad y el IRS recibe el valor del interés del gobierno en la propiedad;

● El IRS decide que el interés del gobierno en la propiedad no tiene valor alguno cuando usted cedió su interés en la propiedad;

● La propiedad gravada será vendida; existe una controversia sobre quién tiene derecho al producto de la venta; y se depositan los fondos recibidos en la venta en una cuenta especial en lo que se resuelve la controversia.

La Publicación 783 en inglés, *"Instrucciones de Cómo Solicitar un Certificado de Relevo de la Propiedad de un Gravamen del Impuesto Federal"*, describe éste proceso y está disponible en las oficinas del IRS.

Form **668 (Y) (c)** (Rev. 02-2004)

 An official website of the United States Government

Here's how you know ⌄

 IRS

MENU

Account Home  /  Account Balance

# Account Balance

## Total Amount Owed

### View your account information in the Details By Year section

The information provided is based on our current data.

The numbers here may not reflect:

- Recently filed or processing returns
- Pending payments or adjustments
- Information on your business account
- Installment agreement fees

MAKE A PAYMENT

Frequently Asked Questions About Balances ⧉

## Details By Year

| Tax Year | You Owe |
|---|---|
| 2019 | $0.00 |

| ⊖ **2020** | **$121,203.53** |
|---|---|

**Income Tax**

| Type | You Owe |
|---|---|
| Assessed Total | $90,328.66 |
| Accrued Failure to Pay Penalty ⍰ | $19,605.69 |
| Accrued Interest ⍰ | $11,269.18 |
| **Income Tax Total** | **$121,203.53** |

| 2021 | $0.00 |
|---|---|
| ⊕ **2022** | **INFO** ⓘ |
| ⊕ **2023** | **INFO** ⓘ |

