## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA,**

        ***Plaintiff,***

**v.**                                        **CASE NO: 21-20005-CR-GAYLES**

**ALBERICO AHIAS CRESPO, et al.**

        ***Defendant.***

_____/

### DEFENDANT CRESPO'S MOTION FOR DOWNWARD DEPARTURE OR, ALTERNATIVELY, FOR DOWNWARD VARIANCE

Defendant, ALBERICO AHIAS CRESPO ("Mr. Crespo"), through undersigned counsel, and pursuant to Fed. R. Crim. P. 32, U.S.S.G. 5K2.0, and 18 U.S.C. § 3553(a) hereby submits his motion for downward departure or, alternatively, motion for downward departure, and in support alleges as follows:

### I.  **INTRODUCTION**

On January 6, 2021, Mr. Crespo, along with three co-defendants, was indicted in this case. ECF # 46. Mr. Crespo was charged in six counts, as follows: Count 1, Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. § 846 and 841(b)(1)(C); Count 5, Conspiracy to Commit Witness Tampering in violation of 18 U.S.C. § 1512(K) and 1512(b)(3); Counts 7-9, Witness Tampering in violation of 1512(b)(3); and Count 10, Conspiracy to Obstruct Justice in violation of 18 U.S.C. § 1512(k) and 1512(c)(2). Mr. Crespo exercised his constitutional right to proceed to trial. And on August 29, 2023, the jury returned a verdict finding him not guilty as to Count 1, the count charging him with conspiracy to possess and distribute Oxycodone pills and guilty of remaining counts charging obstructive conduct.

Mr. Crespo has lived a productive and honorable life in his forty-nine years in this world, apart from the sad circumstances surrounding this case. Indeed, he has devoted much of his life to public service and, in that laudable journey, he has constantly defended and assisted individuals who are less fortunate and vulnerable. Because the Court presided over the trial, it has learned how Mr. Crespo's religious beliefs and his association with Jorge Diaz, an individual who held an exalted position in the Santeria religion, through the years morphed into the circumstances that have placed him in his present situation. According to Anais Lorenzo, Diaz's former common law wife, Mr. Diaz is a master manipulator. That was her testimony at trial. Mr. Diaz at trial testified that for years, the first few years of the relationship, his interactions with Mr. Crespo consisted exclusively of assisting him in religious rituals and practices. But after a few years of interacting with Mr. Crespo, he saw an opportunity to use Mr. Crespo to his own advantage and jumped on it. Essentially, Mr. Diaz used the Santeria religion to manipulate Mr. Crespo. And so, Mr. Diaz maneuvered himself into a position where he got Mr. Crespo tangled up in protecting and defending him from those who represented a threat – all the while, Mr. Diaz continued to keep Mr. Crespo close and loyal by administering religious counseling and guidance.

The dynamic of the relationship between Mr. Diaz and Mr. Crespo is not here mentioned as an excuse or the sole reason for Mr. Crespo's present situation. Not at all. However, this dynamic explains how a good and honorable person could be manipulated – particularly by an accomplished manipulator who uses the Santeria religion (with all its strange beliefs, which even includes talking to, and getting advice from, dead spirits) to manipulate others while portraying himself as a trustworthy individual with powers beyond those of normal humans. As an example, Anais Lorenzo, who testified for the Government and had no reason to help Mr. Crespo, under oath illustrated how Mr. Diaz had manipulated her into becoming a drug addict and putting her in

a position to help him to run his pill peddling business. She testified how she went from a normal, every-day working, and law-abiding individual, with a good and secured job at Jackson Memorial Hospital, to become a homeless drug addict, who assisted Mr. Diaz in his drug business, and ultimately ended up in prison – having to serve 18 months behind bars. Thanks, in great part, to Mr. Diaz. So, in viewing Mr. Crespo's life, taking a panoramic view of that life, it is notable that he has lived a productive and honorable life prior to going to Mr. Diaz for religious guidance and assistance. It doesn't excuse some of Mr. Crespo's conduct, but it does explain an awful lot – and the Court should take into account the importance of the Santeria religion in Mr. Crespo's life during the period in question in this case.

Importantly, the one thing that Mr. Diaz put to rest at trial is that Mr. Crespo did not profit from Mr. Diaz's drug peddling and that he was not present when Mr. Diaz was buying or selling drugs – as unfortunately it was narrated in the Criminal Complaint used to arrest Mr. Crespo in this case. To the contrary, Mr. Crespo has dedicated much of his life to combat drugs – and he bears the disabilities and scars (i.e., PTSD syndrome) suffered while doing so in the jungles of South America while serving our country in the military as well as subsequently during his service as a DEA agent.

## II. MR. CRESPO SHOULD RECEIVE A DOWNWARD DEPARTURE OR VARIANCE

Mr. Crespo is deserving and qualifies for both a downward departure under § 5K2.0 of the Sentencing Guidelines or a variance per the 18 U.S.C. § 3553(a) factors for the reasons outlined below:

### A.    *Downward Departure*

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134 Tel. (305) 858-5700. Fax (305) 358-7848 jquinon@quinonlaw.com*

*(1)   Circumstances of the offense* – The Sentencing Guidelines permit a downward departure given the circumstances in this case. More to the point, in requesting for the downward departure, Mr. Crespo relies on § 5K2.0, which provides as follows:

> (3) DEPARTURES BASED ON CIRCUMSTANCESS PRESENT TO A DEGREE NOT ADEQUATELY TAKEN INTO CONSIDERATION. --- A departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense.

U.S.S.G. § 5K2.O.

The Court presided over the trial and, therefore, knows the evidence surrounding this case. During the testimony of Mr. Diaz – the main Government witness – he testified that he was the one involved in trafficking in Oxycodone, and that Mr. Crespo had never been offered or received any portion of his ill-gotten proceeds. In addition, Mr. Diaz testified that Mr. Crespo had never been present witnessing one of his drug transactions, thereby contradicting information provided by Ruben Cabrera Sotolongo that had been included as part of the Criminal Complaint used to arrest Mr. Crespo. Thus, through this type of evidence, the jury was able to understand that Mr. Crespo was not conspiring or agreeing to engage in drug dealing nor was he profiting from it – and that explains the reasons the jury found Mr. Crespo not guilty of Count 1, the conspiracy to distribute and possess with intent to distribute a controlled substance.

On the other hand, the evidence at trial did show Mr. Crespo had immense respect for Mr. Diaz during those years that Mr. Diaz was his Santeria priest. Indeed, at trial, it became clear that Mr. Crespo would refer to Mr. Diaz as "father." And Mr. Diaz would refer to him as "son." In effect, it was sort of a father/son relationship cemented by the Santeria religion. It was therefore

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134 Tel. (305) 858-5700. Fax (305) 358-7848 jquinon@quinonlaw.com*

not surprising that Mr. Crespo felt an obligation to be protective of his religious guide, who treated him as a son. In fact, this type of protective behavior became a topic at trial because Mr. Crespo, during a phone call, used vulgarities and an aggressive tone while addressing Anais Lorenzo. And the Government used that type of protective behavior to convict Mr. Crespo of the obstruction of justice counts.

But now that the trial is done and gone, the question is whether Mr. Crespo – who did not participate in the drug dealing and made no money from it – should be penalized more harshly than Mr. Diaz, the main drug dealer. That's what is at stake here. And the Guidelines, fortunately, do not allow that. The reason it is not allowed is because the circumstances identified above were not "adequately taken into consideration in determining the applicable guideline range" by the Commission. *Id.* To the contrary, the Guidelines were structured with the idea that those individuals engaged in drug trafficking do it for money. Money is the reason for getting involved in drug trafficking. And the bigger the drug deal, the more money that is made by those involved – and the penalties in the Guidelines are structured to work accordingly. But in that rare case, where the individual did not make any money – indeed, no money was even offered to him – the Guidelines allow for a downward departure. *Cf. United States v. Huber*, 462 F.3d 945 (8th Cir. 2006) (affirming the trial court's determination that the high value of the laundered funds led to a base offense level that substantially overstated the seriousness of the offense). In a case where Mr. Crespo was not involved in drug dealing – and was found not guilty by the jury in that regard – and he received no part of the profits, the base offense level here, which is based on the number of pills, substantially overstates the seriousness of the offense. Accordingly, a downward departure is merited.

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134 Tel. (305) 858-5700. Fax (305) 358-7848 jquinon@quinonlaw.com*

     *(2)*    *Military Service* – The Sentencing Guidelines also recognize military service as a basis for a downward departure. § 5H1.11 states the following:

> Military service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.

     Mr. Crespo honorably served in the military and is deserving of a downward departure based on his service. The Government, in its objections to the Presentence Report, has taken the position that Mr. Crespo lied to the probation officer when interviewed for the purpose of preparing the Presentence Report in this case. The Government is absolutely wrong about that. Mr. Crespo did not misinform or lie to the probation officer. Mr. Crespo did serve in the military in the manner that he described to the probation officer. He firmly stands by page 71 of the Presentence report, where it is stated that "his service in the Air Force included his participation in a drug interdiction mission. He was stationed in Leticia, Colombia, Tabatinga, Brazil, and Ocho Rios, Peru, where he experienced combat against the Revolutionary Armed Forces of Colombia (FARC) guerrilla group." If necessary, or preferred by the Court, Mr. Crespo will testify under oath at his sentencing hearing that what he conveyed to the probation officer was (and is) truthful.

     It is undeniable that around the time that Mr. Crespo served in the military, our armed forces were involved in drug interdiction missions in Latin America. Attached hereto and incorporated as Exhibit "1," is a report published in the Washington Post circa 1997 that provides an overview of our military activities in drug interdictions around the time Mr. Crespo served in the military. Interestingly, the reports notes that; "For officials within SOUTHCOM, the drug war was an opportunity to apply the low-intensity-conflict skills honed during 30 years of fighting guerrilla insurgencies in Central America and the principal means of maintaining and enhancing

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134 Tel. (305) 858-5700. Fax (305) 358-7848 jquinon@quinonlaw.com*

relation with militaries throughout the region." (Exhibit 1, Report at 3.) In sum, Mr. Crespo did serve in the military, and did so honorably, and he suffers from PTSD, which is the by-product of his service for our country. Mr. Crespo deserves our thanks and not our condemnation.

(3)    *Departure based on multiple circumstances* – The Sentencing Guidelines also permit a downward departure based on a combination of two or more "offender characteristic or other circumstances, none of which independently is sufficient to provide a basis for departure." § 5K2.0(c). Accordingly, the combination of the two characteristics or circumstances included immediately above suffices to grant Mr. Crespo a downward departure.

### As an alternative, a Downward Variance is warranted

Mr. Crespo also warrants a downward variance. In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court held that the Sentencing Guidelines serve as a "starting point and initial benchmark," but the district court has authority, based on its "individualized assessment" of the facts, to weigh the factors listed in section 3553(a) and fashion a sentence outside the guidelines. *Id*. at 49-51. The sentencing judge must "'consider every convicted person as an individual and every case as a unique study in [] human failings.'" *Id*. at 52 (quoting from *Koon*, 518 U.S. at 113.) The goal is to impose a sentence that is reasonable, meaning that is sufficient, but not greater than necessary. *See* §3553(a). [1]

---

[1]  § 3553(a) provides the following seven factors that the court shall consider in determining the particular sentence to be imposed:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;

7

Here, as far as (1) the *"nature and circumstances of the offense and the history and characteristics of the defendant,"* the Court heard the evidence during trial, so there is no need to restate in detail the nature of the offense. Likewise, much of the history and characteristics of Mr. Crespo are found in the Presentence Report. The Court is fully aware that Mr. Crespo has never had a single encounter with the criminal justice system prior to the circumstances involved in this case. Indeed, his record in this regard shows not even a single traffic ticket.

And as far as (2) the need for the sentence to *"reflect the seriousness of the offense,"* *"promote respect for the law,"* and *"provide just punishment,"* Mr. Crespo understands this is a serious offense and that he must be punished. He has already absorbed serious punishment because (1) he has been publicly and repeatedly humiliated, so that a once upstanding citizen is now viewed by most folks in the community as a pariah; (2) he has been adjudicated a convicted felon, a striking stain that will follow him for life and that will prevent him from getting a decent job in the future; (3) he lost his career in law enforcement, and lost his retirement fund, which automatically forfeited upon being adjudicated a convicted felon; (4) he lost his license that allowed him to provide psychology services; (5) he lost all his savings, which had to be used to pay lawyers' fees, costs, and many other expenses; (6) he suffers from PTSD, and now must scramble for some treatment while not having health insurance, something that he also lost; (7) he lost perhaps the most valuable possession of all, the ability of waking up in the morning, looking in the mirror, and being satisfied and at peace with that man who's looking back. (8) And now, he

---

(4) the kinds of sentence and the sentencing range established for … [inapplicable categories of offenses to the instant case];
(5) any pertinent policy statement …[none applicable to the instant case];
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134 Tel. (305) 858-5700. Fax (305) 358-7848 jquinon@quinonlaw.com*

stands to lose his liberty, and must serve a prison sentence, something that was unimaginable not too long ago in his life. Yes, he lost a lot. So that, his punishment already has been serious, and it certainly promotes respect for the law.

Although the Presentence Report, to some extent speaks to his character, it is important to remember that at trial we learned some things that speak highly of Mr. Crespo's character. We learned that after Hurricane Maria, a category 5 hurricane, landed in Puerto Rico and devastated most of the island, Mr. Crespo volunteered to go there to help those in need. At that time, Puerto Rico did not have electricity in most of the island, the roads were impassable because trees, garbage, and debris abounded, gasoline was not available, as gas stations had been hit hard, and food was scarce. In short, the island was a disaster. And Mr. Crespo, and a small number of his coworkers, decided to go there. This was done at great personal sacrifice because they had to pay for their own plane fare, for lodging, for their food, etc. And their employer was not paying their salary while they were there. In addition, the island – without electricity – was full of mosquitoes. But notwithstanding all these obstacles Mr. Crespo stayed in Puerto Rico helping less fortunate folks for more than a month. This shows him to be a remarkable individual, who cares for others when there is nothing in it for him. HHS-OIG Agent testified to all this during the trial. He is Puerto Rican, and at trial thanked Mr. Crespo for what he did.

We also learned from HHS-OIG Agent Henry Luna that Mr. Crespo did something for him and that he's forever grateful. Henry Luna, who is gay, one day at work was being bullied by three FBI agents who worked with the Task Force. Luna, by nature, is not one to seek confrontation or stand up for himself under those circumstances. When Mr. Crespo saw the abusive treatment directed to Luna by the FBI agents, he immediately intervened and went up to them and, in no uncertain terms, told them that he would kick their behinds if they didn't stop harassing Luna. And

**JOSE M. QUIÑON, P.A.**
*75 Valencia Avenue, Suite 800, Coral Gables, FL 33134 Tel. (305) 858-5700. Fax (305) 358-7848 jquinon@quinonlaw.com*

the bullying quickly stopped. At trial Luna testified to this event and expressed his gratitude. He also stated that Mr. Crespo is one of his best friends, who was there for Luna when he was divorcing and had to care for his two young girls. Luna would go over to Mr. Crespo's house with his girls and spend time there during the pandemic. Again, these types of circumstances show the goodness in Mr. Crespo. He is an individual who cares for others. He deserves a second opportunity. Accordingly, we ask the Court to grant a downward variance in this case.

Respectfully submitted,

s/Jose M. Quinon
Jose M. Quinon

**JOSE M. QUINON, P.A.**
75 Valencia Avenue, Suite 800
Coral Gables, Florida 33134
Tel. (305) 858-5700
Cell (786) 348-3778
Email: jquinon@quinonlaw.com

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true copy of the foregoing Defendant Crespo's Motion for Downward Departure or, Alternatively, Downward Variance was filed this December 5, 2023, via PACER, which will serve copy on all parties in this case.

s/Jose M. Quinon
Jose M. Quinon

# EXHIBIT 1

**Reluctant Recruits**
**The US Military and the War on Drugs**
**Peter Zirnite**
**WOLA (Washington Office on Latin America), Washington DC,**
**August 1997**



CONTENTS

- Executive Summary

- I. Introduction

- I. Calling in the Marines

- II. Congress Beats the War Drum

- III. Metamorphosis of a Mission

- IV. Aiding Latin American Security Forces

    - Chart 1: US Antinarcotics Assistance, World Distribution

    - Chart 2: US Antinarcotics Assistance, 1988-1998

- V. Training Latin American Security Forces

    - Table 1: US Active Duty Personnel in Latin America

- VI. Controversy on Capitoll Hill

- VII. Detection and Monitoring: The Pentagon's Meat and Potatoes

- VIII. Source Country Shift

    - Table 2: DOD Counternarcotics Spending, FY 1989-1998

- IX. Attacking the "Air Bridge"

- X. Domestic Duty?

    - Table 3: Dept. of Defense Counter-drug Program Operating Tempo

- XI. Looking to the Future

- XII. Conclusion

- A Policy Doomed to Failure

- The Negative Consequences

- What the Future Holds

- Appendix A: The Pentagon's Drug Warriors

  - Southern Command

  - Atlantic Command

  - Pacific Command

  - Special Operations Command

  - North American Aerospace Defense Command

- Appendix B: US Antinarcotics Assistance 1986-1996

- References

**Executive Summary**

Despite the end of the Cold War and recent transitions toward more democratic societies in Latin America, the United States has launched a number of initiatives that strengthen the power of Latin American security forces, increase the resources available to them, and expand their role within society - precisely when struggling civilian elected governments are striving to keep those forces in check. Rather than encourage Latin American militaries to limit their role to the defense of national borders, Washington has provided the training, resources and doctrinal justification for militaries to move into the business of building roads and schools, providing veterinary and child inoculation services, and protecting the environment. Of greatest concern, however, is US encouragement and support for the region's armed forces - including the US military itself - to play a significant role in domestic counternarcotics operations, a law enforcement function reserved in most democracies for civilian police.

Among the vast array of US government agencies involved in drug control efforts, the Department of Defense (DOD) is on the front line of the war on drugs in Latin America, a role mandated by the 1989 National Defense Authorization Act (NDAA). The act designated DOD as the "single lead agency" for the detection and monitoring of illicit drug shipments into the United States. Congress backed this directive with dollars, quadrupling DOD's counter-drug budget between Fiscal Year (FY)1988 and FY1992, when it peaked at $1.22 billion. Billions more have been spent since then.

As the perceived threat of communism faded and eventually collapsed in the 1980s, the drug war replaced the Cold War as the military's central mission in the Western Hemisphere. Few in the military establishment, however, embraced the counternarcotics mission enthusiastically. While many regional commanders and their officers reluctantly complied with the Pentagon's directive to develop plans for carrying out the new mission,

the Panama-based US Southern Command (SOUTHCOM) eagerly took it on.

For officials within SOUTHCOM, the drug war was an opportunity to apply the low-intensity-conflict skills honed during 30 years of fighting guerrilla insurgencies in Central America and the principal means of maintaining and enhancing relations with militaries throughout the region. Closer ties with Latin American military forces help to encourage "subordination to civilian authorities, defense transparency, peaceful resolution of disputes, and protection of human rights," according to Gen. Wesley K. Clark, until recently Commander in Chief of SOUTHCOM. (1)

Testimony of Gen. Wesley K. Clark before the Senate Armed Services Committee, 11 March 1997. Primarily coordinated out of Panama, the US military now undertakes a vast array of assistance, training, intelligence-gathering and surveillance activities aimed at reducing the flow of drugs into the United States.

Passage of the 1989 NDAA coincided with President Bush's announcement of the Andean Initiative. Although US military personnel had been involved in training and transporting foreign antinarcotics personnel outside the country since1983, the Andean strategy opened the door to a dramatic expansion of this role, and to a significant infusion of US assistance to police and military forces; the Andes quickly replaced Central American as the primary recipient of such assistance. While aid levels declined in the early 1990s, over the last 18 months the US Congress and the Clinton administration have again dramatically escalated the provision of antinarcotics-related security assistance, primarily to the Andean region and Mexico.

The Andean Initiative placed the spotlight on Colombia, Peru, and Bolivia, and the impact of the drug war in those countries generated vocal concern among human rights groups. The vast majority of DOD's spending in the early 1990s, however, went to support domestic law enforcement efforts, and to detection and monitoring operations in the Caribbean and Gulf of Mexico transit zones, employing state-of-the-art military surveillance at a staggering financial cost. Those efforts quickly came under fire, as a series of investigations by the General Accounting Office (GAO) found transit zone interdiction programs to be costly and ineffective.

In late 1994, President Clinton shifted the emphasis of the US counter-drug strategy in Latin America, after an extensive administration review concurred with the GAO. Through a Presidential Decision Directive, he moved the focus of interdiction efforts from the transit zone back to the so-called source countries, particularly the "air bridge" connecting coca growers and paste producers in Peru and Bolivia with cocaine refiners in Colombia. A year later, the architect of this strategy, Gen. Barry McCaffrey, former commander-in-chief of SOUTHCOM, was appointed "drug czar."

Mirroring Bush administration claims about victories in transit zone interdiction, the Clinton White House soon declared its air-bridge strategy a success, citing declining prices paid for coca leaf and demands by pilots for more money to fly drug-laden planes. But even the administration's most zealous drug warriors admit that gains have been more tactical than strategic. Drug traffickers circumvent radar interdiction by flying below it and transporting more illicit drugs via land or river. Perhaps most significantly, the need to bring raw materials into Colombia, the primary cocaine-producing country, has been reduced by the expansion of coca production in Colombia itself - by 32 percent in 1996 alone.

Despite spending some $20 billion over the past decade on international drug control and interdiction efforts, illegal drugs from Latin America still flood the United States - a fact that concerns many within the military itself. Pentagon-backed counter-drug operations have resulted in some successes - the arrests of drug traffickers, eradication of coca fields, destruction of processing labs, and disruption of transportation - but gains have been episodic and temporary, as the sophisticated, well-financed "enemy" adapts quickly to enforcement strategies.

The seizure of thousands of metric tons of cocaine between 1988 and 1995, and the eradication of more than 55,000 hectares of coca plants, have failed to reduce the supply of illegal drugs in the United States or their availability, as measured by price and purity. Eradication in the Andes is offset by expanded cultivation. The area under coca cultivation actually grew by 15 percent from 1988 to 1995, and opium poppy cultivation jumped by 25 percent. As a result, the seizures of cocaine and heroin "made little impact on the availability of illegal drugs in the United States and on the amount needed to satisfy the estimated US demand." (2)

After noting how aggressive U.S-led interdiction efforts in Latin America simply force the cartels to diversify routes and improve their methods of shipment, one frustrated military planner compared the cocaine industry to poison ivy and the military response to scratching. "Scratching gives some short-term relief - which is hard to resist - but it spreads the problem." (3) Other military analysts suggest that a cardinal rule for US forces operating abroad is to focus on a clearly identified central target; however, to combat illicit drugs military planners have identified 14 such targets. Pursuit of these moving targets threatens to draw the US armed forces deeper into Latin America, even as some in the Pentagon, such as DOD drug policy coordinator Brian Sheridan, claim to be "looking for the exit door on this issue." (4)

The militarization of the drug war may be spreading more problems than just drug trafficking. US strategy depends on building close ties with Latin American militaries and beefing up their counter-drug capabilities, resorting in some countries to unholy alliances with armies that have deplorable human rights records. In Colombia, Mexico and Peru, US international drug control efforts - including the provision of equipment, training and direct assistance - contribute to counterinsurgency campaigns characterized by gross violations of human rights. Moreover, the US war on drugs has promoted a dangerous internal security role for Latin American militaries. Finally, it provides an on-the-ground role in the region for the US military and expanded intelligence-gathering and surveillance, evoking concerns about national sovereignty among countries throughout the hemisphere.

These issues generate significant controversy on Capitol Hill. Members of Congress have questioned both the human rights impact of drug policy and the US government's ability to effectively monitor use of antinarcotics assistance. In four reports from 1991 to 1994, the GAO concluded that US officials lacked sufficient oversight of military aid to ensure that equipment was being used efficiently and as intended in Colombia and Peru. In February 1997, the agency reported that this problem lingers, and has spread, citing the Mexican government's use of US-supplied, counternarcotics helicopters to transport troops used in quelling the uprising in the state of Chiapas. (5) Amnesty International USA and Human Rights Watch/Americas have released information from the US Embassy in Colombia documenting the provision of US antinarcotics assistance to counterinsurgency units of the Colombian armed forces responsible for some of the worst human rights atrocities in recent years.

The concerns expressed by the Washington Office on Latin America (WOLA) and other human rights organizations about the on-the-ground impact of the drug war are shared by many within the DOD establishment. In fact, some of the harshest criticisms of the Pentagon's anti-drug mission come from within its own ranks, where parallels are often drawn to the Vietnam War. Like their civilian counterparts, military critics question why they were drafted for the mission, the tactics being used to carry it out, and its overall effectiveness. These doubts, however, have not tempered the enthusiasm of Congress and the US public for a military solution. In a nation that historically has a propensity to declare "war" on its social ills, as if waging a "war" simply means rallying others around a cause, it is not surprising that failure in such efforts brings a call for escalation rather than reevaluation. For many, the urge to "scratch" remains irresistible.

## I. Introduction

Despite the end of the Cold War and transitions toward more democratic societies underway in Latin America, the US government has launched a number of initiatives that strengthen the power of Latin American security forces, increase the resources available to them, and expand their role within society - precisely when struggling civilian elected governments are striving to keep them in check. Rather than encourage Latin American militaries to limit their role to the defense of national borders, Washington has done the opposite, providing the training, resources and doctrinal justification for militaries to move into the business of building roads and schools, providing veterinary and child inoculation services, and protecting the environment. Of greatest concern, however, is US insistence that the region's armed forces - including the US military itself - play a significant role in domestic counternarcotics operations, a law enforcement function reserved in most democracies for civilian police.

Although US international narcotics control efforts have borne little fruit to date, the US Congress and the Clinton administration have dramatically escalated the provision of security assistance to Latin America over the past 18 months in the name of fighting the war on drugs. For Fiscal Year (FY)1997, the budget for international drug control programs doubled from the previous year, reaching $213 million. In addition, the administration approved a package of $112 million worth of military equipment and training to be provided to Colombia, Venezuela, Peru, Mexico and select Caribbean countries for antinarcotics purposes. One of the more controversial components of the aid package was the inclusion of helicopters in the military assistance package for Mexico, despite confirmed reports that helicopters provided previously were used in counterinsurgency operations in the Chiapas region. All together - through the provision of foreign aid, additional military equipment and training - antinarcotics support for the region's military and police forces, primarily in the Andean region and Mexico, more than tripled from FY1996 to FY1997.

For Colombia - whose armed forces probably have the worst human rights record in the hemisphere today - the Clinton administration approved the sale of armed Blackhawk helicopters, worth $169 million, and released an additional $30 million in military assistance that had been suspended following the "decertification" of Colombia in 1996. In 1997 alone, Colombia is slated to receive approximately $100 million in US security assistance for antinarcotics purposes. And this spring, for the first time, the Administration asked Congress for authority to provide another $150 million in military aid over five years for Peru and Colombia from the Pentagon budget, rather than through the much smaller and more tightly monitored foreign aid bill. By comparison, the Clinton

administration this year proposed just $273 million in development assistance for all of Latin America and the Caribbean.

While there is little reason to believe that the policy will produce results in terms of controlling illicit drugs, its impact can be devastating in countries where the drug war is being waged. In the Andean region and Mexico, the United States is forging ever closer ties with abusive police and military forces. In Peru and Colombia, Washington is providing assistance to intelligence services and militaries who are the worst human rights violators in the hemisphere. Moreover, through its drug program Washington is reinforcing trends of ceding more and more authority and control to militaries, which themselves present the greatest threat to democracy in those countries. In countries such as Bolivia, struggling to confine militaries to the barracks and limit their mandate to external defense, the US government has succeeded - after years of pressure - to engage the army in the domestic law enforcement functions of drug control. In short, in country after country in Latin America, the US war on drugs undermines efforts to promote human rights democracy and regional security.

The startling aid statistics provided above are over and above direct expenditures by the Pentagon and US intelligence agencies. Among the some 50 government agencies involved in drug control efforts, the Department of Defense (DOD) is on the front line of the war on drugs in Latin America. The Pentagon's drug plan calls for the US military to provide the intelligence, strategic planning, resources and training needed for the region's security forces to carry out antinarcotics efforts. In addition, the Pentagon is in charge of costly interdiction efforts and participates in domestic law enforcement efforts to stem the flow of illegal drugs into the United States. This year alone, DOD's budget allocates nearly one billion dollars to drug control efforts. This report lays out the development of the Pentagon's antinarcotics role, attitudes within the armed services as to that role, and the vast array of programs undertaken by DOD in the name of fighting illicit drugs.

## I. Calling in the Marines

More than eight years after the drug war supplanted the Cold War as the central US military mission in the hemisphere, counternarcotics programs continue to drive the Pentagon's regional agenda. Despite the expenditure of billions of dollars, the deployment of thousands of personnel and sophisticated equipment, and massive assistance to its Latin American allies, the Pentagon has made little headway against its new foe. While the militarization of anti-drug operations may have produced occasional tactical victories - such as the destruction of cocaine processing labs, which are quickly replaced by facilities in more remote locations - even its most ardent supporters admit it has done little, if anything, to stem the flow of cocaine into the United States.

The Pentagon was thrust to the front lines of the drug war by the National Defense Authorization Act (NDAA) for FY1989, which designated DOD as "the single lead agency" of the federal government for detecting and monitoring maritime and aerial shipments of illicit drugs into the United States. DOD had played a significant role in combating drugs since 1981 by providing such services as radar surveillance, transportation, and communication support to federal, state, and local law enforcement agencies engaged in counternarcotics activities. The FY1989 NDAA, however, marked the first legislatively mandated counternarcotics mission for the Pentagon.

While the act authorized DOD to increase its support to state governments and required it to establish a network that integrated the communications and technical intelligence assets

of various federal agencies into a single network, it was the new detection and monitoring role that made the Pentagon a major player in the drug war in this hemisphere. Befitting its enhanced role, Congress rapidly increased funding for DOD's counternarcotics activities from $300 million in FY1988 to $1.22 billion in FY1992. Even at this peak level, counternarcotics activities accounted for less than 0.5 percent of the Pentagon's total budget; however, expensive weapons and surveillance systems were increasingly justified by pointing to their potential to contribute to the drug war.

Soon after taking office in 1989, President Bush began to lay the groundwork for a comprehensive program that would shape the military's newly legislated, anti-drug mission. A key component of the plan, announced in a televised address early that September, was his Andean Initiative, or strategy. The five-year, $2.2-billion plan aimed to dismantle drug-trafficking organizations, isolate major coca growing regions, destroy processing labs, and block the delivery of precursor chemicals by providing enhanced law enforcement, military, and economic assistance to Bolivia, Colombia, and Peru. Under the Andean strategy, which was initially developed without input from the target countries, "US military involvement was to be limited to providing logistical support, equipment, and training to host nation armed forces, unless direct military assistance was specifically requested." (6)

Announced limits on the role the US military would play, however, did not prevent their strong presence from generating concerns about eroding sovereignty in host countries, especially in countries such as Bolivia. US officials repeatedly used Bolivia's economic dependence on the United States to force the Bolivian government's compliance with US policy objectives - often at great social and political cost. In Colombia, opposition to the presence of US troops forced the suspension of civic action programs. Graffiti calling for the "yankees to go home" can still be found throughout Bogotá and other major Colombian cities.

President Bush is widely credited for the Pentagon's formal emergence as a drug warrior, but the roots of the militarization of US counternarcotics efforts go much deeper. By the time he began to unleash the US armed forces in the fight against drugs, Americans already had been conditioned to think in terms of a military solution. It was a process that began in 1968 when President Nixon first declared "war on drugs." In addition to setting the stage for a future military response, the more immediate impact of Nixon's declaration was the establishment of series of offices for narcotics coordination and enforcement, including what in 1973 came to be known as the Drug Enforcement Administration (DEA).

Three years after declaring war, Nixon took what has proven to be the pivotal step in setting the nation on its inexorable march toward militarization; he proclaimed drug trafficking to be a "national security" threat. (Ironically, his pronouncement was made in response to a national heroin "epidemic" that stemmed directly from the real war the United States was conducting in Southeast Asia against its then-number-one national security threat - communism.) The linking of drugs to national security provided the rationale that future presidents would use to justify expanding the role of US armed forces; and protecting national security remains the rallying cry of those who want to provide more money and more firepower to those waging the war on drugs. As recently as July 1997, the State Department released a Memorandum of Justification for the release of military assistance to Colombia, previously withheld due to that country's "decertification," that states: "We believe that the expenditure of up to $30 million in

FMF funds is vital to the national security interests of the United States."

The "national security" rationale was beefed up in the 1980s when US officials began linking drug traffickers to guerrilla insurgencies in the hemisphere. At a 1984 Senate hearing, federal officials warned that international terrorists were turning to drug trafficking to finance their operations. "Drugs have become the natural ally of those that would choose to destroy democratic societies in our hemisphere through violent means," cautioned then-US Customs Commissioner William Von Rabb, who sought to implicate Cuba and Nicaragua in using the regional drug trade to finance insurgencies throughout Latin America. (7) The next year, the Joint Chiefs of Staff cited the narcoguerrilla threat when it unanimously recommended that the US military take unprecedented action, including the imposition of naval and air blockades, to combat drug trafficking in Central America, a plan they that said could be "a rallying point for this hemisphere." (8)

Development of the so-called "narcoguerilla theory" was a critical development in the militarization of international drug control efforts. It has been used not only to justify the Pentagon's involvement in the drug war, but also to legitimize the approach it has taken in carrying out its counter-drug mission. While targets of the Andean operations include "new" enemies - cocaine producers and traffickers - the "old" enemies of Marxist insurgents are explicitly part of antinarcotics programs in Colombia and Peru. Even today, the guerrilla-drug link is routinely cited as an important part of the rationale for increasing military assistance to those military and police forces. Washington is pressing Peruvian officials to accept its proposal for an expanded riverine interdiction program by arguing it would deprive Sendero Luminoso of needed money. (9)

The narcoguerrilla theory, however, is widely questioned by experts in the Andean countries and in the United States. While some links undoubtedly exist, traffickers maintain an array of alliances - with state actors as well as guerrilla forces, potentially creating a quagmire for US policy-makers seeking support from the former. In Colombia - most often put forward as a bastion of "narco-terrorists" - drug mafias are most closely associated with right-wing paramilitary death squads, which themselves more often than not have close ties to members of the Colombian armed forces.

Even before US officials first made the connection between Latin American insurgencies and drug trafficking, Congress went on the war path and in increasingly strident language began demanding a greater role for the military. The first legislative step to widen the Pentagon's role in the drug war came in 1981, when lawmakers amended the Posse Comitatus Act of 1897, which restricts US armed forces personnel from participating in law enforcement activities. (Adopted largely in response to concerns that arose from the military's role in post-Civil War Reconstruction, the act specifically prohibits only the use of the Army to "execute laws," but Pentagon officials have applied its restrictions to the other service branches as a matter of policy.) The amendment allows the military to provide equipment, information, training, and advice to law enforcement agencies, but it retains the prohibition on military participation in search, seizure, and arrests.

Military leaders were reluctant recruits, drafted to conduct a mission for which they never would have volunteered. They tend to see the drug war as a fight better left to civilian forces because it has nothing to with the military's traditional role. "Reliance on military forces to accomplish civilian tasks is detrimental to both military readiness and the democratic process," then-Secretary of Defense Caspar Weinberger warned in 1985. (10) It also was widely believed among Pentagon officials that by calling in military, Congress was tacitly admitting its failure to solve the drug problems and was now looking for a

"whipping boy" to take the blame. This view was summed up by former DOD drug coordinator Lt. Gen. Stephen Olmstead, who said, "What I find is: Let's make the Army the scapegoat. We don't know what the answer is to the drug problem, so let's assign it to the Army and let them try to solve it." (11) Even today, key officials in the Pentagon remain skeptical. "We are doing what we have been told to do," concedes Pentagon drug policy coordinator Brian Sheridan. He bemoans the fact that, to carry out its assigned role in addressing this "terrible social problem," US military planners must choose from "a whole series of lousy policy options." (12)

Undaunted by foot dragging on the part of the US military, Congress - where support continues to span the political spectrum, as no politician wants to be labeled "soft" on drugs - intensified its pressure on the Reagan administration. In response to the lawmakers' demands that the US armed forces be give an enhanced role in the drug war, Reagan issued a National Security Decision Directive (NSDD-221) in April 1986 that declared drug trafficking a "lethal" threat to the United States, "thus setting the stage for a rapid expansion of US military participation in drug interdiction at US borders and abroad." (13) The directive stipulated that US military forces could be used in interdiction overseas only if they were invited by the host country, directed by US agencies, and limited to a support function. Congress showed its enthusiastic support for the President's new directive, by allocating $379 million for DOD's FY1987 drug budget, nearly double the amount they provided the previous year.

The one-two punch of Reagan's NSDD and Congress' increased funding enabled DOD to increase substantially its involvement in US drug interdiction efforts. The expanded effort included the establishment of an Air Force drug surveillance program and the creation of a joint Navy-Coast Guard maritime interdiction program. (14) NSDD-221 also set into motion Operation Blast Furnace, which was to become the "first publicized employment of US Army combat forces on the sovereign soil of another country to conduct joint anti-drug efforts." (15)

Launched in July 1986, DOD's mission sent six Army helicopters and 150 troops to Bolivia to provide transportation and communications support to Bolivian and Drug Enforcement Administration (DEA) forces in their attack on remote cocaine processing labs. Despite its high profile, Operation Blast Furnace was a failure. By all accounts, including those of participants, it accomplished nothing more than a temporary disruption in cocaine processing, as the destroyed labs were quickly replaced once the mission ended in November. The operation, however, did produce the "important lesson" that "the center of gravity on the supply side of the equation is that point at which the chemicals, coca product, and transportation come together," according to one after-action analysis that assessed how well Blast Furnace conformed with the dictates of classic war strategist Carl von Clausewitz, who stressed that success on the battlefield depends on focusing all resources on the enemy's "center of gravity." (16) Eight years later, US drug policy planners would use this justification as the basis for future decisions to make "source countries" the focus of US counter-drug activities in the hemisphere.

## II. Congress Beats the War Drum

On the home front, Congress increased federal funding for demand and supply reduction programs in the Anti-Drug Abuse Acts of 1986 and 1988. It was in the earlier act that Congress established the annual process by which the President must "certify" which countries are cooperating fully with US anti-drug efforts. The sanctions imposed on "decertified" countries were toughened in the latter act, which also waived, for certified

drug war allies, longstanding US restrictions on aid to foreign police forces. Countries which are fully decertified face a range of sanctions, including cut-offs in US assistance not directly related to antinarcotics efforts (with the exception of humanitarian aid), "no" votes on loans by the World Bank and Inter-American Development Bank, and possible trade sanctions. To date, Colombia is the only US ally to be fully decertified, although numerous countries have been decertified and then granted a "national security waiver" of the mandatory sanctions.

With the November elections looming ahead, the House of Representatives approved a bill in 1988 which would have required the US military to seal US borders within 45 days, given the military arrest powers, and authorized hot pursuit of suspected drug smugglers into foreign territory. Concern about this extreme proposal spurred Senate leaders to reach a compromise, which became the 1989 NDAA, discussed above. The legislation:

1. Made DOD the single lead agency for the detection and monitoring of aerial and maritime transit of drugs into the United States;
2. Required DOD to integrate the communications and technical intelligence assets of various federal agencies into a single network; and
3. Required DOD to coordinate the increased use of the National Guard in antinarcotics activities.

Congress also amended the Posse Comitatus Act again, this time giving the military "expanded authority" to work with foreign law enforcement agencies "in areas where the military would be operating outside of the United States." (17)

This legislative action was complemented by two legal developments. In 1989, the Department of Justice Office of Legal Counsel opined that the Posse Comitatus Act does not have extraterritorial application, allowing the military to arrest drug traffickers and other fugitives outside of US territory and to do so without host country consent. About a year later, the US Supreme Court found that the Fourth Amendment did not have extraterritorial application either, meaning that US law enforcement agents conducting searches and seizures abroad could do so without the search warrants required for domestic operations. (18)

Some critics warned that extending law enforcement powers to the military would create foreign policy and international law problems, but the loudest protests came from civil libertarians worried about the domestic implications. From the Whiskey Rebellion to the Vietnam-era, anti-war protests l70 years later, the history of the use of the US armed forces for law enforcement functions has raised concerns, as such efforts "often end in the violation of both the civil and legal rights of US citizens." (19) The recent killing of a teen-ager in Texas by a US marine patrolling the border on a drug-surveillance mission (described in greater detail below) has reignited these concerns.

Even before the Supreme Court's ruling, President Bush sought to take advantage of the military's enhanced overseas law enforcement powers in staging Operation Just Cause, the December 1989 US invasion of Panama. At the time, he released a memo stating, "I hereby direct and authorize the units of the Armed Forces of the United States to apprehend General Manuel Noriega and any other persons in Panama currently under indictment in the United States for drug-related offense." Bush also authorized US military personnel to "detain and arrest" anyone who in their judgment warranted such action. (20)

Nevertheless, while congressional amendment of the Posse Comitatus Act and other actions were designed to cure military commanders of their reluctance to enlist in the drug war, two other events played a more significant role in eventually leading them to accept, if not embrace, their new mission: the crumbling of the Soviet bloc and the Iraqi invasion of Kuwait.

The demise of the "evil empire" knocked communism from its long-unchallenged position at the top of the list of US national security threats. As they approached the end of the 1980s, military commanders began searching for a new "enemy" to replace the one that provided the unquestioned rationale for decades of increased military spending. Gen. Maxwell Thurman, then-commander-in-chief of the US Southern Command, or SOUTHCOM, expressed the feeling of many of his military colleagues who saw their raison d'etre thrown into question. In a widely quoted 1990 assessment of the drug war, he said it "is the only war we've got."

Threats to slash budgets - in November 1989, Secretary of Defense Dick Cheney announced plans to trim military spending by $180 billion over five years - caused many officials to abandon military-based objections to participation in the drug war for a protect-my-turf bureaucratic mind set, under which they would accept the new mission as long as it kept funds flowing. "If there is money in it," one former Navy official explained succinctly, "the military will perform the mission." (21)

As congressional funding for the Pentagon's participation in the drug war increased dramatically in the late 1980s, anti-drug activity was routinely invoked to justify military programs and budget proposals. In one of the more extreme examples, the Navy lauded its nuclear-missile equipped Trident submarine for its value as a drug trafficking deterrent. (22) In its study of DOD counternarcotics programs from FY1989 to FY1991, the General Accounting Office (GAO), the oversight and investigative arm of Congress, raised concerns that "some organizations" viewed the new mission solely as a funding source and "attempted to obtain funding for long-standing, unfunded requirements under the counternarcotics program." Among the culprits identified by the GAO were the Air Force and Navy, as both services sought funding for over-the-horizon radars that had been "originally justified as general air defense requirements and whose contribution to counternarcotics detection and monitoring operations had been questioned, even within DOD." (23)

One of the assumptions that drove efforts to make DOD the lead agency in detecting drug smugglers was that the Pentagon's long experience in monitoring the skies and waters for incoming Soviet and other hostile aircraft allowed it to develop exceptional technical capabilities. The Persian Gulf war in early 1991 gave this argument greater currency because it "demonstrated that the US military's ability to use integrated satellite, radar, and communications technology may be unsurpassed." (24) After their detection and monitoring technology was proven successful against Iraqi forces, military planners were eager to deploy it against another foe; drug traffickers were the most available one. Such a deployment was made even more attractive by the fact that it would be relatively inexpensive, since it would utilize much of the DOD's existing human and material resources.

DOD acceptance of its new mission was facilitated also by a change in its leadership. When first named Secretary of Defense, Dick Cheney echoed the concerns his predecessors had expressed about widening the military's involvement in the drug war.

But by September 1989, he had changed his tune and declared that "detecting and countering" drug production and trafficking was a "high-priority, national security mission." (25) This switch, which ended the Pentagon's rear-guard resistance, could be attributed to the fact that Cheney was a former congressman, and, as such, was more responsive to the political pressures that drive US drug policy. Regardless of what caused his conversion, Cheney became a leading advocate of DOD's counternarcotics mission as put forward in the 1989 NDAA and President Bush's Andean Initiative.

### III. Metamorphosis of a Mission

Even before Congress approved supporting legislation, Cheney directed the commanders-in-chief (CINCs) of the relevant military commands - Atlantic Command (ACOM), Pacific Command (PACOM), North American Aerospace Defense Command (NORAD), Southern Command (SOUTHCOM), and Forces Command (FORSCOM) - to develop campaign plans to carry out the anti-drug mission within the parameters set by the White House's counternarcotics strategy. (26) In March 1990, the Pentagon announced that the administration had approved in final form the plans the submitted by the five CINCs. While the Atlantic, Pacific and Forces Commands established joint task forces to conduct their operations - these would later evolve into joint interagency task forces (JITFs) - NORAD and SOUTHCOM integrated the new mission into existing structures. Of the unified commands, SOUTHCOM, ACOM, and FORSCOM were the ones to become most deeply involved in carrying out the Pentagon's counternarcotics mission (see Appendix A).

Headquartered in Panama, SOUTHCOM became the center of anti-drug efforts. Its area of responsibility (AOR), which includes the countries that produce all the cocaine imported into the United States, made it the natural launching pad of the Andean strategy. Because DOD is the lead agency for detecting and monitoring drug flows, ACOM also was positioned to play an important role, as its AOR at that time encompassed the Atlantic Ocean, Gulf of Mexico, Caribbean Sea, and parts of the eastern Pacific Ocean. (27) FORSCOM, based at Fort Bliss, Texas, coordinates Army forces within the United States, and, as such, its plan focused on supporting domestic counter-drug efforts along the 2,000-mile border with Mexico.

Cheney's zeal to produce an antinarcotics plan as quickly as possible created problems with mission definition and coordination that hamper DOD to this day. The CINCs were given less than two months to submit their plans and requirements to the Joint Chiefs of Staff. According to a GAO study, without adequate time to thoroughly study the drug trafficking threat in their area of operations, they submitted plans that "were based largely on the subjective judgment of their commanders and staff officers who had only limited knowledge of counternarcotics issues." (28) It was not until May 1991, more than two years after being assigned its new mission, that DOD planners had developed a national assessment of the overall cocaine trafficking threat on which to base their counternarcotics program requirements.

SOUTHCOM was far ahead of its colleagues, as it had long been the most enthusiastic advocate of deepening the military's role in combating drug trafficking. Its leaders believed that the new anti-drug mission converged with their previous roles and assignments, principally aimed at countering "Marxist" insurgencies. From the early 1980s, SOUTHCOM officials raised concerns about drug trafficking in the region because of its perceived relationship to guerrilla movements. For them, shifting US military posture in Latin America from the Cold War to the drug war would be easy

because the new enemy, as defined by the narcoguerrilla theory, included many old foes and it would allow US military personnel to employ the same tactics that they had used in fighting communism. They also argued that the drug war, particularly the Andean strategy, dovetailed with another important post-Cold War objective in the hemisphere: maintaining and strengthening bilateral relations and influence with the region's militaries.

Following the 1989 invasion of Panama, then-SOUTHCOM Commander Gen. Thurman directed his troops to make counternarcotics efforts their "number one priority," and, in organizing the command around its new mission, he established a Counternarcotics Operations Center, which reportedly drew on the command's best and brightest officers. Thurman also called on a variety of agencies - including the military's Center for Low-Intensity Conflict (CLIC) and US embassies in the region - to assist in planning anti-drug activities in the Andes. At the time, State Department officials acknowledged that SOUTHCOM "jump started" the counternarcotics effort, and one Washington analyst familiar with SOUTHCOM described the drug mission as a "shark's mouth devouring everything." (29)

Although US military personnel had been involved in training and transporting foreign antinarcotics personnel outside the country since 1983, the Andean strategy opened the door to an expansion of these roles in Peru, Bolivia, and Colombia. Congress supported US military involvement by increasing the levels of resources and personnel available for these tasks. The stated goals of the strategy were to strengthen the political will and institutional capabilities of the Andean governments to combat drugs, increase the effectiveness of local law enforcement and military anti-drug activities, and work with these countries to disrupt and dismantle drug trafficking organizations. The fourth principal objective - one that was added almost as an afterthought - was to strengthen and diversify the legitimate economies of these three countries so that they could overcome the destabilizing effect of eliminating cocaine as a major source of income.

Bush administration officials rejected assertions that the Andean Initiative was a cover for assisting counterinsurgency efforts in the region, stressing that US military personnel were serving in an advisory capacity and were restricted from participating directly in counter-drug operations. But the ties between the two operations are undeniable, as the military component of the Andean strategy was historically, doctrinally, and operationally linked to US counterinsurgency strategy - as evident in the narcoguerrilla theory put forward by administration officials. (30) In 1990, the now-defunct CLIC, a joint Army-Air Force operation based at Langley Air Force Base, Virginia, formally identified counternarcotics as a low-intensity conflict (LIC) mission and one the that overlaps with other LIC operational categories, including counterterrorism and counterinsurgency.

The movement of the DOD Coordinator for Drug Enforcement Policy and Support within the Pentagon bureaucratic structure reinforces the view of counter-drug operations as the latest LIC mission. With the enactment of the FY1989 NDAA, the position of drug policy coordinator was established in the Office of the Assistant Secretary of Defense for Force Management and Personnel. The post was then shifted to the Office of the Assistant Secretary of Defense for Reserve Affairs, before eventually being placed in its current location in the Office of the Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict.

**IV. Aiding Latin American Security Forces**

As has traditionally been the case in US-supported counterinsurgency efforts, the primary tool for US forces waging the drug war abroad is "security assistance," which can include economic assistance, training, intelligence support, equipment transfer and maintenance support, and providing advice. (Channeled through the US Department of State, this assistance is over and above the Pentagon's own antinarcotics budget, which is a separate account.) Currently, the United States annually pumps more than $100 million in counternarcotics assistance into Latin America, most of it in the form of military equipment, services and training. International counternarcotics programs are one of the few areas of growth in US foreign assistance, and an increasing percentage of this aid is being earmarked for Latin America (see Charts 1 and 2).



**Chart 1**

Source: USAID 1998 Congressional Presentation Document, estimated figures.



**Chart 2**

Source: USAID Congressional Presentation Documents. 1997 & 1998 are estimated figures.

According to the State Department's Bureau of International Narcotics and Law Enforcement Affairs (INL), which coordinates all drug-related US aid, of the $213 million budgeted for in-country narcotics programs in FY1997, $116.2 million will go directly to Latin America, an increase of more than 40 percent over 1996. (By comparison, the rest of the world - Asia/Africa/Europe - is slated to receive only $18.9 million. The remaining funds are for regional programs, which are primarily oriented toward Latin America.) For FY1998, INL has earmarked $132.7 million for Latin America, of the $230 million requested for international drug control programs. (31) (It is difficult to determine what percentage of this aid is destined for military forces and how much will be going to law enforcement because of the administration's decision to consolidate international counternarcotics assistance into a single account.)

Traditionally, foreign security assistance has taken the form of Foreign Military Financing (FMF) and Economic Support Fund (ESF) grants under the Foreign Assistance Act of 1961, but the end of the Cold War and concerns about the federal budget deficit resulted in reduced appropriations for these forms of security assistance. To fill the void, Washington has turned to surplus US weapons stocks, using the Pentagon's Excess Defense Articles (EDA) program, which was established in 1976, and the President's special "drawdown" authority to provide assistance to Latin America.

The Foreign Assistance Act was amended by Congress in 1989 to permit EDA transfers to Latin American and Caribbean nations for counternarcotics purposes, provided that the countries have democratic governments and armed forces that "do not engage in a consistent pattern of gross violations of internationally recognized human rights." Originally, the new Section 517 also required the recipient government to certify that the military equipment, the bulk of which is provided through grants, would be used "only" for counternarcotics purposes, rather than to counter political insurgents, but in 1990 Congress "changed this restriction from 'only' to 'primarily,' apparently because the former requirement was not being met." (32)

Although EDA transfers under Section 517 are limited to $10 million per country per year, congressional investigators have found that the Pentagon routinely underestimates the original acquisition value of the equipment on which this limit is based. A study by the Arms Sales Monitoring Project of the Federation of American Scientists revealed that between 1990 and 1995 Colombia "has been by far the leading recipient of excess weaponry under this provision of the law," receiving 32 UH-1 Huey helicopters and dozens of other aircraft, as well as more than 30 landing craft and patrol boats. During the same period, Mexico received 50,000 M-1 carbines and two cutters, while Peru was given 11 attack aircraft. (33)

Millions of dollars in military equipment, services and training are pumped into the region for counternarcotics purposes directly by the President through use of his special drawdown authority. Section 506 of the Foreign Assistance Act provides the President authority to transfer up to $150 million of excess US defense articles annually to meet "unforeseen" emergencies that cannot be met through other aid channels, if he determines that doing so is "in the national interest of the United States." On September 30, 1996, President Clinton determined it would be in the US national interest to draw down up to $112 million of articles, services and military education and training from Defense Department inventories to provide antinarcotics assistance to Peru, Colombia, Venezuela, Mexico, and the seven countries of the Eastern Caribbean Regional Security System.

Although surplus weapons transfers now constitute a major source of security assistance, including counternarcotics aid, they are not subject to the same level of congressional oversight as other forms of assistance. Unlike the FMF, ESF and International Military Education and Training funds, the full Congress never debates and votes on surplus grants or drawdowns. The executive branch is required to notify Congress of proposed transfers, but in most cases not the actual deliveries. Congress is only given composite information on transfers "well after the fact," in the following year's budget justification documents, but, even then, "the executive branch provides no single accounting of all the various channels for surplus arms transfers." (34) As a result, complete statistics are not compiled of the total value of US assistance provided to date to Latin American security forces for antinarcotics purposes.

To maintain and operate equipment provided, particularly aircraft, Washington often

contracts private, US firms claiming that the host country lacks the necessary pilots, mechanics, and other trained personnel. In November 1996, six contracted pilots working for a Virginia-based firm, Dyncorp, which also supplied "fewer than a dozen" technicians and mechanics, began flying high-risk, drug-eradication missions in Colombia. (35) When a US pilot died in a crash in a remote jungle region in early January, it was first thought that he may have been shot down by well-armed guerrillas operating the area; Colombian police, however, eventually attributed the crash to pilot error.

## V. Training Latin American Security Forces

The provision of these different forms of security assistance is accompanied by training and other forms of support provided directly by the US military. A key component of SOUTHCOM's advisory function is its Tactical Analysis Teams (TATs), which are made up of a small number of US Special Forces and military intelligence personnel. The teams, whose size and exact mission vary from country to country, pull together intelligence from human and technical sources to select targets and plan operations to be carried out by host nation military and police forces and US DEA agents. "The TATs," one early participant explained, "are the focal point where the 'rubber' (intelligence support) meets the 'road' (counter-drug operations)." (36) While TATs determine collection priorities and act as data managers, they do not conduct intelligence collection operations.

These activities, like the counter-drug operations they support, are carried out by the DEA - to which the TATs serve as an "adjunct" - and other US and host-nation agencies. (37) After the first two TATs established in Peru and Bolivia in 1989 proved successful in the eyes of US military planners, (38) their number rapidly expanded. By late 1994, there were ten teams, supporting counter-drug operations in Bolivia (two), Peru, Colombia, Ecuador, Paraguay, Venezuela, Panama, Guatemala, and Honduras. (39) In mid-February 1997, the number stood at 14, with three countries hosting two teams - Colombia, Ecuador, and Brazil - and single teams in eight other countries - Belize, Guatemala, El Salvador, Honduras, Panama, Venezuela, Peru, and Bolivia (see Table 1). (40)

As the TATs evolved, they began to integrate tactical operations into an overall strategy to attack drug trafficking organizations, with the goal of establishing evidentiary links between raided cocaine labs and other individuals in the organization. "The optimum scenario is a 'full court press' on all trafficking organization members and critical nodes to completely disrupt or destroy their production and shipping capabilities." (41) And, the host nation's ability to execute this highly desired "full court press" is being enhanced by Special Forces trainers who provide in-country instruction in "drug interdiction and search-and-destroy techniques." (42)

US training teams typically are composed of six Navy Seal and Army Green Beret officers who spend about three weeks in country providing instruction, but they can be as small as a single officer or as large as an entire platoon, 20 to 30 people. A vital part of their instruction, US officials stress, is human rights training. However, training is provided regardless of the human rights record and political will for human rights-related reforms exhibited by recipient forces. For FY1997, SOUTHCOM is planning a total of 37 training deployments - 11 to Ecuador, nine to Venezuela, six each to Peru and Bolivia, and five to Colombia - that will involve 633 personnel. (43)

Operational tactics are only a small piece of the counter-drug training support that US teams provide, according to Pentagon drug czar Brian Sheridan, who touts in-country instructions as the "best type" because troops are "being trained on their home court." He

points out that the number of host-nation military and police personnel who receive operational field training is limited by the fact that counter-drug operations typically are conducted by small units. As such, instruction in operational tactics is given to "only 40 to 60 guys at a time." Many more people receive "technical training" involving instruction in the use and maintenance of equipment and skills such as marine navigation. (44)

In-country training is supplemented by instruction at US military facilities, including the Naval Small Craft Instruction and Technical Training School at Rodman Naval Station in Panama, where Latin American military forces receive instruction in riverine operations and small-craft maintenance, according to former SOUTHCOM Commander, Gen. Clark. US allies also receive training applicable to counter-drug operations at the Army's Jungle Operations Training Center at Fort Clayton, Panama, the only US facility of its kind. (45)

Among the US-based facilities used for counternarcotics instruction is the School of the Americas (SOA) at Fort Benning, Georgia, which last year was rocked by revelations that as recently as 1991, it used manuals that advocated torture and murder of political opponents. The SOA, the Pentagon's longtime favorite training ground for Latin American troops, currently offers officers an 11-week course that provides instruction in planning, leading, and executing drug interdiction operations, including weapons, infiltration, and surveillance techniques; patrolling; demolition; and close-quarters combat. In FY1995, 50 junior and mid-level officers attended this course, while 50 cadets attended a four-week course that provided a basic introduction to tactics and techniques used in counter-drug operations. (46)

Counternarcotics training, whether conducted in-country or at US facilities, is viewed by many Pentagon officials as an important opportunity to foster closer ties with the region's armed forces, one the key goals of DOD's post-Cold War strategy for the hemisphere. A case in point is the current training being provided to Mexican troops, who were called in to fill the void created in 1996 by the dismissal of some 800 federal police officers for ethical breaches. Before the Pentagon began providing counter-drug training to Mexico's military, "essentially we had no relations with them," Sheridan said. "The idea of building military-to-military relations is very important." (47)

US officials insist that corruption among the Mexican police mandates a military response. Yet in bringing in the military, the US may be setting in motion a trend that will be difficult, if not impossible, to reverse of increasing Mexican military involvement in domestic political matters. Mexico's military now commands police forces in two-thirds of the states, looking for drug traffickers, patrolling Mexico City streets, directing traffic and combating petty crime. By encouraging the militarization of Mexican society in the interest of combating narcotics, the United States undermines its own long-term goal of a stable civilian democratic regime in Mexico. Nor is there any evidence that the Mexican military is less susceptible to corruption than the police; they are, however, less transparent and accountable, making corruption even more difficult to rout out. Mexican analysts and human rights activists argue that the Clinton administration should redirect resources toward building strong civilian judicial institutions in Mexico and other countries.

Human rights groups point to a number of other inherent problems with US military counternarcotics training programs. The jungle warfare-type training that the US military is providing to Latin American security forces is not well-suited for drug control efforts, which should be oriented toward sound investigations and criminal prosecutions. Moreover, the law enforcement training that does take place would be more appropriately

carried out by law enforcement agencies. It is deeply disturbing, for example, that the US military is training local forces in surveillance tactics to be used on their own citizens, given the way in which such practices have been used historically to systematically violate basic human rights. Moreover, the United States is aiding and training troops within whose ranks are some of the worst human rights violators in the hemisphere at the present time - in countries such as Colombia and Mexico - without first insisting on fundamental reforms to ensure significant reductions in human rights violations and effective prosecutions of those responsible.

Also of deep concern, by the early 1990s - with the authority, equipment, and funding to plan operations, bolster host nation forces and transport these personnel to the front - US military forces appeared to be perilously close to a direct combat role in the war against the South American drug cartels and, at least indirectly, insurgencies. Bush administration officials strenuously denied that US forces had a direct role in drug arrests and seizures, but "US Army special operation forces boast[ed] they [were] on the front line in the war on drugs," according to an analyst at the Washington, D.C.-based Center for Defense Information. (48) DOD's Sheridan insists that most of these statements are being generated by Special Forces personnel who tend to enlist in the military for "high adventure," and he dismisses all such claims as "bravado which is not uncommon among people in that line of work." In all deployment orders for units assigned to counter-drug work in Latinamerica, he stresses, it is made clear that, while US troops may work with host-nation forces, they "will not accompany them on operations." (49) Nonetheless, reports of US forces fighting at the front line persist today, raising questions about both national sovereignty and the potential US response to casualties.

Drug traffickers and guerrilla forces are not the only ones who pose a danger to US military personnel on the ground in the region. One Green Beret master sergeant complained that distinguishing between drug traffickers, guerrilla forces, "and sometimes even hostile host forces," is so difficult that "it's very hard to keep up with who's trying to blow you away." (50) The danger posed by the uncertainty of who your enemies and allies are was driven home to US officials in April 1992, when a US Air Force sergeant was killed after being sucked out of a C-130H aircraft at 18,500 feet, through a hole blown in the spy plane by Peruvian jet fighters. The 13-member crew, operating out of Howard Air Force Base in Panama, was secretly photographing cocaine labs and airstrips in the Upper Huallaga Valley - it "never trusted the Peruvian military" - when their aircraft was attacked. In addition to the one US airman killed, four others were injured by the Peruvians, who later were awarded commendations from their government for their actions. (51)

**VI. Controversy on Capitol Hill**

The provision of security assistance and training to Latin American forces has proven to be one of the most problematic aspects of the Andean strategy, and on Capitol Hill it remains one of the most contentious aspects of US counter-drug policy in Latin America. Congressional concerns have focused on two issues: end-use monitoring and preventing antinarcotics assistance from being diverted to counterinsurgency uses and contributing to human rights violations. In addressing these concerns, legislators have mandated a range of conditions on US antinarcotics assistance at different point in time.

Government investigations have given credence to these concerns. "The executive branch does not have the oversight needed to ensure that military aid will be used as intended or in the most efficient and effective manner," the GAO said in a 1991 report on US counter-

drug programs in Peru. (52) Even though it concurred with the reasoning behind the policy of use flexibility, the GAO decried the lack of monitoring, arguing, "Stringent end-use monitoring of any military assistance provided will be required because of Peru's corruption and its poor human rights record." The agency noted that US military officials warned that Peru's military "would attempt to use US aid for counterinsurgency missions unless the aid was closely monitored." (53)

Similar concerns about US military aid to Colombia were expressed by the GAO in a another report issued that same year. Top Defense and State Departments officials in the US Embassy assured the agency's investigators that "the United States will not tolerate the aid being used under the guise of counternarcotics to fight insurgents and kill innocent civilians." (54) Nevertheless, the GAO reported, "The State and Defense Departments had not developed policies or procedures for monitoring counternarcotics assistance to Colombia's military." (55)

In 1993, the GAO issued another study on Colombia's counter-drug efforts in which it reported continued problems with end-use monitoring of US-provided military equipment. At that time, GAO investigators also criticized the State and Defense Departments for failing to coordinate their aid programs with each other "to ensure that equipment is provided in an efficient and effective manner." This lack of coordination resulted in the Colombian military receiving equipment it could not use, including machine gun ammunition that was not compatible with the aircraft guns it was to be used for and rockets that could not be fired properly because of faulty launcher motors." (56)

 Four years later, end-use monitoring remains a serious impediment to US counternarcotics operations, according to the GAO's February 1997 report.
Various forms of human rights conditionality have been placed on security-related antinarcotics assistance over the years. The most recent conditions for receiving antinarcotics aid are in an amendment to the law appropriating foreign aid for FY1997. It stipulates that no antinarcotics assistance can be "provided to any unit of the security forces of a foreign country if the Secretary of State has credible evidence to believe such unit has committed gross violations of human rights unless the Secretary determines...that the government of such country is taking steps to bring the responsible members of the security forces unit to justice." The Clinton administration has stated its intention to apply this human rights conditionality to all security assistance provided for antinarcotics purposes, including that provided through EDA and drawdown authority.

Shortly after this amendment became law, information released by Amnesty International USA and Human Rights Watch/Americas drove home the importance of the legislation. Documents obtained from the US Embassy in Colombia confirmed that in the early 1990s, the US provided assistance to units of the Colombian armed forces implicated in some of the worst human rights atrocities committed at that time. In fact, the legislation has caused a furor with regards to aid to Colombia. Throughout the first half of 1997, the Colombian army - slated to receive US military aid in 1997 for the first time in several years - refused to sign an agreement pledging to abide by the amendment. On May 7, 1997, the US Ambassador to Colombia told WOLA that "the Colombian army will not get any equipment based on its attitude so far." He also admitted that "we will never be able to say for certain how US assistance is being used."  Nonetheless, on August 1, 1997 the US government announced that an agreement had been signed between the US and Colombian government in which the latter agrees to abide by Washington's human rights requirements, thereby allowing the aid to the army to go forward. Many questions remain, however, as to what mechanisms will be put in place to ensure compliance.

**VII. Detection and Monitoring: The Pentagon's Meat and Potatoes**

The controversies on Capitol Hill surrounding the Andean strategy belied the fact that it was just a small part of the US government's international drug-control program. The flow of US military personnel and equipment to the Andean region drew much attention, but it was mere trickle compared to the resources the Pentagon was spending on its congressionally mandated role as the lead US agency for the detection and monitoring of air and maritime shipments of illegal drugs into the United States. This surveillance function (58) consumed, by far, the greatest amount of DOD counter-drug resources (see Table 2). And while the detection and monitoring mission stretched from the source countries to the US border, efforts were concentrated in the drug transit zone encompassing the Caribbean and eastern Pacific. (59) Moreover, as the Andean strategy failed to achieve its desired results, the Bush administration pointed increasingly to transit country interdiction as the panacea for the nation's drug problems.

Carrying out detection and monitoring allowed the Pentagon to employ many parts of its vast intelligence network. In response to the directives of the FY1989 defense appropriations bill, DOD planners decided that the Defense Intelligence Agency (DIA), which provides military intelligences and coordinates intelligence activities of the Army, Navy, Air Force, and Marines, would "concentrate on developing the necessary data bases, automation, communications, and collection management necessary to improve the foreign intelligence contribution." Emphasis was placed on supporting the DOD's role as the lead agency for the detection and monitoring of drug trafficking outside of the United States, and DIA analysts were also tasked with "identifying the overall structure" of the Latin American narcotics trade." (60) Although the Pentagon maintains the largest intelligence network among US agencies, the DEA and, more importantly, the Central Intelligence Agency (CIA) are also mandated to play a key role in compiling intelligence for the drug war.

Until DOD was mandated the lead agency for drug surveillance, detection and monitoring of drug trafficking was sporadic, as the civilian agencies that had been charged previously with the task lacked the aircraft and ships needed for continuous surveillance. The Pentagon, however, was able to supply the resources necessary to conduct near continuous surveillance of the primary trafficking routes. Using ground-based and aerostat (tethered balloon) radars, airborne early warning aircraft, and radar-equipped ships, DOD sought to layer fixed and mobile radars as close as possible to source countries.

The personnel and equipment resources required to conduct this mission were enormous. As a commander of one of the regional joint task forces assigned to this mission told the Senate Armed Services Committee in March 1992:

"Our level of effort is substantial. On any day of the year, 24 hours a day, we have about nine ships, 22 aircraft...and 3,000 military personnel deployed in the theater. We use about 4,000 ship days and 38,000 flight hours. To put that in perspective, for you, that is about the equivalent that we would have expended over a year on the Sixth Fleet deployment in the Mediterranean - a substantial commitment." (61)

The financial commitment was staggering, largely because state-of-the-art military surveillance is inherently expensive. The assets being used for the detection and monitoring mission were extraordinarily costly to operate and maintain. The Air Forces's E-3 Airborne Warning and Control System (AWACS), for example, had an estimated

direct operating cost of $4,200 per hour and associated overhead ran this cost to almost $10,000. (62)

Beginning at $212 million in 1989, DOD's detection and monitoring budget mushroomed to more than $950 million in 1992, the peak year for spending on this program. During that same period, the Pentagon's overall spending on its counternarcotics mission jumped from $501.6 million to $1.14 billion. Spending on surveillance grew rapidly, as the GAO pointed out, "despite the lack of clear-cut objectives." As a result, the eventual cost of the program grew "out of proportion to the benefits it provide[d]." (63)

DOD's inventory of radar-equipped ships and aircraft was a major reason for giving the Pentagon the lead detection and monitoring role, but it soon discovered that many of these assets were intrinsically ineffective in combating the drug smuggling threat. As the GAO pointed out in a scathing 1993 report, "Sensors designed to detect large supersonic aircraft and nuclear-powered submarines are less proficient against low-flying planes and small wooden boats." Agency investigators reported that these problems were exacerbated by the "absence of intelligence tips" necessary to sort out smugglers from the considerable legitimate maritime traffick heading toward the United States. (64) Moreover, drug traffickers quickly adopted new tactics and routes - as interdiction efforts in the Caribbean intensified, other US agencies reported that the bulk of cocaine traffic entering the United States began coming overland through Mexico. Yet DOD continued to expand air and maritime surveillance.

Before DOD stepped up its surveillance efforts, researchers at the Rand Corporation - questioning the assumptions underlying the supply-side approach to drug control - cautioned the Pentagon that "a major increase in military support is unlikely to significantly reduce drug consumption in the United States" due to the profit structure of drug trafficking. Their conclusion was driven by estimates that "only about 10 percent of the final price of cocaine comes from smuggling costs and profits." (65) As such, drug traffickers could cover losses incurred as a result of interdiction without having to raise the consumer price of their product, contradicting the premise that increased interdiction leads to higher prices which lead to lower demand, the reasoning cited most frequently by interdiction advocates.

DOD's drug surveillance activities illustrate a critical point about the war on drugs - performance and effectiveness are not synonymous. It is a distinction that advocates of further militarization still do not make, allowing them to declare small, tactical successes "victories," even though they contribute little, if anything, to the ultimate objective of the drug war - reducing domestic drug use. Pentagon officials frequently cite such indicators as their high level of effort, praise from their colleagues in law enforcement, and increasing drug seizures and arrests. But, the level of effort is an indication of their commitment to the mission, not its success. Neither are increased arrest and drug seizures accurate measures of effectiveness, because they may reflect increases in drug trafficking, rather than an actual reduction in drug availability.

## VIII. Source Country Shift

Congress began cutting funds for DOD's detection and monitoring mission in 1993, trimming more than $110 million from the previous year's record level of spending $962 million. But it was a decision by President Clinton late that year that resulted in a drastic reduction in detection and monitoring funding and another shift in the focus of the Clinton administration's drug control strategy for Latin America and the Caribbean.

Following a seven-month review of the US counter-drug strategy completed in November 1993, Clinton issued a Presidential Decision Directive (PDD-14) that shifted the emphasis from the interdiction of cocaine as it moved through the transit zones to stopping it at its source in Bolivia, Colombia, and Peru.

Despite the steady increase in coca production since the Andean strategy was launched, the Clinton administration refocused anti-drug efforts on coca plants, the leaves of which are mixed with chemicals to make cocaine. Because fewer alternatives exist for growing coca than for any other link in the drug trafficking chain, argues Robert E. Brown, Office of National Drug Control Policy (ONDCP) deputy director for supply reduction, source country operations should focus more on crop eradication and substitution programs than on the disruption of processing and transportation. (66) ONDCP recently announced its intention to eliminate worldwide coca production within ten years, a laughable proposition at best and an invitation to direct US intervention in coca-growing regions at worst.

Coca substitution programs are expensive, and Brown and other US officials acknowledge that because Washington is unable to pay the tab it is encouraging its Latin American allies, most of whom have other development priorities, to seek assistance for crop substitution programs from multilateral institutions. The ability of these institutions to shoulder the burden is also questionable. The annual budget of the United Nations Drug Control Program (UNDCP), for example, is about $70 million, or about half of the State Department's international narcotics funding in FY1996. In 1995, UNDCP could provide just $2.2 million in supplemental funding to Peru, compared to an estimated $15 million provided by Washington. (67)

The Clinton administration's announced shift in strategy touched off a battle between the Republican-controlled Congress and the White House over US drug control policy, which reached a fevered pitch in 1996, an election year, and still rages today. Republicans seek to blame the increasing flow of cocaine into the country on the President's decision to reduce transit zone interdiction efforts. Clinton administration officials counter by arguing that Congress cut back funding for interdiction faster than the White House had originally proposed, while failing to provide the full funding requested for source country programs.

As DOD funding for counternarcotics activities in the transit zone fell from a high of $504.5 million in FY1992 to $214.7 million in FY1995, source country funding grew during the same period but at a considerably slower rate, rising from $120.7 million to $153.3 million. But even with the change in US strategy, total funding for source country programs - including DOD, DEA, Customs Service, and State - fell by $35.8 million between FY1992 and FY1995. And, at $230 million, the 1995 total was less than half the total amount being spent in the interdiction zones. This reflected congressional cuts in the overall budgets of all the agencies involved.

To accommodate the reduction in transit zone funding, between December 1994 and November 1995, the Pentagon deactivated three aerostat radars in the Bahamas, two Caribbean Basin Radar Network sites, two mobile tactical radars, and other equipment. Even though the Pentagon brought on line two relocatable over the horizon radars (ROTHRs) in Virginia and Texas, the cutbacks resulted in a significant reduction in US surveillance capabilities in the Caribbean and Gulf of Mexico. The number of ship days devoted to drug interdiction also declined, falling from a high of 4,448 in 1993 to 2,845 two years later (68) (see Table 2).

The Clinton administration has attempted to offset transit zone funding cuts by encouraging greater cooperation from its Caribbean allies, but it efforts have been met with strong resistance from leaders concerned about a further erosion of their national sovereignty. Although Trinidad and Tobago quickly agreed to a "hot pursuit" treaty, Barbados and Jamaica were both strongly opposed to attempts by Washington to forge bilateral antinarcotics agreements that would allow US forces to pursue suspected drug traffickers within the territorial waters and airspace of another country, and only recently signed treaties after intense US pressure. (Barbados has enacted the treaty, but the Jamaican Congress has yet to pass enabling legislation.) Regional leaders accused the United States of using "unfounded allegations, innuendoes and the threat of punitive measures aimed at the economic welfare of Caribbean states" in its efforts to force them to provide the carte blanche for hot pursuits. (69)

At the same time that it was cutting resources dedicated to transit zone interdiction, where US efforts are aided by British, French, and Dutch naval forces, the Clinton administration sought to strengthen interagency coordination of interdiction efforts. PPD-14 ordered a review of the nation's counternarcotics command and control intelligence center, leading to the April 1994 creation of several joint interagency task forces (JTIFs) made up of representatives from DOD, DEA, Customs, US Coast Guard and other federal agencies. The JTIFs, which expanded the idea of the joint task forces (JTFs) that several unified commands had established earlier, were set up in five locations: Key West, Florida (JIATF-East), where a new, \$13.5-million command center was built; Alameda, California (JIATF-West); Howard Air Force Base, Panama (JIATF South); March Air Force Base, California (Domestic Air Interdiction Coordination Center); and Fort Bliss, Texas, which kept its original name, JTF-6.

Nonetheless, problems persist with coordination between the myriad of government agencies involved in overseas antinarcotics efforts. A "lack of coordination and clear statements of responsibilities" created confusion among those charged with intelligence analysis and related operational plans," one GAO investigator told Congress in June 1995. (70) A study conducted by a SOUTHCOM Analytic Support Team was even more scathing in its criticism. With the DOD "barely on speaking terms with its number one customer - DEA," in many areas of Latin America, the report says, it "is the equivalent of two battalions going into combat, with one having the bullets and the other having the guns." (71) A former Army intelligence analyst who contributed to the report said the problems identified previously "remain unaddressed."(72)

## IX. Attacking the "Air Bridge"

While the Pentagon continues to spend more money on transit zone interdiction programs and assistance to domestic law enforcement agencies, most of DOD's energy, at least in terms of public promotion, is now being spent on source country programs, and in particular its attack on the so-called "air bridge" that connects coca growers and coca paste manufacturers in Peru and Bolivia with Colombian cocaine refiners and distributors. (73) The aim is to interdict drugs before they enter the transit zone. By targeting the small aircraft that ferry coca paste from Peru and Bolivia to Colombia for refining, US military planners argue, coca farmers will no longer be able to get their product to the "market," thus driving down the price paid for coca leaf to growers and forcing them to convert their coca fields into farms for more lucrative, licit crops. At the same time, it will drive up the cost of transport for Colombian drug traffickers, an increase that will then be passed on to US consumers, who will be discouraged from using cocaine by the higher price.

This strategy temporarily became entangled in a dispute over policies adopted by the Peruvian and Colombian governments - with strong US encouragement - to shoot down planes of suspected drug traffickers. When Colombia announced in early 1994 that it too, like Peru, would adopt a shoot-down policy, some US officials in Washington became concerned that the policy would violate international law. After the US Justice Department ruled that "US officials who knowingly provide information that leads to the shooting down of civilian aircraft could be subject to criminal prosecution," DOD halted the sharing of "real-time" aircraft tracking information with Colombia and Peru in May 1994. (74) Congress responded that fall by providing official immunity for authorized US personnel engaging in assisting foreign countries in anti-drug aircraft interdiction as part of the FY1995 DO D Authorization Act.

Freed of legal constraints, the Pentagon began its attack on the air bridge in early 1995 by supplying the Peruvian and Colombian armed forces with sophisticated radar and surveillance equipment. By October of that year, these efforts had evolved into a formal, classified mission dubbed Operation Green Clover, a three-month operation in which more than 300 US soldiers, sailors, airmen and Marines worked in tandem with forces from Peru, Colombia, Ecuador, Panama, Costa Rica, and Venezuela. "We assist with what we call the 'end game,' which is the actual capturing of a plane, but it is the host nations themselves that do any chasing or shooting," explained Brig. Gen. George Close, SOUTHCOM's Director of Operation, who noted that Green Clover marked "the first time that we have had this level of multinational cooperation between allied nations." (75)

SOUTHCOM officials also point to Green Clover's success in terms of disrupting the air bridge, but reports on the extent of this success vary. According to the command's own newspaper, Tropic Times, the operation "resulted in the shooting down of 27 drug-smuggling aircraft by allied nations" (76) When touting the success of Green Clover three months later, then-Secretary of Defense William Perry said, "Twelve drug-smuggling aircraft were interdicted or shot down by allied nation forces during the operation." (77) (Reports on the daily number of drug trafficking flights between Peru and Colombia vary, but Peruvian analysts claim that there are several a day.) Nonetheless, the "superbly executed military operation" led to an expansion of the source country strategy, according to its self-proclaimed "principal architect," Gen. Barry McCaffrey. (78)

In April 1996, a month after McCaffrey stepped down as SOUTHCOM's Commander to become national drug czar, DOD announced the launch of its successor mission, Operation Laser Strike. As part of the on-going operation, US military personnel work cooperatively with nine Latin American countries, operating ground-based radar sites, flying detection and monitoring aircraft, including C-130 Hercules, P-3 Orion, and E-3 Sentry AWACS, and providing operation and intelligence support to host nation forces. While the air bridge between Peru and Colombia was the sole focus of Green Clover, Laser Strike expanded the source country strategy to include operations aimed at disrupting the river and coastal smuggling routes developed by drug traffickers as an alternative to air transportation in neighboring Ecuador, Venezuela, and Bolivia, as well as in Peru and Colombia.

As of October 1996, McCaffrey told Congress, "on any particular day, there are about 20 US Coast Guard, Customs, and DOD aircraft involved in source country operations. Approximately 300 additional military personnel are deployed in South America supporting Operation Laser Strike." (79) The DEA and CIA also assist the operation. According to McCaffrey:

"The results of this multinational , cooperative effort have yielded stunning tactical results. The so-called "air bridge" between Peru and Colombia saw a greater than 50-percent temporary reduction of flights as aircraft were intercepted and, in some cases, shot down. The cost of shipments increased five-fold, as pilots demanded more money as their personal risk increased dramatically. Movement was reduced so dramatically that there was a glut of coca base on the market and the price of the product being shipped fell by 50 percent overall and as much as 80 percent in some areas." (80)

In the 12-month period beginning in April 1, 1996, air and ground-based radar used as part of Laser Strike tracked 45,000 total aircraft, of which 5,390 were "tracks of interest." Of these, only 150 were suspected of being involved in drug trafficking, with 21 "suspected" planes eventually either forced or shot down - the exact disposition is "classified." (81)

The "success" of the air bridge attacks is touted widely by the Clinton administration, even as the flow of drugs into the country continues to rise and South American coca and poppy production expand. While acknowledging that these operations have had no impact on the availability and price of cocaine in the United States, a high-ranking National Security Council (NSC) official still argued that the administration has "been successful to an extent that no one has had before." By dramatically reducing the profits from coca leaf production, farmers are now "more open" to growing alternative, licit crops, he explained, adding that intelligence reports indicate there has been "significant abandonment of coca field in Peru." (82)

The administration's assertion that coca production in Peru in 1996 fell precipitously - 18 percent according to its figures - is not in dispute. What is in dispute are the reasons for that fall. Coca fields continue to be abandoned due to the spread of a fungus that has plagued coca production in Peru in recent years. (In fact, Peruvian coca farmers have been clamoring for years for economic support in order to switch to alternative crops.) In addition, Peruvian coca and cocaine base has traditionally been purchased by the Cali cartel; hence, coca production in Peru was significantly affected by the Colombian government's gains against the Cali cartel, most of whose leadership is now behind bars. More important, Colombian drug analysts point out that Colombian traffickers have sought to "verticalize" the cocaine industry by eliminating the need to transport a raw material, coca or cocaine base, from other countries. As a result, coca production in Colombia increased by a whopping 32 percent last year alone, according to the US government's own figures. Colombian traffickers are now importing and promoting production of the most potent variety of Peruvian coca, from the Tingo Maria region, to Colombia. Finally, administration officials themselves note that as a result of the "successful" air interdiction program, more cocaine-related products are transported by river - hence the need for more resources for greatly expanded riverine interdiction programs.

The GAO has questioned the potential effectiveness of the air bridge strategy, pointing out that the Pentagon has failed to evaluate and apply lessons learned from past counternarcotics efforts. In a February 1997 report, the GAO claims that this failure is one of the long-standing organizational problems that hinder US international efforts. Even though the current strategy to attack the Andean "air bridge" is similar to past operations in the region, they note, SOUTHCOM personnel admitted that they "were not aware of the problems that had been encountered, or of the solutions developed in the early 1990s when planning the current operation." This lack of institutional memory was blamed on the continual turnover of personnel and the requirement to destroy most classified

documents and reports after five years. SOUTHCOM claims to have attempted to resolve this problem by instituting a new after-action reporting system; (83) however, the underlying problems go well beyond better reporting requirements.

## X. Domestic Duty?

Source-country programs and transit zone interdiction encompass just three of the five "strategic elements" of DOD's current counter-drug strategy - detection and monitoring, source country support, and disruption of drug trafficking organizations. Of the remaining two elements, it is assistance to domestic law enforcement agencies that consumes the most resources, while creating the greatest controversy. (The fifth goal, demand reduction within the United States, including the military itself, was allocated $87.8 million in FY1997, barely 9 percent of DOD's overall counternarcotics budget.)

Since the National Guard was first called in to help eradicate marijuana in Hawaii in the late 1970s, the military's involvement in domestic counternarcotics work has grown dramatically (see Table 3).

Expansion of the military's domestic role was based on the same premise that fuels the expansion of its international anti-drug mission - it had the right personnel and equipment. The March 1990 discovery of a tunnel running under the US-Mexico border in Douglas, Arizona, is touted by Army officials as a example of how their domestic antinarcotics work is a good match of team and task. After Customs officials had been frustrated for months in their search, Army personnel, using skills honed in Korea, found the tunnel in "only a matter of hours," leading to the seizure of two tons of cocaine and 14 tons of marijuana. (84)

US military forces are linked with domestic law enforcement through JTF-6, a component of FORSCOM, the command charged with coordinating US Army forces inside the United States. Headquartered at Fort Bliss, Texas, just outside El Paso, JTF-6 is at the most critical front of the drug war - the 2,000-mile border with Mexico, across which an estimated 70 percent of the cocaine enters the country. To promote its partnership with civilian forces, JTF-6 circulates to police departments an operation support guide "marketing the use of Green Beret units, Navy SEAL teams and Marine reconnaissance patrols." (85) Apparently, its personnel are excellent salesmen.

In 1995, according to The Washington Post, more than 8,000 active-duty and reserve military personnel - "a force almost equivalent to an infantry division" - participated in 754 domestic counter-drug operations, ranging from high-tech monitoring of drug smugglers along the border to the translation of telephone conversations garnered by DEA eavesdropping. Military personnel also routinely assist domestic law enforcement by inspecting airport cargo, tracking money laundering operations, and providing equipment, such as high-intensity lights, to disrupt street-level drug trade. (86)

As with its international counternarcotics operations, the Pentagon says it follows strict rules designed to keep its active-duty personnel out of trouble, both physical and legal. JTF-6 officials stress that in all cases where "a confrontation with potential smugglers is likely" military personnel are accompanied by the law enforcement agency that requested their support and they do not participate in any subsequent seizures of arrests. Additionally, they say, "care is taken not to maintain intelligence on US citizens." (87) The thousands of National Guard troops who assist law enforcement agencies, however, have much more latitude in undertaking their mission because they are not covered by

Posse Comitatus, unless they are called up for federal duty. As part of its embrace of the domestic drug mission, DOD approved the National Guard Bureau's creation of a National Interagency Counterdrug Institute in California in 1990.

The growth in drug-related violence along the US-Mexico border has many people calling for active-duty military personnel to be given similar flexibility to that enjoyed by National Guard troops. At a July 1996 Senate hearing, a Texas rancher pleaded for federal protection against, as one Senator put it, the "heavily armed Mexican drug gangs [that] terrorize them in broad daylight." A number of lawmakers responded by indicating they might support an increased military presence, including Sen. Dianne Feinstein of California, who said she was nearing the opinion that it would take expanded military involvement "to stop these incursions" along the border. (88) Such an expansion would require further amendment of Posse Comitatus. But, as one JTF-6 official notes, "if Congress can authorize military protection of guano deposits - an actual authorized Posse Comitatus exception - then permission to accompany law enforcement agents onto private land or to give active-duty forces authority to examine inbound cargo is distinctly possible." (89)

Legislation presently pending before the US Congress would do just that. Rep. Jim Traficant (D-OH) presented an amendment to DOD's Authorization Act that would authorize the Pentagon to send up to 10,000 troops to the border to "assist...in preventing the entry of terrorists, drug traffickers and illegal aliens." At the time of this writing, the legislation has passed the House of Representatives and is pending in the Senate. If passed, Traficant's proposal would dramatically escalate the US military presence along the border with Mexico. While at this point it does not look like the amendment will survive final passage, Traficant's initiative provides a powerful symbol of the dangers inherent in militarizing the drug war and the politics surrounding that militarization.

Such a development could pose a significant risk for the US population living along the border. On May 20, 1997, Esequiel Hernandez Jr. was killed by a US Marine Corps unit engaged in anti-drug surveillance along the US-Mexico border. According to press reports, the 18-year old US citizen, was a well respected, gentle, studious high school student. He was herding goats near his home town when he was stalked and shot, and allowed to bleed to death. Hernandez is not implicated in any drug-related crime. The marines claim that he fired shots in their direction; he carried an old rifle he inherited from his grandfather to protect his goat herd. However, the marines were in camouflage, did not identify themselves and the community was not aware of their presence. No civilian law enforcement officials were present when the killing occurred. Evidence provided in press reports indicate that it was not a typical case of self-defense; a grand jury proceeding is about to get underway in the first shooting of a US citizen by a member of a military drug-surveillance team.

"What are these Rules of Engagement?" A local resident asked in response to the official response to the killing. "We had no idea we were being engaged in the first place. I was amazed when I heard that the military was walking around the hills in our back yard." (90) The marines implicated were part of JTF-6, described above, based at Camp Pendelton. In response to the killing, and the trial underway, on July 29 the Pentagon withdrew indefinitely the 240 military personnel who had been stationed along the 2,000-mile border. Pentagon spokesman Kenneth Bacon stated:

"The entire policy is now under review, and that review has several elements in it. One is whether it's appropriate for troops to be involved in border patrol activities. Another is, if

it is appropriate for them to be involved in border patrol activities, what are the proper operating procedures for them?" (91)

Critics of military involvement in domestic law enforcement activities point to the risks involved in having troops trained in war tactics confronting US citizens in non-wartime situations. Even Lt. General Carlton W. Fulford, Commander of the 1st Marine Expeditionary Force at Camp Pendelton, admitted, as reported in The Washington Post, that "the killing might not have happened had civilian law enforcement agencies patrolled the border." (92)

## XI. Looking to the Future

While it is too soon to evaluate the impact that the Hernandez killing may have on some lawmakers interest in expanding the military's domestic counternarcotics role, Pentagon officials are more interested in sustaining and building on the initial success of the air bridge strategy, and their focus is Peru, where drug traffickers adapted to stepped up air interdiction in part by shipping their goods via the 8,600-mile network of Amazonian tributaries. "Peru is the center of the source, and its heart," former SOUTHCOM Commander, Gen. Wesley K. Clark, explained. "And riverine interdiction is the heart of the next important step in disrupting the supply." (93)

In January 1997, Peruvians signed an agreement with Washington for a $15-million riverine interdiction program, under which they will receive three patrol boats, four light aircraft, communications equipment, and training. The Pentagon, however, is seeking to establish a riverine interdiction program on a much grander scale, according to press reports. DOD's preliminary plans include supplying Peru, where an estimated 80 percent of the cocaine consumed in the United States originates, with more than 100 patrol boats outfitted with M-60 machine guns, satellite-linked tracking and communications equipment. Additionally, "scores" of Navy SEAL and Green Beret trainers would make regular visits to the Peruvian jungles, and US personnel would to pilot light aircraft to guide Peruvian police and navy forces plying the waterways. (94)

Some Clinton administration officials, however, downplay reports of the large-scale riverine plan for Peru, a program which The New York Times said "could eventually bring a significant expansion of United States military involvement in anti-drug efforts in Latin America." (95) Nor is it clear whether sufficient funding could be obtained to finance such a large operation. It is "just one of a number of proposals" under consideration by military planners, according to one NSC official, and nothing has been agreed to beyond the January accord to supply Peru with a small number of light aircraft and patrol boats. (96) Even that proposal, however, evokes concern from human rights groups, due to the Peruvian navy's abysmal human rights record. Almost all of the "disappearances" documented in recent years by Peruvian human rights groups have allegedly been carried out by the navy. In not one case has a serious investigation or prosecution moved forward.

According to press reports, the Clinton administration may also be considering plans to create a regional anti-drug air force using US aircraft and foreign pilots. The Dallas Morning News reported that the NSC is considering a $400-million proposal to transfer more than 70 US war and surveillance aircraft being retired by the Pentagon to Colombia, Mexico, Venezuela, Brazil, Peru, and Ecuador. (97) Although Clinton administration officials downplay this report, it does dovetail with proposals to create a multilateral drug base to be located in Panama.

In fact, Panama has been at the focus of much speculation about the future course of the US drug war in the hemisphere because Washington has agreed to vacate its eight remaining military bases in there by the end of 1999, when that nation takes over the Panama Canal. As part of the US withdrawal, SOUTHCOM is set to move its headquarters to Miami, Florida. Despite the withdrawal requirement of the 1979 Panama Canal Treaty, ACOM Commander Gen. John Sheehan said in June 1996 that he expected about 4,000 US troops to remain in Panama after 1999 to help fight narcotics trafficking, and a few months later Congress gave the Clinton administration authority to negotiate such an extension.

While most US military planners downplay the impact of the withdrawal from Panama, DOD's Sheridan is less sanguine, openly expressing concerns about the Pentagon's loss of its Latin America base. SOUTHCOM's move to Miami, he admitted, will make it more difficult for US forces to develop better relations with the region's militaries because it is "culturally critical" for the commander-in-chief to "live and breath in the theater" to which he is assigned. He also laments the loss of Howard Air Force Base, where an estimated 1,500 personnel currently support 8,000 flights annually. "It would be hard to pick a better spot out on a map" from which to support counter-drug operations in Latin America. (98)

In July 1996, Panamanian President Ernesto Perez Balladares proposed that a hemispheric Center for the Combat of Drugs be established at Howard Air Force Base, once the US troops remaining there are withdrawn. The plan was met by skepticism from officials in coca-producing countries and elsewhere, who are wary that the proposal, clearly backed by Washington, could lead to a regional strike force - under de facto US control - that would make international drug raids. "The balance of this relationship has been unfair," said Peruvian President Alberto Fujimori, insisting that an anti-drug accord must emerge from Latin America, with eventual US support, and not vice versa.(99)

Clinton administration officials in Washington initially claimed that while they "have been consulting" with the Panamanians on the regional counter-drug center proposal, "it hasn't gotten that far along." They emphatically deny that they have any intention to push for the creation of a regional drug-fighting force. Such claims, they maintain, are "being spun by those who are against an increased role for the military." (100)

But, according to former SOUTHCOM Commander Gen. Clark, the Panamanian proposal to establish a multilateral counternarcotics center holds "a great deal of promise." He points out that Colombia, Peru, Venezuela, and Ecuador already have taken the "logical first step" by assigning military liaison officers to Panama. Last March he stated that these countries, along with the United States, currently were involved in "informal discussions" with Panama aimed at creating a center that would "go beyond military support and handle the myriad of civilian and law enforcement activities" involved in counternarcotics operations. Clark, however, adds that even if these discussions are successful, any proposal that they yield would be subject to a national plebiscite in Panama. (101)

Since those statements, the proposal appears to have advanced significantly. On July 15 the Associated Press reported that, "after months of informal negotiations, Panama and the United States will begin talks later in July on establishing a regional anti-drug center," citing a Panamanian government statement. That statement added that the talks would seek to "establish a Multinational Anti-Drug Office with the participation of the United States." No reference was made to the participation of other countries in the talks or the

issue of a possible continued US troop presence at Howard Air Force base. (102)

## XII. Conclusion

Even as the Pentagon plans further expansion of its counternarcotics efforts, many within its ranks remain highly critical of the military's involvement in the drug war. Like their civilian counterparts, these critics question the underlying rationale for the mission, its effectiveness, and the impact it is having on the region's democratic institutions. They also challenge the strategy and tactics being used to carry out the mission, arguing that they work at cross purposes with the desired result.

## A Policy Doomed to Failure

For many military critics the parallels between the drug war and the Vietnam War are unmistakable. As one official put it, "Just as in Vietnam, the overwhelming advantages the United States possesses in technology, intelligence services, and military strength are not sufficient to overcome the political, economic, and social factors that influence the drug war." (103) The current situation is also similar to that during US involvement in Southeast Asia in that many people then thought that the US military should shoulder more of the burden, but in doing so it ultimately damaged US interests. And, as in Vietnam, it is "easier from a political standpoint to plunge ahead rather than conduct a serious reassessment." (104)

Moreover, a central lesson of Vietnam, according to military strategists, is the need to "win the hearts and minds" of the people in order to deny support to the opponent. With large segments of the rural populations in Bolivia, Peru, and Colombia economically dependent on coca cultivation, the effect of counter-drug operations is destined to be the opposite, pushing people into the arms of the enemy. Noting that each of the 150,000 cocaleros in the zone was a potential "subversive," a former Peruvian regional commander in the Upper Huallaga Valley warned, "Eradicate his field and the next day he will be one." (105)

DOD's counternarcotics operations in Latin America have also been hurt by its poor understanding of the Clausewitzian principle of attacking the enemy's "center of gravity," according to critics. If, as Clausewitz suggests, the "center of gravity" is the "hub of all power" and "the point against which all energies should be directed," then, by its own estimation, the Pentagon is fighting a foe whose defeat is improbable. SOUTHCOM officials have identified 14 "centers of gravity" in the drug war, including "narcoguerillas," coca farmers, drug labs, coca and poppy growing areas, and drug mafias, as well as drug users in the United States and Latin America. These many centers of gravity alone would indicate that the mission nears the impossible. Many analysts argue that the real "center of gravity" is the demand for drug in the United States, which creates the economic incentive to supply them. In which case, "the enemy in the drug war is not a foreign army of insurgency, but an economic market." (106)

The current supply-side approach is further hampered by the "balloon effect" of applying pressure one place only to see the problem pop up somewhere else. Perhaps an even more accurate description is the "hydra effect." As noted by analysts Eva Bertram and Ken Sharpe: "Like the mythical sea serpent that Hercules battled, the drug trade is an evasive enemy: Each time one of the hydra's heads is cut off, two more grow in its place." (107) Repeated counternarcotics operations have caused traffickers to diverify their supply routes, while sometimes forcing coca growers and processors to move their fields and

labs to more remote areas. The potential for controling the impact of the hydra effect on drug interdiction efforts is severely limited by the shear size of the geographic area involved. Peru, Colombia, and Bolivia combined are as large as the United States east of the Mississippi, and the Caribbean and Gulf of Mexico equal slightly less than half the land area of the United States. Despite the best intentions of the Pentagon and other US government agencies, all evidence points to a glut of coca, cocaine and heroin on the international and US markets.

**The Negative Consequences**

Beyond the failure of the drug war to date to stem the flow of illicit drugs into this country, US military personnel express concern about the unintended consequences of a drug war that has led Washington to forge closer ties with military forces that are among the worst human rights violators in the hemisphere. In calling for the demilitarization of US anti-drug efforts, one Navy commander cited a report on drug policy produced by an Inter-American commission that noted that the increased military role in drug enforcement in Colombia, Peru, and Bolivia resulted in "greater violence and increased violations of human rights." (108) Others warn that by tightening its alliance with local military forces, the US government undermines people's faith in civilian institutions at a time when democratic development remains delicate.

Clinton administration officials respond vociferously to suggestions that human rights and democratization take a back seat to the objectives of the drug war. They routinely stress that all counternarcotics training provided to the region's militaries includes human rights instruction and that all US personnel receive human rights training before they are sent to the region, where they are required to report any suspected abuses by their allies. But through the drug war, US assistance is provided prior to improvements in human rights performance or demonstrated political will on the part of aid recipients to hold accountable those responsible for abuses.

Washington works most closely with local military forces because there are few alternatives, explains ONDCP's Brown, noting that police in the region are "most typically corrupt because they are vastly underpaid." The alternative of strengthening civilian institutions to increase their effectiveness in countering drug trafficking "is not a viable approach anywhere in the near term." (109) However, as described above, the long-term consequences of increasing military involvement in the drug war may be even more detrimental to prospects for democratic consolidation and regional stability, both of which are fundamental for international drug control efforts to ultimately succeed. Calling out the troops may satisfy short-term needs to score political points at home, but it undermines efforts to reign in Latin American militaries and redefine their roles to encompass only traditional national defense. Nor is it clear that bringing in the military will allow local governments to circumvent the very real problem of corruption. As Bolivian President Gonzalo Sánchez de Lozado, who just completed his term in office, once put it succinctly: "When you have a corrupt chief of police, you fire him. When you have a corrupt chief of the army, he fires you." (110) The lack of accountability and transparency for the region's armed forces make routing out the inevitable corruption that accompanies anti-drug efforts even more difficult.

**What the Future Holds**

The future course of the Pentagon's counternarcotics efforts is unlikely to be shaped as much by the debate within the US military or the Clinton administration as it will be by

developments on Capitol Hill by those who control the purse strings. In the drug war, as DOD's Sheridan admits, the Pentagon does "what we have been told to do" by Congress. (111) Political pressure there for further militarization of the drug war is undeniable, with lawmakers displaying their enthusiasm by consistently providing DOD with more counternarcotics funding than the White House requests, including an additional $143 million in FY1997.

A senior staff member of the Senate Armed Services Committee observed, "There are people who want to send the 1st Infantry down there to take on the Cali cartel, the Medellin cartel, FARC, and everyone else." (112) However, he stressed that none of these calls is emanating from his committee or its House equivalent, the two bodies that have the most direct influence on military policy. One of the US Navy's highest ranking officials, now retired, also dismissed the heated rhetoric by noting, "When congressmen and senators sound off, it is usually 10 percent body and 90 percent odor." 113

How noxious the current stink becomes may depend on how effective general-turned-drug-czar McCaffrey is in his post. When Clinton named the Persian Gulf war hero and former SOUTHCOM Commander head of the ONDCP in March 1996, it was widely seen as a direct response to Republican election-year criticisms that the President was "soft" on drugs. And many people argued, some favorably, that the appointment presaged a further militarization of the drug war. Since taking office, however, McCaffrey has eschewed use of the war metaphor when discussing US anti-drug efforts, preferring to cast the enemy not as a military foe but rather a social "cancer" that requires a different sort of response. "At the end of the day, I would suggest that this actually isn't a war and it's not to be won by anybody's army," he told Congress soon after being named drug czar. "At the end of the day, prosecutors, law enforcement officers, teachers, school superintendents, religious leaders, that is who the front-line troops are." (114)

Nevertheless, while McCaffrey may be inclined to view the Surgeon General as the most appropriate commander for the overall US counternarcotics effort, it is clear that he believes there still is a vital role for US military forces to play. In a March 1997 speech at the Heritage Foundation, he reiterated his argument that the use of the war metaphor is inappropriate, but then quickly made an exception for Latin America, where "the language is pretty useful for us." (115) Despite General McCaffrey's rhetoric highlighting the problem of demand for illegal drugs, programs and resources have not shifted accordingly. The expanded ONDCP staff is stacked with his military proteges, and he has proven himself to be more adept at obtaining funds for his Latin American military allies than for domestic, demand-related programs. In fact, the Clinton administration continues to maintain the ratio of spending for supply and demand-side programs at approximately two to one.

The 1997 National Drug Control Strategy, the first the ONDCP has produced fully under his tenure, provides additional evidence that McCaffrey will keep US military personnel active in the fight against illegal drugs, both internationally and domestically. US forces and their regional allies must continue to "give the traffickers no quarter," the report urges, and to do so will require "taking aggressive action in source countries, throughout the transit zone, and at our borders." (116) But the plan also calls for carrying out these actions with less money, as the Clinton administration has proposed giving the Pentagon $808.6 million for counternarcotics programs in FY1998, $150 million less than Congress provided in FY1997.

Since politics shapes the course of US policy more than the realities of the drug problem,

the future role of the military in solving this problem ultimately may be decided by which of two strong popular currents proves to be the most powerful, in terms of generating public pressure. The first is the deficit-driven mania to slash government spending, which raises the question of how long the public will tolerate the expenditure of nearly a billion dollars a year on DOD counternarcotics efforts that have yielded little in terms of reducing the demand for and availability of drugs in the United States. Will advocates of expanded drug treatment programs soon gain the upper hand in the debate with their arguments that such programs reduce demand at a fraction of the cost of interdiction, whether it takes place in the ever-expanding transit zone or source countries?

But defense spending traditionally has been the last area hit by the congressional budget ax, and this is a result of the second driving force, the near-childlike faith Americans have in the ability of their armed forces. "Americans want the cavalry to come to the rescue, as it did in so many movies they saw as children," and they believe the military solution the national drug problem will be relatively painless "precisely because it would occur outside the United States." (117) As long as the national drug control strategy continues its overwhelming emphasis on supply side controls, much of the action in the drug war action is guaranteed to occur beyond US borders under the Pentagon's command. The principal question that remains is how "aggressive" that action will be. The costs to democratization and human rights throughout the region will no doubt continue to be high.

### Appendix A

### The Pentagon's Drug Warriors

The US military currently is organized into nine Unified Combat Commands (UCCs), although the number is not fixed by law or regulation. Each of the UCCs, most of which are geographically defined, is made up of two or more military services and is subdivided into component commands. The following are the commands most directly and deeply involved in carrying out the Department of Defense counternarcotics mission in Latin America and the Caribbean.

### Southern Command

With approximately active 6,500 military personnel, SOUTHCOM is the smallest of the UCCs, but it plays the largest role in US counternarcotics operations, as "supporting drug suppression efforts" is a top priority. While the number of US troops in Panama peaked at nearly 75,000 during World War II, the ongoing US withdrawal will reduce that number to just 4,400 by September 1997. The command depends heavily on reserve and National Guard forces to carry out its mission, annually deploying more than 50,000 personnel from these forces throughout the Americas.

Its area of responsibility (AOR) stretches 6,000 miles from Mexico's southern border to Cape Horn. The command also has responsibility for security assistance to Mexico, even though it is outside its AOR, which is being expanded in 1997 as part of recently approved changes in the Unified Command Plan. In January, it assumed responsibility for the waters adjoining Central and South America, and as of June 1 it is responsible for an additional portion of the Atlantic Ocean, the Caribbean Sea and its island nations, and the Gulf of Mexico. The transfer of these areas, previously part of ACOM's AOR, to SOUTHCOM will allow the US military to "synchronize and unify all counter-drug activities in the transit and source zones," according to Gen. Wesley Clark, who until

recently was commander in chief. As part of the US withdrawal from Panama, the command will be moving its headquarters to Miami this year.

Primary elements of SOUTHCOM include an Army light infantry brigade, Army aviation brigade with helicopters and fixed-wing aircraft, Navy special warfare unit, and Air Force medium airlift and tactical aircraft. The command's facilities in Panama include Howard Air Force Base, home of the Air Force's only short take-off and landing squadron, a vital support unit in an AOR where "the vast majority of airstrips are dirt strips less than 2,000 feet long." The Air Force component of SOUTHCOM also currently operates ground-based radars in Iquitos, Peru; Pucallpa, Peru; Leticia, Colombia; and Marandua, Colombia. Naval personnel, from the US Atlantic Fleet, operate the Naval Small Craft Instruction and Technical Training School at Rodman Naval Station in Panama, where Latin American military forces receive instruction in riverine operations and small-craft maintenance. Based at Fort Clayton, Panama, the Army component runs a Jungle Operations Training Center, the only US center of its kind.

The Army and Air Force have some 500 personnel permanently assigned to and temporarily deployed with Joint Task Force Bravo, located at Soto Cano Air Base, Honduras, whose mission includes support for multilateral counter-drug exercises and operations. Other subordinate commands that focus on counternarcotics operations include a Joint Inter-Agency Task Force (JIATF-South), which has representatives of DIA, DEA, US Customs Service, other federal agencies, and allied military services.

**Atlantic Command**

Recent revisions of the United Command Plan removed the drug transit zones from ACOM's area of responsibility. Nevertheless, the command continues to play a vital role in detection and monitoring operations through its component JIATF-East, headquartered in Key West, Florida. With the 1997 National Drug Control Strategy calling for stepped up efforts to close the Caribbean "back door" drug traffickers use as a route into the United States, the task force is certain to remain busy.

ACOM also plays a key role in the military's domestic counternarcotics operations through its subordinate commands, particularly US Army Forces Command (FORSCOM), which consists of more than 760,00 active Army, US Army Reserve and Army National Guard soldiers. FORSCOM, which coordinates military forces inside the United States, supports counter-drug operations along the southwest border through Joint Task Force (JTF-6), based at Fort Bliss, Texas. JTF-6 builds and maintains border fences, installs remote sensors, and conducts surveillance missions. Troops also assist domestic law enforcement by inspecting airport cargo, tracking money laundering operations, and providing equipment, such as high-intensity lights, to disrupt street-level drug trade.

**Pacific Command**

Geographically the largest UCC, PACOM's area of responsibility extends from the west coast of the United States mainland to the east coast of Africa, and from the Arctic Ocean to Antarctica. Subordinate commands directly involved in counternarcotics operations include JIATF-West in Alameda, California, and the Domestic Air Interdiction Coordination Center at March Air Force Base, California. In response to interdiction efforts in the Caribbean and Mexico, drug traffickers have turned to the vast open waters of the eastern Pacific, making them a primary transit route for cocaine entering the United States and drawing PACOM deeper into the drug war. The lack of natural choke points in

the Pacific shipping lanes makes interdiction even more problematic than it is in the Caribbean and Atlantic.

## Special Operations Command

The 46,000-plus members of the special operation force - mainly Army Green Beret and Navy SEALs - are assigned to both the Special Operations Command, which was activated in 1987, and to geographic commanders in chief. They serve in all regions of the world, including Latin America, where "on an average day" 200 people are deployed in nine different countries. US ambassadors in the region have hailed them as "truly the cream of our country's military" and "one of our country's great resources."

Center for Defense Information analyst David Isenberg notes that "SOC has long seen drug trafficking as an opportunity to justify its existence." Its personnel contribute to counternarcotics efforts both overseas and at home, where it provides listening/observation posts in remote areas along the southwest border. International counter-drug operations - undertaken as part of its foreign internal defense mission aimed at defending friendly governments against insurgency - provide support to the US ambassador and "country team," primarily through the DEA. According to Commander Gen. Henry H. Shelton, support includes: the use of Military Information Support Teams assistance for the development of public drug awareness programs in the host nation; training for host-nation counter-drug law enforcement personnel; intelligence analysis; and language proficiency and translation support "against major drug trafficking operations in the United States." Special forces personnel currently play a vital role in the riverine interdiction training in Peru, Colombia, and elsewhere.

## North American Aerospace Defense Command

A component of the US Space Command, NORAD is a binational United States and Canadian organization charged with monitoring and controlling North American air space. As part of its aerospace control mission NORAD assists in the detection and monitoring of aircraft suspected of illegal drug trafficking. It operates a network of ground radars to warn against high-altitude penetration of US airspace, while the coverage of low-flying aircraft is accomplished with land-based aerostat (tethered balloons) radar that form a detection fence along the southern border.

Sources: Department of Defense; Office of National Drug Control Policy; testimony of Gen. Wesley Clark and Gen. Henry H. Shelton before the Senate Armed Services Committee, March 11, 1997; and The Defense Monitor, Vol. XXI, No. 1, 1992.

---

**References**
1. Testimony of Gen. Wesley K. Clark before the Senate Armed Services Committee, 11 March 1997.
2. General Accounting Office, "Long-Standing Problems Hinder US International Efforts," GAO/NSIAD-97-75, February 1997.
3. Shear, Lt. Cdr. Wayne G., "The Drug War: Applying the Lessons of Vietnam," Naval War College Review, Summer 1994. p. 120.
4. Interview with Brian Sheridan, Principal Deputy Assistant Secretary of Defense for Special Operations and Low Intensity Conflict, April 1997.
5. GAO, February 1997, op. cit. p. 16.
6. Perl, Raphael, "Drug Control: International Policy Options," Congressional Research

Service Issue Brief, Updated 7 January 1997. p. 11.

7. See "Drugs Termed Funds Source For Terrorists," The Washington Post, 3 August 1984.

8. See "Military Urges Wider Drug War," The Washington Post, 20 June 1985.

9. Krauss, Clifford, "Pentagon to Help Peru Stop Drug-Base Shipping on Rivers," The New York Times, 3 February 1997. p. A3.

10. See "The Pentagon's War on Drugs: The Ultimate Bad Trip," The Defense Monitor, Vol. XXI, Number 1, 1992.

11. Ibid.

12. Sheridan, op. cit.

13. Bagley, Bruce, "Myths of Militarization: Enlisting Armed Forces in the War on Drugs," Drug Policy in the America, Westview Press, 1992. p. 131.

14. The US Coast Guard is an agency of the Department of Transportation, but the President has the authority to place the service under the command of the US Navy in times of war. It is charged with the enforcement of all federal laws on, under, and over the high seas and waters under US jurisdiction, and, unlike military personnel, its personnel have arrest powers.

15. Abbott, Col. Michael, "The Army and the Drug War: Politics or National Security?," Parameters, December 1988. p. 103. The first deployment of US military forces to suppress drug activities in Latin America and the Caribbean was conducted quietly in 1982, as first Air Force and then Army crews were used to man helicopters in the Bahamas as part of Operation BAT.

16. Fishel, Lt. Col. John T. "Developing a Drug War Strategy: Lessons from Operation Blast Furnace," Military Review, June 1991. p. 64.

17. Bryant, Major Leroy C., "The Posse Comitatus Act, and Drug Interdiction: Just How Far Can We Go?" The Army Lawyer, December 1990. p. 10.

18. Ibid.

19. Marsh, Harry L., "Law Enforcement, the Military and the War on Drugs: Is the military Involvement in the War on Drugs Ethical?" American Police Journal, Vol. X. No. 2 1991. p. 63.

20. The Defense Monitor. p. 3.

21. Personal interview with Rear Admiral Eugene J. Carroll (Ret.) , February 1997. A former Deputy Chief of Naval Operations, Carroll currently is deputy director of the Washington, D.C.-based Center for Defense Information.

22. The Defense Monitor. p. 1.

23. General Accounting Office, "Defense Spending for Counternarcotics Activities for Fiscal 1989-91," GAO/NSIAD-92-82, April 1992. p 24.

24. Marby, Donald J., "The Role of the Military," Drugs and Foreign Policy, Westview Press, Boulder, CO., 1994. p. 105.

25. Bagley, op. cit. p. 137.

26. Unified commands are geographically defined commands that are made up of two or more military services.

27. As a result of the biennial review of the unified command structure, conducted by the Joint Chiefs of Staff in 1995, the waters adjoining Central America and South America were shifted from ACOM to SOUTHCOM's area of responsibility. The change was justified, in large part, on the basis that it would eliminate problems in coordinating anti-drug efforts.

28. GAO, April 1992, p. 23.

29. Washington Office of Latin America, Clear and Present Dangers: The US Military and the War on Drugs in the Andes, , October 1991. p. 37.

30. According to a May 1990 article in The Philadelphia Inquirer, many of the same personnel who had become involved in the military component of the Andean strategy

were previously involved in US counter-insurgency campaigns of the 1980s in Central America. See Frank Greve, "Contra Advisers in Peru," 30 May 1990.

31. From State Department's 1997 Congressional Presentation Document for International Narcotics Control, and the State Department's 1997 International Narcotics Control Strategy Report Budget.

32. Lumpe, Lora and Paul F. Pineo, "Recycled Weapons: American Exports of Surplus Arms, 1990-1995," Federation of American Scientists, Washington, D.C., June 1996. p. 11.

33. Ibid.

34. Ibid. p. 18.

35. Marquis, Christopher, Tim Johnson, "US on front line of drug eradication," The Miami Herald, 4 December 1996. p. 20A.

36. Lamberson, Major Eric L., "The Tactical Analysis Team," Military Intelligence, January-March 1995. p.12.

37. Sheridan, op.cit.

38. WOLA, op. cit. p. 79.

39. Lamberson, op. cit.

40. Data supplied by Office of the Department of Defense Coordinator for Drug Enforcement Policy and Support.

41. Ibid.

42. Isenberg, David, "The Army vs. Cocaine," Old Oregon, Spring 1990. p. 26.

43. From interviews with public affairs officers at SOUTHCOM and briefing papers they provided.

44. Sheridan, op. cit.

45. Clark, op. cit.

46. General Accounting Office, "School of the Americas: US Military Training for Latin American Countries," GAO/NSIAD-96-178. August 1996. pp. 10-11.

47. Sheridan, op. cit.

48. Isenberg, op. cit.

49. Sheridan, op. cit.

50. Isenberg, op. cit.

51. Waller, Douglas, "Spy Mission Gone Wrong," Newsweek, 31 May 1993. pp. 34-35.

52. General Accounting Office, "US Programs in Peru Face Serious Obstacles," GAO/NSIAD-92-36, October 1991. p. 35.

53. Ibid., p. 33.

54. General Accounting Office, "Observations on Counternarcotics Aid to Colombia," GAO/NSIAD-91-296. p.24.

55. Ibid., p. 36.

56. General Accounting Office, "Colombia Is Undertaking Antidrug Programs, but Impact Is Uncertain," GAO/NSIAD-93-158, August 1993. p. 35.

57. Interview with WOLA Senior Associate Coletta Youngers at the US Embassy in Bogotá, 7 May 1997.

58. The terms "detection and monitoring" and "surveillance" are used synonymously in this report.

59. The General Accounting Office reported that, according to DOD, only about 12 percent of its counter-drug flying hours in 1992 were expended in the cocaine "source" countries in support of those nations' efforts to disrupt drug production and transportation.

60. Holden-Rhodes, op. cit. p. 61.

61. General Accounting Office, "Heavy Investment in Military Surveillance Is Not Paying Off," GAO/NSIAD-93-220, September 1993. p 23.

62. Ibid., p. 21.

63. Ibid., pp. 4, 15.

64. Ibid., pp. 29-30.
65. Reuter, Peter, Gordon Crawford, Jonathan Cave, "Sealing the Borders: The Effect of Increased Military Participation in Drug Interdiction," Rand Corporation, January 1988. Prepared for the Office of the Under Secretary of Defense for Policy. pp. xi-xiv.
66. Interview with ONDCP deputy director for supply reduction Robert E. Brown Jr. and Latin American analyst Alison Major. March 1997.
67. GAO February 1997, op. cit. p. 17.
68. Ibid., pp. 14-15.
69. MacSwan, Angus, Reuters News Agency, "Anti-drug efforts strain US ties to Caribbean nations," Washington Times, 13 January 1997.
70. Testimony of Joseph E. Kelley before the House Subcommittee on National Security, International Affairs, and Criminal Justice, GAO/T-NSIAD-95-182, 27 June 1995.
71. Holden-Rhodes, J.F., "Sharing the Secrets: Open Source Intelligence & The War On Drugs," University of Mexico Printing Services, 1994. p. 140.
72. Interview with J. F. Holden-Rhodes, March 1997.
73. In FY 1997, DOD allocated $304.6 million for detection and monitoring, $322.3 million to support domestic law enforcement agencies, and $181.5 million for source country support. Another $61.3 million was allocated for programs aimed at the "disruption of drug mafia organizations," many of which involve source countries.
74. Testimony of Joseph E. Kelley, director-in-charge of International Affairs Issues, GAO National Security and International Affairs Division, before the House Legislation and National Security Subcommittee, GAO/T-NSIAD-95-32, Oct. 7, 1994. p. 1.
75. Calkins, Staff Sgt. Chris, "Green Clover: Multinational effort disrupts flow of illegal drugs from South America," Tropic Times, 19 Jan. 1996. p. 5.
76. Ibid.
77. Press release from US Southern Command, "Secretary of Defense Announces Enhanced Counterdrug Operation," 27 April 1996.
78. Testimony of Gen. Barry R. McCaffrey (Ret.), director of Office of National Drug Control Policy, before the House Subcommittee on National Security, International Affairs and Criminal Justice, 1 October 1996.
79. Ibid.
80. Ibid.
81. Public affairs office of the US Air Force 24th Wing at Howard Air Force Base.
82. Personal interview with Peter Boynton, Director of Global Issues and Multilateral Affairs, National Security Council, March 1997.
83. GAO February 1997, op. cit. pp 15-16.
84. Brown, Major Dale, "Drugs on the Border: The Role of the Military ," Parameters, Winter 1991-92. p. 56.
85. McGee, Jim, "Military Seeks Balance in Delicate Mission: The Drug War," The Washington Post, 29 November 1996. p. A29.
86. Ibid.
87. D. Brown, op. cit. pp. 54-56.
88. "Border areas are overrun with drugs, ranchers says," The Miami Herald, 1 August 1996. p. 3A.
89. D. Brown, op. cit., p. 59.
90. Quoted in Howe Verhovek, Sam, "After Marine Patrol Kills a Teen-Ager, a Texas Border Town Wonders Why," The New York Times, 29 June 1997.
91. Quoted in Presley, Sue Anne, "Troops Pulled From Anti-Drug Patrols," The Washington Post, 30 July 1997.
92. Ibid.
93. Krauss, op. cit.
94. Ibid.

95. Ibid. Personal interview with Ted Piccone, Director of Latin American Issues, and Peter Boynton, Director of Global Issues and Multilateral Affairs, US National Security Council. March 1997.

96. Personal interview with Ted Piccone, Director of Latin American Issues, and Peter Boynton, Director of Global Issues and Multilateral Affairs, US National Security Council. March 1997.

97. LaGesse, David, "Anti-drug air force idea studied," The Dallas Morning News," 24 January 1997. p. 1A.

98. Sheridan, op. cit.

99. Johnson, Tim, Andres Oppenheimer, and Christopher Marquis, "Panama offers itself as regional anti-drug base," The Miami Herald, 19 July 1996. p. 17A.

100. Piccone, op. cit.

101. From testimony of before the Senate Armed Forces Committee, 11 March 1997, and a brief interview following the hearing.

102. Associated Press, "Panama-US talks to start on anti-drug base," The Boston Globe, 15 July 1997.

103. Shear, op. cit. p. 122.

104. Ibid., p. 117.

105. Ibid., p. 27.

106. Bertram, Eva, Kenneth Sharpe, "TheUnwinnable Drug War: What Clausewitz Would Tell Us," World Policy Journal, Winter 1996/97. p. 44.

107. Bertram and Sharpe, op. cit. p. 45.

108. Shear, op. cit., p. 118.

109. R. Brown, op. cit.

110. Quoted in Kahn, Thomas, "Bolivians Fear a US-led War on Drugs," The Wall Street Journal, 24 June 1991.

111. Sheridan, op. cit.

112. Interview with senior committee staff member who spoke on the condition of anonymity. March 1997.

113. Interview with Adm. Elmo Zumwalt. March 1997.

114. McCaffrey, Gen. Barry, "Hearings before Subcommittee on the Treasury, Postal Service, and General Government Appropriations," US House Committee on Appropriations, 17 April 1996. p. 328.

115. Barry McCaffrey speech at the Heritage Foundation, 19 March 1997.

116. Office of National Drug Control Policy, "The National Drug Control Strategy, 1997," February 1997. p. 55.

117. Mabry, 1990, op. cit.