DEA quietly ousted Mexico chief over ties to drug trafficker lawyers - Los Angeles Times



# Los Angeles Times

WORLD & NATION

# DEA quietly ousted Mexico chief over misconduct including ties to drug lawyers



Nicholas Palmeri was removed in 2022 as the DEA's top official in Mexico after a brief tenure marked by an increase in the flow of cocaine, heroin and fentanyl from Mexico into the U.S. and deteriorating cooperation between the countries.  (U.S. Drug Enforcement Administration)

BY JOSHUA GOODMAN AND JIM MUSTIAN |  ASSOCIATED PRESS

JAN. 27, 2023 6:01 PM PT

MIAMI —  The U.S. Drug Enforcement Administration last year quietly ousted its former top official in Mexico over improper contact with lawyers for narcotraffickers, an embarrassing end to a brief tenure marked by deteriorating cooperation between the countries and a record flow of cocaine, heroin and fentanyl across the border.

Nicholas Palmeri's socializing and vacationing with Miami drug lawyers, detailed in confidential records viewed by the Associated Press, brought his ultimate downfall after a stint of just 14 months as the DEA's powerful regional director, supervising dozens of agents across Mexico, Central America and Canada.

But separate internal probes raised other red flags, including complaints of lax handling of the pandemic, resulting in two agents having to be airlifted out of the country with COVID-19. And it was disclosed in recent days that Palmeri had approved the use of drug-fighting funds for inappropriate purposes, including seeking to be reimbursed for his own birthday party expenses.

"The post of regional director in Mexico is the most important one in DEA's foreign operations, and when something like this happens, it's disruptive," said Mike Vigil, the DEA's former chief of international operations.

"It's even more critical because of the deteriorating situation with Mexico," added Phil Jordan, a former director of the DEA's El Paso Intelligence Center. "If we don't have a strong regional director or agent in charge there, it works against the agency's overall operations, because everything transits through Mexico, whether it's coming from Colombia or the fentanyl that flows in through China. It cannot be taken lightly."

Palmeri's case adds to a growing list of misconduct roiling the nation's premier narcotics law enforcement agency at a time when its foreign operations — spanning 69 countries — are under scrutiny from an external review ordered by DEA Administrator Anne Milgram.

That review came in response to the case of Jose Irizarry, a disgraced former agent now serving a 12-year federal prison sentence after confessing to laundering money for Colombian drug cartels and skimming millions from seizures to fund an international joyride of jet-setting, parties and prostitutes.

Palmeri's is the second case in recent months to shine a light on the often-cozy interactions between DEA officials and Miami lawyers for some of Latin America's biggest narcotraffickers and money launderers. Last year, federal prosecutors charged a DEA agent and a former supervisor with leaking confidential law enforcement information to two Miami defense attorneys in exchange for $70,000 in cash.

One of those lawyers, identified by current and former U.S. officials as David Macey, was also implicated in the probe into Palmeri. Internal investigative records indicate that Macey hosted Palmeri and his wife for two days at his home in the Florida Keys — a trip that investigators said served no useful work purpose and violated rules governing interactions with attorneys that are designed to avoid even the appearance of impropriety.

Palmeri, 52, acknowledged to investigators that he had stayed at Macey's home; that his wife had worked as a translator for another prominent attorney, Ruben Oliva; and that the couple had taken an unauthorized trip to Miami in February 2021.

The purported purpose of the Miami trip was to "debrief" a confidential source. But it took place at a private home, where Palmeri showed up with his wife and a bottle of wine, according to the internal report.

"The meeting had the appearance of a social interaction with a confidential source," the investigators wrote, "and there was no contemporaneous official DEA documentation concerning the substance of the debrief, both of which violate DEA policy."

Those violations prompted Palmeri's abrupt transfer to Washington headquarters in May 2021 before he ultimately stepped down last March, the records show. Palmeri told investigators he had shown "not the best judgment."

ADVERTISEMENT

DEA officials would not discuss the specifics of Palmeri's ouster or why he was allowed to retire instead of being fired. But one official told the AP that the agency "has zero tolerance for improper contacts between defense attorneys and DEA employees."

"The DEA aggressively investigates this serious misconduct and takes decisive action, including removal, against employees who engage in it," said the official, who wasn't authorized to speak publicly and asked not to be named.

Palmeri described the misconduct investigations as a "witch hunt" prompted by personal and professional jealousies he refused to specify and "an ill-conceived narrative to remove me from my position."

He added that his relationships with attorneys had "always been professional and ethical," and that all of his expenditures in Mexico were "judicious" and benefited the U.S. government.

"It is ironic," Palmeri wrote in an email, "that the Department of 'Justice' would commit this injustice to the country."

Macey, one of the lawyers, did not respond to requests for comment. Another, Oliva, told the AP that the translation work Palmeri's wife did for him was "totally unrelated" to Palmeri and that he had "never met a more ethical, hardworking and highly effective drug enforcement agent."

Palmeri, a former New York City police officer, had raised eyebrows from the moment he arrived in Mexico in 2020.

Some agents complained that he had a near-obsession with capturing Rafael Caro Quintero, the infamous drug lord behind the killing of a DEA agent in 1985. They said Palmeri prioritized that over the agency's less-flashy efforts to stem the flow of Chinese precursor chemicals used to make fentanyl. Quintero was finally taken into custody last summer, months after the DEA recalled Palmeri to Washington.

Chris Landau, who oversaw Palmeri as U.S. ambassador to Mexico during the Trump administration, said that focus on Quintero and other such headline-grabbing arrests was characteristic of the DEA's broader failings in the drug war.

Landau cited the U.S. arrest in 2020 of a former Mexican defense secretary, Gen. Salvador Cienfuegos, which prompted President Andrés Manuel López Obrador to disband the elite police unit that had been the DEA's key ally in Mexico. López Obrador also rammed through a national security law that kept DEA agents at their desks instead of out in the field. Overnight, law enforcement cooperation between the neighboring countries went from strained and spotty to nonexistent.

"Unfortunately, in the absence of a broader strategy, DEA is driving the bus of U.S. counter-narcotics policy, and it's a very narrow lane they drive in," Landau said. "It's not going to move the needle in terms of stemming the flow of drugs into the U.S., and frequently [carries] sometime devastating foreign policy consequences."

Palmeri also came under criticism for his handling of coronavirus procedures in 2020, when federal agents were under orders to avoid in-person meetings and unnecessary travel. Several agents under Palmeri's command, including an assistant regional director, became sick with COVID-19 after a meeting at the DEA office in the resort town of Mazatlán, where some agents say they were admonished or ridiculed for wearing masks.

Two agents became so ill they had to be airlifted out of the country, according to two former U.S. officials who spoke to the AP on the condition of anonymity because they weren't authorized to discuss the controversy.

An Office of Inspector General report released last week also said that Palmeri had sought government reimbursement to pay for his own birthday party and had approved the purchase of "unallowable items" as part of foreign trips by the then-acting DEA administrator. Tim Shea, who held that position during Palmeri's tenure, did not respond to requests for comment.

The report, which did not detail specific items or amounts spent, also did not explain its conclusion: "Criminal prosecution of the Regional Director was declined."

*Mustian reported from New York.*



**U.S. Department of Justice**
Drug Enforcement Administration

*Office of the Deputy Administrator*                    *Springfield, VA 22152*

Nicholas J. Palmeri
Associate Deputy Assistant Administrator
Office of Special Intelligence

Dear Mr. Palmeri:

This letter is notice of a proposed removal action to be taken in accordance with Title 5, Code of Federal Regulations, Part 752, and the authority vested in me by Drug Enforcement Administration (DEA) directives. The oath a DEA Special Agent takes, DEA's mission, and the public we serve, require us as individuals and as an Agency to maintain the highest standard of conduct. Your conduct, based on facts in the Office of Professional Responsibility (OPR) Investigative File PR-TA-2021-0076, falls far short of that high standard. As a result, I am proposing your removal from federal service and from your position in the DEA Senior Executive Service (SES). I am doing this to promote the efficiency of the service, based on the charges of **(1) Failure to Follow Instructions; (2) Lack of Candor; (3) Conduct Unbecoming;** and **(4) Poor Judgement** (3 Specifications). This proposal, if found warranted, will be taken no earlier than thirty (30) calendar days from the date you receive this notice. Upon receipt of this proposal, you will be placed on limited duty in accordance with DEA Personnel Manual 2752.61.A.3.

## Background

This OPR investigation was initiated following a March 25, 2021 memorandum submitted by then-Deputy Chief of Operations (DCO)                     citing three actions by you that he believed represented poor judgment, insubordination, conduct unbecoming, and failure to follow instructions.

On February 8, 2021, you requested temporary duty (TDY) to Tampa and Miami, Florida, from February 22, 2021, through February 24, 2021, and February 28, 2021. You also submitted a request for annual leave on Friday, February 26, 2021. According to your travel request, the purpose of your travel to Florida included, among other things, meeting with several defense attorneys and a high-level Confidential Source (CS) in Miami. On February 10, 2021, DCO                     followed up with questions concerning the Miami portion of your travel request, to which you responded, "If there are concerns, cancel the Miami portion." In a February 12, 2021 email, DCO                     instructed you to "cancel that portion of the trip and meeting with those attorneys," indicating that he had concerns, to which you replied, "ok."

2

On March 4, 2021, DCO █████ asked you if, while on leave, you met with the CS and defense attorneys in Miami. You stated that, because that portion of your trip was at no cost to the government, you met with the defense attorneys on your personal time. DCO █████ then requested a trip report documenting these meetings to the extent they were related to DEA.

Also on March 4, 2021, DCO █████ denied your requested travel to Guadalajara, Mexico, for March 6, 2021, through March 7, 2021, stating it was not essential or mission critical for you to travel. You told OPR that you believed the denial was personal. You requested a phone call with DCO █████ to discuss why your travel request was denied. During the phone call on March 15, 2021, DCO █████ stated that you used vulgar language and insults, including telling DCO █████ to "do [his] fucking job," to "go fuck [himself]," and that he was "being such an asshole." You admitted during the OPR interview that you cursed at DCO █████ and that your language was unprofessional, stating you had "never spoken to a person like that in your life." On March 19, 2021, DCO █████ reminded you to provide a trip report concerning the Miami portion of your February travel. You responded that, during the "personal portion" of your Tampa-Miami trip, you met with defense attorneys █████ and █████ "to exchange pleasantries/personal discussions" with no other government personnel present. You also indicated that, along with Special Agent (SA) █████ you met with a CS to discuss flipping a high-level member of a cartel. On March 29, 2021, you were counseled concerning your travel to Miami and your conduct during the phone call with DCO █████

The OPR investigation revealed that your wife accompanied you to the February 25, 2021 debrief meeting with the CS. Both your wife and the CS's spouse were in close proximity to you, SA █████ and the CS during the debrief. You further informed OPR that you consumed food provided by the CS and admitted to bringing wine to the meeting, which you drank. You also stated during the OPR investigation that you and your wife visited Mr. █████ s home in the Florida Keys for two nights, during which time some DEA-related topics were discussed, but that Mr. █████ did not have the type of access to Mexico that would have been useful to DEA. Additionally, you indicated that Mr. █████ reviewed legal documents for you concerning a child support matter in New York. You also told OPR that, on February 27, 2021, you and your wife met Mr. █████ and his wife for dinner, where DEA-related topics were discussed in generalities. During your OPR interview, you stated that you told Mr. █████ that his clients should cooperate for DEA's benefit. Furthermore, you informed OPR that your wife has a translation business and has, on occasion, provided translation work for Mr. █████. During your OPR interview, you indicated that both Mr. █████ and Mr. █████ have represented clients who have been investigated by DEA and, more specifically, by offices in your area of responsibility.

**Charge 1: Failure to Follow Instructions**

On or around February 12, 2021, DCO █████ instructed you to cancel the Miami portion of your trip to Florida and to not attend the meetings you had planned with defense attorneys due to his concerns. On March 4, 2021, in response to an inquiry from DCO █████, you admitted to going to Miami and meeting with these defense attorneys on your personal time despite being instructed to cancel the meetings.

Nicholas J. Palmeri                                                                                     Page 3

     The DEA Personnel Manual, Section 2735.20(S), Conduct Prejudicial to the Government, states, *"S. Insubordination. DEA employees shall follow the lawful orders, directions, and policies of supervisors, managers, on-scene commanders, and/or more senior officials, as well as all policies, procedures, regulations, and laws which govern their conduct or duties. DEA employees shall similarly obey the lawful directions or commands of acting supervisory or management personnel."*

     The DEA Guide for Disciplinary Offense and Penalties, Appendix 2735, states that *"failure to follow supervisory instructions [is] an employee's refusal or noncompliance with a supervisor's instruction to complete a task."*

     As such, your actions described above constitute **Failure to Follow Instructions**, and you are so charged.

**Charge 2: Lack of Candor**

On or around March 19, 2021, in response to DCO ▮▮▮▮▮'s request for a trip report concerning the Miami portion of your trip, you told him that you met with two defense attorneys to "exchange pleasantries/personal discussions." During your OPR interview, you admitted that, in fact, you and your wife stayed at Mr. ▮▮▮▮▮'s home for two nights and had dinner with Mr. ▮▮▮▮▮. While you characterized both of these interactions to DCO ▮▮▮▮▮ as personal, you admitted during your OPR interview that DEA-related topics were discussed with both defense attorneys. You therefore omitted facts responsive to DCO ▮▮▮▮▮'s request for information.

     The DEA Personnel Manual, Section 2735.20(E), Conduct Prejudicial to the Government, states, *"E. Lack of Candor. 1. DEA employees will not omit or conceal information that in the circumstances should have been disclosed in order to make a written or oral statement accurate and complete. Knowing failure to be forthright includes, but is not limited to, omission or concealment in employment and official document or other matters under official investigation. 2. DEA employees will not permit a known falsehood to continue unreported or unchallenged, or provide non-responsive answers to properly authorized official such as supervisory personnel, prosecutors, or agency investigators."*

     As such, your actions described above constitute **Lack of Candor**, and you are so charged.

**Charge 3: Conduct Unbecoming**

DCO ▮▮▮▮▮ described your conduct during a phone call, on or around March 15, 2021, as hostile and disrespectful. He further stated that you used profanity throughout the conversation, including telling him that he "can go fuck [him]self" and that he was "being such an asshole." You admitted during your OPR interview that, during this phone call, you yelled at DCO ▮▮▮▮▮, used unprofessional language, and had "never spoken to a person like that in your life."

The DEA Personnel Manual, Section 2735.20(I)(1), Conduct Prejudicial to the Government, states, *"I. Unprofessional Conduct. 1. Every DEA employee is responsible for behaving in a professional manner appropriate to the setting, and in a civil and courteous manner toward other DEA employees and the general public. Employees will be mindful that their conduct and demeanor reflects directly upon DEA and will ensure that their actions do not reflect unfavorably upon DEA. No employee will act in a manner which will bring disgrace or disfavor upon DEA or act in a manner that will cause the general public to question, ridicule or attack the efforts of this agency or its personnel."*

The DEA Personnel Manual, Section 2735.12(B)(1), Responsibilities, states, *"B. Supervisors. It is the responsibility of DEA's supervisors, in addition to their duties and responsibilities as employees of this agency, to 1. Set and maintain high standards of personal conduct as an example to employees. Supervisory personnel will be held to a higher standard of conduct given their status as managers. Failure to act in response to a situation that the supervisor was or should have been aware of may subject the supervisor to disciplinary action or other appropriate measures."*

As such, your actions described above constitute **Conduct Unbecoming**, and you are so charged.

**Charge 4: Poor Judgment (3 Specifications)**

*Specification 1:* On or around February 25, 2021, you conducted a debrief with a CS at the CS's residence. At this meeting, you also shared a meal with the CS, during which you consumed wine, which you brought to the meeting. Furthermore, both your wife and the CS's spouse were present at the same table where the debrief occurred. During your OPR interview, you acknowledged that bringing your wife to the debrief was probably not the best judgment and that you would not allow your subordinates to conduct a CS briefing in a similar manner. The meeting had the appearance of a social interaction with a CS, and there was no contemporaneous official DEA documentation concerning the substance of this debrief, both of which violate DEA policy.

*Specification 2:* On or around February 25 through 27, 2021, you and your wife stayed at defense attorney Mr. ▮▮▮ 's home in the Florida Keys. You acknowledged during your OPR interview that DEA-related topics were discussed although Mr. ▮▮▮ did not have information useful to DEA. You also stated during your OPR interview that you asked Mr. ▮▮▮ for his assistance in a personal legal matter.

*Specification 3:* On or around February 27, 2021, you and your wife had dinner with defense attorney Mr. ▮▮▮ and his wife, for which Mr. ▮▮▮ paid. You acknowledged during your OPR interview that DEA-related topics were discussed, including Mr. ▮▮▮ 's client who could cooperate with DEA. You also stated during your OPR interview that your wife owns a translation business which has provided translation services to Mr. ▮▮▮.

The DEA Personnel Manual, Section 2735.12(C)(1)-(3), Responsibilities, states, *"C. All
DEA Employees. DEA personnel, as members of the law enforcement community, occupy
positions of trust. It is the responsibility of all DEA employees to: 1. Refrain from engaging in
any criminal, infamous, dishonest, or notoriously disgraceful conduct or other conduct
prejudicial to DEA, to DOJ, or to the United States Government. This includes any conduct that
indicates that an employee failed to exercise good judgment either on or off duty. DEA personnel
shall always conduct themselves in a professional manner and observe the DEA Standards of
Conduct, as well as applicable orders, policies, regulations, and laws of DEA, DOJ, and the
federal government. 2. Refrain from conduct or omissions in their off-duty hours which will
impact, influence, impede, or adversely affect their DEA responsibilities. 3. All DEA employees
shall avoid any actions that create the appearance that they are violating the law or the ethical
standards set forth in the DEA Standards of Conduct, or in any applicable orders, policies,
regulations, and laws of DEA, DOJ, and the federal government."*

The DEA Personnel Manual, Section 2735.20(I)(1)-(2), Conduct Prejudicial to the
Government, states, *"I. Unprofessional Conduct. 1. Every DEA employee is responsible for
behaving in a professional manner appropriate to the setting, and in a civil and courteous
manner toward other DEA employees and the general public. Employees will be mindful that
their conduct and demeanor reflects directly upon DEA and will ensure that their actions do not
reflect unfavorably upon DEA. No employee will act in a manner which will bring disgrace or
disfavor upon DEA or act in a manner that will cause the general public to question, ridicule or
attack the efforts of this agency or its personnel. 2. DEA employees are prohibited from
associating with individuals known or suspected to be involved in illegal drug trafficking or
other criminal activity in other than a strictly professional capacity. This prohibition also
applies to CSs and former CSs. Extrinsic social, financial or business contacts with individuals
of this nature are expressly prohibited. DEA employees are to strictly maintain only the highest
standards of conduct with respect to informants, known criminals, or with individuals engaged in
criminally violative activity."*

The DEA Agent's Manual, Section 6612.41(H)(2), Prohibited Transactions and
Relationships, states, *"2. A Controlling Investigator shall not socialize with a CS except to the
extent necessary and appropriate for operational reasons. Personal business, social, or romantic
relationships between DEA employees or other authorized personnel and CSs are strictly
prohibited."*

The DEA Agents Manual, Section 6211.2 (C), Report Review and Writing, states,
*"Submission of Reports. C. Investigative reports are required to be prepared within ten (10)
\*business\* days after concluding the investigative activity or collecting the information being
reported. Exceptions to this ten (10) \*business\* day requirement will be reports for which a
separate submission date has been established (as specified under the various subject matters in
this Manual), or where the event being reported is time sensitive, or the event itself is sensitive to
the point where the report must be completed as soon as possible (e.g., a shooting incident)."*

The DEA Agents Manual, Section 6612.44, Debriefing of Confidential Sources, states,
*"1. Operational debriefing. Controlling Investigators must debrief CSs after they participate in
an operational activity. For all debriefings, the Controlling Investigators must prepare a DEA-6*

*(Report of Investigation), which should be titled according to the activity the CS performed. For example, if a CS assisted in the purchase of evidence from an investigative target, the DEA-6 should be titled "Undercover Purchase of Exhibit X from XXX XXXX." All CS debriefing reports must be completed within five (5) business days from the date the activity occurred or the information was received. 2. Quarterly debriefing. Controlling Investigators are required to debrief CSs (with the exception of Limited Use CSs) each quarter (i.e., every 90 days). All quarterly CS debriefing reports (DEA-6s) must be titled "Quarterly Debriefing of CS-XX-XXXXXX." All CS debriefing reports must be completed within five (5) business days of the debriefing. DEA-473 forms may be executed as part of the quarterly debriefing. Refer to 6612.42."*

As such, your actions described above constitute **Poor Judgment**, and you are so charged.

### Penalty Discussion

As a DEA Special Agent, you occupy a position of public trust in which you are held to a high standard of personal conduct, both on duty and off duty, in order to promote public confidence in the integrity and dependability of DEA, and to ensure embarrassment is not brought upon the Agency. Your conduct should be beyond reproach and should withstand public scrutiny both personally and professionally. Furthermore, as a member of the Senior Executive Service, and due to the significant responsibilities with which you are charged, DEA expects you to exercise sound judgment at all times, to adhere to DEA policy and the Standards of Conduct, and to serve as an example to Special Agents throughout the Agency.

The catalyst of this investigation was your failure to follow DCO███████'s instructions to cancel your meetings with defense attorneys during the Miami portion of your February trip to Florida. During your OPR interview, you stated that you did not understand DCO████████'s direction for you to cancel the Miami portion of your trip to mean that you could not meet with the defense attorneys as planned. This assertion that you did not understand DCO████████'s directive lacks credibility. DCO████████'s order was clear, as he specifically instructed you to "cancel that portion of the trip *and* meeting with those attorneys" (emphasis added) noting for the second time that he had concerns. Further, a couple of hours after DCO████████ instructed you via email to cancel the Miami portion of your trip, you forwarded the email to Assistant Regional Director████████ who at the time was in Miami, saying "C u in Miami." This seemingly indicates an immediate and deliberate decision on your part to disregard DCO████████'s order. Your intentional disregard of your supervisor's instructions calls into question your reliability as not only a DEA employee, but as a supervisor.

Later, when describing the defense attorney meetings to DCO████████ in the requested trip report, you were not forthcoming with the facts. You described the meetings as exchanges of pleasantries and personal discussions, which the OPR investigation revealed was clearly not an accurate description of your interactions. During your OPR interview, you admitted that your interactions with both of these defense attorneys were more significant than a mere exchange of pleasantries and that DEA-related matters were discussed with both. Further, your lack of candor

concerning your interactions with these defense attorneys raises questions concerning your trustworthiness, as your supervisor must have total confidence in your integrity, judgment, and decision-making skills.

By law, the United States must provide attorneys representing opposing parties with any derogatory information contained in the personnel files of law enforcement personnel prior to their testimony in a criminal matter. Demands for such information, commonly referred to as *Brady*[1] requests or motions, mandate that DEA disclose any information that indicates perjurious conduct or other like dishonesty on the part of a witness. Because of the United States' duty under *Brady*, and as a result of your conduct as described herein, your ability to testify in criminal trials has been dramatically impaired.

Additionally, on December 9, 1996, then Attorney General Janet Reno implemented a policy requiring the disclosure of potential impeachment material to United States Attorneys' Offices and Department of Justice (DOJ) prosecuting offices. Particularly, in the memorandum entitled "Policy Regarding Disclosure to Prosecutors of Potential Impeachment Information Concerning Law Enforcement Agency Witnesses" ("*Giglio* Policy"), the Attorney General established a reporting mechanism within the DOJ to ensure prosecutorial personnel are provided information pertaining to findings of misconduct reflecting upon the truthfulness or possible bias of the employee, including lack of candor during an administrative inquiry, any past or pending criminal charge brought against the employee, and any credible allegation of misconduct that reflects upon the truthfulness or possible bias of the employee that is the subject of a pending investigation.

Derogatory information of this nature concerning a DEA employee is relevant in a criminal prosecution and will often, if not always, be provided to the defense to ensure that DOJ prosecutors fully comply with their obligations under *Brady* and *Giglio*. DOJ policy requires that prosecutorial personnel be provided with information which reflects upon truthfulness or bias of an employee, even in certain circumstances where the allegations cannot be sustained, are not credible, or have resulted in exoneration, including when such allegation is made by a federal prosecutor, magistrate judge, or judge.

You admitted to meeting with defense attorneys in circumstances that were essentially personal, but also involved discussions of DEA-related topics. While you insisted that you keep distinct lines between your personal and professional relationships with these defense attorneys, you acknowledged both represented clients who have been investigated by DEA and, more troublesomely, represented clients who were currently being investigated by an office in your area of responsibility. The dinner with Mr.        and his wife, if an isolated incident, demonstrates poor judgment that might not necessarily warrant removal by itself. However, your wife also has a business relationship with Mr.        which you did not report to DEA until the

---

[1] See *Brady v. Maryland*, 383 U.S. 83 (1963), and the progeny of cases decided thereto such as *Giglio v. United States*, 405 U.S. 150 (1972), *United States v. Agurs*, 427 U.S. 97 (1976), and *United States v. Bagley*, 473 U.S. 667 (1985) and others. In fact, the Ninth Circuit Court of Appeals has held that law enforcement agencies must disclose certain derogatory information concerning an enforcement official to defendants in criminal matters, including past disciplinary actions. *Henthorn v. United States*, 931 F.2d 29 (9th Cir. 1991).

OPR investigation. Further, you did not simply meet with Mr.          but rather you spent two nights at his home in the Florida Keys. During this stay, you also sought Mr.          's assistance with a personal legal matter, for which, at the time of the OPR investigation, you did not pay him. These interactions, viewed cumulatively, evidence extremely poor judgment on your part.

At a minimum, this comingling of personal and professional matters with defense attorneys could give rise to an appearance of impropriety. You demonstrated poor judgment in allowing yourself to be put in such a position, especially considering that DCO          your supervisor, had previously instructed you not to attend the meetings. Even if DCO          did not specifically state why he did not want you to meet with these defense attorneys, an experienced agent like yourself should have known that these social interactions could potentially have an adverse effect on your DEA responsibilities. Your failure to understand this raises questions concerning your judgment.

You also violated several DEA policies when conducting your meeting with the CS at the CS's residence. Not only did this debrief occur in a seemingly social setting, but your wife and the CS's spouse were in close proximity at the time of the debrief. Additionally, you consumed food provided by the CS and brought alcohol, which you also consumed, to the debrief. Furthermore, this meeting with the CS was not documented in a timely manner. A law enforcement officer with your experience should have known that this meeting with the CS did not comport with DEA policies. Your failure to adhere to these polices calls into question your judgment and decision-making skills.

Furthermore, it is concerning that throughout the OPR investigation you attempted to minimize your conduct. While you admitted that you conducted yourself in an unprofessional manner during the phone call with DCO          another member of the SES and your direct supervisor, you attempted to diminish the unprofessionalism by stating that it occurred during a private conversation. When asked during your OPR interview whether you would accept a subordinate speaking to you in a similar manner, you would not directly answer. Similarly, as it pertains to the meeting with the CS, you acknowledged that you would not allow your subordinates to conduct a debriefing in this manner, but justified your actions by stating that, despite the social nature of the meeting, it was for the benefit of the government. The fact that you could acknowledge that you would not allow subordinates to conduct themselves in a similar manner as you, but continued to attempt to justify your own conduct further calls your judgment into question.

At this point in your career, and with the authority and responsibilities bestowed upon you by DEA, conduct demonstrating poor judgment or unwillingness to comply with rules and regulations raises questions about your reliability and trustworthiness. Indeed, among the most important qualities of your position as a Federal law enforcement officer are integrity, judgment, and decision-making skills. Your behavior leads me to have significant concerns about your ability, not only to lead, but to continue to serve as a DEA Special Agent.

In determining the appropriate penalty, I considered several relevant factors, the most important of which is the nature and seriousness of your conduct and its relation to your duties,

position, and responsibilities. As a law enforcement member of the SES, you are held to a very high standard of conduct. Your failure to follow your supervisor's instructions, your unprofessional conduct during the phone call with your supervisor, and your mischaracterization of the meetings to your supervisor, falls short of the expectations of a DEA Special Agent and has resulted in DEA's loss of trust and confidence in you, not only as member of the SES, but as a supervisor and an employee. Instead of being an example to your subordinates, you included a GS-13 Special Agent in your meeting with the CS, during which you did not follow DEA protocols. Furthermore, the social nature of your interactions with the CS and two defense attorneys, and the co-mingling of DEA-related business with these personal interactions, could potentially impact or otherwise adversely affect your ability to perform your duties and responsibilities at DEA as the interactions could appear to be improper.

While I also considered your performance record, the fact that you have 24 years of government service, and have had no prior discipline with DEA, these factors do not mitigate the seriousness of the charges. Your high-ranking position in the SES leads me to believe that you should have known that your conduct did not meet DEA's standards. I also considered the clarity with which you were on notice of the rules you violated and that you are required to certify annually that you have read and understand the DEA Standards of Conduct. I further considered the consistency of the proposed penalty with those imposed on similarly situated employees for the same or similar offenses and with the DEA Guide for Disciplinary Offenses and Penalties. Additionally, I considered your potential for rehabilitation and whether an alternative penalty, such as a suspension of more than 14 days, would be sufficient. These factors, coupled with my above outlined concerns about your judgement and decision-making skills, plus the loss of trust and confidence in you, lead me to the conclusion that your removal is the only penalty that fits the seriousness of your conduct and appropriately deters similar misconduct in the future.

For all of the reasons detailed above, I find that your conduct is clearly prejudicial to DEA and am proposing your removal so as to promote the efficiency of the service.

**Right to Review Materials and Answer**

You have the right to review the material upon which this proposal is based. You may contact Chief Inspector Erik Smith, Inspection Division, and he will make this material available to you. If you have any questions about this proposed action, you may communicate with the Employee Relations Unit in person, by telephone at (571-776-3677), or by mail at DEA Headquarters, 8701 Morrissette Drive, Springfield, Virginia 22152.

You have the right to answer to this notice either orally or in writing, or both. Any reply you choose to make should be directed to the Deciding Official, Administrator Anne Milgram. You may contact Chief of Staff                                    @dea.gov) in order to schedule an oral reply and/or submit a written answer. You may submit affidavits in support of your answer, including medical documents (as defined in 5 C.F.R. Part 339) to support any medical condition alleged to have contributed to the misconduct upon which this proposal is based. You will be given ten (10) calendar days from the date you receive this notice to present your answer to this proposal. Any request for additional time to respond must be made to the Deciding

Official. The Deciding Official, upon review of the evidence of record (to include any response you choose to provide), may affirm the proposal, reduce the proposed penalty, issue a non-disciplinary letter of caution, or completely clear you of any wrongdoing.

## Right to a Representative

You may have a representative or attorney assist you, if you desire. If you choose to have a representative, you must provide a written designation of your representative to the Deciding Official. Upon request, you and your representative (if a DOJ employee) will each be allowed up to eight (8) hours of official time to prepare your reply. Consideration will be given to extending the ten (10) day and/or eight (8) hour period if you submit a request in writing to the Deciding Official stating your reasons for desiring more time. Full consideration will be given to any reply you submit.

## Adverse Action Statutory Appeal Rights

After a decision is made regarding this proposal, you may have the right to appeal this matter to an outside agency, or internally through the grievance procedures. You also may have the right to seek redress if you believe that the agency proposed this action in reprisal for a protected activity. Information regarding the forums available to you is detailed below. Please be advised that the appeal rights listed below are not applicable in every case, and it is your responsibility to determine in what forum, if any, to file an appeal.

## Forums in Which You May Seek Redress

## Office of Special Counsel

If you believe that this proposal, or any subsequent action, is in reprisal for your engaging in protected activity, such as whistleblowing, you may seek corrective action with the United States Office of Special Counsel (OSC), by filing a complaint at www.osc.gov. Please be advised that you will be limited to those matters within the OSC's jurisdiction and foreclosing your appeal of other issues. For more information, you may visit www.osc.gov.

## US Equal Employment Opportunity Commission

If you believe that this proposal, or any subsequent action, is in reprisal for your engaging in Equal Employment Opportunity (EEO) activity, or because you are a member of a protected group, you may initiate a complaint with a local EEO counselor. For a current list of EEO counselors, you may visit DEA Intranet/Webster/Employees/EEO/Discrimination Complaint Procedures/EEO Counselor Roster. Please be advised you will be limited to those matters within the Equal Employment Opportunity Commission's (EEOC) jurisdiction and foreclosing your appeal of other issues. For more information, you may visit www.EEOC.gov.

## US Department of Labor

Nicholas J. Palmeri

If you believe your past, present, or future connection with uniformed service is a motivating factor of this proposal, you may seek assistance from the U.S. Department of Labor, Veterans Employment and Training Service (VETS). VETS is the government agency authorized to investigate and resolve complaints of violations of the Uniformed Services Employment and Reemployment Rights Act (USERRA). For assistance in filing a complaint, or for any other information on USERRA, contact VETS at 1-866-4-USA-DOL or visit its website at www.dol.gov/agencies/vets.

**Conclusion**

As soon as possible after your reply is received, but no earlier than thirty (30) days after you receive this notice, a written decision will be issued to you. Until such time, you will be on limited duty.

Sincerely,

Louis J. Milione
Principal Deputy Administrator

# NOTICE OF PROPOSED REMOVAL

## SIGNATURE PAGE

*Received by:* NICHOLAS J. PALMERI     *Date* 1/14/22

*(Print Name)*

_____ *(Signature)*

*Delivered by:* Louis J. Milione     *Date* 1-14-22

*(Print Name)*

_____ *(Signature)*

*Witnessed by:* ███████████     *Date* 1/14/2022

███████████

_____ *(Signature)*



**U.S. Department of Justice**
Drug Enforcement Administration

---

*Office of the Administrator*                                        *Springfield, VA 22152*

Nicholas J. Palmeri                                           March 14, 2022
Associate Deputy Assistant Administrator
Office of Special Intelligence
(b) (6), (b) (7)(C)

Dear Mr. Palmeri:

On March 14, 2022, the Administrator of the Drug Enforcement Administration (DEA) issued the attached letter removing you from your position as Associate Deputy Assistant Administrator in the Office of Special Intelligence and from the federal service. Before the letter could be served, you notified the Drug Enforcement Administration (DEA) of your intent to voluntarily retire from federal service effective March 14, 2022.

The attached removal sustains the disciplinary proposal based on the charges of **(1) Failure to Follow Instructions; (2) Lack of Candor; (3) Conduct Unbecoming;** and **(4) Poor Judgement** (3 Specifications) that had been pending prior to your retirement. As explained in the attached letter, but for your voluntary retirement, I would have removed you from your position as Associate Deputy Assistant Administrator and from the federal service to promote the efficiency of the service.

Sincerely,

Anne Milgram
Administrator



**U.S. Department of Justice**
Drug Enforcement Administration

---

*Office of the Administrator*                                    *Springfield, VA 22152*

Nicholas J. Palmeri                                    **MAR 1 4 2022**
Associate Deputy Assistant Administrator
Office of Special Intelligence

Dear Mr. Palmeri:

In a letter dated January 14, 2022, Principal Deputy Administrator Louis J. Milione proposed you be removed from your position in the U.S. Department of Justice (DOJ), Drug Enforcement Administration (DEA) Senior Executive Service (SES) and from federal service based on the charges of: (1) Failure to Follow Instructions; (2) Lack of Candor; (3) Conduct Unbecoming; and (4) Poor Judgement (3 Specifications). The proposal contained the specific reasons for the proposed removal and informed you of your right to reply to the proposal orally, in writing, or both. On January 20, 2022, your designated representative requested an extension to respond, which I granted. On February 24, 2022, Joel Kirkpatrick, Esq., submitted a written response on your behalf and, on March 9, 2022, you and your counsel provided an oral response.

I have carefully examined the evidence of record, which includes the Office of Professional Responsibility (OPR) Investigative File, PR-TA-2021-0076, the proposal letter, your written response, including Attachment 1, and oral response. Based on my review and consideration of the evidence, I conclude that a preponderance of the evidence supports all of the misconduct charges against you and they are sustained. In assessing the appropriate penalty, I have considered: the seriousness of your violations of the DEA Standards of Conduct and DEA policies; the Douglas Factors, including, but not limited to, the duties and responsibilities of your position, your performance record, your lack of prior discipline, and your 24 years of government service; whether a sanction other than removal would be adequate in deterring future misconduct by you or other employees; what sanction will best promote the efficiency of the DEA; and the DEA Guide for Disciplinary Offenses and Penalties.

It is my decision to remove you from your position within the DEA SES and from federal service effective upon your receipt of this letter.

This is the final decision of the U.S. Department of Justice, Drug Enforcement Administration. The federal law establishing the FBI/DEA SES, 5 U.S.C. § 3151 and DOJ Order 1202, "Executive Resources Management," provide no right to initiate an appeal from this decision before the Merit Systems Protection Board under 5 U.S.C. § 7701.

If you believe that this notification, or any subsequent action, is in reprisal for your engaging in protected activity, such as whistleblowing, you may seek corrective action with the United States Office of Special Counsel (OSC), by filing a complaint at www.osc.gov. Please be

Nicholas J. Palmeri                                                          Page 2

advised that you will be limited to those matters within the OSC's jurisdiction and foreclosing your appeal of other issues. For more information, you may visit www.osc.gov.

If you believe that this notification, or any subsequent action, is in reprisal for your engaging in Equal Employment Opportunity (EEO) activity, or because you are a member of a protected group, you may initiate a complaint with a local EEO counselor. For a current list of EEO counselors, you may visit DEA Intranet/Webster/Employees/EEO/Discrimination Complaint Procedures/EEO Counselor Roster. Please be advised you will be limited to those matters within the Equal Employment Opportunity Commission's (EEOC) jurisdiction and foreclosing your appeal of other issues. For more information, you may visit www.EEOC.gov.

If you believe your past, present, or future connection with uniformed service is a motivating factor of this proposal, you may seek assistance from the U.S. Department of Labor, Veterans Employment and Training Service (VETS). VETS is the government agency authorized to investigate and resolve complaints of violations of the Uniformed Services Employment and Reemployment Rights Act (USERRA). For assistance in filing a complaint, or for any other information on USERRA, contact VETS at 1-866-4-USA-DOL or visit its website at www.dol.gov/agencies/vets.

Sincerely,

Anne Milgram
Administrator

cc:     CC
        IG
        OPR
        HRER
        NS

## RECEIPT OF DECISION LETTER

### NAME: Nicholas Palmeri

### ACTION: Removal

REFUSED TO SIGN NP to
Refuse to
Sign

*Received by:* ___NICHOLOS J. PALMERI___ *Date* 031522

*(Print Name)*

_____ *(Signature)*

*Delivered by:* ___JAMES W SCHRANT___ *Date* 031522

*(Print Name)*

___J W NJ___ *(Signature)*

*Witnessed by:* ___(b) (6), (b) (7)(C)___ *Date* 031522

*(Print Name)* (b) (6), (b) (7)(C)

_____ *(Signature)*

PLEASE SCAN AND E-MAIL THIS SHEET TO THE OFFICE OF THE ADMINISTRATOR