```
 1                      UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF FLORIDA
 2                      CASE NO. 21-CR-20005-DPG-1

 3

 4    UNITED STATES OF AMERICA,            )    Pages 1-48
                                           )
 5                   vs.                   )    Miami, Florida
                                           )
 6    ALBERICO AHIAS CRESPO,               )
                                           )    January 24, 2024
 7                   Defendant.            )    1:44 P.M.

 8                      TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE DARRIN P. GAYLES
 9                    UNITED STATES DISTRICT JUDGE

10

11    APPEARANCES:

12    For the Government:       SEAN THOMAS MCLAUGHLIN
                                United States Attorney's Office
13                              99 NE 4th Street
                                Miami, Florida 33132
14
      For the Defendant:        JOSE M. QUINON
15                              Jose M. Quinon, P.A.
                                75 Valencia Avenue
16                              Suite 800
                                Coral Gables, Florida 33134
17

18

19

20

21

22    Reported By:             VERNITA ALLEN-WILLIAMS
      Vernita_Allen-Williams   Official Court Reporter
23    @flsd.uscourts.gov       United States District Court
      305.523.5048             400 North Miami Avenue
24                             Miami, Florida  33128

25
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

01:44PM  1              (Call to order of the Court at 1:44 P.M.)

01:44PM  2              THE COURTROOM DEPUTY:  Calling Case No. 21-CR-20005,

01:44PM  3  United States of America vs. Alberico Ahias Crespo.

01:44PM  4              Counsel, please state your appearance, starting with the

01:45PM  5  government.

01:45PM  6              MR. MCLAUGHLIN:  Good afternoon, Your Honor.  Sean

01:45PM  7  McLaughlin on behalf of the United States.  Also with me at

01:45PM  8  counsel table, my cocounsel, AUSA Chris Clark, and also the case

01:45PM  9  agent, FBI Special Agent Heidi Ford.

01:45PM  10             THE COURT:  All right.

01:45PM  11             MR. QUINON:  Jose Quinon on behalf of Alberico Crespo,

01:45PM  12  who is to my right here today.  Also to my right sitting at

01:45PM  13  counsel's table is my investigator/paralegal Jose Gonzalez.  Thank

01:45PM  14  you, sir.

01:45PM  15             THE COURT:  All right.  Good afternoon.  Sorry we're

01:45PM  16  starting a few minutes late.  We had a meeting and it got me

01:45PM  17  behind schedule.

01:45PM  18             Oh, and from probation.

01:45PM  19             MS. GALVEZ:  Good afternoon, Your Honor.  Stephanie

01:45PM  20  Galvez, U.S. Probation.

01:45PM  21             THE COURT:  All right.  Good afternoon.

01:45PM  22             All right.  We are here for Mr. Crespo's sentencing.  I

01:45PM  23  reviewed the presentence report, as well as the objections filed

01:45PM  24  by both sides in this case.

01:45PM  25             I guess to some degree some of the guidelines issues are

01:45PM   1   overlapping.  We'll take them one by one, starting with the

01:46PM   2   government.

01:46PM   3           MR. MCLAUGHLIN:  Your Honor, our first objection is to

01:46PM   4   the offense level.  In the government's opinion, and the case law

01:46PM   5   is very clear on that, in a plain text reading of the guideline is

01:46PM   6   very clear that the offense level should be a 34, which captures a

01:46PM   7   drug weight of between 10,000 and 30,000 kilograms of converted

01:46PM   8   drug weight.  I have laid out our position very clearly in my

01:46PM   9   opinion in our objections.  If the Court has any questions, I'm

01:46PM   10  happy to answer them.

01:46PM   11          But our opinion is, Judge, the guideline is very clear.

01:46PM   12  The offense level for an obstruction case is the guideline of the

01:46PM   13  underlying crime.  The underlying crime here is the conspiracy to

01:46PM   14  traffic in oxycodone from November of 2016 up until his arrest in

01:46PM   15  July of 2020.  That's it.  I think to hold him accountable as the

01:46PM   16  revised PSI does only for the Gonzalez era not only ignores the

01:46PM   17  facts, it ignores the law.

01:47PM   18          The Court sat here in trial.  For three weeks we

01:47PM   19  presented damning evidence, clear evidence, that not only did Mr.

01:47PM   20  Crespo know about Diaz's oxy trafficking during the Gonzalez era,

01:47PM   21  he knew about it thereafter and he reasonably should have known

01:47PM   22  about it.  I would draw the Court's attention to specifically the

01:47PM   23  events of July 17th where Crespo is specifically told by Diaz:  I

01:47PM   24  am engaged in oxycodone trafficking.  I have bought some pills

01:47PM   25  from one of my patients, Mercedes Perez.  And lo and behold, the

01:47PM  1   FBI has gone and talked to her and implicated me.  So the idea

01:47PM  2   that he doesn't know that Diaz is still oxy trafficking even after

01:47PM  3   the Gonzalez era just doesn't fly with the facts, Your Honor.

01:47PM  4          That's our position.  We have laid it out again in our

01:47PM  5   written response.  If the Court has any questions, I'm happy to

01:47PM  6   answer them.

01:47PM  7          THE COURT:  Okay.  And your response.  I understand you

01:47PM  8   have your own idea what the calculation should be.

01:48PM  9          MR. QUINON:  Judge, may I come up to the podium?

01:48PM  10          THE COURT:  Yes, sir.

01:48PM  11          MR. QUINON:  Thank you.

01:48PM  12          Judge, kind of an unusual case and circumstances.

01:48PM  13   Concerning the -- where we all end up in the PSI in this case,

01:48PM  14   it's unusual to have all of us end up at a different location, so

01:48PM  15   to speak, or a different conclusion.  That is to say, probation

01:48PM  16   ends up with their calculations; I ended up with different

01:48PM  17   calculations, and based upon objections that I filed, as you know;

01:48PM  18   and also the government ends up at a different level altogether.

01:48PM  19   So everybody ended up at a different level.

01:48PM  20          I think it is important to just go back and just give a

01:48PM  21   brief review of how we got here.  Okay.

01:48PM  22          The first thing that happened was probation filed the

01:48PM  23   initial draft of a PSI, which is normally the case.  And in doing

01:49PM  24   that, probation came up and concluded that the right way to

01:49PM  25   compute the guidelines in this case is to take the patients that

01:49PM 1 were named in the indictment, and actually patients that were the

01:49PM 2 core of this case.  Those were the patients who were visited by

01:49PM 3 the FBI agent, if you recall the testimony when we had the trial.

01:49PM 4 So there are six patients that were critical in connection with

01:49PM 5 the case, and really the whole trial revolved around, for the most

01:49PM 6 part, around those patients.  Okay.

01:49PM 7 And so probation came up with, based upon the evidence

01:49PM 8 that was given to probation by the government, not by the defense,

01:49PM 9 they gave them the reports, probation read all the reports, and

01:49PM 10 probation came up with the conclusion that the proper converted

01:49PM 11 drug weight under the guideline formulas was 1,802 kilograms.

01:49PM 12 Okay.  And based upon that, the base offense level, I believe, was

01:50PM 13 24, if I recall correctly.  Okay.  And came up with a total

01:50PM 14 offense level of 26, but recognized in paragraph 96 of the PSI

01:50PM 15 that Mr. Crespo was entitled to get that 4C1.1 reduction.

01:50PM 16 Anyways, the point being that at the end of the day the

01:50PM 17 first PSI probation concluded that the proper level here was

01:50PM 18 Level 24, which yielded 51 to 63 months of incarceration.  That

01:50PM 19 was probation's conclusions.

01:50PM 20 I filed my objections saying:  No, I think that's not the

01:50PM 21 way to compute the guidelines.  I object.  The reason that I

01:50PM 22 objected is because I brought up the fact that under the

01:50PM 23 guidelines when you have a conspiracy, it is not an individual

01:51PM 24 crime; it's a crime of joint criminal conduct.  And, therefore,

01:51PM 25 you have to go to a provision in the guidelines, which is

01:51PM  1    Section 1B1.3, to factor in the crossover in this case.

01:51PM  2         Under this section of the guidelines it tells you that

01:51PM  3    whenever you're going to attribute, as in this case, the amount of

01:51PM  4    drugs to determine punishment under the guidelines, there are

01:51PM  5    three things that you need to satisfy in order to hold the

01:51PM  6    defendant accountable to that.

01:51PM  7         Number one is that the joint criminal activity is within

01:51PM  8    the scope.  In other words, that what happened is within the scope

01:51PM  9    of the jointly undertaken criminal activity.  What that means is

01:51PM  10   the defendant gets punished not for the whole scope of the

01:52PM  11   conspiracy, and that's important.  That's where we part ways here.

01:52PM  12   I part ways with probation and the government here.  Okay.

01:52PM  13        If you read the commentary to this section, it tells you

01:52PM  14   that when you have joint criminal activity such as a conspiracy,

01:52PM  15   which is what we have here, okay, you don't attribute to the

01:52PM  16   defendant the entire scope of the conspiracy; you must attribute

01:52PM  17   only that conduct that is within the scope of the jointly

01:52PM  18   undertaken criminal activity.  That is to say, what the defendant

01:52PM  19   agreed to do within the scope of what he agreed to do within the

01:52PM  20   conspiracy is what he gets punished for, which is less typically

01:52PM  21   than the whole scope of the conspiracy.

01:52PM  22        And when you read the commentary of this particular

01:52PM  23   section, it tells you precisely that, in those words:  That the

01:52PM  24   scope of the conspiracy and the scope of jointly undertaken

01:52PM  25   criminal activities are two different concepts.  And the court,

01:53PM  1    according to the guidelines, must make a finding to what was the

01:53PM  2    jointly undertaken criminal activity in this case.  Okay.  So

01:53PM  3    that's the first element of that section.

01:53PM  4         The second element is that the criminal activity has to

01:53PM  5    be undertaken by -- other than the defendant has to be in

01:53PM  6    furtherance of the conspiracy, in furtherance of the criminal

01:53PM  7    activity.

01:53PM  8         And the last thing, the third element is that it has to

01:53PM  9    be reasonably foreseeable in connection with that criminal

01:53PM  10   activity.

01:53PM  11        My main objection was on the first element of those three

01:53PM  12   things that the guidelines require.  If any of those three

01:53PM  13   elements is missing, then the defendant cannot be held accountable

01:53PM  14   in this case, as has been done.

01:53PM  15        So the issue here is then:  What is the jointly

01:54PM  16   undertaken criminal activity on the part of Mr. Crespo?  And my

01:54PM  17   position is that it is not the totality of the scope of

01:54PM  18   conspiracy.  Probation finds that it should be the scope of the

01:54PM  19   Gonzalez conspiracy.  Okay.  Initially they didn't come out to

01:54PM  20   that conclusion.  They came to that conclusion in the revised PSI,

01:54PM  21   the second one that we got.  Okay.  And so probation concluded,

01:54PM  22   once they read the government's objections that:  Okay.  We're

01:54PM  23   going to hold Mr. Crespo responsible for the totality of the

01:54PM  24   Gonzalez conspiracy.  Okay.  I objected to that.

01:54PM  25        The government also objected because the government said:

01:54PM 1   No, you've got to hold him accountable also for that part that

01:54PM 2   deals with Dr. Carpman, a different doctor, and also a Dr.

01:55PM 3   Espinosa, a doctor up in Boca Raton.  Okay.  And probation said:

01:55PM 4   No, it should only be Dr. Gonzalez.  And I'm saying it should be

01:55PM 5   only Dr. Gonzalez's conspiracy but not the entire scope of the

01:55PM 6   conspiracy; it should be only that part that Mr. Crespo agreed to

01:55PM 7   undertake criminal activity.

01:55PM 8           So that's the difference between all three parties here,

01:55PM 9   okay.  And this is one of those cases that, ironically, Mr.

01:55PM 10  Crespo's punishment is based upon the amount of oxycodone pills.

01:55PM 11  The higher the pills, the higher the accountable punishment under

01:55PM 12  the guidelines.  But what makes this ironic is that Mr. Crespo got

01:55PM 13  acquitted of Count 1.  As you know, Judge, the jury found him not

01:55PM 14  guilty of being involved in the trafficking aspect of Mr. Diaz,

01:56PM 15  the codefendant who testified.

01:56PM 16          So what is happening here is -- essentially is that now

01:56PM 17  Mr. Crespo gets acquitted of conduct in Count 1, and essentially

01:56PM 18  the way that this is working out if you listen to the government,

01:56PM 19  they want to punish him as if he had been found guilty of Count 1

01:56PM 20  essentially because of the number of pills that Mr. Diaz was

01:56PM 21  involved in.

01:56PM 22          Now, as I said before, the Court must make a finding of

01:56PM 23  the jointly undertaken criminal activity.  Mr. McLaughlin

01:56PM 24  mentioned this woman, Mercedes Perez, I mentioned her as well in

01:56PM 25  my pleadings.  And I pretty much put it out there that, yes, as to

01:56PM 1  the amount of pills that were dispensed to her, because Mr. Crespo

01:56PM 2  was communicating with Mr. Diaz about Mercedes Perez, and there

01:57PM 3  was conversation that could be, and obviously the jury took it to

01:57PM 4  mean, that there was obstruction there.  I can see where -- and I

01:57PM 5  put that in my pleadings -- I can see where that particular type

01:57PM 6  of conduct and pills could be taken into account.  And I used that

01:57PM 7  to come out to a Level 18 under my calculations.  Under the base

01:57PM 8  offense level and the total offense level, I came out to Level 18

01:57PM 9  in this case, which is 27 to 33 months.

01:57PM 10       Now, again, in assessing to what is Mr. Crespo going to

01:57PM 11  be held accountable, there are a couple of things that happened in

01:57PM 12  this unusual case during the trial that merit for us to review at

01:57PM 13  this point, particularly the Court, since you've got to make a

01:57PM 14  finding of what the undertaking by Mr. Crespo of what he

01:58PM 15  supposedly undertook from a criminal point of view as to joint

01:58PM 16  criminal activity in this case.

01:58PM 17       In this case we know that Mr. Crespo on October the 2nd

01:58PM 18  of 2019 calls Orlando, a coworker, to ask, and Orlando happened to

01:58PM 19  be -- Alvarez happened to be the lead agent in the case that

01:58PM 20  supposedly has been obstructed of Dr. Gonzalez.  And this lead

01:58PM 21  agent tells Mr. Crespo on October 2nd, when Mr. Crespo asked:  Are

01:58PM 22  you looking for this individual, Mr. Diaz, Jorge Diaz?  Is he

01:58PM 23  somebody you're looking for in connection with this investigation?

01:58PM 24  Orlando Alvarez said:  No.  The investigation is closed.  That is

01:58PM 25  October 2nd.

01:58PM 1        Now, that is important because Mr. Diaz kept selling

01:59PM 2    drugs or trafficking in oxycodone thereafter.  Mr. Crespo, with

01:59PM 3    all due respect, cannot be held accountable for obstructing an

01:59PM 4    investigation that in his mind doesn't exist.  Okay.  So that's a

01:59PM 5    factor that I wanted to bring up to the Court.

01:59PM 6        And also a second factor that I think is to be considered

01:59PM 7    by the Court is the fact that Mr. Diaz, the main witness for the

01:59PM 8    government, says in his testimony before the Court that it is only

01:59PM 9    essentially a few months before the arrest went down in this case.

01:59PM 10   Mr. Diaz and Mr. Crespo were arrested in this case July 21, 2020.

01:59PM 11   And Mr. Diaz testified that he moved into the house of Mr. Crespo

02:00PM 12   sometime at the very end of December of 2019 or early January.

02:00PM 13   And it is only a month after that, according to the codefendant's

02:00PM 14   testimony, that he tells Mr. Crespo that he, Mr. Diaz, was

02:00PM 15   involved in the trafficking or he was selling pills; he was

02:00PM 16   selling oxycodone pills.

02:00PM 17       So this is not a case where Mr. Crespo should be saddled

02:00PM 18   with all kinds of pills that he didn't sell, he didn't traffic.

02:00PM 19   We know he didn't profit because even the codefendant, the main

02:00PM 20   government witness, said he never got a penny out of this.  And we

02:00PM 21   also know that even the codefendant says he doesn't tell Diaz --

02:00PM 22   I'm sorry.  He doesn't tell Crespo until the very end that he was

02:00PM 23   selling these pills.

02:00PM 24       So that is what we have here.  And so I submit to you

02:00PM 25   that the proper level is as we have set forth in our pleadings,

02:01PM   1   which is a Level 18, which I believe comes to 27 to 33 months in

02:01PM   2   this case.

02:01PM   3          Now, that deals only with the base offense level that we

02:01PM   4   have been discussing.  There are other matters that are

02:01PM   5   objectionable.  You asked the government for their objections.  I

02:01PM   6   do have an objection to the two-level enhancement for obstruction

02:01PM   7   of justice.

02:01PM   8          THE COURT:  Well, we're going to get to that next.

02:01PM   9          MR. QUINON:  All right.  So I'm going to sit down, and

02:01PM   10  that's it for me for the time being.  Thank you, sir.

02:01PM   11         THE COURT:  All right.  So I will ask the government.

02:01PM   12         So the defendant was acquitted of the drug charge.  And,

02:01PM   13  look, I understand relevant conduct and that the standard here is

02:01PM   14  less than proof beyond a reasonable doubt, but how do you suggest

02:01PM   15  I should consider the acquittal in this determination?

02:02PM   16         MR. MCLAUGHLIN:  It's irrelevant, Your Honor, to speak

02:02PM   17  bluntly.

02:02PM   18         All due respect to Mr. Quinon, but his attempt to sort of

02:02PM   19  carve out accountability for this defendant just ignores the

02:02PM   20  truth.  And the truth is very simple, Your Honor.  This defendant

02:02PM   21  engaged in a long-running -- years-long obstruction conspiracy

02:02PM   22  with Jorge Diaz to protect his oxycodone trafficking.  And we have

02:02PM   23  proved that at our trial with all the exhibits -- with all due

02:02PM   24  respect to probation, they did not sit in on the trial --

02:02PM   25  overwhelming, and the basic facts tell you that.

02:02PM   1          So during that, as you heard Diaz testify at trial, that

02:02PM   2   of course Crespo warns him to get out of there, because of course

02:02PM   3   Crespo was on the strike force, the healthcare fraud strike force,

02:02PM   4   and they're investigating Gonzalez.

02:02PM   5          Why would Crespo need to warn Diaz to get out of there if

02:02PM   6   Crespo didn't know that Diaz was a drug trafficker?  Why would all

02:02PM   7   of the calls be happening on the day of the takedown in advance of

02:02PM   8   the search warrant?  Why would that happen?  Why did this happen,

02:03PM   9   Judge?  Because he knows he's a drug trafficker.  The attempts to

02:03PM  10   run his NCIC, reading up on reports, reporting back to Diaz.

02:03PM  11          They would talk six, seven times a day, Your Honor.  Is

02:03PM  12   it reasonably foreseeable for Crespo to believe that once he left

02:03PM  13   the Gonzalez office, he would continue trafficking?  Of course it

02:03PM  14   is.  Is it reasonable to assume when he invites him to move into

02:03PM  15   his house in late 2019 that he's still trafficking?  Of course it

02:03PM  16   is.  And, in fact, Diaz confirms to him that he still is.

02:03PM  17          And then we get to January 17th where it's crystal clear

02:03PM  18   that Crespo knows again.  And he also knows that Diaz is a

02:03PM  19   trafficker because, as we showed at trial, there was the e-mail in

02:03PM  20   June that Crespo receives, he tells Diaz to run home.  He shows

02:03PM  21   that FBI e-mail to Diaz; they have a conversation.  Crespo says:

02:03PM  22   I'm not worried about you.  Continue on with the Uber, just

02:04PM  23   continue trafficking.

02:04PM  24          The 17th it's crystal clear where Diaz and Crespo are

02:04PM  25   talking about Diaz's trafficking that specific day.  And I would

02:04PM  1   direct your attention, Your Honor, to our response, which I'm

02:04PM  2   pulling verbatim from the trial where Crespo is telling Diaz:

02:04PM  3   I've been warning you for a year that Lorenzo and Pozo are going

02:04PM  4   to sell you out.  A year prior to 2020.

02:04PM  5          From the government's point of view, Your Honor, this

02:04PM  6   defendant has known about Diaz's oxycodone trafficking from the

02:04PM  7   word go.  Should he be held accountable for it?  Absolutely.  And

02:04PM  8   it is very clear in our response too.  There is a policy reason

02:04PM  9   for that:  The bigger -- the more serious crime you obstruct, the

02:04PM  10  bigger hit you get at sentencing, and I've laid out the cases for

02:04PM  11  that.

02:04PM  12         And he's not accountable for the entire drug conspiracy.

02:04PM  13  He gets a six-level reduction.  The defense knows that.

02:04PM  14         Do you have any other questions, Judge?

02:04PM  15         But it is a basic truth of what this case is about.  This

02:05PM  16  is about a corrupt agent who was protecting a drug trafficker

02:05PM  17  being investigated, by the way, by his colleagues that he worked

02:05PM  18  with every day for years; not a couple days, not a couple months,

02:05PM  19  for years.  Should he be accountable for the entire conspiracy?

02:05PM  20  Absolutely.

02:05PM  21         THE COURT:  All right.  Well, considering --

02:05PM  22         Well, first it's the government's objection.  I am going

02:05PM  23  to overrule the objection, and I guess I'll be overruling the

02:05PM  24  objection as well as to the defense calculation, as I find that

02:05PM  25  probation properly calculated the defendant's base offense level.

02:05PM  1         MR. MCLAUGHLIN:  Your Honor, if I may?

02:05PM  2         How is the Court not finding him accountable for --

02:05PM  3         THE COURT:  You're going to sit here and argue with me

02:05PM  4    when I'm making a finding?

02:05PM  5         MR. MCLAUGHLIN:  I'm just asking.

02:05PM  6         THE COURT:  You can object.  Have a seat.

02:05PM  7         I find that probation has made a reasonable determination

02:05PM  8    regarding the base offense level.  Of course the Court is

02:06PM  9    considering the base offense level based on conduct for which the

02:06PM 10    defendant was acquitted.  However, that does not end the

02:06PM 11    calculation.

02:06PM 12         I still consider his relevant conduct and his jointly

02:06PM 13    undertaken criminal activity, along with his co-conspirators,

02:06PM 14    understanding the standard is less than beyond a reasonable doubt,

02:06PM 15    which is the standard the jury considered.

02:06PM 16         The evidence is strongest with regard to the defendant's

02:06PM 17    knowledge regarding the criminal activity involving Dr.

02:06PM 18    Gonzalez's clinic.  While there may be some evidence to suggest

02:06PM 19    his knowledge regarding the other two doctors, Espinosa or

02:06PM 20    Carpman, under these circumstances I do find that probation made a

02:07PM 21    reasonable calculation; and therefore, I will overrule both

02:07PM 22    objections.

02:07PM 23         The next objection from the government.

02:07PM 24         MR. MCLAUGHLIN:  Your Honor, I think our next objection

02:07PM 25    -- and I apologize for interrupting -- is the zero point offender.

02:07PM   1   I think defense has other objections, but that's our last

02:07PM   2   objection.

02:07PM   3            THE COURT:  Any further argument on that?

02:07PM   4            MR. MCLAUGHLIN:  I don't see how on earth probation is

02:07PM   5   awarding zero to this offender, Your Honor.  We have a series of

02:07PM   6   very credible direct threats to kill possible cooperators.  I have

02:07PM   7   laid out in our response the law; you don't have to communicate

02:07PM   8   that directly to the person themselves.  Again, probation was not

02:07PM   9   at the trial, has not listened to the calls, the Court has.

02:07PM   10           It's very clear from the government that these were

02:08PM   11   threats, they were very credible threats, and for that reason he

02:08PM   12   is not a zero point offender, Your Honor.

02:08PM   13           THE COURT:  All right.  And your response.

02:08PM   14           MR. QUINON:  Your Honor, I need to remind counsel, who

02:08PM   15   was at trial and I certainly was and so was the Court, when his

02:08PM   16   own witness -- main witness in the case testified that he did not

02:08PM   17   believe that those threats that Mr. Crespo was going to hurt

02:08PM   18   anybody with those threats.

02:08PM   19           In addition to that, he testified that Mr. Crespo, he can

02:08PM   20   hear from the voice and the recordings in the courtroom that Mr.

02:08PM   21   Crespo was drunk on that night of July 17th of 2020.  That's the

02:08PM   22   testimony of the government's own witness.  He testified that Mr.

02:08PM   23   Crespo was drunk at the time, and that he didn't think that that

02:08PM   24   was something that he was going to act on.

02:08PM   25           Mr. Crespo never acted upon any of that.  What the man

02:08PM  1    was -- Mr. Crespo was, unfortunately, very drunk that night and

02:08PM  2    talked a lot of things that he really shouldn't have, you know.

02:09PM  3    And that happens sometimes when we drink excessively, as he did

02:09PM  4    that night.  And the testimony was from Agent Henry Luna, who

02:09PM  5    testified that there were a number of bottles of wine that were

02:09PM  6    consumed in a very short period of time.

02:09PM  7         There was no credible threat in this case; and therefore,

02:09PM  8    I think that -- that was the testimony that was here at trial.

02:09PM  9         THE COURT:  With regard to the zero point offender

02:09PM  10   objection, I am going to sustain that objection, as based on this

02:09PM  11   record and the totality of the evidence, I can't find that those

02:09PM  12   threats were not credible.  I don't think that it's appropriate,

02:09PM  13   even considering the 3553(a) factors, so I will sustain that

02:09PM  14   objection.

02:09PM  15        Any other objections from the government?

02:09PM  16        MR. MCLAUGHLIN:  No, not from the government, Your Honor.

02:10PM  17        THE COURT:  All right.

02:10PM  18        From the defense, your additional objections.

02:10PM  19        MR. QUINON:  Yes, sir.  We do object to the two-level

02:10PM  20   adjustment for obstruction of justice.  This was awarded because

02:10PM  21   of supposedly a contact with this individual who --

02:10PM  22        Just give me a second here, Judge.  Let me just get my

02:10PM  23   documentation.  I just want to make sure that I'm accurate.

02:11PM  24        So this was supposedly -- the evidence regarding this is

02:11PM  25   supposedly a statement made by Mr. Crespo to an individual named

1   Valodia Aguilera according to the assertions in this case, and

2   they were supposedly aimed to intimidate or to silence Mr. Diaz.

3   Okay.

4   The problem here is, A, those assertions weren't made.  I

5   made an objection to that effect, stating that our position is

6   that the statements were not made.

7   Second of all and importantly, the notification to Mr.

8   Crespo was never given that he's not supposed to have contact with

9   Mr. Valoria.  If the Court wishes, I have an e-mail here from

10  Mr. Seitles' office confirming that he never gave the list of no

11  contact.  It was a list that was made by the government and sent

12  to different individuals, including Mr. Seitles.  But Mr. Seitles

13  never -- as the attorney never gave the list to his client, Mr.

14  Crespo.  That's acknowledged by his office here.

15  I also have Mr. Crespo's fiancee or wife here today,

16  Samantha, who can testify that she was in contact with

17  Mr. Seitles' office at one point asking whether they had ever sent

18  that no contact list to Mr. Crespo, and the answer is no, they

19  never sent the list.  I would like to make this a part of the

20  record, an exhibit to today's sentencing hearing.  I gave a copy

21  to the government before we started today.  I have the fiancee

22  here who can testify to that under oath if the Court desires that.

23  But at this point I will move in this particular e-mail between --

24          (Door alarm sounding.)

25          -- with Mr. Seitles' office, Judge.

THE COURT:  So are you suggesting that there had to be a communication from Mr. Seitles to the defendant for this witness list to apply?

MR. QUINON:  Well, I basically raised four grounds why it shouldn't apply.

One, the statement wasn't made.  We deny that.

Two, Mr. Crespo was never notified.

Three, if the government knew of this, which apparently they said that they did, they never communicated that to me at the time when this supposedly happened.  They never moved to revoke Mr. Crespo's bond.  They never called me and said:  Hey, what's going on with your guy?  He's not supposed to be contacting witnesses.  Besides, Mr. Valoria never testified, was never a witness here to my knowledge.  But I was never notified.  The government never did anything with this information.

And, four, this is rank hearsay from an individual, Mr. Valoria.  There is a reason why he may want to do something like this, if he did that, if he made the statement to the agents, which we don't know, there is a reason for that.  Mr. Valoria, the line sheets in the wire tap in this case, the Title 3 in this case, shows that Mr. Valoria may have been doing some of that drug business with Mr. Diaz; and he has a reason, therefore, to try to please the agents in this case, Judge.

Judge, the bottom line is, it really is very, very thin and, quite frankly, very unfair to take that type of statement

02:15PM   1   without this individual ever coming into court to give now an

02:15PM   2   adjustment -- an upward adjustment that will put this man in

02:15PM   3   prison for an additional period of time with this type of

02:15PM   4   evidence, with an individual of this character, who may have been

02:15PM   5   involved in the drug business himself and had a reason to try to

02:15PM   6   ingratiate himself with the agents in this case.

02:15PM   7        And so those are the four reasons.  And I think that,

02:15PM   8   quite frankly, you shouldn't really award such an adjustment in

02:15PM   9   this case, Judge.

02:15PM  10        THE COURT:  All right.  Give me a moment before I hear

02:15PM  11   from the government.

02:16PM  12        All right.  The government's response.

02:16PM  13        MR. MCLAUGHLIN:  Your Honor, as set forth in our first

02:16PM  14   sentencing exhibit, this list was communicated not only to Mr.

02:16PM  15   Seitles but to a series of people in probation.  It's irrelevant

02:16PM  16   from the government's point of view whether or not Mr. Seitles

02:16PM  17   communicates that, but it was provided to probation.  Logically we

02:16PM  18   would assume that that was communicated to the defendant from his

02:17PM  19   probation officer because it was provided to probation.

02:17PM  20        THE COURT:  This enhancement is solely based on the

02:17PM  21   contact with Mr. Aguilara?

02:17PM  22        MR. MCLAUGHLIN:  It's also with Mr. Diaz, because Mr.

02:17PM  23   Diaz was also on the no contact list.  So he's going through Mr.

02:17PM  24   Valoria to get to Diaz, so it's two parts to it.

02:17PM  25        MR. QUINON:  Well, the part of Mr. Diaz was discounted by

1   probation.  That's why I only addressed Valoria, Your Honor.

2            MR. MCLAUGHLIN:  And again we object to that discount;

3   discounting by probation, but.

4            THE COURT:  Okay.  Hold on for a second.

5            There are two people allegedly contacted; Mr. Diaz and

6   Mr. Aguillara.  And your argument was focused on Mr. Aguillara.

7            MR. QUINON:  That's correct, because that's the one that

8   probation used to enhance in this case.  Probation analyzed the

9   Diaz situation and they decided that that was not sufficient to

10  add or to take into account in trying to give Mr. Crespo this

11  adjustment, so I only addressed Aguillara because that's the one

12  that probation used.

13           And again, Aguillara never has been a witness in this

14  case and, again, not in court.  I mean if you're going to use him

15  to give this man what amounts to a period of time in prison, at

16  the very least we should have an opportunity to be able to

17  cross-examine him.  Bring him to court, you know.  This is really

18  almost like gossipy stuff.  If there's really any essence to this,

19  it would have been used to violate the bond at the time when it

20  happened, because they had been, in my opinion, and this is again

21  conjecture again on my part, but they've been after Mr. Crespo,

22  you know, from the very beginning.  If there was an opportunity to

23  put him in, they would have put him in, bottom line.

24           And I have never heard of this thing about Aguillara

25  until we get to now, at the very end.

02:19PM 1        THE COURT:  All right.  Let me hear from the government.

02:19PM 2        MR. MCLAUGHLIN:  Your Honor, it is our position that Mr.

02:19PM 3   Crespo was not allowed to have contact with the codefendant Diaz

02:19PM 4   or Mr. Aguillara.  Like I noted in our response, although the bond

02:19PM 5   paperwork -- the box wasn't checked, it was very clear in the

02:19PM 6   joint motion that they were not allowed to have contact.  And the

02:19PM 7   evidence will show you that they're not allowed, because that's

02:19PM 8   why he reaches out to not only Diaz's son but also Valaria to pass

02:19PM 9   the message to Diaz to stop talking.

02:19PM 10       In terms of whether or not we sought to revoke his bond

02:19PM 11  is irrelevant for the determination of why Crespo is reaching out

02:19PM 12  to these people and saying what he's saying.  It's very clear why

02:19PM 13  he's reaching out to the son to deliver a message to Diaz, which

02:19PM 14  is to:  Keep your mouth shut.

02:19PM 15       It's very clear why he's reaching out to Valoria and

02:19PM 16  communicating to Valoria to keep his mouth shut.

02:20PM 17       And the timing of it is especially relevant from the

02:20PM 18  government's point of view because it comes at the time of

02:20PM 19  disclosures about Diaz's cooperation.  So from our point of view,

02:20PM 20  the only reason Crespo is reaching out to either of these people

02:20PM 21  is to silence Diaz, and that's why the enhancement applies.

02:20PM 22       One last thing, Your Honor.  In our objections there is

02:20PM 23  an alternative grounds to apply this enhancement; those are

02:20PM 24  Crespo's materially false statements regarding his military

02:20PM 25  service.  We have laid out the details of that.  So if the Court

22

02:20PM  1   does not want to apply it regarding the Valaria and Diaz's son

02:20PM  2   prong, it is very clear that he has obstructed justice regarding

02:20PM  3   his materially false statements regarding his military service as

02:20PM  4   to the other prong.

02:20PM  5        THE COURT:  Let's unpack these one by one.

02:20PM  6        So with regard to Mr. Valodia Aguilera, that person did

02:20PM  7   not testify; is that correct?

02:20PM  8        MR. MCLAUGHLIN:  That's correct, Your Honor.

02:20PM  9        THE COURT:  So I do agree with defense counsel; that for

02:20PM  10  me to make this finding, I have to hear some testimony.

02:21PM  11       Does the government have a witness?

02:21PM  12       MR. MCLAUGHLIN:  We do not, Judge.  We just have the 302.

02:21PM  13       THE COURT:  So I don't find that the contact with Valodia

02:21PM  14  Aguilera can be a basis for this enhancement.

02:21PM  15       So regarding your alternative argument regarding

02:21PM  16  statements about the defendant's military service or what you

02:21PM  17  allege to be false statements, let me hear from you on that issue.

02:21PM  18       MR. MCLAUGHLIN:  Your Honor, in our objections we have

02:21PM  19  laid out a series of materially false statements that Crespo made

02:21PM  20  regarding his service, regarding his alleged combat service.  I

02:21PM  21  would note to the Court in preparing our objection and for court

02:21PM  22  today, I have consulted with Air Force personnel who are currently

02:21PM  23  serving, and those that served at the time of Crespo's service.  I

02:21PM  24  myself served in the military, so I am very familiar with what a

02:22PM  25  DD214 is.  As I stated in our response, there is nothing to

02:22PM 1    suggest at all that Mr. Crespo is a military combat veteran, let

02:22PM 2    alone serving in the jungles of Peru, Brazil, and Colombia during

02:22PM 3    that time.  There is nothing in his DD214.  Certainly there would

02:22PM 4    be medals and awards to that effect.  We provided under seal his

02:22PM 5    DOD records.  There are no orders.  Again, there are no awards,

02:22PM 6    commendations, medals to that effect.

02:22PM 7         If you look at his resume, which he submits to DEA and, I

02:22PM 8    believe, HHOIG, which is part of our trial exhibits, there is no

02:22PM 9    mention of any combat experience, overseas combat experience.  All

02:22PM 10   he listed in his resume is that he was stationed at MacDill, he

02:22PM 11   guarded the parameter of the installation and some airplanes.

02:22PM 12        So the key from the government's point of view is why

02:22PM 13   he's doing this.  He's essentially doing this to get a variance

02:22PM 14   under 3553 or get a departure under the guidelines.  There is no

02:22PM 15   reason to lie about your military record, unless you're trying to

02:23PM 16   get sympathy from the Court.  Given those that have actually

02:23PM 17   served, Your Honor, faced combat, to have a former special agent

02:23PM 18   with years of experience, who is very familiar by the way with the

02:23PM 19   PSI process, his years as a special agent, he has participated in

02:23PM 20   the indictments of multiple defendants, the multiple sentencing of

02:23PM 21   defendants, he is very aware of what the PSI process is, what it

02:23PM 22   entails, to lie egregiously about his military service is

02:23PM 23   appalling, and he should be held accountable for it.

02:23PM 24        THE COURT:  All right.

02:23PM 25        MR. QUINON:  Judge, this is a particularly sensitive

02:23PM  1   matter, because it is offensive to hear the prosecutor get up in

02:23PM  2   court and do exactly what he just did.  To call the man a liar

02:23PM  3   when he served, it's particularly offensive.  Mr. Diaz -- I'm

02:23PM  4   sorry.

02:23PM  5        Mr. Crespo in this case will go under oath if you want

02:23PM  6   him now about what he served.  But I asked him:  What do you have

02:23PM  7   by way of anything at all from way back then?  Here is his Air

02:24PM  8   Force uniform at the time with his name tag.  Here is the medal

02:24PM  9   that Mr. McLaughlin just called Mr. Crespo a liar about.  This is

02:24PM  10  the uniform.  This is the medal that he's got.  Okay.

02:24PM  11       Here is kind of a jumpsuit that he still has -- Mr.

02:24PM  12  Crespo has from the time that he served in Colombia with Grupo de

02:24PM  13  Combate 31, that's Combat Group 31, Colombia.  These are things

02:24PM  14  that he has, okay, from that time.  He will go under oath, I

02:24PM  15  mentioned that in my pleadings, if you want him to testify to that

02:24PM  16  he, in fact, was where he said he was to probation, and he did

02:24PM  17  serve in that capacity.

02:24PM  18       Now, to make sure that you understand that this is no

02:24PM  19  accident, it just so happens that he has a friend who also served

02:24PM  20  in the military who is here today, Gabriel Garcia, who I spoke to

02:25PM  21  a few minutes ago before we started court.  Mr. Garcia is a

02:25PM  22  retired U.S. Army captain who served in Kuwait, and he will tell

02:25PM  23  you that if you take a look at his military records, it will not

02:25PM  24  appear that he served in Kuwait.  If you want me to, I will call

02:25PM  25  Mr. Garcia at this time.

02:25PM  1       THE COURT:  No, I don't think it's necessary.

02:25PM  2       MR. QUINON:  And he is a captain.  Again, a captain in

02:25PM  3  the service.

02:25PM  4       THE COURT:  Gentlemen, it goes for both of you.  When I

02:25PM  5  start talking, I want you to stop talking.

02:25PM  6       MR. QUINON:  I apologize.  I apologize.

02:25PM  7       THE COURT:  It's not necessary because I don't find that

02:25PM  8  the enhancement would apply on this basis.  It doesn't affect the

02:25PM  9  guidelines, although certainly both sides can argue whatever they

02:25PM 10  want with regard to an appropriate sentence.  So with regard to

02:25PM 11  your objection for adjustment, the adjustment for obstruction of

02:26PM 12  justice, I will sustain that objection, and that enhancement will

02:26PM 13  not apply.

02:26PM 14       What other objections do you have?

02:26PM 15       MR. QUINON:  I believe that those were the only

02:26PM 16  objections that we had.

02:26PM 17       The base offense level, the total offense obviously, and

02:26PM 18  the obstruction enhancement.  Judge, if I could have a second

02:26PM 19  here.

02:26PM 20       MR. MCLAUGHLIN:  And, Your Honor, if I may.

02:26PM 21       Based on the Court's ruling --

02:26PM 22       THE COURT:  Hold that.  I want to make sure he's done

02:26PM 23  with his objections, then I'm going to go to probation, and then

02:26PM 24  I'm going to turn back to you.  Okay.

02:26PM 25       MR. QUINON:  Judge, I'm done.  Thank you.

02:26PM 1          THE COURT:  So for probation, if you can walk us back

02:26PM 2    through the guidelines calculations.  Okay.

02:26PM 3          MS. GALVEZ:  Okay.  So the base offense level remains a

02:27PM 4    26.  The defendant got a plus-2 for abuse of position of public

02:27PM 5    trust, 3B1.3, resulting in an adjusted offense level of 28, and an

02:27PM 6    advisory guideline range of 78 to 97 months.

02:27PM 7          THE COURT:  All right.  And that also the Court removed

02:27PM 8    the adjustment for obstruction of justice.

02:27PM 9          MR. QUINON:  Judge, after you're finished, I do have

02:27PM 10   something.

02:27PM 11         THE COURT:  You both are going to have plenty of time to

02:27PM 12   talk.

02:27PM 13         MR. QUINON:  No, no.  I apologize, but something just

02:27PM 14   occurred to me.

02:27PM 15         THE COURT:  Regarding the calculation?

02:27PM 16         MR. QUINON:  No, about 4C1.1.  I had not objected because

02:27PM 17   it was on my side of the table so to speak.  In other words, I

02:27PM 18   should have.  You took it away when the government objected to it,

02:27PM 19   and I should -- and I have an objection to that.

02:28PM 20         I had not objected formally before because I had no need

02:28PM 21   to object because it wasn't on the table, so to speak, to object.

02:28PM 22   It was on my side of the ledger, so to speak.  Do you get what I'm

02:28PM 23   saying?

02:28PM 24         THE COURT:  Yes.  So go ahead.

02:28PM 25         MR. QUINON:  All right.

02:28PM   1          I object on the grounds that the government is --

02:28PM   2   essentially the government is saying that this is based upon

02:28PM   3   credible threats.  But again, Judge, I think if I'm correct, and

02:28PM   4   you heard the trial, if I'm correct, their own witness said that

02:28PM   5   he did not believe that these were credible threats, and he said

02:28PM   6   he was not afraid of Mr. Crespo.

02:28PM   7          And again, he admitted that he knew Mr. Crespo.  And

02:28PM   8   based upon the voice of Mr. Crespo over those recordings, it was

02:28PM   9   patently obvious to him that Mr. Crespo was drunk when the

02:29PM   10   so-called threats were made.

02:29PM   11          In addition to that, we know that the agents -- an agent

02:29PM   12   that testified, they had the house of Mr. Crespo under

02:29PM   13   surveillance that night.  Mr. Crespo went to sleep, obviously.

02:29PM   14   Nothing happened.  Those were not -- there is nothing at all

02:29PM   15   indicating, I submit, that those were credible threats, okay.

02:29PM   16          And so I really ask you to really consider that.  It

02:29PM   17   makes a difference here.  And, you know, there has to be -- to be

02:29PM   18   credible, you have to take some action other than to talk while

02:29PM   19   you're drunk about:  I'm going to feed you.  And this was the kind

02:29PM   20   of threats that we're talking about:  I'm going to -- I'm going to

02:29PM   21   feed her to the alligators because I kill somebody every day.  I

02:29PM   22   am tired of killing people.  That's what he was saying on that

02:29PM   23   tape.  Think about that.

02:29PM   24          This is not a -- this is not a serial killer that I'm

02:30PM   25   sitting next to.  Okay?  But if you're going to find those

02:30PM  1   credible -- those threats credible, then you have to believe that

02:30PM  2   Mr. Crespo is a serial killer who is tired of killing people,

02:30PM  3   because that's what -- that's the garbage -- the alcohol-fueled

02:30PM  4   garbage that he was talking about that night.  And even the

02:30PM  5   government's main witness said:  I don't believe it, and I'm not

02:30PM  6   afraid of him; even though he came in here and unloaded on Mr.

02:30PM  7   Crespo, his so-called son and all that.  But he said as to that:

02:30PM  8   I don't believe it.

02:30PM  9          So, please, there has to be more credible than that.

02:30PM  10  That's just incredible threats.  Quite frankly, I even argued in

02:30PM  11  my closing argument to the jury, I used that to my advantage

02:30PM  12  actually in this case, in arguing to the jury that you couldn't

02:30PM  13  believe some of the evidence here because of what happened; the

02:30PM  14  fact that those were not credible, that Mr. Crespo wouldn't kill

02:30PM  15  people every day and feed them to the alligators.

02:31PM  16         So I ask you please to reconsider that and not to grant

02:31PM  17  that, Judge.  It's just -- it isn't warranted in this case.  It's

02:31PM  18  not a credible threat.

02:31PM  19         THE COURT:  All right.

02:31PM  20         Well, considering all of the evidence, including that the

02:31PM  21  jury did find the defendant guilty of the remaining counts, right,

02:31PM  22  beyond a reasonable doubt, I've ruled.  I don't see any reason to

02:31PM  23  revisit it.

02:31PM  24         So that calculation, my ruling will stay the same.

02:31PM  25         The calculation remains the same.  A total offense level

02:31PM  1   of 28, a criminal history category of I, placing the defendant's

02:31PM  2   advisory guideline range between 78 and 97 months.

02:31PM  3           What is the government's recommendation as to an

02:31PM  4   appropriate sentence?

02:31PM  5           MR. MCLAUGHLIN:  Your Honor, we recommend 97 months.  And

02:31PM  6   specifically under the 3553 factors, as we proved at trial, this

02:31PM  7   was a multi-year conspiracy to obstruct justice by a defendant,

02:32PM  8   who was working at the time with the healthcare fraud strike

02:32PM  9   force, charged with investigating and taking down the very

02:32PM  10  criminals and the very crimes that he was protecting.

02:32PM  11          This is not a case which -- I'm about to go to trial in

02:32PM  12  one where you have an undercover and a CI, you have a couple

02:32PM  13  recorded meetings over the course of a couple weeks or a couple

02:32PM  14  months and there's a takedown.  There is years, Your Honor; years

02:32PM  15  of conduct.

02:32PM  16          And it's especially galling given Mr. Crespo's position

02:32PM  17  on the strike force, and especially galling given what the opioid

02:32PM  18  crisis has done to this country, which the Court is very well

02:32PM  19  aware of.  And I think especially in terms of deterrence, a

02:32PM  20  sentence of 97 months is important, Your Honor.

02:32PM  21          The world is watching.  The country is watching.  The

02:32PM  22  community is watching.  What is this Court going to give an agent

02:32PM  23  who for years, sitting next to his colleagues day in and day out,

02:33PM  24  lying to them about what he knows about Diaz and his activities,

02:33PM  25  and actually invites him and has him live at his home, and is only

30

02:33PM 1   caught via a wire tap where you get to hear unvarnished, as the

02:33PM 2   Court did at trial, who this person is and what he's all about.

02:33PM 3   He's all about himself and what he can do to get ahead and who he

02:33PM 4   can protect.

02:33PM 5           Thankfully, Judge, we still live in a democracy right

02:33PM 6   now.  We are a country of laws, not men or women.  He does not --

02:33PM 7   he does not get to choose who he protects when and why.  It is a

02:33PM 8   violation of his oath, it is a violation of the oath that all of

02:33PM 9   us in law enforcement take.

02:33PM 10          And from our perspective, his conduct in this case is

02:33PM 11  galling to the extreme.  And it is for those reasons, Your Honor,

02:33PM 12  a sentence of 97 months is appropriate to send a message to

02:33PM 13  everyone in this community that such conduct will not be

02:33PM 14  tolerated.

02:33PM 15          I will say in terms of the other codefendants' sentences,

02:34PM 16  Diaz was given 76 months, so I don't think a sentence of 97 is

02:34PM 17  that much of a disparity, Judge, and especially given the conduct

02:34PM 18  and the violence he threatened against potential cooperators,

02:34PM 19  which is just galling and appalling.  From our point of view,

02:34PM 20  97 months is appropriate, Judge.

02:34PM 21          THE COURT:  All right.

02:34PM 22          I should note before you begin your presentation, I did

02:34PM 23  also review the character letters that were submitted at Docket

02:34PM 24  Entry 311, which contained several letters from family members,

02:34PM 25  friends, and a former law enforcement coworker.

02:34PM  1      MR. QUINON:  Yes, Your Honor.  Thank you.

02:34PM  2      Judge, I also -- we filed a motion for a downward

02:34PM  3  departure or in the alternative a variance as well, and I'd like

02:34PM  4  to address that as well.

02:34PM  5      THE COURT:  Okay.

02:34PM  6      MR. QUINON:  And so in relation to what the proper

02:35PM  7  sentence should be, that's how I will argue it.  Okay.

02:35PM  8      And so very important, this is one of those cases that

02:35PM  9  you heard the evidence and you had the benefit of seeing Mr. Diaz

02:35PM 10  testify and also Ms. Lorenzo in this case.  Mr. Diaz, according to

02:35PM 11  Anais Lorenzo, the other codefendant who testified, is an

02:35PM 12  accomplished manipulator according to her.  Remember that.

02:35PM 13      Ms. Lorenzo was at one time -- when she met Mr. Diaz, she

02:35PM 14  was employed at Jackson Memorial Hospital as a medical technician,

02:35PM 15  had a good job, worked like the rest of us; a working stiff who

02:35PM 16  works from 9:00 to 5:00 every day and had a normal life, until she

02:36PM 17  got involved with Mr. Diaz, who she sees as, again, her word,

02:36PM 18  master manipulator.  That's what she called him during the course

02:36PM 19  of the trial.

02:36PM 20      And that man got her involved essentially in drugs; and

02:36PM 21  eventually not only got her involved in drugs, she became a rabid

02:36PM 22  drug addict.  But also he had her be his right-hand person in the

02:36PM 23  drug distribution.  Ms. Lorenzo at one time took the place of this

02:36PM 24  individual Pozo, who was the right-hand man of Mr. Diaz in his

02:36PM 25  business.

32

02:36PM     1          So Mr. Diaz, who is a master manipulator, for years --

02:36PM     2     the first three years or so, two years or so, I asked him on

02:36PM     3     cross-examination whether he had any conversations with Mr. Crespo

02:36PM     4     other than religion.  And the answer was no, during those early

02:37PM     5     years of his relation with Mr. Crespo, it was all about religion.

02:37PM     6          This Santeria religion to me anyways, I'm not a believer

02:37PM     7     in it and so I can say this, I just find it a troubling religion

02:37PM     8     that makes people believe that you can talk to your loved ones,

02:37PM     9     even though they passed away, and ask them counseling in your

02:37PM    10     everyday life problems.  It's kind of a -- to me, that's kind of a

02:37PM    11     scary religion; but for whatever, Mr. Crespo was a devotee of the

02:37PM    12     religion.  And Mr. Diaz happened to be a high priest of the

02:37PM    13     religion, which means that he had a lot of credibility and a lot

02:37PM    14     of respect and reverence coming to him from Mr. Crespo.  In fact,

02:37PM    15     Mr. Crespo used to call him father.  If you recall, that's the

02:37PM    16     testimony in this case.

02:37PM    17          And Mr. Diaz saw an opportunity to use Mr. Crespo, who

02:38PM    18     was a federal agent, to his advantage and did.  Now, very clear

02:38PM    19     Mr. Diaz testified that even though he -- Mr. Diaz was involved in

02:38PM    20     the trafficking or selling of this oxycodone, he never, ever was

02:38PM    21     in a situation where Mr. Crespo was with him engaged in that

02:38PM    22     activity, or that he gave a single penny to Mr. Crespo because of

02:38PM    23     Mr. Crespo helping him or being involved with him in the drug

02:38PM    24     business, not at all.  Mr. Crespo was not at all involved in that,

02:38PM    25     and that's why the jury found him not guilty in this case.

02:38PM 1       Now, the guidelines in this case, again, the thinking,

02:38PM 2   the rationale behind the guidelines is the higher you are in the

02:39PM 3   hierarchy of drugs, the more the punishment; the more pills, the

02:39PM 4   higher the punishment.  But Mr. Crespo didn't sell any pills, even

02:39PM 5   though -- and this --

02:39PM 6       Bear this in mind, Judge, in the criminal complaint, they

02:39PM 7   had a witness named Sotolongo, who said that he, Sotolongo, has

02:39PM 8   seen Mr. Crespo with Mr. Diaz selling drugs.  Mr. Diaz,

02:39PM 9   fortunately, at least as to this that, told the truth.  He said

02:39PM 10  that's not true.

02:39PM 11      But when Mr. Crespo got arrested in this case, the

02:39PM 12  government arrested him with the idea that they had a witness in

02:39PM 13  their camp who was going to say that Mr. Crespo was out in the

02:39PM 14  street selling drugs, which is absolutely not true.  That's part

02:39PM 15  of the reason why we went to trial.  And Mr. Diaz gave it up in

02:40PM 16  this trial and said:  That's not true.  Mr. Crespo was not ever in

02:40PM 17  my presence whenever I did my business of drugs, and I didn't give

02:40PM 18  him a penny of whatever profit I made.

02:40PM 19      And the evidence that we heard at trial concerning the

02:40PM 20  profit of Mr. Diaz was absolutely daunting.  He was making about

02:40PM 21  $14,000 a month he said at times, but not a penny to Mr. Crespo.

02:40PM 22  And under the guidelines, Judge, again, 5K2.0, if this case falls

02:40PM 23  outside of the normal case and the guidelines, something that was

02:40PM 24  not contemplated by the commission, then the Court can give a

02:40PM 25  downward departure.

02:40PM   1        This is one of those cases.  The only reason why you get

02:40PM   2   involved in trafficking in drugs is to make money.  Nobody else --

02:40PM   3   nobody goes into business -- in the drug business other than to

02:41PM   4   make money.  Mr. Crespo didn't make any money.  He was not in the

02:41PM   5   drug business, but yet his punishment has gone up and up because

02:41PM   6   pills were distributed to people that he did not know.

02:41PM   7        During the trial the government had a chart with a number

02:41PM   8   of people, and the overwhelming majority of them were not known to

02:41PM   9   Mr. Crespo.  Mr. Crespo didn't know most of those people, and now

02:41PM   10  he's going to get punished for that; for the distribution of pills

02:41PM   11  to people he didn't know, deals that he didn't make, profit that

02:41PM   12  he didn't make.  And so I submit to you that this is a case that

02:41PM   13  is ripe for a downward departure under that basis.

02:41PM   14       There is an additional basis for a downward departure,

02:42PM   15  and that is Section 5H1.11 of the guidelines, which again allows

02:42PM   16  for that type of departure to someone who served our country in

02:42PM   17  the military, and Mr. Crespo did that.  He did that honorably for

02:42PM   18  four years.  And when he was serving, he did serve overseas.  He

02:42PM   19  has not lied to probation, on the contrary.  And he served in the

02:42PM   20  places that he told probation that he did serve.

02:42PM   21       I attached to my pleadings an article that at around the

02:42PM   22  time that Mr. Crespo was serving overseas there were skirmishes

02:42PM   23  and our armed forces were in South America serving to prevent drug

02:43PM   24  trafficking, and they were, indeed, battling in the jungles with

02:43PM   25  the individuals who were there; the FARC and the other militants

02:43PM 1    who were in the jungle.  The article is there.  It is documented.

02:43PM 2    This is not something that I made up.  I went into the Internet, I

02:43PM 3    got it, I put it there.

02:43PM 4         So Mr. Crespo is deserving as well of a downward

02:43PM 5    departure because he honorably served us, he served our country;

02:43PM 6    not to mention that for many years he served as a federal agent,

02:43PM 7    as a police officer for over 20 years; 27 years.

02:43PM 8         In addition to that and alternatively, the Court can

02:43PM 9    grant him a variance.  When you take a look at his history, he

02:44PM 10   doesn't even have a ticket, never had any prior contact with the

02:44PM 11   criminal justice system at all.  First time here.

02:44PM 12        Always the history of this man has been public service

02:44PM 13   since he was young.  He served in the military, he served as a

02:44PM 14   Hialeah police officer, he served the DEA, he served with HHS,

02:44PM 15   he's always been a public servant.  And when you consider what

02:44PM 16   you're going to do with this case and how you're going to punish

02:44PM 17   him, he's been punished.  He suffered tremendously so far.  We

02:44PM 18   know that he has gone from what was then a prestigious, honorable

02:44PM 19   position to a point in his life where he is publicly humiliated.

02:44PM 20        He has become a pariah within his community; the people

02:45PM 21   that he has known for all these years.  He has lost his career;

02:45PM 22   something that he has devoted more than half of his life to in

02:45PM 23   this case.  He's lost his savings.  He's had to pay lawyers like

02:45PM 24   me to come in and to represent him in court.  Bond, all the other

02:45PM 25   issues, not working for years because he was suspended without pay

02:45PM   1   waiting.  He served over 12 months of home confinement in this

02:45PM   2   case when you put it all together.

02:45PM   3        He suffers from PTSD.  It's documented.  He's gotten

02:45PM   4   treatment for that.  Now he doesn't even have health insurance,

02:45PM   5   and he will not have health insurance when he gets out as well

02:45PM   6   because once you're a convicted felon, which he is now, he can

02:46PM   7   kiss goodbye the idea that he is going to have a decent job where

02:46PM   8   he's going to have the benefit of healthcare.  And so he's going

02:46PM   9   to have to suffer through his PTSD however he can, but he won't

02:46PM   10  have the healthcare to attend to that.

02:46PM   11       And most of all he's lost the ability to do something

02:46PM   12  that is very valuable to all of us, and that is to be able to in

02:46PM   13  the morning as we shave or we look ourselves in the mirror to feel

02:46PM   14  satisfied with ourselves.  To be able to look at ourselves in the

02:46PM   15  mirror to say:  Hey, you're a good guy.  You're doing your damn

02:46PM   16  best, and you're okay.  He's lost that.  And now he is going to

02:46PM   17  also serve time in a prison system; something that was

02:46PM   18  unfathomable, that was unimaginable to him.

02:47PM   19       So, yeah, it's been something of a harsh journey for him,

02:47PM   20  but at trial you saw the character, the goodness in him too.  I

02:47PM   21  don't want you to judge him basically based upon what the

02:47PM   22  prosecutor has highlighted; what amounts to a very short period of

02:47PM   23  his life.  I think he showed a lot of character here.

02:47PM   24       You heard Orlando Alvarez, the lead in this investigation

02:47PM   25  that brought Mr. Crespo here, testify that Mr. Crespo volunteered

02:47PM   1    to go to Puerto Rico.  He's not Puerto Rican.  He volunteered

02:47PM   2    without pay after Hurricane Maria, a Category 5 hurricane that

02:47PM   3    destroyed that little beautiful island of Puerto Rico, and he did

02:47PM   4    it without getting paid, and went to an area that was infested

02:48PM   5    with mosquitoes, no electricity, nothing going, no food, and he

02:48PM   6    stayed there over a month helping people.  And even Rolley Alvarez

02:48PM   7    who came in and testified said:  Hey, I'm thankful that he did

02:48PM   8    that.  That, I'm very grateful that he did that.

02:48PM   9         And then he also showed character when Henry Luna, an

02:48PM   10   agent that worked with him in HHS, Henry is a gay man who was

02:48PM   11   being bullied by three FBI agents at the job, and nobody really

02:48PM   12   stood up for Henry.  And Henry was a really decent human being and

02:48PM   13   came in and testified in this case and told us about what

02:48PM   14   happened.  Like Henry said, nobody stood up for Henry except Mr.

02:48PM   15   Crespo.  He told the agents -- the FBI agents who were bullying

02:49PM   16   Henry:  You better stop, or I'm going to kick your butt basically

02:49PM   17   in different language.  And Henry has always been very thankful

02:49PM   18   that his friend, Mr. Crespo, had the character and the caring to

02:49PM   19   stand up to people at the job, FBI agents who were bullying Henry.

02:49PM   20        And Henry explained that to this day Al Crespo is one of

02:49PM   21   his dearest friends and he is very grateful to him.  And when

02:49PM   22   Henry was going through his divorce, Henry has two little girls,

02:49PM   23   he would bring them over to Crespo's house.  And that shows again

02:49PM   24   the kind of character.  Not too many people stand up for other

02:49PM   25   people when they're being bullied.  No, you're always thinking

02:49PM   1    about your own self; what's good for you.

02:49PM   2         It wasn't good for Crespo to confront three FBI agents

02:50PM   3    who are part of the same task force that he works.  That's not the

02:50PM   4    way to get promoted.  That's not the way to get kudos from the

02:50PM   5    gang so to speak, but it was the right thing to do.  I think that

02:50PM   6    speaks very highly about him.  It speaks very highly about his

02:50PM   7    character.  And I think that those are the things in life that at

02:50PM   8    a time like today, a time of need, it's like a savings account

02:50PM   9    that you should be allowed to withdraw from that savings account

02:50PM   10   of all the good things and all the good character that you have

02:50PM   11   accumulated through life.

02:50PM   12        And, therefore, I think that you should give him a

02:50PM   13   reduction under either a downward departure or a variance.

02:50PM   14        And you asked what the recommendation is from our

02:50PM   15   position, I submit to you, Your Honor, that a sentence of

02:51PM   16   18 months in prison is more -- is sufficient in this case.  It is

02:51PM   17   not -- more is not warranted.  He's gone through a lot.  He's been

02:51PM   18   on this ride for years now waiting for his trial because we had

02:51PM   19   the pandemic in between.

02:51PM   20        Again, he served 12 months home confinement, has been

02:51PM   21   absolutely devastated by what happened and all those things, and I

02:51PM   22   submit to you that a sentence of 18 months in prison should be

02:51PM   23   sufficient but not greater than necessary in this case.  Thank

02:51PM   24   you.

02:51PM   25        THE COURT:  Mr. Crespo, is there anything you want to say

02:51PM  1    before I impose your sentence?

02:51PM  2          You should stay there.  That's fine.  Just pull the

02:51PM  3    microphone close.

02:51PM  4          DEFENDANT CRESPO:  If I may, Your Honor, first -- first

02:52PM  5    of all, Your Honor, under the eyes of God I'd like to apologize to

02:52PM  6    the beautiful people of the United States that allowed me to serve

02:52PM  7    all of my life, and I'll explain a little bit more about that.

02:52PM  8          I'd like to apologize to the United States government.

02:52PM  9    I'd like to apologize to some of my coworkers that are sitting

02:52PM  10   back there, and I saw them today and I shook their hand and I was

02:52PM  11   allowed to hug them, and I appreciated that from them, because

02:52PM  12   they were kind to me.  Thank you.  I appreciate it.

02:52PM  13         I'd like to apologize to my family, Your Honor, that I

02:52PM  14   have put through this terrible ordeal.  And particularly I'd like

02:53PM  15   to apologize to my wife, who has had to deal with a sick man, Your

02:53PM  16   Honor.  See, I came to this country as a young boy.  I lost my

02:53PM  17   father to alcoholism shortly after.  I hated alcohol; couldn't

02:53PM  18   smell it, couldn't see it.  And I needed to know how could I say

02:53PM  19   thank you to the United States, and the only way I could was to

02:53PM  20   serve.

02:53PM  21         See, it may not be important to people; but from the age

02:53PM  22   of 16, the only thing I've ever done is serve.  And I'll tell you

02:54PM  23   why I still hold my red beret.  Some people that are from New York

02:54PM  24   will know the Guardian Angels.  There's people back there that

02:54PM  25   know what I'm talking about, people who worked with me, because

1    they had -- this is a community service group.  So when -- in high

2    school when kids were out partying and hanging out, the Guardian

3    Angels had a chapter in Miami.  I was the vice president of the

4    chapter.  I was the second in command.  Every Friday night, every

5    Saturday night, and every Sunday midday we would patrol Miami

6    Beach, because at the time there were terrible injustices and hate

7    crimes that were happening to individuals in the LGBT community at

8    the time, so we did that type of community service work.

9          And from 16 to 18, that's what I did.  I wasn't out

10   partying, I wasn't doing any of that.  I was going to high school,

11   I was wrestling, and then I changed my red beret for my black one

12   for the Air Force.

13         I sit here and, you know, I am -- I am hurt that my

14   service has been called into question in that manner, because I

15   got to tell you, Your Honor, I'm a broken man and I'm no victim

16   but I'm a broken man from 30 years of service, because I've seen

17   the worst in humanity.  And unfortunately through this process --

18         I was drunk, I was blacking out.  There were things that

19   were happening to me that I couldn't explain it to you.

20         And, Your Honor, even through all my service --

21         And while in the government I got my master's degree in

22   psychology for licensure, and I became a master's level

23   psychologist or a licensed psychotherapist so I can help people

24   like myself.

25         Your Honor, for many years I had no will to live because

02:56PM   1    the only thing I knew how to do was serve others.  I would never

02:56PM   2    harm myself or harm anybody else.  I'm a deeply religious man, and

02:56PM   3    I said that to Ms. Galvez during my PSI.

02:56PM   4         Your Honor, I hope you can give me a second opportunity,

02:56PM   5    because I'm going to start again, but I'm going to go back to

02:56PM   6    helping people.  I've made my mind up on that.  I'm going to try

02:56PM   7    to see how I can go back, and I'm going to try to help veterans

02:56PM   8    just like I used to.  I had this psychology practice that was just

02:56PM   9    discussed.

02:56PM   10        Your Honor, I've got to be honest with you:  I'm a

02:56PM   11   terrible businessman.  I was mostly pulling money out of my pocket

02:56PM   12   because veterans would come see me and I was certified in

02:57PM   13   hypnotherapy, and I would do hypnosis to help people like me.  I

02:57PM   14   suffer from PTSD, I suffer from clinical depression, I suffer from

02:57PM   15   nightmares, tremors.  My wife could tell you what she suffers

02:57PM   16   through sometimes, me waking up fighting and the things that I've

02:57PM   17   seen and I've been through.

02:57PM   18        I'm alive under the grace of God, because I've been

02:57PM   19   through so many things.  I -- I couldn't -- and just because I

02:57PM   20   didn't put on a paper all the bad things that have ever happened

02:57PM   21   to me, Your Honor, I want to forget them.  Every day I want to

02:57PM   22   forget them.  I don't want to think about when I went through

02:57PM   23   treatment and when I even went through the PSI, having to talk

02:57PM   24   about those things, Your Honor, they put me in a dark place.

02:57PM   25        It was kind of like when I got arrested, they put me in

1    solitary confinement for almost four days and nobody would give me

2    medication.  I was having convulsions, I was coming in and out of

3    tremors, cold sweat laying on the floor screaming for help, so

4    that's how I know that, you know.

5         I have a great friend who is back here who is the Army

6    captain who fought in Iraq, and him and I talk all the time of how

7    we deal with the demons.  And they just don't go away, but it was

8    not just my military service.  I saw some ugly things at the PD,

9    in DEA.  I mean, just the things I've been through.

10        I am an idiot.  I am an idiot, sir, and I wish I could

11   have a do-over because I didn't ask for help.  And I believed in

12   somebody that -- in a manner that I shouldn't.  I know better and

13   I should have acted better.  I let everybody down, most of them,

14   and I'm sorry.

15        But I've lost everything, I've lost my pensions, I lost

16   my life savings, I have nothing.  I have to start from scratch.

17   I'm living out of the kindness of my fiancee, sir.  Even my

18   medication, I've had to find a Good Rx card, and I have to find

19   coupons when it's prescribed to me.  I have to bring coupons to

20   try to get my medication, Your Honor.

21        Alcohol, I started drinking alcohol in the jungles of

22   South America because that's how you calm down.  That's what you

23   did in the military, because I never drank alcohol before that;

24   never during high school.  I never did that.  Service led me down

25   that path because that's what you did.  That's what you do in the

02:59PM    1    military, and it just went on worse from there.

02:59PM    2         So I want you to know that the person you heard on that

02:59PM    3    fateful night, who was drunk, dark, and really didn't have the

02:59PM    4    will to live, is not the person that I am.  I am not a terrible

03:00PM    5    person.  I know at times I felt the government has been unfair to

03:00PM    6    me, been unfair.  I wasn't the easiest guy to get along with, but

03:00PM    7    it was out of fear, Your Honor, and I realize that.

03:00PM    8         I was rough, I was hard.  But I'll tell you every day,

03:00PM    9    every day I gave a hundred percent.  I worked every single day of

03:00PM   10    the week.  My boss, who is the big boss here in Florida now, is

03:00PM   11    back there.  He used to yell at me because I was working

03:00PM   12    Saturdays, Sundays.  This is what I did.  This is who I was.

03:00PM   13         And, Your Honor, I accept the responsibility of my

03:00PM   14    mistakes.  But I swear to you, Your Honor, I never had any

03:00PM   15    intention to violate the code, and I'm sorry that I did, because I

03:01PM   16    didn't even benefit from it.  The total opposite.  I've been

03:01PM   17    punished worse than everybody else because I've lost everything I

03:01PM   18    had.  And I'm just riddled with debt and all kinds of issues, so I

03:01PM   19    hope you can find some clemency and leniency for this old

03:01PM   20    broken-down civil servant.  Thank you, Your Honor.

03:01PM   21         THE COURT:  All right.  Thank you, sir.

03:01PM   22         I've considered the statements of the parties, the

03:01PM   23    presentence report, which contains the advisory guidelines and the

03:01PM   24    statutory factors set forth in Title 18, United States Code,

03:01PM   25    Section 3553(a).

03:01PM 1       It is the finding of the Court that the defendant is not

03:01PM 2    able to pay a fine.

03:01PM 3       Obviously, this was an unusual case, and Mr. Crespo

03:01PM 4    seemed to have led a law-abiding life until this situation arose.

03:02PM 5    He was a public servant until he was not.

03:02PM 6       And the thing that struck me during the trial was, I was

03:02PM 7    just wondering:  How does someone like this fall under the

03:02PM 8    influence of Mr. Diaz?  For the life of me, you know, I still to

03:02PM 9    this day don't understand it; and why Mr. Crespo would risk it at

03:02PM 10   all, literally, to help that man.

03:02PM 11      I think about, of course, the crimes for which the

03:02PM 12   defendant was convicted, the seriousness of those crimes.  And it,

03:02PM 13   quite frankly, was, Mr. Crespo, your actions were a betrayal of

03:02PM 14   the public's trust, a betrayal of the trust of your fellow law

03:03PM 15   enforcement officers.  And it wasn't passive, it wasn't isolated;

03:03PM 16   it happened over a pretty significant period of time.  And, of

03:03PM 17   course, someone --

03:03PM 18      I mean it wasn't just your actions, the potential

03:03PM 19   jeopardizing or hindering the investigation, it could also

03:03PM 20   potentially endanger other law enforcement officers, because there

03:03PM 21   are people that had information about these investigations and the

03:03PM 22   intent of law enforcement who should not have had that

03:03PM 23   information.  Of course, balance the fact, of course, that you

03:03PM 24   have no prior criminal history.

03:04PM 25      The government from their pleading sought something in

03:04PM  1  the range of 151 months, and the defense is seeking something much

03:04PM  2  less than that.

03:04PM  3          But having considered everything, I do find that a

03:04PM  4  sentence at the high end of the guideline range is appropriate and

03:04PM  5  in line with what I was thinking is sufficient but not greater

03:04PM  6  than necessary, in any event.

03:04PM  7          So it is the judgment of the Court that the defendant,

03:04PM  8  Alberico Ahias Crespo, is committed to the Bureau of Prisons for a

03:04PM  9  term of 97 months as to Counts 5 and 7 through 10.  All such terms

03:04PM  10 shall run concurrent with one another.

03:04PM  11         Upon his release from imprisonment, the defendant shall

03:04PM  12 be placed on supervised release for a term of three years as to

03:04PM  13 each of those counts, which shall run concurrent with one another.

03:05PM  14         Within 72 hours of the defendant's release, he shall

03:05PM  15 report in person to the probation office in the district where he

03:05PM  16 is released.

03:05PM  17         While on supervised release, the defendant shall comply

03:05PM  18 with the mandatory and standard conditions of supervised release,

03:05PM  19 as referenced in Part F of the presentence report -- the revised

03:05PM  20 report.

03:05PM  21         The defendant shall also comply with the following

03:05PM  22 special conditions:  a permissible search, mental health

03:05PM  23 treatment, substance abuse treatment, the association restriction,

03:05PM  24 and he shall pay a special assessment in the amount of $500, which

03:05PM  25 shall be paid immediately to the United States, which reflects a

03:05PM  1    hundred dollars for each count of conviction.  Those special

03:05PM  2    conditions are also noted in Part F of the report.

03:05PM  3            In sum, the defendant's total sentence is:  97 months of

03:06PM  4    imprisonment, to be followed by three years of supervised release,

03:06PM  5    with the mandatory, standard, and special conditions that I

03:06PM  6    previously mentioned, including a $500 special assessment.

03:06PM  7            Forfeiture of the defendant's right, title, and interest

03:06PM  8    in certain property is hereby ordered consistent with the

03:06PM  9    indictment.

03:06PM  10           If the government is seeking forfeiture, you shall submit

03:06PM  11   a proposed order within three days of this proceeding.

03:06PM  12           Now that sentence has been imposed, does the defendant or

03:06PM  13   counsel object to the Court's findings of fact or the manner in

03:06PM  14   which sentence was pronounced?

03:06PM  15           MR. QUINON:  Yes, Your Honor, we do.

03:06PM  16           I will restate the objections that I wrote in the

03:06PM  17   pleadings that were filed, as well as the objections that I have

03:06PM  18   raised here today.

03:06PM  19           And I would add that the findings as to the joint

03:07PM  20   criminal activity were insufficient by the Court.  So those would

03:07PM  21   be my objections at this point as to the sentence imposed.

03:07PM  22           THE COURT:  All right.  Your objections are noted.

03:07PM  23           Mr. Crespo, you have the right to appeal your sentence

03:07PM  24   imposed.  Any notice of appeal must be filed within 14 days of

03:07PM  25   entry of the formal judgment.

03:07PM  1    If you are unable to pay the cost of an appeal, you may

03:07PM  2   apply for leave to appeal in forma pauperis, meaning at no cost to

03:07PM  3   you.

03:07PM  4        Are there recommendations?

03:07PM  5        MR. QUINON:  Yes.  I would ask the Court to recommend the

03:07PM  6   RDAP program.

03:07PM  7        THE COURT:  I will make that recommendation.

03:07PM  8        MR. QUINON:  And I would ask the Court to recommend that

03:07PM  9   Mr. Crespo serve his sentence as close as possible to an

03:07PM  10  institution here in South Florida, Your Honor.

03:07PM  11       THE COURT:  All right.  I will make that recommendation

03:07PM  12  as well.

03:07PM  13       MR. QUINON:  That's it, Judge.  Thank you.

03:07PM  14       THE COURT:  All right.  The defendant shall be

03:07PM  15  surrendered here in court by the court security officers.

03:08PM  16       Is there anything else today on behalf of the government?

03:08PM  17       MR. MCLAUGHLIN:  Not for the government, Your Honor.

03:08PM  18       THE COURT:  All right.

03:08PM  19       Anything else on behalf of Mr. Crespo?

03:08PM  20       MR. QUINON:  No, sir.

03:08PM  21       THE COURT:  All right.  If you want me to excuse the

03:08PM  22  audience while that happens, I will do that; or if you want that

03:08PM  23  to happen in open court, I will allow that to happen.  I'm asking

03:08PM  24  you, counsel.

03:08PM  25       MR. QUINON:  Me?

03:08PM   1      THE COURT:  Yes.  I don't know if his family and friends

03:08PM   2   want to be here, or if the defendant wants them there for this

03:08PM   3   part.

03:08PM   4      DEFENDANT CRESPO:  Can I say bye to my family, Your

03:08PM   5   Honor?

03:08PM   6      THE COURT:  Well, orally, I'm going to defer to the

03:08PM   7   marshals that there are to be no physical contact.  All right.

03:08PM   8      So you will have a moment to say goodbye.

03:09PM   9      All right.  We're in recess.

03:09PM   10      (Proceedings adjourned at 3:09 P.M.)

11                    C E R T I F I C A T E

12      I, VERNITA ALLEN-WILLIAMS, do hereby certify that

13   the foregoing is a complete, true, and accurate transcript of

14   the proceedings had in the above-entitled case before the

15   Honorable DARRIN P. GAYLES, one of the judges of said Court,

16   at Miami, Florida, on January 24, 2024.

17

18                         /s/Vernita Allen-Williams
                           Official Court Reporter
19                         United States District Court
                           Southern District of Florida
20

21

22

23

24

25